1  ANTHONY & PARTNERS, LLC
   JOHN A. ANTHONY (FL SBN 0731013)
2    janthony@anthonyandpartners.com
   ANDREW J. GHEKAS (FL SBN 0119169)
3  *Both Appearing Pro Hac Vice*
   aghekas@anthonyandpartners.com
4  100 S. Ashley Drive, Suite 1600
   Tampa, Florida 33602
5  Telephone: 813.273.5616
   Facsimile: 813.221.4113
6
   NIESAR & VESTAL LLP
7  PETER C. CALIFANO (SBN 129043)
     pcalifano@nvlawllp.com
8  JOHN A. KELLEY (SBN 194073)
     jkelley@nvlawllp.com
9  90 New Montgomery St. 9th Floor
   San Francisco, California 94105
10 Telephone: 415.882.5300
   Facsimile: 415.882.5400
11
   Attorneys for Plaintiff
12 CENTENNIAL BANK

13

14

15

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**[San Jose Division]**

| | |
|---|---|
| 16  In re | CASE NO. 21-50028 SLJ |
| 17  EVANDER FRANK KANE, | Chapter 7 |
| 18              Debtors. | |
| 19  CENTENNIAL BANK, an Arkansas state | Adv No. 21-05016 |
|     chartered bank, | |
| 20 | |
| 21              Plaintiff, | **CENTENNIAL BANK'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**[1] |
| 22        vs. | |
| 23  EVANDER FRANK KANE, | Date:     January 10, 2023 |
| 24              Defendant. | Time:     1:30pm |
|     | Place:    Via Zoom Video-conference |
| 25 | Judge:    Hon. Stephen L. Johnson |
| 26 | |

27

28

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. "Civil Rule" references are to the Federal Rules of Civil Procedure, "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, "AP" references are to the docket in this proceeding, and "BK" references are to the docket in the underlying bankruptcy case.

# TABLE OF CONTENTS

I. INTRODUCTION .............................................................................................. 1

II. STATEMENT OF RELEVANT FACTS ...................................................... 1

   **A. Kane is a Highly Compensated Professional Ice Hockey Player** ............. 1

   **B. PETITION, SCHEDULES, AND STATEMENT OF FINANCIAL AFFAIRS** ........................ 2

   **C. THE 341 MEETING AND STIPULATED 2004 EXAMINATION** ..................................... 3

   **D. DISCOVERY COMPLIANCE AND LACK OF DOCUMENTATION** ................................... 5

   **E. THE DEPOSITION TESTIMONY AND DOCUMENT PRODUCTION** ............................. 10

**III. LEGAL ANALYSIS** .......................................................................................... 13

   A. SUMMARY JUDGMENT AND BURDEN OF PROOF ...................................................... 13

   **B. KANE'S DENIAL OF DISCHARGE IS APPROPRIATE UNDER §727(A)(3).** ........................ 14

     i. Kane Has No Records Regarding $2,150,000 of Loans from Individual Lenders ........... 15

     ii. Because of the Admitted Lack of Record Keeping, Kane Cannot Explain Significant Cash Transfers and Deposits To and From Unknown Sources ................................. 17

     iii. Kane Cannot Explain the Purpose and Use of the Private Lender Loans ....................... 19

     iv. Kane's Gambling Losses Are Largely Unaccounted For .................................................. 20

     v. Portions Received From Total Compensation Have Disappeared .................................... 21

   **C. KANE'S DENIAL OF DISCHARGE IS APPROPRIATE UNDER §727(A)(5)** ........................ 21

**IV. CONCLUSION** ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ............................................................................................. 13

Aoki v. Atto Corp. (In re Aoki),
    323 B.R. 803 (1st Cir. BAP 2005) ..................................................................... 22

Bell v. Stuerke (In re Stuerke),
    61 B.R. 623 (9th Cir. BAP 1986) ....................................................................... 22

Caneva v. Sun Cmty. Operating Ltd. P'ship (In re Caneva),
    550 F.3d 755 (9th Cir. 2008) ........................................................... 14, 15, 16, 19

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ............................................................................................. 13

Davis v. Macway (In re Macway),
    677 Fed. Appx. 658 (9th Cir. 2016) .................................................................... 14

Dolin v. N. Petrochemical Co. (In re Dolin),
    799 F.2d 251 (6th Cir. 1986) .............................................................................. 21

First Fed. Life Ins. Co. v. Martin (In re Martin),
    698 F.2d 883 (7th Cir. 1983) .............................................................................. 22

Hendon v. Lufkin (In re Lufkin),
    393 B.R. 585, (Bankr. E.D. Tenn. 2008), aff'd, 2010 WL 1332114 (E.D. Tenn. Mar. 29, 2010)
    ................................................................................................................................ 22

In re Brandenfels,
    BAP No. OR-14-1145-FJuKi, 2015 WL 5883317 (9th Cir. BAP 2015)............................ 15

In re Carter,
    236 B.R. 173 (Bankr. E.D. Pa. 1999) ................................................................ 22

In re Chen,
    BAP No. WW-17-1067, KuFB, 2017 WL 4768104 (9th Cir. BAP 2017).................... 20, 21

In re D'Agnese,
    86 F.3d 732 (7th Cir. 1996) ................................................................................ 22

In re Long,
    2:196-ap-01086-ER, 2020 WL 8184203 (Bankr. C.D. Cal. Nov. 30, 2020)....................... 24

In re Manevska,

587 B.R. 517 (Bankr. N.D. Ill. 2018) ................................................................... 24

In re Mann,

2014 WL 2523451 (Bankr. D. S.C. June 4, 2014).............................................. 19

In re Mitsopoulos,

548 B.R. 620 (Bankr. E.D.N.Y. 2016)............................................................... 21

In re Nevett,

2021 WL 2769799 (July 1, 2021) ................................................ 14, 16, 17, 20

In re Potts,

501 B.R. 711 (Bankr. D.Colo. 2013) ................................................................ 25

In re Racer,

580 B.R. 45 (Bankr. E.D.N.Y. 2018)........................................................... 17, 23

In re Retz,

606 F.3d 1189 (9th Cir. 2010) .......................................................................... 25

In re Sharp,

244 B.R. 889 (Bankr. E.D. Mich. 2000) ........................................................... 23

In re Yanni,

354 B.R. 708 (Bankr. E.D.Pa. 2006) ................................................................ 22

Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,

475 U.S. 574 (1986)......................................................................................... 14

Meridian Bank v. Alten,

958 F.2d 1226 (3rd Cir. 1992) ......................................................................... 15

n re Juzwiak,

89 F.3d 424 (7th Cir. 1996) ....................................................................... 14, 15

Person v. Dep't. of Revenue,

No. TC-MD 091421D, 2011 WL 2222261 (Or. Tax. Magistrate Div. June 6, 2011) .......... 20

Retz v. Samson (In re Retz),

606 F.3d 1189 (9th Cir. 2010) .................................................................... 14, 22

Saluja v. Mantra (In re Mantra),

314 B.R. 723, 730 (Bankr. N.D. Ill. 2004) ....................................................... 24

The Cadle Co. v. Terrell,

2002 WL 22075 (N.D. Tex. Jan 7, 2002), aff'd, 46 Fed. Appx. 731, 2002 WL 1973217 (5th Cir. July 30, 2002) ........................................................................................ 18

United States Tr. v. Hong Minh Tran (In re Hong Minh Tran),

    464 B.R. 885 (Bankr. S.D. Cal. 2012) ........................................................................ 21

United States Tr. v. Macway (In re Macway),

    No. 14-16680, 2016 WL 4039745 (9th Cir. July 28, 2016) ...................................... 20

Weddell v. Landis,

    551 B.R. 74 (Dist. Nev. 2016) ........................................................................... 14, 15

Western Wire Works, Inc. v. Lawler (In re Lawler),

    141 B.R. 425 (9th Cir. BAP 1992) ............................................................................ 14

**Statutes**

11 U.S.C. § 727(a)(3) ....................................................................................................... 14, 25

11 U.S.C. § 727(a)(5) ....................................................................................................... 21, 25

**Rules**

Federal Rule of Civil Procedure 56 ................................................................................... 1, 13

Centennial Bank ("Centennial"), moves this Court, pursuant to Federal Rule of Civil Procedure 56, and asserts that the admissions by Evander Kane ("Kane") demonstrate the absence of any genuine issue of material fact and that Centennial is entitled to a judgment as a matter of law.

## I. <u>INTRODUCTION</u>

This summary judgment motion (this "Motion") focuses on whether Kane can adequately substantiate what happened to millions of dollars received (i) pursuant to his employment as a professional ice hockey player, (ii) as loans from personal "friends" in the years preceding the petition date, and (iii) from Centennial and other third-party lending institutions. Kane has admitted that (i) he does not personally maintain any books, records, or documents regarding his prior loans, (ii) he had no documentation or information relating to the use of the personal loans he received from his "friends", and (iii) has no recollection or information relating to what the purpose of the Private Lender Loans were or what the funds were used for. In fact, other than the limited bank statements produced by Kane, Kane has testified that he has no other documents or records that would support the use of any of the loan funds that he received. Thus, the relevant issue for this Motion is whether Kane satisfactorily maintained and preserved records to substantiate material transactions. Kane has not. Therefore, this Court should grant the Motion.

## II. <u>STATEMENT OF RELEVANT FACTS</u>

### A. KANE IS A HIGHLY COMPENSATED PROFESSIONAL ICE HOCKEY PLAYER

Since 2009 Kane has been employed as a professional ice hockey player[2]. From 2018 to 2021, Kane was party to a "National Hockey League Standard Player's Contract" (the "Player's Contract") with the San Jose Sharks (the "Sharks").[3] Under its terms, Kane is to receive base compensation in the amount of $37,000,000 over the course of seven league years (the "Base Compensation"), together with a $12,000,000 signing bonus (the "Signing Bonus"), spread out across five years, for a total compensation of $49,000,000 (the "Total Compensation").[4]

As of the Petition Date, Kane had received all sums owed to him under the Player's Contract

---

[2] Paragraph 48.a, Exhibit 29, to "Declaration of Andrew J. Ghekas in Support of Centennial Bank's Motion for Summary Judgment" (the "**Ghekas Declaration**"), filed contemporaneously herewith.
[3] Paragraph 48.b, Exhibit 29, to the **Ghekas Declaration**.
[4] Paragraph 48.c, Exhibit 29, to the **Ghekas Declaration**.

at that time.[5]   In Kane's amended "Statement of Financial Affairs for Individuals Filing for Bankruptcy" (the "Amended SOFA")[6], Kane identified that his "Gross income (before deductions and exclusions)" for the three  calendar years preceding his bankruptcy filings totaled $20,000,000.[7] However, personal tax returns produced in this Adversary Proceeding show that this figure is higher. Kane's U.S. Individual Income Tax Return form for 2018 identifies Kane's total income to be $8,424,166[8] –$2,000,000 more than what Kane identified on his Amended SOFA.  Kane's U.S. Individual Income Tax Return form for 2019 identifies Kane's total income to have been $6,840,169[9].  Accordingly, Kane's actual gross income for the three calendar years preceding the Petition Date is closer to $22,000,000.

## B.   PETITION, SCHEDULES, AND STATEMENT OF FINANCIAL AFFAIRS

Kane filed a voluntary petition (the "Petition") under chapter 7 of the Bankruptcy Code on January 9, 2021 (the "Petition Date").  As of the Petition Date, Kane estimated his assets to be valued at $10,224,743.65 (the "Total Assets")[10], and his total liabilities to be $26,837,340 (the "Total Liabilities")[11].  The Total Assets primarily consist of three (3) separate residential properties (collectively, the "Real Properties")[12]   At the Petition Date, the Real Properties were fully encumbered by loans other than the Individual Loans and Non-Real Estate Loans, defined below.[13]

As part of the Total Liabilities, Kane disclosed a total of $2,150,000 non-priority, unsecured claims comprised of six different "loans" (collectively, the "Individual Loans") he received from "friends."  The Individual Loans are listed in Kane's Schedule E/F, as amended, and include: (1) $150,000 – Davis Sanchez, (2) $430,000 – Hebron Shyng, (3) $750,000 – Mike Lispti, (4) $400,000

---

[5] Paragraph 48.e, Exhibit 29, to the **Ghekas Declaration**.
[6] Exhibit 3 to "Centennial Bank's Request for Judicial Notice in Support of Motion for Summary Judgment") (the "**Judicial Notice Request**"), filed contemporaneously herewith.
[7] Exhibit 3 to **Judicial Notice Request**, at ¶2, Part 2.4.
[8] Exhibit 28 to the **Ghekas Declaration**.
[9] Id.
[10] Exhibit 1 to **Judicial Notice Request**, at ¶8, Part 1; [Bk. 1].
[11] Exhibit 1 to **Judicial Notice Request**, at ¶8, Part 2; [Bk. 1].
[12] Exhibit 8 to **Judicial Notice Request**; [Bk. 272]
[13] Exhibit 2 to **Judicial Notice Request**; [Bk. 18]

– Pete Gianakas, (5) $100,000 – Raj Banghu, and (6) $320,000 – Tony Veltri.[14]

In addition to the Individual Loans, Total Liabilities consist of four separate loans received from four separate lending institutions (the "Non-Real Estate Loans") and are listed in Schedule D, as amended, and include: (1) $8,360,000 – Centennial, (2) $1,354,000 – Professional Bank ("Professional"), (3) $1,074,494.87 – South River Capital LLC ("South River"), and (4) $4,250,000 - Zions Bancorporation ("Zions").[15] The Non-Real Estate Loans represent $15,038,494.87 of the Total Liabilities as listed and are identified as being incurred in 2018 and 2019.

The Petition, Schedules, and Statement of Financial Affairs, and amendments to those documents, were filed with Kane's declaration, under penalty of perjury, that information in those documents is true and correct.

### C.   THE 341 MEETING AND STIPULATED 2004 EXAMINATION

At the initial meeting of creditors held pursuant to §341(a) on February 3, 2021 (the "341 Meeting"), the Assistant United States Trustee for the San Jose filed office, Marta Villacorta, Esquire (the "United States Trustee"), asked Kane questions regarding each of the Individual Loans, including (i) whether there was written documentation evidencing each of the Individual Loans, (ii) what the money was used for (iii), the last time a payment was made in connection with each of the Individual Loans, and (iv) when certain of the Individual Loans were incurred. In response, Kane confirmed there was no written documentation, did not recall when they were incurred, was unsure as to when payments were last made, and for most of the Individual Loans could not remember or was unsure as to what the funds were used for.[16]

The Chapter 7 Trustee, Frode S. Hjelmeset (the "Chapter 7 Trustee"), asked Kane a series of questions regarding each of the Non-Real Estate Loans, specifically, "[w]hat was [the] loan for?"

---

[14] Id. at ¶¶12-14, 16, and 17, Part(s) 4.5, 4.7, 4.12, 4.16, 4.18, and 4.21.
[15] Id. at ¶¶3, 5-7, Part(s) 2.3, 2.7, 2.10, and 2.11.
[16] Paragraphs 7 and 8, Exhibit 1 to the **Ghekas Declaration**.

In response, Kane confirmed loans from Centennial, Professional, and Zions, were used to "get [Kane] out of some of the hard money loans [he] was in … [a]nd pay them off." But when asked "why did you obtain those hard money loans in the first place[]", Kane responded that "[t]here were many loans that were taken out for a number of years. I ended up just paying off loan after loan."[17] Ultimately the undersigned expressly asked Kane "what were those hard money loans that you paid off utilized for[]" and Kane responded "I don't recall."[18] Kane did confirm, however, that the loan with South River was used to pay off a casino debt.[19]

Prior to the commencement of this Adversary Proceeding, Kane stipulated to be examined, on a limited basis, under Rule 2004 (the "2004 Exam"). During the 2004 Exam, Kane's testimony regarding the Individual Loans changed in one material respect, Kane now remembered that the money received was used to pay his bills, to pay off some other people he had borrowed money from in the past, and to stay current. Other than that, Kane still could not remember when the loans were incurred and reconfirmed that there was no written documentation evidencing them.[20] And when asked who these "other people" were, Kane could not recall.[21]

As it relates to the Non-Real Estate Loans, Kane's testimony at the 2004 Exam remained consistent with his testimony at the 341 Meeting in that (i) he did not recall as to why he took out the prior hard money loans and private money loans and (ii) could not recall what the purpose of the prior hard money loans and private money loans were.[22] Kane did testify, however, that none of the proceeds received as part of the Non-Real Estate Loans were used to (i) purchase any property, (ii) to invest in any ongoing or operating business, (iii) to start a new business, or (iv) invest in any

---

[17] Paragraphs 9 and 10, Exhibit 2 to the **Ghekas Declaration**.
[18] Paragraph 11, Exhibit 3 to the **Ghekas Declaration**.
[19] Paragraph 10.d, Exhibit 2 to the **Ghekas Declaration**.
[20] Paragraph 14, Exhibit 4 to the **Ghekas Declaration**.
[21] Paragraphs 14.d and 14.f, Exhibit 4 to the **Ghekas Declaration**.
[22] Paragraph 15, Exhibit 5 to the **Ghekas Declaration**.

investments or other business ventures.[23]   Such testimony is in conflict with Kane's Petition, in which Kane swore under penalty of perjury that his "debts are primarily business debts," meaning that they "are debts that [Kane] incurred to obtain money for a business or investment or through the operation of the business or investment."[24]   And when asked whether Kane maintained any books or records or documents regarding these prior loans, Kane responded that he does not.[25]

In addition to the Non-Real Estate Loans, Individual Loans, and other scheduled debt, Kane was the recipient of over $50,000,000 in gross compensation through his eleven (11) year professional ice hockey career, $20,000,000 of which Kane earned over the three (3) year period immediately preceding the Petition Date.  At both the 341 Meeting and 2004 Exam, Kane responded that he "ha[d] no idea" and could not "recall exactly" what his earnings were primarily utilize for.[26]

## D.   DISCOVERY COMPLIANCE AND LACK OF DOCUMENTATION

On December 3, 2021, Centennial served its initial set of interrogatories, admissions request, and production request (collectively, the "Initial Discovery Requests") on Kane, pursuant to which Centennial sought basic information regarding Kane's financial condition both as of the Petition Date and the years leading up to the same.  Centennial requested that Kane produce "[a]ny and all documents [and communications] relating to the debt obligation [Kane] owes" to Sanchez, Shyng, Lispti, Gianakas, Banghu, Tony Veltri (collectively, the "Individual Lenders").  In response to each request, Kane asserted the same general and boilerplate objections, but committed to producing any "non-privileged documents responsive to this Request that are in Kane's possession, custody, and control, and that can be located by a reasonable search."

On January 21, 2022, Kane made his document production.  Notably, nowhere within the document production did Kane produce documents relating to or evidencing any debt owed to the

---

[23] Paragraphs 15.a, 15.c, 15.d, Exhibit 5 to the **Ghekas Declaration**.
[24] Exhibit 1 to the **Judicial Notice Request**, at ¶6, Part 6.16a-16.c; [Bk. 1].
[25] Paragraph 15, Exhibit 5 at 34:3-5, to the **Ghekas Declaration**.
[26] Paragraph 48, Exhibits 29-30 to the **Ghekas Declaration**.

Individual Lenders, let alone documents evidencing how said monies were used. In e-mail correspondence from Kane's counsel accompanying Kane's document production, Kane conveyed that "[t]here are some instances where Mr. Kane agreed to produce any documents that were in his possession, custody, or control, but was unable to locate any documents."[27] Given the vague and nonspecific nature of the preceding information, the undersigned sent correspondence on February 2, 2022, and requested that Kane supplement his responses to "affirm[] that no responsive documents exist in the party's possession, custody or control".[28] In response, Kane served "Defendant's Amended Responses to Plaintiff's First Request for Production of Document" (the "Amended Responses")[29] on February 28, 2022, in which Kane represented that "[a]fter a reasonable search, Kane did not locate any documents responsive to" the following requests[30]:

- Any and all documents reflecting communications as between the Debtor and Davis Sanchez relating to the debt obligation the Debtor owes to Davis Sanchez, as listed in Section 4.5 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18];

- Any and all documents reflecting communications as between the Debtor and Hebron Shyng relating to the debt obligation the Debtor owes to Hebron Shyng, as listed in Section 4.7 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18];

- Any and all documents relating to the debt obligation the Debtor owes to Mike Lispti, as listed in Section 4.12 of the Debtor's Amended Schedule E/F: Creditors Who have Unsecured Claims [Doc. 18];

- Any and all documents reflecting communications as between the Debtor and Mike Lispti relating to the debt obligation the Debtor owes to Mike Lispti, as listed in Section 4.7 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18];

- Any and all documents relating to the debt obligation the Debtor owes to Pete Gianakas, as listed in Section 4.16 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18];

- Any and all documents reflecting communications as between the Debtor and Pete

---

[27] Exhibit 11 to the **Ghekas Declaration**.
[28] Paragraph 20, Exhibit 10 to the **Ghekas Declaration**.
[29] Paragraph 19, Exhibit 9 to the **Ghekas Declaration**.
[30] Id.

Gianakas relating to the debt obligation the Debtor owes to Pete Gianakas, as listed in Section 4.7 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18];

- Any and all documents reflecting communications as between the Debtor and Raj Banghu relating to the debt obligation the Debtor owes to Raj Banghu, as listed in Section 4.7 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18]; and

- Any and all documents reflecting communications as between the Debtor and Tony Veltri relating to the debt obligation the Debtor owes to Tony Veltri, as listed in Section 4.7 of the Debtor's Amended Schedule E/F: Creditors Who Have Unsecured Claims [Doc. 18].

In sum, Kane has admitted that he has not provided any documents supporting disposition of the loan proceeds – or even evidence that the loans exist – received from the Individual Lenders, because Kane does not have documents regarding the same.

In addition, Centennial did not receive documentation regarding Kane's prior hard money and private money loans. Centennial requested that Kane produce documents (i) reflecting communications as between Kane and certain identified hard money lenders, (ii) relating to the disbursement of any monies, funds, and/or proceeds from any lending arrangement as between Kane and certain identified hard money lenders, and (iii) reflecting the recipient of any proceeds from any lending arrangement as between Kane and certain identified hard money lenders. In response, Kane asserted that the prior loans were "arranged by Sure Sports LLC ("Sure Sports") and any and all documents related to [said loan] may be obtained from Sure Sports" as well as that "this [subject loan] was arranged by Sure Sports and all communications were through Sure Sports."[31]

The lack of documentation maintained and produced by Kane relating to the Individual Loans and self-described hard money loans is only matched by the lack of financial documentation produced by Kane. Centennial requested that Kane produce "[c]opies of the Debtor's bank account statements, including any canceled checks, signature cards, wire transfers, withdrawals, debits and

---

[31] Exhibit 9 to the **Ghekas Declaration**, Requests 3-18.

credits, cashier checks, and account closing documents, during the past twelve (12) years." In response, Kane lodged a series of boilerplate objections, but nonetheless committed to producing "non-privileged documents from the two years prior to the petition date that are responsive to this Request that are in Kane's possession, custody, and control, and that can be located by a reasonable search."[32] In Kane's Amended Schedules A_B [Bk.. 272], Kane identified eight (8) "[c]hecking, savings, or other financial accounts" as follows (collectively, the "Identified Accounts")[33]:

      i.      Acct ending in 0171 – Checking Account: Bank of America ("BOA 0171");

      ii.      Acct ending in 1607 – Checking Account: Wells Fargo ("WF 1607");

      iii.      Checking – Scotia Bank ("Scotia Bank 28");

      iv.      Savings account – Scotia Bank ("Scotia Bank 87");

      v.      Checking – Royal Bank of Canada ("RBC 5955");

      vi.      Account ending in 0532 – Royal Bank of Canada ("RBC 0532");

      vii.      Acct. ending in 2824 – spouse's Wells Fargo account; and

      viii.      Savings account ending in 5963 – Royal Bank of Canada.

In addition to the foregoing, the Amended SOFA identify three credit cards that Kane utilized prior to the Petition Date, those being: (i) American Express – Wells Fargo ("AmEx Wells Fargo"), (ii) American Express ("AmEx")[34], and (iii) Royal Bank of Canada ("RBC 4741") (collectively, the "Credit Cards").

On March 1, 2022, the undersigned sent e-mail correspondence to Kane's counsel regarding (i) the lack of financial documentation produced to date, and (ii) the two-year lookback period Kane was attempting to limit discovery too.[35] As to the latter, the undersigned first sought confirmation as to whether Kane has financial documents relating to the Identified Accounts pre-dating January 2019. As to the former, the undersigned noted that Kane's production to date, despite agreeing to

---

[32] Paragraph 21, Exhibit 9 to the **Ghekas Declaration**, Request 53.

[33] Paragraph 24 to the **Ghekas Declaration**; Exhibit 8 to the **Judicial Notice Request**.

[34] Kane confirmed that he had no documents associated with this specific credit card. Paragraph 26.e, Exhibit 12, to the **Ghekas Declaration**.

[35] Paragraph 22, Exhibit 11 to the **Ghekas Declaration**.

produce the same, had only produced limited 2019 documentation for three of the Identified Accounts – BOA 0171, Scotia Bank 28, and Scotia Bank 87. In response, Kane's counsel stated:

> I am undertaking a comparison of all statements produced to you against all statements that Mr. Kane has in his possession or control. If I find any missing statements within the 2-year time period, then we will produce them to you promptly. For what it's worth (and we can discuss this later in detail), non-production of statements within the 2-year window is due to them not being in Mr. Kane's possession or control, rather than withholding them on privilege or other grounds. I am in the process of verifying, but I do not believe that Mr. Kane has any statements dating prior to midway through 2019.[36]

Nearly a week later, on March 9, 2022, Kane's counsel sent a follow up correspondence, indicating:

> Following up on this – we have found RBC -5963 statements from February to July of 2020 that we will be producing. We may also have a few statements from late 2019 for RBC 0532 and -5955 that I am looking into. We are attempting to gain access to other statements (and will produce those on a rolling basis if found). Otherwise, we will confirm that Mr. Kane no longer has access to the accounts.[37]

Ultimately, Kane's counsel "confirmed with Evander" on March 14, 2022, that "he no longer has any access to the accounts at Bank of America and Wells Fargo, and cannot obtain statements electronically."[38]

The result of the foregoing is the fact that Kane, despite agreeing to produce documents two years preceding the Petition Date, only produced, as to the Identified Accounts[39] and Credit Cards:

    ix.    BOA 0171 – Documents from August 22, 2019 to January 20, 2021;

    x.     WF 1607 – Documents from January 1, 2020 to January 31, 2021[40];

    xi.    Scotia Bank 28 – January 1, 2019 to December 30, 2019; January 1, 2020 to January 31, 2021;

    xii.   Scotia Bank 87 – January 1, 2019 to June 29, 2019; August 1, 2019 to January 31, 2020; March 1, 2020 to January 31, 2021;

    xiii.  RBC 5955 – September 12, 2019 to January 12, 2021[41];

---

[36] Id.
[37] Id.
[38] Id.
[39] Despite indicating that "we have found RBC – 5963 statements," the same have never been produced.
[40] Paragraph 26.a, Exhibit 12 to the **Ghekas Declaration.**
[41] Paragraph 26.c, Exhibit 12 to the **Ghekas Declaration.**

| | |
|---|---|
| 1 | xiv. RBC 0532 - September 12, 2019 to January 12, 2021[42]; |
| 2 | xv. AmEx Wells Fargo, account ending in 2-64004 – September 5, 2020 to |
| 3 | December 7, 2020; and |
| 4 | xvi. RBC 4741 – June 26, 2020 to August 25, 2020; September 26, 2020 to |
| 5 | December 29, 2020[43]. |

6 Thus, a vast majority of documents for both 2020 and 2019, let alone any year prior to 2019, are

7 missing and have not been kept, maintained, or produced by Kane.[44]

8       In addition to the foregoing Identified Accounts, through discovery two additional accounts

9 were discovered. The first was another checking account that Kane historically maintained at Royal

10 Bank of Canada, account ending in 0046 ("RBC 0046"), that was the recipient of large wire transfers

11 stemming from the various "hard money loans" Kane incurred. Kane has confirmed that "[i]n terms

12 from that account, no I wouldn't have any records today"[45] as he closed the account three or four

13 years prior to the Deposition.[46] The second was an account that Kane maintained at East West Bank,

14 ending in -4455 (the "EWB Account"). Although Kane testified that "[he] never had access to the

15 account," his testimony was that "[he] signed paperwork to set up the account originally" and that

16 he never actually asked anybody at East West Bank for access to the EWB Account[47]. Accordingly,

17 Kane has no knowledge of what the funds in this account were used for.[48]

18 **E. THE DEPOSITION TESTIMONY AND DOCUMENT PRODUCTION**

19       On July 6, 2022, Centennial conducted the deposition (the "Deposition") of Kane. Through

20 documents received from Sure Sports[49] – not Kane as Kane did not maintain adequate books and

21 records – it was revealed that since 2014 Kane entered into at least twenty-four separate lending

22 arrangements with various third-party lenders, including Centennial. In fact, Kane testified that his

23

24

---

25 [42] Paragraph 26.d, Exhibit 12 to the **Ghekas Declaration**.

[43] Paragraph 26.b, Exhibit 12 to the **Ghekas Declaration.**

26 [44] Paragraph 26.g, Exhibit 12 to the **Ghekas Declaration**.

[45] Paragraph 27, Exhibit 12 at 84:5-21, to the **Ghekas Declaration**.

27 [46] Paragraph 27, Exhibit 12 at 34:2-6; 69:25-70:6, to the **Ghekas Declaration**.

[47] Paragraph 27, Exhibit 12 at 102:9-11, to the **Ghekas Declaration**.

28 [48] Paragraph 27, Exhibit 12 at 38:6-24, to the **Ghekas Declaration**.

[49] Paragraph 28 to the **Ghekas Declaration**.

"business" is "[t]aking out … loans."[50]  Kane further testified that his "business" consisted of "[t]aking out other loans on top of other loans on top of other loans to avoid late payments or get out of late payments or high interest rates."[51]  Despite this being Kane's self-described "business," he testified that he did not self-document or maintain a personal ledger accounting for the various loans that he received in the years immediately preceding his bankruptcy filing.[52]

On two separate occasions Kane testified "it [was] very rare where [he] received any of the proceeds" from the loans he entered into and if he did "it was very nominal … where money came directly to [him]."[53]  This is demonstratively false.  The closing statements for each of these loans indicate that Kane received, in total, approximately $8,574,944.43, nearly $6,525,441.57 of which was received by Kane within the four years preceding the Petition Date.[54]  When questioned on each, Kane acknowledged or had no reason to dispute directly receiving portions of the various loan proceeds.[55]  However, when asked what he did with the funds or if he had any records to support his use of the same, Kane's responses were consistently "I don't know" and "no," respectively.[56]

During the Deposition, Kane was questioned on his self-described "gambling problem," that Kane has testified "has been an issue in [his] past and it would be inaccurate to pretend it has not had a negative effect on [his] life, financially and otherwise."[57]  Kane does not view himself as a professional gambler.[58]  But regardless, Kane did not regularly document and tally his wins and losses associated with his gambling.[59]  Nor could Kane identify any of the "bookies" he utilized for gambling.[60]  Instead, Kane would "keep track of what [he] was up and down in [his] head" or rely upon the "online bookies" that were "just sites" that he "[did not] even know what they were

---

[50] Paragraph 30.a, Exhibit 13 at 51:4-8, to the **Ghekas Declaration**.
[51] Paragraph 30.a, Exhibit 13 at 37:7-10, 51:9-12, to the **Ghekas Declaration**.
[52] Paragraph 35, Exhibit 13 at 105:25-106:7; 110:21-111:8; 123:23-124:7, to the **Ghekas Declaration**.
[53] Paragraphs 30.b. and 30.c to the **Ghekas Declaration**.
[54] Paragraph 30, Exhibit 14, to the **Ghekas Declaration**; Paragraph 31 of the **Ghekas Declaration**.
[55] Paragraphs 30.d-30.s to the **Ghekas Declaration**.
[56] Id.
[57] Exhibit 6 to the **Judicial Notice Request**, at ¶19; see also Paragraph 39.a to the **Ghekas Declaration**.
[58] Paragraph 39.b, Exhibit 16, of the **Ghekas Declaration**.
[59] Paragraph 38, Exhibit 8 of the **Ghekas Declaration**, at Interrogatory No. 16; Paragraph 30.c, Exhibit 9 of the **Ghekas Declaration**.
[60] Paragraph 39.e, Exhibit 9, of the **Ghekas Declaration**.

called."[61]  In one instance, Kane utilized $140,000 of the loan proceeds he received from DeAngelo Vehicle Sales to pay off "Vinny", an individual Kane identified as "a bookie."  But according to Kane, Vinny is "not like his real name, it's just a name that was used" and he had no records to support what was owed to "Vinny".[62]  And despite Kane testifying that the bank statements he provided would be the only records he would have to account for funds withdrawn or transferred for purposes of gambling, a review of the produced statements do not substantiate Kane's $1,500,000 in gambling losses identified on Kane's Amended SOFA.[63]

During the Deposition, Kane confirmed that he had no documentation to support what he used any of the loan proceeds received from the Individual Loans.[64]  In many instances, Kane could not recall the dates in which he incurred the Individual Loans or the amount of the same, as he has no documentation supporting them.[65]

During the Deposition, Kane was examined on the limited bank statements he produced for the Identified Accounts.  For the RBC 0532 and RBC 5955, it is Kane's understanding that where an "online transfer" is indicated, it had to stay within the RBC network.[66]  In some instances, a reference number is provided, and the same can be matched between the two accounts to confirm that the funds were transferred between the RBC 0532 and RBC 5955 accounts.[67]  However, in many instances, this sort of tracing cannot be accomplished, and Kane's testimony is that he does not know where the money was transferred to or for what purpose.  In relation to RBC 0532, from November 2019 through December 1, 2020, the bank statements identify $156,512.94 worth of funds unexplainedly leaving the account.[68]  Similarly, from October 2019 through September 2020, $527,463.50 worth of funds once contained in the RBC 5955 account were unexplainedly transferred to accounts that Kane could not identify.[69]  In addition to the unexplained transfers to

---

[61] Paragraph 39.d, Exhibit 9, of the **Ghekas Declaration**.
[62] Paragraph 30.m, Exhibit 13, of the **Ghekas Declaration**.
[63] Paragraph 40, Exhibits 17 and 18, of the **Ghekas Declaration**.
[64] Paragraph 41.a-f, Paragraph 49, of the **Ghekas Declaration**.
[65] Paragraph 8.a-q, of the **Ghekas Declaration**.
[66] Paragraph 43, Exhibit 20 at 172:10-15, of the **Ghekas Declaration**.
[67] Paragraph 43, Exhibit 20 at 172:18-173:16, of the **Ghekas Declaration**.
[68] Paragraph 43.p-s, Exhibits 20 and 21, of the **Ghekas Declaration**.
[69] Paragraph 43.a-o, Exhibits 20 and 22, of the **Ghekas Declaration**.

unidentified accounts, there were a substantial number of deposits into both the RBC 0532 and RBC 5955 accounts for the period of October 2019 through December 2020, in the amounts of $279,410.48 and $939,497.84, respectively. Kane's testimony, other than a couple instances of speculation without any backup documentation, was that he did not know where the money was coming from.[70] Several of these deposits were $80,000 to over $140,000, and still Kane's response remained the same – he did not know.[71]

As with the RBC accounts, Kane's inability to explain substantial incoming deposits carried over to his WF 1607 account. A review of the 2020 bank statements for the WF 1607 account confirms that Kane received approximately $307,826.61 in deposits from unexplained sources.[72]

For his accounts at Scotia Bank, Kane's testimony was consistent. For each entry with "MB-transfer to" or the equivalent, Kane was unable to explain where the money was going.[73] Even with a more descript identify, Kane still "d[rew] a complete bank," such as with a $123,000 deposit Kane received on March 7, 2020, from Alexandra Duggan - Kane could not remember who she was.[74]

## III. LEGAL ANALYSIS

### A. SUMMARY JUDGMENT AND BURDEN OF PROOF

Centennial, as the moving party, bears the initial burden of demonstrating that no genuine issue of material fact exists for a motion for summary judgment under Federal Rule of Civil Procedure 56. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A "genuine" dispute exists if a reasonable jury could find for the non-movant based on the evidence, and "material" fact is one that could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the movant shows an absence of material fact issues, the non-movant has the burden to show genuine dispute of material fact with specific facts, not simply allegations or denials in the pleadings. Id. No genuine issue of material fact exists if a rational trier of fact could not find for the non-movant based on the record, taken as a whole. Matsushita Elec. Indus. Co., Ltd.

---

[70] Paragraph 44.a-x, Exhibits 20, 21, and 22, of the **Ghekas Declaration**.
[71] Paragraph 44.n, 44.p, and 44.t, of the **Ghekas Declaration**.
[72] Paragraph 45.a-q, Exhibits 24 and 32, of the **Ghekas Declaration**.
[73] Paragraph 46, Exhibit 25 at 195:5-22, 196:18-22, and 199:7-11, of the **Ghekas Declaration**.
[74] Paragraph 46, Exhibit 25 at 199:16-200:5, of the **Ghekas Declaration**.

V. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The standard of proof under §727 is preponderance of evidence. Davis v. Macway (In re Macway), 677 Fed. Appx. 658, 659 (9th Cir. 2016); Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010); Western Wire Works, Inc. v. Lawler (In re Lawler), 141 B.R. 425, 428-29 (9th Cir. BAP 1992).

**B.     KANE'S DENIAL OF DISCHARGE IS APPROPRIATE UNDER §727(A)(3).**

Section 727(a)(3) of the Bankruptcy Code provides that the court shall not grant the debtor a discharge if the debtor has,

> Concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to at was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

"The purpose of § 727(a)(3) is to make discharge dependent on the debtor's true presentation of his financial affairs." Caneva v. Sun Cmty. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 761 (9th Cir. 2008); see also Macway, 677 Fed. Appx.at 659; Retz, 606 F.3d at 1196; Lawler, 141 B.R. at 428-29. The debtor has an affirmative duty to create books and records accurately to document business affairs under §727(a)(3). Id. at 762. The debtor is required to present sufficient written evidence so that creditors can reasonably follow the debtor's transactions for a reasonable period in the past. Id. at 761. This "requirement removes the risk to creditors of 'the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.'" Id. (quoting Burchett v. Myers, 202 F.2d 920, 926 (9th Cir. 1952)).

A creditor such as Centennial can show a prima facie case under §727(a)(3) by: (1) the debtor's failure to maintain and preserve adequate records; and (2) inability to ascertain debtor's financial condition and material business transactions because of such debtor's failure. Id. Intent to conceal or knowing or fraudulent failure to maintain records is not required to show a violation under §727(a)(3). In re Nevett, 2021 WL 2769799, at *11 (9th Cir. BAP July 1, 2021); Weddell v. Landis, 551 B.R. 74, 82 (Dist. Nev. 2016); see also In re Juzwiak, 89 F.3d 424, 430 (7th Cir. 1996). Once the creditor establishes inadequacy of records, "the burden of proof then shifts to the debtor

to justify the inadequacy or nonexistence of the records." <u>Caneva</u>, 550 F.3d at 761. A lack of records is not justified by the debtor's honest belief that records do not need to be kept. <u>Weddell</u>, 551 B.R. at 82; <u>see</u> <u>also</u> <u>Meridian Bank v. Alten</u>, 958 F.2d 1226, 1232 (3rd Cir. 1992).

Creditors are entitled to written records regarding disbursements, not just oral testimony. <u>Juzwiak</u>, 89 F.3d at 429 (creditor was entitled to written documentation of details of certain disbursements and oral testimony was not a valid substitute). The records are inadequate if there are no documents substantiating or explaining expenses; accounting ledgers, canceled checks, bank statements, and income tax returns do not substantiate expenses; and disbursement of funds cannot be traced or verified. <u>Id.</u> at 428 (checking account ledgers, canceled checks, bank statements, and income tax returns do not substantiate expenses and business transactions could not be reconstructed from such records where disbursement of funds could not be verified or traced). Simply producing volumes of disorganized records is insufficient; "[c]reditors are not required to 'sift through documents and attempt to reconstruct the flow of the debtor's assets' because it is the debtor's burden to maintain organized, dependable, and comprehensible records to trace his financial history." <u>Id.</u> at 429; <u>see</u> <u>also</u> <u>Caneva</u>, 550 F.3d at 762 (debtor's focus on the quantity of records produced misses the point of absence of records related to $500,000 payment and business entities and incorrectly argues that court should find "a needed in this haystack"). "It is not enough for [Kane] to provide records about [his] overall financial situation; [he] must also provide records adequate to allow creditors to trace all of [his] transactions." <u>In re Brandenfels</u>, No. OR-14-1145-FJuKi, 2015 WL 5883317 at *6 (9th Cir. BAP 2015). Summary judgment is appropriate where debtor admits he has no documents regarding the disposition of funds. <u>Caneva</u>, 550 F.3d at 764.

### i. Kane Has No Records Regarding $2,150,000 of Loans from Individual Lenders

The Ninth Circuit has held that summary judgment to deny discharge under §727(a)(3) is appropriate where the debtor admits he has no documents regarding disposition of funds. <u>Caneva</u>, 550 F.3d at 764. In <u>Caneva</u>, a creditor examined the debtor at a Rule 2004 examination and questioned about the records for entities the debtor owned. The debtor admitted that he kept no records for the entities and no documents regarding the $500,000 payment of fee to another person. <u>Id.</u>at 759. The creditor moved for summary judgment, in part, to deny discharge under §727(a)(3)

by arguing the debtor failed to keep or preserve records. Id.at 760. The bankruptcy court granted the summary judgment on §727(a)(3) and denied discharge. Id. The Ninth Circuit agreed with the bankruptcy court, reasoning that the absence of records related to (1) the business entities and (2) $500,000 payment made it impossible to determine the debtor's financial condition and business transactions. Id. at 762. The Ninth Circuit noted that without documents regarding the $500,000 payment, the creditor could not determine the transaction details or verify the transaction took place. Id. The Ninth Circuit pointed out that the debtor's testimony at the Rule 2004 exam established unequivocally that he failed to keep or preserve any documents regarding the $500,000 payment. Thus, the Ninth Circuit held that "when a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer or the fact that the payment actually took place establishes a prima facie violation of 11 U.S.C. § 727(a)(3)." Id. The Ninth Circuit held that the debtor's "failure to provide an explanation for the lack of records regarding the $500,000 payment to Bowden is even more egregious. The transfer of a half million dollars is the kind of transaction for which most business entities would preserve some record." Id.

In a more recent opinion from the Bankruptcy Appellate Panel of the Ninth Circuit (the "Ninth BAP"), the court affirmed the bankruptcy court's entry of an order granting summary judgment and denying the debtor's discharge pursuant to §727(a)(3). Nevett, 2021 WL 2769799, at *5. In Nevett, the debtor admitted during his Rule 2004 examination that he kept no records to support his claimed disposition of approximately $925,000[75] in loan proceeds received from individual lenders, that were supposedly used to purchase interest in third party entities or, alternatively, to pay the debtor's business and personal debts. Id. at *9. The Ninth BAP held that "[g]iven the substantial amount at issue, there was no genuine dispute that this amount required documentation" and that "Mr. Nevett conceded he had not kept any records for these three loans." Id. Following the holding in Caneva, the Ninth BAP affirmed the lower court's decision, finding that "the absence of any records for the use of these significant loan proceeds established not only

---

[75] "Though the bankruptcy court here subsequently modified its ruling after trial by giving Mr. Nevett credit for the content of his check registers, which accounted for the disposition of $544,000 of the $925,000, the remaining $381,000 unaccounted for is still a substantial sum." Nevett, at *9.

the inadequacy of the records kept but the need for such records in order to understand Mr. Nevett's finances and transactions." Id.

This case is analogous to both Caneva and Nevett. Kane has admitted to failing to keep documents regarding disposition of $2,150,000 in purported loan proceeds. Kane is a highly compensated ice hockey player whose self-described "business" is to take out loan, after loan, after loan.[76] But despite this business practice, Kane has failed to maintain any documents associated with the same. With respect to Individual Loans, Kane admitted that he did not have records to show how those funds were disbursed, when the loans were incurred, what the purpose of the funds were, and that there was no written contract or documentation supporting the same.[77] Without the documents, it is impossible to verify that these various transactions took place, let alone at the amounts Kane has identified. These transactions alone total $2,150,000 - four times the amount at issue in Caneva and five times the amount ultimately at issue in Nevett.

Based on Kane's admissions of failing to have or provide any record regarding the disbursement of $2,150,000, Centennial has met the prima facie case of violation under §727(a)(3). Kane has failed to maintain and preserve adequate records and such failure makes it impossible to ascertain what happened to the material transactions totaling $2,150,000. In re Racer, 580 B.R. 45, 52 (Bankr. E.D.N.Y. 2018) ("Without any evidence such as checks or bank statements reflecting receipt or disbursement of loan proceeds, or any identification or documentation of assets purchased with these funds, it is impossible to ascertain what happened to these substantial sums of money. Plaintiff has made a prima facie showing that Defendant failed to produce sufficient records.").

This Court should grant this Motion and enter summary judgment denying Kane's discharge.

**ii.  Because of the Admitted Lack of Record Keeping, Kane Cannot Explain Significant Cash Transfers and Deposits To and From Unknown Sources**

In addition to admitting to failing to maintain and preserve records relating to the Individual Loans, Kane has admitted to failing to maintain and preserve adequate records relating to his Identified Accounts.[78] Out of the eleven Identified Accounts and Credit Cards, Kane produced only

---

[76] Paragraph 30.a, Exhibit 14 at 51:4-12 and 37:7-10, of the **Ghekas Declaration**.
[77] Paragraph 49 of the **Ghekas Declaration**.
[78] Paragraph 52 of the **Ghekas Declaration**.

minimal documents for eight of them. Even then, Kane has admitted to:

- Failing to maintain and preserve records regarding any of the Identified Accounts predating 2019[79];
- Failing to maintain and preserve records for the RBC 5955 account predating September 12, 2019[80];
- Failing to maintain and preserve records for the RBC 0532 account predating September 12, 2019[81];
- Failing to maintain and preserve records for the WF 1607 account predating 2020[82]; and
- Failing to maintain and preserve records for the RBC 4741 account predating June 26, 2020.[83]

Because Kane has testified that other than the bank records he produced, he did not maintain and preserve other records regarding his use of the various loan proceeds and his Total Compensation[84], the lack of records makes it impossible to ascertain Kane's true financial condition. See The Cadle Co. v. Terrell, 2002 WL 22075, at *5 (N.D. Tex. Jan 7, 2002), aff'd, 46 Fed. Appx. 731, 2002 WL 1973217 (5th Cir. July 30, 2002) ("While bank statements and credit card receipts or monthly statements may be simple records, they 'form the core' of what [is necessary] to ascertain [the Debtors] financial condition, primarily his use of cash assets.").

Even with respect to statements produced by Kane, the records and Kane's testimony fail to account for over $683,976.44 in transfers to unidentified accounts, as well as over $1,526,734.93 in deposits from unnamed sources.[85] Most concerning is the fact that Kane testified that he did not know who some of the identified recipients were.[86] Kane has not, and cannot provide any identifying information that would allow any person to locate other accounts to trace where over

---

[79] Paragraph 26.g, Exhibit 12 at 202:20-23, of the **Ghekas Declaration**.
[80] Paragraph 26.c, Exhibit 12 at 186:5-16, of the **Ghekas Declaration**.
[81] Paragraph 26.d, Exhibit 12 at 189:18-25, of the **Ghekas Declaration**.
[82] Paragraph 26.a, Exhibit 12 at 170:15-25, of the **Ghekas Declaration**.
[83] Paragraph 26.b, Exhibit 12 at 174:1-14, of the **Ghekas Declaration**.
[84] Paragraphs 34 and 35, Exhibit 13 at 202:24-203:7, of the **Ghekas Declaration**.
[85] Paragraphs 43, 44, 45, and 46 of the **Ghekas Declaration**. See n. 666-74 supra.
[86] Id.

$1,000,000 would have materialized from. The failure to provide this information is not justified. Kane's admitted lack of documentation or information regarding these transactions requires a denial of discharge. See In re Mann, 2014 WL 2523451, at *6 (Bankr. D.S.C. June 4, 2014).

Accordingly, there is no disputed issue of material fact as to what records Kane did, and did not, keep, and their inadequacy.[87] Centennial is entitled to summary judgment denying Kane's discharge under §727(a)(3).

### iii. Kane Cannot Explain the Purpose and Use of the Private Lender Loans

Kane has no understanding of why he was required to incur the Non-Real Estate Loans. While Kane admitted that the Non-Real Estate Loans was incurred for the sole purpose of paying off hard money and private money loans (collectively, the "Private Lender Loans"), Kane could not recall or remember the purpose in obtaining nearly $15,000,000 in loans in the first place. Kane admitted to not maintaining any books, records, or documents regarding the Private Lender Loans.[88]

Although Kane subpoenaed records from Sure Sports, this is not an acceptable substitute for Kane failing to maintain contemporaneous records as he is required to do under §727(a)(3). See Caneva, 550 F.3d at 762 (Section 727(a)(3) "places an affirmative duty on the debtor to create books and records…"). Moreover, the records received from Sure Sports only accentuate the problem associated with the total absence of records and documentation relating to Kane's use of the loan proceeds. Despite testifying that any amount he would have received from the Private Lender Loans would have been "nominal," if any, the records from Sure Sports evidence that Kane received approximately $8,574,994.43 from the Private Lender Loans[89]. While this may be "nominal" to Kane who made $22,000,000 from 2018 to 2020, this is no trifling amount. Kane has admitted to having no records associated with his receipt or use of this sum.[90]

Because Kane has admitted to not maintaining any records for these loans, or his use of the

---

[87] Kane has been contemplating bankruptcy since he hired John Fiero, Esquire of the nationally recognized bankruptcy restructuring firm, Pachulski Stang Ziehl & Jones in October 2019, in order to aid Kane to restructure his debts. See Exhibit 6 of the **Judicial Notice Request**, at ¶5 [Bk. 65-1]. Any failure on Kane's part to maintain and preserve adequate records regarding his finances is inexcusable.
[88] Paragraph 15, 29, 30, and 50, Exhibit 8 at 33:25-34:5, of the **Ghekas Declaration**.
[89] Paragraph 15, 29, 30, 31, and 50, of the **Ghekas Declaration**.
[90] Paragraphs 30-32 of the **Ghekas Declaration**.

1  $8,574,994.43 loan proceeds, Centennial has met the <u>prima</u> <u>facie</u> case of violation under §727(a)(3).

2  "Following <u>Caneva</u>, as [this Court] must, the absence of any records for the use of these significant

3  loan proceeds established not only the inadequacy of the records kept but the need for such records

4  in order to understand [Kane's] finances and transactions." <u>Nevett</u>, 2021 WL 2769799, at *9.

5      **iv.**    **Kane's Gambling Losses Are Largely Unaccounted For**

6          On his Amended SOFA, Kane listed $1,500,000 in certain losses attributable to "[g]ambling

7  at casino and via bookie (sports betting)."[91]  However, Kane has admitted that he does not maintain

8  a document or tally of his winnings or losses associated with his gambling.[92]  Instead, Kane relies

9  upon calculations that he performs "in [his] head or what would be up in [his] head."[93]  Kane further

10  testified that "a lot of these online bookies where you place your bets they keep a tally for you," but

11  when pressed, Kane could not identify any of the "online bookies" that he used.[94]  When reviewing

12  the limited bank statements produced by Kane where supposedly Kane withdraw cash for gambling,

13  the records do no support $1,500,000 in gambling losses.[95]  This is because, as admitted by Kane,

14  he has no records that he could look to in order to verify any losses.[96]

15          Whether a "problem" or not, Kane's gambling does not absolve him from keeping

16  appropriate records. <u>See</u> <u>In re Chen</u>, BAP No. WW-17-1067, KuFB, 2017 WL 4768104, at *9 (9th

17  Cir. BAP 2017).  "Indeed, since gambling earnings are 'income' for tax purposes, the Internal

18  Revenue Service requires gambling documentation, such as '[a]n accurate diary or similar record

19  regularly maintained by the taxpayer, supplemented by verifiable documentation.'" <u>Id.</u> (quoting

20  <u>Person v. Dep't. of Revenue</u>, No. TC-MD 091421D, 2011 WL 2222261 (Or. Tax. Magistrate Div.

21  June 6, 2011).  "Many courts have denied a debtor's discharge under §727(a)(3) for failure to

22  maintain gambling records." <u>Id.</u> (citing <u>United States Tr. v. Macway (In re Macway)</u>, No. 14-16680,

23  2016 WL 4039745 (9th Cir. July 28, 2016) (affirming denial of discharge where debtor failed to

24  maintain records for his gambling activities); <u>Dolin v. N. Petrochemical Co. (In re Dolin)</u>, 799 F.2d

25

---

26  [91] Exhibit 3 to the **Judicial Notice Request**, at ¶6, Part 6.15; [Bk 29].

   [92] Paragraph 39.c, Exhibit 16 at 14:19-20:16, of the **Ghekas Declaration**.

27  [93] Paragraph 39.d, Exhibit 16 at 15:8-21, of the **Ghekas Declaration**.

   [94] Paragraphs 39.e-f, and 39.j, Exhibit 16 at 15:22-16:3, 19:1-25, of the **Ghekas Declaration**.

28  [95] Paragraph 40 of the **Ghekas Declaration**.

   [96] Paragraphs 39.g-k, Exhibit 16, of the **Ghekas Declaration**.

251 (6th Cir. 1986) (chemical dependence and compulsive gambling did not excuse the debtor's failure to keep adequate records); <u>United States Tr. v. Hong Minh Tran (In re Hong Minh Tran)</u>, 464 B.R. 885 (Bankr. S.D. Cal. 2012) (denying discharge where debtor provided no contemporaneous personal or casino records for his gambling wins and losses)).

Accordingly, Kane's admitted failure to keep and maintain records associated with his gambling practices is another basis for this Court to grant summary judgment in favor of Centennial. Afterall, "[t]his is the price [Kane] pays for seeking bankruptcy protection and the privilege of a discharge." <u>Id.</u> (citing <u>Macway</u>, 2014 WL 3817103, at *3).

### v. Portions Received From Total Compensation Have Disappeared

In 2018, Kane received $8,424,166[97] in total gross income – over $2,000,000 more than what Kane identified on his Amended SOFA.[98] In 2019, he earned another $6,840,169[99], in gross income. And in 2020, Kane estimated his gross income to be $7,000,000.[100] This $22,000,000 is just a fraction of the gross earnings Kane has received throughout his eleven (11) year career. And despite receiving such substantial sums, Kane's testimony is that "[he] ha[s] no idea"[101] or would be unable to "generalize or remember" what he did[102] with the money. Neither Centennial nor this Court have the ability to verify the same in light of the inadequacy that is Kane's record keeping.

## C. KANE'S DENIAL OF DISCHARGE IS APPROPRIATE UNDER §727(a)(5)

Kane's discharge should also be denied under §727(a)(5) for failing to provide a satisfactory explanation for the loss of nearly $47,000,000. A debtor's discharge may be denied if "the debtor failed to explain satisfactorily … any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). "The purpose of § 727(a)(5) is to deter and punish debtors from 'abus[ing] the bankruptcy process by obfuscating the true nature of their affairs, and then refusing to provide a credible explanation.'" <u>In re Mitsopoulos</u>, 548 B.R. 620, 627 (Bankr. E.D.N.Y. 2016) (internal quotation marks omitted). "Section 727(a)(5) is broadly drawn and gives the bankruptcy

---

[97] Paragraph 47, Exhibit 27, of the **Ghekas Declaration**.
[98] Exhibit 3 to the **Judicial Notice Request at ¶**2, Part 2.4.
[99] Paragraph 47, Exhibit 27, of the **Ghekas Declaration**.
[100] <u>See</u> n. 98 <u>supra</u>.
[101] Paragraph 48, Exhibit 30 at 79:19-80:3, of the **Ghekas Declaration**.
[102] Paragraph 48.f, Exhibit 29 at 20:10-12, 100:20-102:9, of the **Ghekas Declaration**.

court broad power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets." Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 817 (1st Cir. BAP 2005); see also In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996) (citing First Fed. Life Ins. Co. v. Martin (In re Martin), 698 F.2d 883, 886 (7th Cir. 1983)).

Like §727(a)(3), the objecting party has the initial burden to show a prima facie case under §727(a)(5). Retz, 606 F.3d at 1205. A creditor can show a prima facie case under §727(a)(5) by showing that: (1) the debtor owned identifiable assets at a time not too remote from the bankruptcy petition date; (2) on the bankruptcy petition date, the debtor did not own the assets; and (3) the petition, schedules, and statement of financial affairs do not reflect an adequate explanation for the disposition of the assets. Id. After the creditor shows a prima facie case, the debtor must offer credible evidence, and failure to offer a satisfactory explanation is a sufficient ground for denial of discharge under §727(a)(5). Id.; Devers v. Bank of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985). Intent to defraud is not required. In re Carter, 236 B.R. 173, 180 (Bankr. E.D. Pa. 1999). Indeed, courts have noted that §727(a)(5) "simply imposes strict liability," so that the plaintiff is not required to prove that the debtor acted knowingly, fraudulently, or with bad intent. Hendon v. Lufkin (In re Lufkin), 393 B.R. 585, 601-603 (Bankr. E.D. Tenn. 2008), aff'd, 2010 WL 1332114 (E.D. Tenn. Mar. 29, 2010).

The debtor has the ultimate burden of persuasion. Id. Thus, the debtor cannot overcome the prima facie case by general assertions that money was spent on living expenses without documentations, Id. at 181, or "vague and indefinite explanations of losses based on estimates uncorroborated by documentation." Bell v. Stuerke (In re Stuerke), 61 B.R. 623, 626 (9th Cir. BAP 1986). "A debtor facing an objection to discharge under § 727(a)(5) may very well have to gather or produce documents and records which she might otherwise not ordinarily keep and in fact may be justified for failing to keep under § 727(a)(3). She may well have to hire professionals to locate her assets if she is unable to do so herself." In re Yanni, 354 B.R. 708, 716 (Bankr. E.D.Pa. 2006) (quoting Sonders v. Mezvinsky (In re Mezvinsky), 265 B.R. 681, 690-91 (Bankr. E.D.Pa. 2001)).

The aggregate principal loan amount that Kane claims in his Petition to have borrowed from

various creditors between 2018 and 2020 equals $25,688,494.87.[103] During the same time period, the Petition reflects that Kane received a total of $20,000,000 in gross proceeds under his Player's Contract.[104] And yet, Kane has not brought forth a scintilla of evidence explaining how he borrowed almost $25,000,000 in a span of three (3) years, while at the same time earning $20,000,000, with no trace of how such cash was lost other than the $8,500,000 that was used to purchase Real Properties and an interest in tax conservation easement. As of the Petition Date, Kane did not have over $37,000,000 in his Identified Accounts; Kane's Schedules indicate that he only maintained $38,805.65 in the same.[105] Furthermore, the Petition, Schedules, and Statement of Financial Affairs do not reflect any meaningful assets, business ventures, or investments, or any adequate explanation of over $17,000,000 Kane received in loans in the immediate years preceding his filing.[106]

Of the Total Liabilities, $2,150,000 represents loan proceeds received from the Individual Lenders who were "friends" of Kane and his family.[107] According to Kane's testimony at the 2004 Exam – which differed from the 341 Meeting – these loan proceeds were used to pay bills, pay off unidentified people Kane had borrowed money from, and "stay current."[108] At the 341 Meeting, Kane had no recollection of what the majority of these funds were used for.[109] Regardless of the change in testimony, Kane did not substantiate his assertion with any checks, documents, bills, or bank statements. This is because, as confirmed in the Deposition, Kane did not have any documentation to support the use of over $2,150,000 received from the Individual Lenders.[110] "Courts have noted that 'explanations of such generalized, vague, indefinite nature such as assets being spent on 'living expenses,' unsupported by documentation, are unsatisfactory.'" Racer, 580 B.R. at 55 (quoting Mezvinsky, 265 B.R. at 690); see also Stuerke, 61 B.R. at 626 (same); In re Sharp, 244 B.R. 889, 895 (Bankr. E.D. Mich. 2000) (denying discharge under §727(a)(5) because the only evidence concerning sale proceeds of a car is debtor's testimony that he used the proceeds

---

[103] Exhibit 2 to the **Judicial Notice Request** at ¶7, Part 1 and ¶¶12-17.
[104] Exhibit 3 to the **Judicial Notice Request** at ¶2, Part 2.4.
[105] Exhibit 8 to the **Judicial Notice Request** at ¶¶5-9, Part 4.17.
[106] See Exhibit 5 to the **Judicial Notice Request**.
[107] Exhibit 2 to the **Judicial Notice Request** at 4.5, 4.7, 4.12, 4.16, 4.18, and 4.21.
[108] Paragraph 14.a-f, of the **Ghekas Declaration**.
[109] Paragraphs 7, 8.a-q of the **Ghekas Declaration**.
[110] Paragraphs 8, 14, 19, 40, and 49 of the **Ghekas Declaration**.

to "pay bills and expenses"); <u>In re Long</u>, 2:196-ap-01086-ER, 2020 WL 8184203 (Bankr. C.D. Cal. Nov. 30, 2020) (denying discharge under §727(a)(5) where the Debtor had failed to explain her loss of assets by failing to provide documents to fully explain what happened to the entirety of the "Borrowed Funds" totaling $112,500 and the Debtor's admitted that she "cannot explain the loss").

Kane's explanation as to the use and purpose of the Private Lender Loans is even less satisfactory, as Kane does not know why he incurred them in the first place and therefore does not know what happened to the money and has no documentation to explain the loss of such substantial assets.[111] The fact that a debtor would not know why and for what purpose he incurred over $15,000,000 in loans over such a short period of time preceding his seeking protection under the Bankruptcy Code is implausible.[112] Regardless, "Section 727 puts some onus on [Kane] to retrace his steps and put some of the puzzle pieces back together. 'It is not the Court's duty to act as a sleuth, ferreting through a debtor's books and records in an attempt to trace the loss of assets or reconstruct the debtor's financial history." <u>Yanni</u>, 354 B.R. at 720 (quoting <u>Spirk v. Sullivan</u>, 2003 WL 22048077, at *5 (N.D.Ill. Aug. 28, 2003)). Kane is incapable of offering any testimony as to what he did with over $8,000,000 that he directly received out of the Private Lender Loans.[113] <u>See</u> <u>Long</u>, 2020 WL 8184203 at *6.

Also, unexplainedly missing from the Identified Accounts is over $683,976.44 in transfers out of the same to unidentified and unaccounted for accounts.[114] Kane cannot explain this phenomenon.[115] This does not account for the various other miscellaneous withdrawals that are nondescriptive that Kane could also not offer any opinion on. Other than the bank statements showing these transfers to accounts Kane cannot identify, Kane has no documentation that would support such a substantial loss.[116] <u>See</u> <u>Saluja v. Mantra (In re Mantra)</u>, 314 B.R. 723, 730 (Bankr. N.D. Ill. 2004) (in order to be "satisfactory" at least some documentation must support the debtor's explanation of the loss); <u>In re Manevska</u>, 587 B.R. 517, 540 (Bankr. N.D. Ill. 2018) (denying

---

[111] Paragraphs 15, 29, 30, 31, 32, 33, 34, 36, and 50 of the **Ghekas Declaration**.
[112] <u>Id.</u>
[113] <u>Id.</u>
[114] Paragraphs 43 and 46 to the of the **Ghekas Declaration**.
[115] <u>Id.</u>
[116] Paragraphs 34 and 35 of the **Ghekas Declaration**.

24

discharge under §727(a)(5) where debtor could not satisfactorily explain the loss and deficiency of $600,000 received in less than three years, where debtor's explanation were "hopelessly incomplete" despite the assistance of some bank statements evidencing the cash withdrawals and wire transfers); In re Potts, 501 B.R. 711, 726 (Bankr. D.Colo. 2013) (denying discharge under §727(a)(5) as "the Court cannot overlook more than $700,000 in unexplained cash losses …").

Additionally, Kane cannot explain where most of his earnings as a professional ice hocky player went. In the three (3) years preceding the Petition Date, Kane earned over $22,000,000 under his Player's Contract. This is in addition to nearly $30,000,000, for a total of approximately $50,000,000[117], that Kane has earned over the course of his career. And yet, Kane's Petition, Schedules, Statement of Financial Affairs, and documents produced do not explain where this money went. Kane's own testimony is that he has "no idea" and does not "recall exactly" what he utilized his salary for.[118] As this Court has already ruled, Kane's salary qualifies as "identifiable assets," [Doc. 19 at ¶13 (citing Retz, 606 F.3d at 1200), and Kane fails to offer any explanation regarding the dissipation of the same.

Because Kane lacks adequate records of his dissipation of identifiable assets, this Court is left only with Kane's own self-serving story. But Kane's story is missing several chapters, as most of his sworn testimony in response to "where did the money go," has been he does not know. Although consistent, such an excuse is unsatisfactory. Having failed to provide any explanation of the loss of such significant sums, let alone, a plausible one, Kane's discharge must be denied.

## IV. <u>CONCLUSION</u>

Centennial has made its <u>prima facie</u> case under §727(a)(3) and §727(a)(5), and Kane has failed to produce adequate documents or explanation. No genuine issue of material fact exists. Kane has admitted to his failures and has acknowledge, on multiple occasions, his inability to answer the most basic questions about his financial picture. Centennial respectfully requests that this Court enter summary judgment as a matter of law under §727(a)(3) and §727(a)(5).

---

[117] Paragraph 48 of the **Ghekas Declaration**.
[118] Paragraph 48.f, Exhibit 29 at 20:10-12, 100:20-102:9, Exhibit 30 at 79:19-80:3, of the **Ghekas Declaration**.

DATED: November 17, 2022                    ANTHONY & PARTNERS, LLC


                                            By:    /s/ Andrew J. Ghekas
                                                   Andrew J. Ghekas
                                                   Attorneys for Plaintiff
                                                   CENTENNIAL BANK

DATED:  November 17, 2022                   NIESAR & VESTAL LLP


                                            By:    /s/ Peter C. Califano
                                                   Peter C. Califano
                                                   Attorneys for Plaintiff
                                                   CENTENNIAL BANK