ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (FL SBN 0731013)
  janthony@anthonyandpartners.com
ANDREW J. GHEKAS (FL SBN 0119169)
  aghekas@anthonyandpartners.com
*Both admitted Pro Hac Vice*
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813.273.5616
Facsimile: 813.221.4113

NIESAR & VESTAL LLP
PETER C. CALIFANO (SBN 129043)
  pcalifano@nvlawllp.com
JOHN A. KELLEY (SBN 194073)
  jkelley@nvlawllp.com
90 New Montgomery St. 9th Floor
San Francisco, California 94105
Telephone: 415.882.5300
Facsimile: 415.882.5400

Attorneys for Plaintiff
CENTENNIAL BANK

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### [San Jose Division]

| | |
|---|---|
| In re | CASE NO. 21-50028 SLJ |
| EVANDER FRANK KANE, | Chapter 7 |
| Debtors. | |
| CENTENNIAL BANK, an Arkansas state chartered bank, | Adv No. 21-05016 |
| Plaintiff, | **DECLARATION OF ANDREW J. GHEKAS IN SUPPORT OF CENTENNIAL BANK'S MOTION FOR SUMMARY JUDGMENT VOLUME 2 (EXHIBITS 15-21)** |
| vs. | |
| EVANDER FRANK KANE, | Date: January 10, 2023 |
| Defendant. | Time: 1:30pm<br>Place: Via Zoom Video-conference<br>Judge: Hon. Stephen L. Johnson |

I, Andrew J. Ghekas, know the following matters to be true of my own, personal knowledge and, if called as a witness, could and would testify competently thereto:

1.      I am a member of the State Bar of Florida in good standing and am admitted *pro hac vice* to practice before this Court in this case.  I am a partner employed by Anthony & Partners, LLC, counsel of record for creditor Centennial Bank ("Centennial").  This declaration is offered in support of "Centennial Bank's Motion for Summary Judgment" (the "Summary Judgment Motion") regarding Debtor Evander Frank Kane's ("Kane").

2.      The defendant, Kane, is also the debtor who commenced Case No. 21-50028-SLJ (the "Bankruptcy Case") with the filing of a voluntary petition under Chapter 7 of the Bankruptcy Code on January 9, 2021 (the "Petition Date").  Frode S. Hjelmest (the "Chapter 7 Trustee") was appointed as the Chapter 7 Trustee in the Bankruptcy Case.  Marta Villacorta, Esquire (the "United States Trustee") was appointed as the United States Trustee in the Bankruptcy Case.

3.      Centennial is scheduled as a secured creditor in the amount of $8,360,000.  Centennial has filed its "Proof of Claim" (the "Centennial Obligation") [POC 5] on March 18, 2021.  On December 17, 2021, Centennial amended its Proof of Claim.

4.      On May 5, 2021, Centennial filed its "Complaint to Determine Nondischargeability of Debt Pursuant to:  11 U.S.C. §523(a)(2)(A); and 11 U.S.C. §§727(a)(2)-(a)(5)" (the "Original Adversary Complaint") thereby initiating the above-captioned adversary proceeding, No. 21-05016 (the "Adversary Proceeding").

5.      On December 7, 2021, Centennial amended the Original Adversary Complaint by filings its "Amended Complaint to Determine Nondicharageability of Debt Pursuant to:  11 U..S.C. §523(a)(2)(A); and 11 U.S.C. §§727(a)(2)-(a)(5)" (the "Operative Adversary Complaint"), pursuant to the "Order on Stipulation to File an Amended Complaint and Amended Answer" entered on December 6, 2021.

6.      I attended, via teleconference, the initial meeting of creditors held pursuant to §341(a) (the "Initial 341 Meeting") that occurred on February 3, 2021.

7.      At the Initial 341 Meeting, Kane was examined, <u>inter alia</u>, by the United States Trustee.  The United States Trustee asked Kane a series of questions regarding certain loans Kane listed on his Schedule E/F and amended Schedule E/F that Kane received from Davis Sanchez, Hebron Shyng, Mike Lispti, Pete Gianakas, Raj Banghu, and Tony Veltri (collectively, the

"Individual Loans").  A true and correct copy of the cover page, pages 55-60, and the reporter's certificate of the transcript of the Initial 341 Meeting are attached hereto as **Exhibit 1**.

8.  As it relates to the Individual Loans, Kane testified that:

a.  there was no written documentation relating to the loan that he received from Davis Sanchez. <u>See</u> Tr. 55:11-24, attached as part of **Exhibit 1**.

b.  he could not recall at that time what he used the loan proceeds he received from Davis Sanchez for. <u>See</u> Tr. 55:25-56:2, attached as part of **Exhibit 1**.

c.  he could not recall when he incurred the loan that he received from Hebron Shyng. <u>See</u> Tr. 56:3-6, attached as part of **Exhibit 1**.

d.  he used the loan proceeds he received from Hebron Shyng to "pay off bills … [p]robably mortgages". <u>See</u> Tr. 56:7-11, attached as part of **Exhibit 1**.

e.  there "is some written documentation, promissory note" memorializing the loan he received from Hebron Shyng. <u>See</u> Tr. 56:17-22, attached as part of **Exhibit 1**.

f.  he could not recall when he incurred the loan that he received from Mike Lispti. <u>See</u> Tr. 56:23-4, attached as part of **Exhibit 1**.

g.  he used the loan proceeds he received from Mike Lispti to "pay back other personal loans." <u>See</u> Tr. 57:5-6, attached as part of **Exhibit 1**.

h.  he did not have any written documentation with respect to the loan that he received from Mike Lispti. <u>See</u> Tr. 57:11-15, attached as part of **Exhibit 1**.

i.  he could not recall when he incurred the loan that he received from Pete Gianakas. <u>See</u> Tr. 58:12-19, attached as part of **Exhibit 1**.

j.  he could not recall what the loan funds he received from Pete Gianakes were used for. <u>See</u> Tr. 58:20-21, attached as part of **Exhibit 1**.

k.  he did not have any written contract with Pete Gianakas associated with the loan that he received. <u>See</u> Tr. 59:1-3, attached as part of **Exhibit 1**.

l.  he believes that the loan he incurred from Raj Banghu was incurred sometime in 2019. <u>See</u> Tr. 59:4-14, attached as part of **Exhibit 1**.

| | | |
|---|---|---|
| 1 | m. | he could not recall what he used the loan funds he received from Raj Banhu |
| 2 | | for. <u>See</u> Tr. 59:15-17, attached as part of **Exhibit 1**. |
| 3 | n. | he did not have any documentation with respect to the loan that he received |
| 4 | | from Raj Banhu. <u>See</u> Tr. 59:21-24, attached as part of **Exhibit 1**. |
| 5 | o. | he did not recall when he incurred the loan that he received from Tony Veltri. |
| 6 | | <u>See</u> Tr. 60:23-61:4, attached as part of **Exhibit 1**. |
| 7 | p. | he did not recall what he used the loan funds that he received from Tony |
| 8 | | Veltri for. <u>See</u> Tr. 61:5-7, attached as part of **Exhibit 1**. |
| 9 | q. | there was nothing reduced to writing evidencing the loan he received from |
| 10 | | Tony Veltri. <u>See</u> Tr. 61:8-9, attached as part of **Exhibit 1**. |

9. At the Initial 341 Meeting, Kane was also examined by the Chapter 7 Trustee who asked him a series of questions regarding each of the loans Kane incurred from Centennial, Professional Bank ("Professional"), South River Capital LLC ("South River"), and Zions Bancorporation ("Zions"), collectively, the "Non-Real Estate Loans," listed on Kane's Amended Schedules D, Schedules E_F. A true and correct copy of cover page, pages 21-23, and reporter's certificate are attached hereto as **Exhibit 2**.

10. As it relates to the Non-Real Estate Loans, Kane testified that:

a. the loan he incurred with Centennial was used "to get [him] out of some of the hard money loans [he] was in … [a]nd pay them off." <u>See</u> Tr. 21:13-19, attached as part of **Exhibit 2**.

b. the hard money loans "were many loans that were taken out for a number of years. [That he] ended up just paying off loan after loan." <u>See</u> Tr. 21:24-22:3, attached as part of **Exhibit 2**.

c. the loan he incurred with Professional Bank was used for the "exact same thing" and "coordinated by Leon in order to pay off all the hard money loans that [he] had between those three banks." <u>See</u> Tr. 22:7-15, attached as part of **Exhibit 2**.

d. the loan he incurred from South River was to pay off a casino debt. <u>See</u> Tr.

23:2-8, attached as part of **Exhibit 2**.

    e.    the loan he incurred from Zions was to pay off hard money loans. <u>See</u> Tr. 23:13-19, attached as part of **Exhibit 2**.

11.    At the Initial 341 Meeting, I also had the opportunity to briefly examine Kane and asked him "what were those hard money loans that you paid off utilized for[]" to which Kane testified that he did not recall. A true and correct copy of cover page, page 78, and reporter's certificate are attached hereto as **Exhibit 3**.

12.    In addition to the Initial 341 Meeting, I attended and conducted the Rule 2004 Exam of Kane that occurred, via Zoom, on March 24, 2021.

13.    I also personally reviewed all of the documents produced by Kane on March 19, 2021, pursuant to the "Order Approving Stipulation Regarding Centennial Bank Rule 2004 Examination" dated March 17, 2021.

14.    At the 2004 Exam, I asked Kane a series of questions regarding his use of the loan proceeds he received from the Individual Loans. A true and correct copy of the cover page, pages 68-70, and reporter's certificate of the transcript are attached hereto as **Exhibit 4**. As it relates to each of the Individual Loans, Kane testified that:

    a.    he borrowed the money from Davis Sanchez in order to "basically just be able to pay my bills" and that it was incurred "over the course of a number of years." <u>See</u> Tr. 68:14-23, attached as part of **Exhibit 4**.

    b.    he borrowed the money from Hebron Shyng in order to "help pay off some debt that [he] had and also to stay current on [his] bills" and that the debt was "probably some credit card debt, some bills that [he] was behind on, so [he] can be able to pay [his] mortgages, rent at the time, food." <u>See</u> Tr. 69:5-14, attached as part of **Exhibit 4**.

    c.    he borrowed the money from Mike Lispti to "help pay off some – some other people that [he] borrowed money from" and there is no documentation regarding it. <u>See</u> Tr. 69:17-70:2, attached as part of **Exhibit 4**.

    d.    he borrowed the money from Pete Gianakas to "pay off some other people

| | | |
|---|---|---|
| 1 | | that [he] had borrowed money from in the past", could not recall who those |
| 2 | | people were, and there is no documentation regarding the loan. See Tr. 70:3- |
| 3 | | 15, attached as part of **Exhibit 4**. |
| 4 | e. | he borrowed the money from Raj Bhangu because he "was behind on some |
| 5 | | bills and needed – needed the cash to – stay current and make up some late |
| 6 | | payments" and had no documentation regarding the loan. See Tr. 70:16- |
| 7 | | 71:71, attached as part of **Exhibit 4**. |
| 8 | f. | he borrowed the money from Tony Veltri to "pay off other people that [he] |
| 9 | | had borrowed money from in the past", did not recall who those other people |
| 10 | | were, and there is no written documentation regarding the loan. See Tr. 71:2- |
| 11 | | 16, attached as part of **Exhibit 4**. |

15.     Also at the 2004 Exam, Kane offered further testimony regarding his use of the Non-Real Estate Loans.  A true and correct copy of the cover page, pages 31-34, and 65-68, and reporter's certificate are attached hereto as **Exhibit 5**.  With respect to each of the Non-Real Estate Loans, Kane testified that:

| | | |
|---|---|---|
| 16 | a. | he did not use any of the loan proceeds received from Centennial to purchase |
| 17 | | any properties, to purchase an operating business, to fund an operating |
| 18 | | business, or to invest in any investments or business ventures. See Tr. 31:12- |
| 19 | | 32:5, attached as part of **Exhibit 5**. |
| 20 | b. | he could not recall if he ever owned or operated any businesses. See Tr. |
| 21 | | 32:24-33:3, attached as part of **Exhibit 5**. |
| 22 | c. | the great majority of the loan proceeds received from Professional Bank |
| 23 | | "went to pay off preexisting loans", that he may have "received a small |
| 24 | | portion of that amount, but [was] not sure", and did not use any of the loan |
| 25 | | proceeds to purchase any property, invest in any ongoing business, or start a |
| 26 | | new business. See Tr. 65:4-66:7, attached as part of **Exhibit 5** |
| 27 | d. | the money received from the loan he took out with Zions was "used to pay |
| 28 | | off preexisting loans" and not to purchase any property, invest in any ongoing |

business, or to start a new business. <u>See</u> Tr. 67:8-16, 22-68:11, attached as part of **Exhibit 5**.

However, Kane testified that he could not recall when he took out these prior loans or why he took them out in the first place. <u>See</u> Tr. 32:12-18 and 65:5-17, attached as part of **Exhibit 5**. He further testified that he did not maintain any books, records, or documents regarding these prior loans. <u>See</u> Tr. 34:3-5, attached as part of **Exhibit 5**.

16. On or about January 14, 2022, Kane provided "Defendant's Responses to Plaintiff's First Request for Production of Document" (the "Initial Production Responses"), "Defendant's Responses to Plaintiff's First Request for Admission" (the "Initial Admissions"), and "Defendant's Responses to Plaintiff's First Set of Interrogatories" (the "Initial Interrogatory Responses"), collectively, the "Initial Discovery Responses." The Initial Interrogatory Responses were verified by Kane on January 12, 2022.

17. A true and correct copy of the Initial Production Responses is attached hereto as **Exhibit 6**. A true and correct copy of the Initial Admissions is attached hereto as **Exhibit 7**. A true and correct copy of the Initial Interrogatory Responses is attached hereto as **Exhibit 8**.

18. I have personally reviewed all of the documents produced by Kane on July 1, 2022, February 28, 2022, March 9, 2022, and March 14, 2022.

19. On or about February 28, 2022, Kane provided "Defendant's Amended Responses to Plaintiff's First Request for Production of Document" (the "Amended Production Responses"), thereby amending Kane's response to Request for Production No. 10, 12, 13, 16, 17, 24, 26, 27, 28, 29, 30, 32, and 34, stating that "After a reasonable search, Kane did not locate any documents responsive to this request", and to Request for Production 57, stating that "Kane response that no responsive documents exist. A true and correct copy of the Amended Production Responses is attached hereto as **Exhibit 9**.

20. On February 2, 2022, I sent correspondence to counsel for Kane in regards to his deficient discovery responses and production. On or about February 10, 2022, Kane's counsel of record, Stephen D. Finestone, Esquire, exchanged correspondence with me regarding Kane's objections and responses as set forth in the Initial Discovery Responses. As it relates specifically

to the Initial Admissions, Kane amended his answer to Request for Admission 20, due to a "scrivener's error" to reflect that Kane "Admitted" that "the debt obligation the Debtor owes to Raj Banghu, as listed in Section 4.18 of the Debtor's Amended Schedule E/F:  Creditors Who Have Unsecured Claims [Doc. 18] is a consumer debt as the term is defined above in Section I, paragraph 23.  A true and correct copy of the foregoing correspondence from myself to Kane's counsel, along with the response correspondence from Kane's counsel to me, are attached hereto as **Exhibit 10**.

21.     In its discovery request to Kane, Centennial requested that Kane produce "[c]opies of the Debtor's bank account statement, including any canceled checks, signature cards, wire transfers, withdrawals, debits and credits, cashier checks, and account closing documents, during the past twelve (12) years." See **Exhibit 9** at Request 53.  In the Amended Production Response, Kane agreed to producing "non-privileged documents from the two years prior to the petition date that are responsive to this Request that are in Kane's possession, custody, and control, and that can be located by a reasonable search." See **Exhibit 9** at ¶¶39-40.

22.     On January 21, 2022, and accompanying Kane's initial document production, counsel for Kane, Ryan Witthans, Esquire, conveyed that "[t]here are some instances where Mr. Kane agreed to produce any documents that were in his possession, custody, or control, but was unable to locate any documents." On March 1, 2022, I sent e-mail correspondence to Kane's counsel regarding (i) the lack of financial documentation contained in Kane's production to date, and (ii) the two (2) year lookback period Kane was purporting to limit discovery too.  As to the latter, I first sought confirmation as to whether or not Kane maintained and preserved financial documentation responsive to Request 53 extending beyond January 2019 that Kane was withholding pursuant to his objection.  As to the former, I communicated to counsel for Kane that my review of the documents produced thus far evidenced a lack of bank statements and other financial documentation pertaining to Kane's identified accounts listed on his bankruptcy schedules even for the time period Kane was agreeable to producing.  Counsel for Kane responded that "I am in the process of verifying, but I do not believe that Mr. Kane has any statements dating prior to midway through 2019." A true and correct copy of the foregoing e-mail correspondence is attached hereto as **Exhibit 11**.

23.     On March 14, 2022, Kane's counsel "confirmed with Evander" that Kane "no longer has any access to the accounts at Bank of America and Wells Fargo, and cannot obtain statements electronically." See **Exhibit 11**.  On June 28, 2022, Kane's counsel "Confirmed that Mr. Kane has produced all responsive documents within his possession and control and that no further production is expected."  See **Exhibit 11**.

24.     I have personal reviewed Kane's amended Schedules A/B and note that Kane has identified eight (8) "[c]hecking, savings, or other financial accounts" as follows (collectively, the "Identified Accounts"):

a.     Acct ending in 0171 – Checking Account: Bank of America;

b.     Acct ending in 1607 – Checking Account: Wells Fargo;

c.     Checking – Scotia Bank;

d.     Savings account – Scotia Bank;

e.     Checking – Royal Bank of Canada;

f.     Account ending in 0532 – Royal Bank of Canada;

g.     Acct. ending in 2824 – spouse's Wells Fargo account; and

h.     Savings account ending in 5963 – Royal Bank of Canada.

In addition to the foregoing, Kane's Amended SOFA identifies three (3) credit cards that he utilized prior to the Petition Date, those being (i) American Express – Wells Fargo, (ii) American Express, and (iii) Royal Bank of Canada (collectively, the "Credit Cards").

25.     A review of the documents produced by Kane confirms that as to the Identified Accounts and Credit Cards, Kane has not produced bank statements or documents for:

a.     his Bank of America account ending in -0171 predating August 22, 2019;

b.     his Wells Fargo account ending in -1607 predating January 1, 2020;

c.     his Scotia Bank account ending in -28 predating January 1, 2019;

d.     his Scotia Bank account ending in -81 predating January 1, 2019;

e.     his Royal Bank of Canada account ending in -5955 predating September 12, 2019;

f.     his Royal Bank of Canada account ending in -0532 predating September 12,

2019;

g.    his Wells Fargo American Express account ending in 2-64004 predating September 5, 2020 or post dating December 7, 2020;

h.    his American Express credit card for any year; and

i.    his Royal Bank of Canada account ending in 4741 predating June 26, 2020.

26.    On July 6, 2022, I conducted the deposition of Kane (the "Deposition") in the Adversary Proceeding.  I asked Kane a series of questions regarding the lack of bank statements and documentation associated with the Identified Accounts and Credit Cards.  A true and correct of cover page, pages 34, 38, 84, 170, 174, 102, 186, 189, and 200-202, and reporter's certificate are attached hereto as **Exhibit 12**.  In response to the questions posed by me, Kane testified that:

a.    he has no bank statements for his Wells Fargo account ending in -1607 for 2019, 2018, or any year prior to 2020. <u>See</u> Depo. Tr. 170:15-25, attached as part of **Exhibit 12**.

b.    he has no bank statements for his Royal Bank of Canada account ending in -4741 predating June 26, 2020. <u>See</u> Depo. Tr. 174:1-14, attached as part of **Exhibit 12**.

c.    he has no bank statements predating September 12, 2019, for his Royal Bank of Canada account ending in -5955. <u>See</u> Depo. Tr. 186:5-16, attached as part of **Exhibit 12**.

d.    he has no bank statements predating September 12, 2019, for his Royal Bank of Canada account ending in -0532. <u>See</u> Depo. Tr. 189:18-25, attached as part of **Exhibit 12**.

e.    he does not have any documents for any year associated with his American Express that is unaffiliated with any financial institution. <u>See</u> Depo. Tr. 200:11-23, attached as part of **Exhibit 12**.

f.    he does not have any documents predating September 2020 for his Wells Fargo American Express account ending in 2-64004. <u>See</u> Depo. Tr. 200:24-201:7, attached as part of **Exhibit 12**.

g.      he has no records regarding any of his bank statements or accounts predating 2019. See Depo. Tr 202:20-23, attached as part of **Exhibit 12**.

27.      In addition to the accounts identified by Kane on his Schedules, my review of the documents produced by Kane uncovered two additional accounts historically maintained by Kane: The first is an additional Royal Bank of Canada account ending in -0046 that was the recipient of large wire transfers stemming from multiple loans Kane incurred over the years.  At his deposition, Kane admitted that "[i]n terms of that account, no I wouldn't have any records today" as he closed the account three or four years prior to the Deposition – or within two years of the Petition Date. See Depo. Tr. 34:2-6, 69:25-70:6, and 84:5-21, attached as part of **Exhibit 12**.  The second was an account at East West Bank, ending in -4455, that Kane opened but never asked anybody at East West Bank for access to the account and therefore did not know what the funds associated with the same were used for. See Depo. Tr. 38:6-24 and 102:9-11, attached as part of **Exhibit 12**.

28.      On January 17, 2022, Kane served his "Notice of Subpoena (Sure Sports, LLC)" (the "Sure Sports Subpoena") pursuant to which Kane sought to subpoena certain documents from Sure Sports.  On February 17, 2022, Centennial served "Centennial Bank's Request for Copies" (the "Copy Request"), thereby formally requesting Kane produce a copy of any documents he received from Sure Sports pursuant to the Sure Sports Subpoena.  On March 2, 2022, Kane, through counsel, served upon Centennial a link to access copies of Sure Sports production (the "Sure Sports Production").

29.      I have personally accessed the link containing the Sure Sports Production and have downloaded and reviewed all documents contained therein.

30.      A review of the Sure Sports Production reveals that since 2014 Kane entered into at least twenty-four (24) separate lending arrangements with various third-party lenders, including Centennial.  At the Deposition, I questioned Kane extensively on his receipt and use of these various loan funds.  A true and correct copy of the cover page, pages22, 51, 59-64, 67-69, 72-73, 77-78, 80-94, 102-119, 123-124, and 202-203, and reporter's certificate are attached hereto as **Exhibit 13**.  A true and correct copy of the closing statements associated with the foregoing loans incurred by Kane are attached hereto as **Exhibit 14**.  In response to my questions of Kane at the Deposition, Kane

testified that:

      a.     his "business" consisted of "[t]aking out other loans on top of other loans on top of other loans to avoid late payments or get out of late payments or high interest rates." <u>See</u> Depo. Tr. 51:7-12, attached as part of **Exhibit 13**.

      b.     it was "very rare where [he] received any of the proceeds - - if any it was very nominal, if you look at the loan documents, which I'm sure you have, where money came directly to [him]." <u>See</u> Depo. Tr. 22:11-17, attached as part of **Exhibit 13**.

      c.     "the money was used to pay off a preexisting loan for another entity. It was nominal money or very little if any went to me directly." <u>See</u> Depo. Tr. 51:13-16, attached as part of **Exhibit 13**.

However, despite testifying that it was "very rare" that the loan proceeds that he incurred "came directly" to him, the closing statements say otherwise. <u>See</u> **Exhibit 14**. As to each of these loans, Kane testified that:

      d.     he could not recall entering into a lending arrangement with Capital Financial Partners, LLC on or about May 14, 2014, for $600,000, out of which he directly received $562,500; did not recall the purpose of entering into the lending agreement with Capital Financial Partners, LLC; and has no records regarding his use of the loan funds received. <u>See</u> Depo. Tr. 59:5-60:9, 61:20-22, attached as part of **Exhibit 13**; **Exhibit 14** at 2-24.

      e.     he could not recall entering into a lending arrangement with American Bank on or about June 20, 2014, for $1,000,000, he received $261,429.36 directly from the loan proceeds; he could not recall what he utilized this portion of the loan proceeds for; and is not aware of any records that he has regarding his use of any of the loan proceeds that he directly received from American Bank. <u>See</u> Depo. Tr. 62:1-63:19, attached as part of **Exhibit 13**; **Exhibit** 14 at 25-31.

      f.     he entered into a lending arrangement with East West Bank on or about July

15, 2015, for $1,750,000, of which he was directly to receive $736,875; however; he has no recollection as to what he utilized the loan proceeds that he directly received for and has no records pertaining to his use of the specific loan proceeds that he received from East West Bank. See Depo. Tr. 63:20-64:13, 66:20-67:14, attached as part of **Exhibit 13**; **Exhibit 14** at 32-37.

g.    he could not recall entering into a loan agreement with Tenacity 7401 New Hampshire, LLC on or about August 28, 2015, for $500,000, but had no reason to dispute the same; he had no reason to dispute his receipt of $450,948.50 in the loan proceeds; could not recall what he used the $450,948.50 for; and had no documents relating to his use of these loan proceeds he received from Tenacity 7401 New Hampshire, LLC. See Depo. Tr. 67:15-69:16, attached as part of **Exhibit 13**; **Exhibit 14** at 38-43.

h.    he entered into a $3,300,000 lending agreement with Thrivest Specialty Funding, LLC, on or about January 23, 2016, of which he directly received $931,541 in net proceeds; he could not recall exactly what he utilized the loan proceeds for; and to his knowledge he had no records regarding his use of the $931,541 in net loan proceeds. See Depo. Tr. 72:8-73:24, attached as part of **Exhibit 13**; **Exhibit 14** at 44-50.

i.    he entered into a $50,000 loan agreement with Now Playing on or about July 6, 2016, of which he received approximately $42,000 in net loan proceeds; he could recall what he utilized these specific loan proceeds for; and he had no documentation regarding his use of these specific loan proceeds. See Depo. Tr. 73:25-75:4, attached as part of **Exhibit 13**; **Exhibit 14** at 51-52.

j.    he entered into a $200,000 lending arrangement with SCL-D, LLC, on or about July 7, 2016, of which he directly received approximately $149,500 in net loan proceeds; he could not recall what he utilized these specific loan proceeds for; did not recall why he needed a loan of this size at the time; and would not have any records regarding his use of these specific loan proceeds

| | | |
|---|---|---|
| 1 | | from SCL-D, LLC. See Depo. Tr. 75:5-16, 77:11-78:12, attached as part of |
| 2 | | **Exhibit 13**; **Exhibit 14** at 53-70. |
| 3 | k. | he entered into a $4,150,000 loan agreement with DeAngelo Vehicle |
| 4 | | Services, LLC, on or about October 6, 2016, of which he received $242,471 |
| 5 | | in net loan proceeds; he could not recall what he used these specific loan |
| 6 | | proceeds for; he would not have any records of his use of these specific funds; |
| 7 | | and he is not aware of any records that would confirm the $3,507,500 of the |
| 8 | | $4,150,000 leant actually went to pay off preexisting loans. See Depo. Tr. |
| 9 | | 80:5-83:12, attached as part of **Exhibit 13**; **Exhibit 14** at 71-82. |
| 10 | l. | he entered into a second loan with DeAngelo Vehicle Sales, LLC in the |
| 11 | | amount of $580,000 on or about December 23, 2016, of which he received |
| 12 | | approximately $505,912.53 in net loan proceeds; he could not recall what he |
| 13 | | utilized these specific loan funds for; and would not have any records |
| 14 | | regarding his use of these specific loan funds. See Depo. Tr. 84:22-86:12, |
| 15 | | 87:13-17, attached as part of **Exhibit 13**; **Exhibit 14** at 83-93. |
| 16 | m. | he entered into a second loan with Thrivest Specialty Funding, LLC in the |
| 17 | | amount of $1,975,000 on or about March 3, 2017, of which he was to receive |
| 18 | | $748,600 to pay off various "personal loans" that he had incurred from people |
| 19 | | over the years; however, he was unable to identify these people, the one |
| 20 | | identified, "Vinny," was "a bookie, but that's not like his real name, it's just |
| 21 | | a name that was used," he would have no records to support what he owed to |
| 22 | | Vinny, and he had no other records to support his use of these specific funds |
| 23 | | "other than what [he] provided"; When asked to identify which documents |
| 24 | | he has provided to support paying off Vinny or these other personal loans, |
| 25 | | Kane testified that he "[does not] have reference to support paying off any". |
| 26 | | See Depo. Tr. 87:18-92:20, attached as part of **Exhibit 13**; **Exhibit 14** at 94- |
| 27 | | 100. |
| 28 | n. | he entered into a third lending arrangement with Thrivest Specialty Funding, |

| | | |
|---|---|---|
| 1 | | LLC in the amount of $1,225,000 on or about April 6, 2017, of which he |
| 2 | | directly received $610,830.40 in net loan proceeds; he could not recall what |
| 3 | | he utilized these specific loan proceeds for; and he has no records to support |
| 4 | | his use of these specific loan proceeds. <u>See</u> Depo. Tr. 93:4-94:22, attached as |
| 5 | | part of **Exhibit 13**; **Exhibit 14** at 101-106. |
| 6 | o. | he entered into a lending arrangement with Seven Isles Capital, LLC in the |
| 7 | | amount of $3,550,000 on or about July 5, 2017, of which he directly received |
| 8 | | $859,987 in net loan proceeds; he did not know what he utilized these specific |
| 9 | | loan proceeds for; and he has no documents to support his use of these |
| 10 | | specific funds. <u>See</u> Depo. Tr. 102:23-106:7, attached as part of **Exhibit 13**; |
| 11 | | **Exhibit 14** at 107-119. |
| 12 | p. | he entered into a fourth lending arrangement with Thrivest Specialty |
| 13 | | Funding, LLC, in the amount of $3,000,000 on or about July 5, 2017, of |
| 14 | | which he received $300,655 in net loan proceeds; he does not recall what he |
| 15 | | utilized these specific loan proceeds for. <u>See</u> Depo. Tr. 106:8-109:7, attached |
| 16 | | as part of **Exhibit 13**; **Exhibit 14** at 120-125. |
| 17 | q. | he entered into a fifth lending arrangement with Thrivest Specialty Funding, |
| 18 | | LLC, in the amount of $4,850,000, on or about September 28, 2017, of which |
| 19 | | he directly received $721,807.89 in net loan proceeds; he could not recall |
| 20 | | what he utilized these loan proceeds for; and he has no personal records to |
| 21 | | support his use of these funds. <u>See</u> Depo. Tr. 109:8-111:8, attached as part of |
| 22 | | **Exhibit 13**; **Exhibit 14** at 126-133. |
| 23 | r. | he, through Kane Financial, LLC, entered into a $1,250,000 loan with |
| 24 | | Democracy Capital Corporation on or about December 18, 2017, that he |
| 25 | | personally guaranteed, of which he directly received $895,261.75 in net loan |
| 26 | | proceeds; he did not know what these funds were used for. <u>See</u> Depo. Tr. |
| 27 | | 112:19-116:9, attached as part of **Exhibit 13**; **Exhibit 14** at 134-142. |
| 28 | s. | he entered into a $1,850,000 lending arrangement with South River Capital, |

LLC on or about March 22, 2018, of which $163,000 was to pay off an Alex Jabori who he could not recall who he was or why he would be paying him $163,000; and an additional $554,675 was to be deposited in his account at East West Bank. See Depo. Tr. 116:10-119:16, attached as part of **Exhibit 13**; **Exhibit 14** at 143-150.

31.     A review of the testimony and documentation identified and referenced in the preceding paragraph confirms that Kane has admitted to directly receiving $8,574,994.43 in net loan proceeds that were deposited into various bank accounts in his name, of which $6,525,441.57 he incurred since 2016. Kane has admitted to not knowing and having no records to support his use of these funds.

32.     At the Deposition, Kane testified that to his knowledge he had no other documents regarding each of the various loans that I went through at his Deposition other than what we specifically identified. See Depo. Tr. 123:23-124:2, attached as part of **Exhibit 13**.

33.     At the Deposition, Kane admitted to not having any other documents that would support his use of any of the loan proceeds that he received from any of these loans other than the documents we went through at the Deposition. See Depo. Tr. 124:3-7, attached as part of **Exhibit 13**.

34.     At the Deposition, I asked Kane if he would have any records other than the bank statements or credit card statements regarding his use of any of the loan funds that we had discussed, to which Kane testified "Not to my knowledge, no." See Depo. Tr. 202:24-203:2, attached as part of **Exhibit 13**.

35.     At the Deposition, I asked Kane if he had any other records other than the bank statements or credit card statements, he had produced that would show his use of his earned wages and salary, to which Kane testified "Not that I know of, no." See Depo. Tr. 203:3-7, attached as part of **Exhibit 13**.

36.     At the Deposition, Kane admitted to not creating or maintaining a personal ledger documenting his receipt and use of the various loan proceeds he received. See Depo. Tr. 105:25-106:7, attached as part of **Exhibit 13**.

37. On March 18, 2021, Kane executed the "Declaration of Evander Kane in Support of Debtor's Opposition to Motion to Convert and for Appointment of Chapter 11 Trustee", filed in the Bankruptcy Case at Docket 65-1, admitting that gambling "has been an issue in my past and it would be inaccurate to pretend it has not had a negative effect on my life, financially and otherwise." A true and correct copy of this declaration is attached hereto as **Exhibit 15**. Kane's bankruptcy schedules show that in the year preceding his Petition Date, he estimates gambling losses of $1,500,000.

38. In Kane's Initial Interrogatory Responses, in response to a request of Kane to identify the extent of his gambling losses from January 1, 2016, to present, including (i) the casino, online service, and/or bookie at which said gambling losses were incurred, (ii) the date of said gambling losses, (iii) the amount of the gambling losses, and (iv) when applicable, the source of funds utilized by Kane to repay said gambling losses, Kane responded under oath that:

> Where appropriate, responsive facts are the gambling losses were primarily incurred with bookies and were a result of gambling on football, baseball, and basketball games. Occasionally, Kane gambled at casinos, which issued him markers representing line of credit with which to gamble. Typically, Kane would withdraw a sum of cash from his bank account for use in gambling. Typically, the gambling in casinos was on baccarat. The results of his bets were settled in cash. The amounts listed are Kane's best estimate of his losses. He did not keep a regular tally of his wins and losses.

See **Exhibit 8**, Interrogatory No. 16.

39. During the Deposition, I examined Kane on his gambling losses. A true and correct copy of the cover page, pages 13-20, 58, 90 and the court reporter's certificate are attached hereto as **Exhibit 16**. In response to the questions I asked, Kane testified that:

    a.    he "had a gambling problem." See Depo. Tr. 58:13, attached as part of **Exhibit 16**.

    b.    he does not consider himself a professional gambler. See Depo. Tr. 58:10-23, attached as part of **Exhibit 16**.

    c.    he "didn't keep a document and tally" of his wins and losses when it came to gambling. See Depo. Tr. 13:19-15:7, attached as part of **Exhibit 16**.

    d.    he did not maintain any "documented" records relating to his dealings with

his bookies, but "would know what [he] owe[s] them in [his] head or what would be up in [his] head". See Depo. Tr. 15:8-21, attached as part of **Exhibit 16**.

e.   he could not identify any of the bookies that he used. See Depo. Tr. 15:22-23, attached as part of **Exhibit 16**.

f.   other than what is in his head, he has no records regarding what exactly the bet was, when it took place, how much, how much he would have won or how much he would have lost. See Depo. Tr. 15:24-16:3, attached as part of **Exhibit 16**.

g.   other than the bank statements produced by Kane, he would have no other records that would document from what bank account he would have withdrawn funds or transferred funds for purposes of gambling. See Depo. Tr. 16:22-17:19, attached as part of **Exhibit 16**.

h.   sometimes he would deposit his winnings into his bank accounts, sometimes he would not. See Depo. Tr. 17:20-18:3, attached as part of **Exhibit 16**.

i.   other than what the bank statements produced by Kane, he would have no other documents or records that would document winnings that would have been deposited into specific accounts or not deposited at all. See Depo. Tr. 18:4-8, attached as part of **Exhibit 16**.

j.   he could not recall the name of any of the bookies or online bookies he used. See Depo. Tr. 19:1-25, attached as part of **Exhibit 16**.

k.   he has no records that he could look at to verify any losses pertaining to gambling for any year prior to 2020. See Depo. Tr. 20:1-16, attached as part of **Exhibit 16**.

40.   Although Kane testified at the Deposition that the bank statements he provided would be the only records he would have to account for funds withdrawn or transferred for purposes of gambling, through my review of the bank statements produced by Kane for 2020, I have been unable to substantiate Kane's $1,500,000 in gambling losses identified on his amended statement of

financial affairs. My review of the bank statements produced takes into consideration two entries to "Clark County District Attorney" which Kane testified at the 2004 Exam were used to pay off a casino marker, **Exhibit 17**, 2004 Tr. 85:1-12, as well as several entries that contain the identifier "Gigadat Inc.," which Kane testified at the Initial 341 Meeting was associated with gambling, **Exhibit 18**, 341 Tr. 27:17-28:8.

41.     Also at the Deposition, I had the opportunity to reexamine Kane on his use of the loan proceeds from the Individual Loans in light of the passage of time from the 2004 Exam. A true and correct copy of cover page, pages 143-152, and the court reporter's certificate are attached hereto as **Exhibit 19**. For each of the specific Individual Loans, Kane testified that:

a.      he incurred the loan from Hebron Shyng "not later than 2018" but was "not sure exactly when" and he is not aware of any documents that would support what he used the loan funds he received from Hebron Shyng for. See Depo. Tr. 147:7-149:8, attached as part of **Exhibit 19**.

b.      he is not aware of any documents that would support what he used the loan funds received from Raj Banghu for. See Depo. Tr. 149:9-12, attached as part of **Exhibit 19**.

c.      he has no documents that would support what he used the loan funds that he received from Tony Veltri for. See Depo. Tr. 149:18-150:11, attached as part of **Exhibit 19**.

d.      he has no documentation on the loan proceeds that he received from Pete Gianakas including documentation that would support what he used said loan proceeds for. See Depo. Tr. 150:12-151:1, attached as part of **Exhibit 19**.

e.      to his knowledge he has no documents that would support what he used the loan proceeds he received from Mike Lispti for and is unsure of the dates in which he incurred said debt. See Depo. Tr. 151:2-19, attached as part of **Exhibit 19**.

f.      he does not know the exact date in which he incurred the loan(s) with Davis Sanchez and has no documentation that would support what he used the loan

1                 proceeds that he received from Davis Sanchez for. <u>See</u> Depo. Tr. 151:20-

2                 152:9, attached as part of **Exhibit 19**.

3        42.     Also at the Deposition, I extensively walked Kane through the limited bank

4 statements that he did produce for his identified accounts and proceeded to ask him several questions

5 regarding certain transfers/withdrawals and deposits. A true and correct copy of the cover page,

6 pages 154-200, and the court reporter's certificate are attached hereto as **Exhibit 20**.

7        43.     As it relates specifically to Kane's Royal Bank of Canada 0532 account and 5955

8 account, there were many instances where money was withdrawn, and an "online transfer" is

9 indicated. A true and correct copy of the relevant excerpts of the bank statements produced by Kane

10 for the 0532 account are attached hereto as **Exhibit 21**. A true and correct copy of the relevant

11 excerpts of the bank statements produced by Kane for the 5955 account are attached hereto as

12 **Exhibit 22**. Where an "online transfer" is indicated, Kane testified that "to my knowledge I believe

13 it had to stay within the RBC account somewhere or be paying off a credit card." <u>See</u> Depo. Tr.

14 172:10-15, attached as part of **Exhibit 20**. My review of the bank statements produced by Kane,

15 and attached hereto as **Exhibits 21** and **22**, show that in some instances a reference number is

16 provided and the same can be matched between the two accounts to confirm that the funds were

17 transferred between Kane's 0532 and 5955 account. <u>See</u> Depo. Tr. 172:18-173:16, attached as

18 **Exhibit 20**; <u>compare</u> **Exhibit 22** at January 17, 2020, Ref -4130 <u>with</u> **Exhibit 21** at January 17,

19 2020, Ref -4130. However, in many instances I was unable to perform this sort of tracing and match

20 up the reference numbers that were provided on the bank statements produced by Kane. <u>Compare</u>

21 **Exhibit 22** at January 17, 2020, Ref -8989, -1588, and -8760, <u>with</u> **Exhibit** 21 at January 17, 2020.

22 When I questioned Kane regarding this, Kane testimony was that he did not know where the money

23 was being transferred too. Specifically, as to each instance of an unexplained "Online Banking

24 transfer" or "Cash withdrawal" out of the 5955 account, Kane testified that he did not know where

25 the money was being transferred too for the following:

26               a.    $48,500 online transfer out of the 5955 account on October 25, 2019. <u>See</u>

27                    Depo. Tr. 187:4-7, attached as part of **Exhibit 20**; **Exhibit 22** at 4.

28               b.    $15,000 online banking transfer out of the 5955 account on January 3, 2020.

| | | |
|---|---|---|
| 1 | | *See* Depo. Tr. 187:22-188:1, attached as part of **Exhibit 20**; **Exhibit 22** at 9. |
| 2 | c. | $10,000 online banking transfer out of the 5955 account on January 8, 2020. |
| 3 | | *See* Depo. Tr. 188:2-5, attached as part of **Exhibit 20**; **Exhibit 22** at 9. |
| 4 | d. | three separate online banking transfers totaling $98,000 out of the 5955 |
| 5 | | account on January 17, 2020. *See* Depo. Tr. 171:15-19, attached as part of |
| 6 | | **Exhibit 20**; **Exhibit 22** at 10. |
| 7 | e. | two separate online banking transfers totaling $8,617.56 out of the 5955 |
| 8 | | account on March 23, 2020. *See* Depo. Tr. 177:9-16, attached as part of |
| 9 | | **Exhibit 20**; **Exhibit 22** at 16-. |
| 10 | f. | $1,000 online banking transfer out of the 5955 account on March 30, 2020. |
| 11 | | *See* Depo. Tr. 177:21-24, attached as part of **Exhibit 20**; **Exhibit 22** at 16. |
| 12 | g. | $25,000 online banking transfer out of the 5955 account on April 17, 2020. |
| 13 | | *See* Depo. Tr. 180:10-13, attached as part of **Exhibit 20**; **Exhibit 22** at 19. |
| 14 | h. | two separate "Cash withdrawal BR to BR" totaling $15,000 out of the 5955 |
| 15 | | account on April 27, 2020. *See* Depo. Tr. 188:14-181:1, attached as part of |
| 16 | | **Exhibit 20**; **Exhibit 22** at 19-20. |
| 17 | i. | $65,258.22 online banking transfer out of the 5955 account on April 27, 2020. |
| 18 | | *See* Depo. Tr. 181:2-7, attached as part of **Exhibit 20**; **Exhibit 22** at 20. |
| 19 | j. | $1,196.09 online banking transfer out of the 5955 account on April 28, 2020. |
| 20 | | *See* Depo. Tr. 181:8-11, attached as part of **Exhibit 20**; **Exhibit 22** at 20. |
| 21 | k. | $45,000 "Cash withdrawal BR to BR" out of the 5955 account on May 14, |
| 22 | | 2020. *See* Depo. Tr. 181:1-23, attached as part of **Exhibit 20**; **Exhibit 22** at |
| 23 | | 23. |
| 24 | l. | $6,674.90 online transfer out of the 5955 account on May 25, 2020. *See* |
| 25 | | Depo. Tr. 181:24-182:4, attached as part of **Exhibit 20**; **Exhibit 22** at 24. |
| 26 | m. | $30,000 "Cash withdrawal BR to BR" out of the 5955 account on July 10, |
| 27 | | 2020. *See* Depo. Tr. 183:22-25, attached as part of **Exhibit 20**; **Exhibit 22** at |
| 28 | | 28. |

| | | |
|---|---|---|
| 1 | n. | $57,216.73 withdrawal out of the 5955 account on August 20, 2020. <u>See</u> |
| 2 | | Depo. Tr. 184:8-11, attached as part of **Exhibit 20**; **Exhibit 22** at 31. |
| 3 | o. | $100,000 "Cash withdrawal BR to BR" out of the 5955 account on September |
| 4 | | 9, 2020. <u>See</u> Depo. Tr. 184:16-19, attached as part of **Exhibit 20**; **Exhibit 22** |
| 5 | | at 32. |

6  Similarly, as to each instance of an unexplained "Online Banking transfer" or "Cash withdrawal"

7  out of the 0532 account, Kane testified that he did not know where the money was being transferred

8  too for the following:

| | | |
|---|---|---|
| 9 | p. | $40,000 "funds transfer" out of the 0532 account on November 8, 2019. <u>See</u> |
| 10 | | Depo. Tr. 190:1-4, attached as part of **Exhibit 20**; **Exhibit 21** at 4. |
| 11 | q. | $26,623.06 withdrawal out of the 0532 account on November 29, 2019. <u>See</u> |
| 12 | | Depo. Tr. 190:1-8, attached as part of **Exhibit 20**; **Exhibit 21** at 5. |
| 13 | r. | three separate online banking foreign exchange transfers totaling $50,000 out |
| 14 | | of the 0532 account on January 17, 2020. <u>See</u> Depo. Tr. 188:6-12, attached |
| 15 | | as part of **Exhibit 20**; **Exhibit 21** at 9. |
| 16 | s. | $38,977.71 withdrawal out of the 0532 account on October 14, 2020. <u>See</u> |
| 17 | | Depo. Tr. 189:8-11, attached as part of **Exhibit 20**; **Exhibit 21** at 24. |

18  Based on the foregoing, Kane has admitted to not knowing and having no documentation regarding

19  where $526,463.50 and $155,600.77 worth of funds out of the 5955 and 0532 Royal Bank of Canada

20  accounts, respectively, was transferred too.

21         44.    In addition to the unexplained "Online transfers" and "Cash withdrawals" identified

22  in the preceding paragraph, my review of the bank statements produced by Kane for the 5955 and

23  0532 Royal Bank of Canada accounts revealed several instances of unexplained deposits.  When I

24  questioned Kane about these deposits at the Deposition, Kane's testimony was that he did not know

25  what the source of these deposits were or had no documentation to support any speculative guess:

| | | |
|---|---|---|
| 26 | a. | $50,000 deposit into the 5955 account on October 7, 2019. <u>See</u> Depo. Tr. |
| 27 | | 186:17-20, attached as part of **Exhibit 20**; **Exhibit 22** at 2. |
| 28 | b. | $10,000 deposit into the 5955 account on October 16, 2019. <u>See</u> Depo. Tr. |

| | | |
|---|---|---|
| 1 | | 186:21-24, attached as part of **Exhibit 20**; **Exhibit 22** at 4. |
| 2 | c. | $40,000 deposit into the 5955 account on October 18, 2019. <u>See</u> Depo. Tr. |
| 3 | | 186:25-187:3, attached as part of **Exhibit 20**; **Exhibit 22** at 2. |
| 4 | d. | $35,000 deposit into he 5955 account on November 29, 2019. <u>See</u> Depo. Tr. |
| 5 | | 187:12-15, attached as part of **Exhibit 20**; **Exhibit 22** at 6. |
| 6 | e. | $25,100 deposit into the 5955 account on February 4, 2020. <u>See</u> Depo. Tr. |
| 7 | | 174:15-175:9, attached as part of **Exhibit 20**; **Exhibit 22** at 11. |
| 8 | f. | $30,000 deposit into the 5955 account on February 5, 2020. <u>See</u> Depo. Tr. |
| 9 | | 175:10-14, attached as part of **Exhibit 20**; **Exhibit 22** at 11. |
| 10 | g. | $1,118.23 deposit into the 5955 account on March 26, 2020. <u>See</u> Depo. Tr. |
| 11 | | 177:17-20, attached as part of **Exhibit 20**; **Exhibit 22** at 16. |
| 12 | h. | $100,000 deposit into the 5955 account on March 31, 2020. <u>See</u> Depo. Tr. |
| 13 | | 177:25-180:1, attached as part of **Exhibit 20**; **Exhibit 22** at 17. |
| 14 | i. | $50,000 deposit into the 5955 account on May 14, 2020. <u>See</u> Depo. Tr. |
| 15 | | 181:12-17, attached as part of **Exhibit 20**; **Exhibit 22** at 23. |
| 16 | j. | $9,694.90 deposit into the 5955 account on May 26, 2020. <u>See</u> Depo. Tr. |
| 17 | | 182:5-8, attached as part of **Exhibit 20**; **Exhibit 22** at 24. |
| 18 | k. | $1,000 deposit into the 5955 account on June 30, 2020. <u>See</u> Depo. Tr. 182:9- |
| 19 | | 12, attached as part of **Exhibit 20**; **Exhibit 22** at 26. |
| 20 | l. | $850 deposit into the 5955 account on July 3, 2020. <u>See</u> Depo. Tr. 182:13- |
| 21 | | 15, attached as part of **Exhibit 20**; **Exhibit 22** at 26. |
| 22 | m. | $100,000 deposit into the 5955 account on July 9, 2020. <u>See</u> Depo. Tr. |
| 23 | | 182:16-183:21, attached as part of **Exhibit 20**; **Exhibit 22** at 27. |
| 24 | n. | $144,664.71 deposit into the 5955 account on August 17, 2020. <u>See</u> Depo. |
| 25 | | Tr. 184:1-4, attached as part of **Exhibit 20**; **Exhibit 22** at 31. |
| 26 | o. | $100,000 deposit into the 5955 account on August 20, 2020. <u>See</u> Depo. Tr. |
| 27 | | 184:5-7, attached as part of **Exhibit 20**; **Exhibit 22** at 31. |
| 28 | p. | $88,070 deposit into the 5955 account on September 9, 2020. <u>See</u> Depo. Tr. |

| | | |
|---|---|---|
| 1 | | 184:12-15, attached as part of **Exhibit 20**; **Exhibit 22** at 32. |
| 2 | q. | $10,000 deposit into the 5955 account on September 16, 2020. <u>See</u> Depo. Tr. |
| 3 | | 184:20-25, attached as part of **Exhibit 20**; **Exhibit 22** at 34. |
| 4 | r. | $3,500 deposit into the 5955 account on October 5, 2020. <u>See</u> Depo. Tr. |
| 5 | | 185:1-4, attached as part of **Exhibit 20**; **Exhibit 22** at 36. |
| 6 | s. | $9,500 deposit into the 5955 account on October 5, 2020. <u>See</u> Depo. Tr. |
| 7 | | 185:5-8, attached as part of **Exhibit 20**; **Exhibit 22** at 36. |
| 8 | t. | two deposits in the amount of $131,000 into the 5955 account on October 14, |
| 9 | | 2020. <u>See</u> Depo. Tr. 185:9-13, attached as part of **Exhibit 20**; **Exhibit 22** at |
| 10 | | 38. |
| 11 | u. | $169,854.48 deposit into the 0532 account on December 31, 2019. <u>See</u> Depo. |
| 12 | | Tr. 190:9-12, attached as part of **Exhibit 20**; **Exhibit 21** at 7. |
| 13 | v. | $29,802.95 deposit into the 0532 account on February 14, 2020. <u>See</u> Depo. |
| 14 | | Tr. 188:17-20, attached as part of **Exhibit 20**; **Exhibit 21** at 11. |
| 15 | w. | $40,056.68 deposit into the 0532 account on August 20, 2020. <u>See</u> Depo. Tr. |
| 16 | | 188:21-189:7, attached as part of **Exhibit 20**; **Exhibit 21** at 21. |
| 17 | x. | $30,000 deposit into the 0532 account on December 1, 2020. <u>See</u> Depo. Tr. |
| 18 | | 189:12-15, attached as part of **Exhibit 20**; **Exhibit 21** at 26. |

Based on the foregoing, Kane has admitted to not knowing and having no documentation regarding where $939,497.84 and $279,410.48 worth of deposits into the 5955 and 0532 Royal Bank of Canada accounts, respectively, came from or for what purpose.

45.     In addition to the two Royal Bank of Canada accounts ending in 5955 and 0532, I have personally reviewed the bank statements produced by Kane for his Wells Fargo account ending in 1607.  A true and correct copy of the relevant excerpts from the bank statements associated with Kane's Wells Fargo account ending in 1607 are attached hereto as **Exhibit 23**  At the Deposition, I asked Kane several questions regarding certain deposits into his Wells Fargo 1607 account.  A true and correct copy of the cover page, pages 154, 156, 157, 159, 161, 163, and 166-169, and the court reporter's certificate are attached hereto as **Exhibit 24**  My review of the Wells Fargo 1607 account

statements produced by Kane revealed a total of $307,826.61 in deposits from unidentified sources. When I asked Kane questions regarding these deposits, his testimony was he could not recall:

    a.    $120,000 e-deposit on January 8, 2020. <u>See</u> Depo. Tr. 154:6-12, attached as part of **Exhibit 24**; **Exhibit 23** at 5.

    b.    $15,060 e-deposit on February 10, 2020. <u>See</u> Depo. Tr. 156:24-157:2, attached as part of **Exhibit 24**; **Exhibit 23** at 12.

    c.    $37,000 e-deposit on February 24, 2020. <u>See</u> Depo. Tr. 157:17-24, attached as part of **Exhibit 24**; **Exhibit 23** at 12.

    d.    $3,176.33 e-deposit on March 16, 2020. <u>See</u> Depo. Tr. 159:5-8, attached as part of **Exhibit 24**; **Exhibit 23** at 18.

    e.    $9,005.72 e-deposit on April 17, 2020. <u>See</u> Depo. Tr. 161:19-21, attached as part of **Exhibit 24**; **Exhibit 23** at 21.

    f.    $6,600 e-deposit on August 24, 2020. <u>See</u> Depo. Tr. 163:22-24, attached as part of **Exhibit 24**; **Exhibit 23** at 42.

    g.    $40,442.19 deposit on October 30, 2020. <u>See</u> Depo. Tr. 166:4-6, attached as part of **Exhibit 24**; **Exhibit 23** at 56.

    h.    $1,033 deposit on November 6, 2020. <u>See</u> Depo. Tr. 167:5-7, attached as part of **Exhibit 24**; **Exhibit 23** at 61.

    i.    $9,000 e-deposit on November 24, 2020. <u>See</u> Depo. Tr. 167:24-1, attached as part of **Exhibit 24**; **Exhibit 23** at 62.

    j.    two e-deposits totaling $6,000 on November 27, 2020. <u>See</u> Depo. Tr. 168:27, attached as part of **Exhibit 24**; **Exhibit 23** at 62.

    k.    $1,500 e-deposit on November 30, 2020. <u>See</u> Depo. Tr. 168:15-17, attached as part of **Exhibit 24**; **Exhibit 23** at 62.

    l.    $3,100 e-deposit on December 1, 2020. <u>See</u> Depo. Tr. 168:18-20, attached as part of **Exhibit 24**; **Exhibit 23** at 67.

    m.    $15,000 e-deposit on December 10, 2020. <u>See</u> Depo. Tr. 168:25-169:2, attached as part of **Exhibit 24**; **Exhibit 23** at 67.

| | | |
|---|---|---|
| 1 | n. | $5,000 e-deposit on December 11, 2020. <u>See</u> Depo. Tr. 169:3-5, attached as |
| 2 | | part of **Exhibit 24**; **Exhibit 23** at 67. |
| 3 | o. | $9,009.37 e-deposit on December 14, 2020. <u>See</u> Depo. Tr. 169:6-8, attached |
| 4 | | as part of **Exhibit 24**; **Exhibit 23** at 67. |
| 5 | p. | $9,900 e-deposit on December 22, 2020. <u>See</u> Depo. Tr. 169:12-14, attached |
| 6 | | as part of **Exhibit 24**; **Exhibit 23** at 69. |
| 7 | q. | $11,000 e-deposit on January 7, 2021. <u>See</u> Depo. Tr. 169:15-18, attached as |
| 8 | | part of **Exhibit 24**; **Exhibit 23** at 73. |

46.     The last bank statements I reviewed and examined Kane on at the Deposition were the bank statements that Kane produced associated with his two Scotia Bank accounts ending in 28 and 87.  In many instances, these statements showed an entry identified as "MB-transfer to" or the equivalent thereof.  Each time I asked Kane where these certain funds were being transferred too, Kane was unable to explain where the money was going.  On one occasion, the bank statements showed a $123,000 deposit Kane received on March 7, 2020, from Alexandra Duggan.  However, when asked about this deposit, Kane could not remember who Alexandra Duggan was.  A true and correct copy of the cover page, pages 195-199, and the court reporter's certificate are attached hereto as **Exhibit 25**.  A true and correct copy of the relevant excerpts of the bank statements produced by Kane for Scotia Bank account ending in 28 is attached hereto as **Exhibit 26**.  A true and correct copy of the relevant excerpts of the bank statements produced by Kane for Scotia Bank account ending in 87 is attached hereto as **Exhibit 27**.

47.     As part of the documents produced in advance of the 2004 Exam, Kane produced copies of his 2018 and 2019 U.S. Individual Income Tax Return forms, true and correct copies of which are attached hereto as **Exhibit 28**.  Kane's 2018 Tax Return shows that his total income in 2018 was $8,424,166, or $2,000,000 more than what Kane identified on his amended statement of financial affairs.  Kane's 2019 Tax Return shows that his total income in 2019 was $6,840,169.  On his amended statement of financial affairs, Kane estimated that his 2020 gross income would be $7,000,000.

48.     At the 2004 Exam, I asked Kane questions regarding his historic salary and wages

and use of the same. A true and correct copy of the cover page, pages 15-20, and 99-102, and the court reporter's certificate are attached hereto as **Exhibit 29**. Kane testified that:

a. he has been employed as a professional ice hockey player since 2009. <u>See</u> 2004 Tr. 15:4-9, attached as part of **Exhibit 29**.

b. at the time of initiating his bankruptcy, he was employed by the San Jose Sharks pursuant to "National Hockey League Standard Player's Contract" dated May 25, 2019. <u>See</u> 2004 Tr. 15:10-16:1, attached as part of **Exhibit 29**.

c. under the terms of the Player's Contract, he was to receive base compensation in the amount of $37,000,000 over the course of seven seasons. <u>See</u> 2004 Tr. 16:2-8, attached as part of **Exhibit 29**.

d. in addition to the base compensation, he was to receive a $12,000,000 signing bonus spread out across five years. <u>See</u> 2004 Tr. 16:9-24, attached as part of **Exhibit 29**.

e. as of the date of initiating his bankruptcy case, he had received all sums owed to him under the Player's Contract at that time. <u>See</u> 2004 Tr. 19:8-21, attached as part of **Exhibit 29**.

f. he does not recall exactly what he utilized the money he received under his Player's Contract for. <u>See</u> 2004 Tr. 20:10-12; 100:20-102:9, attached as part of **Exhibit 29**.

g. prior to his current Player's Contract, he had a six year contract at $5,250,000 per year, for a total of $31,500,000. <u>See</u> 2004 Tr. 99:13-19.

Similarly, at the Initial 341 Exam, Kane testified that he "ha[s] no idea" what he has primarily utilized his salary and wages for. <u>See</u> 341 Tr. 79:19-80:3, attached as **Exhibit 30**.

49. Based on Kane's Amended Discovery Responses as well as his testimony at the Initial 341 Meeting, 2004 Exam, and Deposition, as reflected in the attached **Exhibit 9, Exhibit 1, Exhibit 4**, and **Exhibit 19**, Kane has admitted that he did not provide any documents supporting disposition of funds totaling $2,150,000 that he received from creditors as follows: (i) $150,000 – Davis Sanchez, (ii) $430,000 – Hebron Shyng, (iii) $750,000 – Mike Lispti, (iv) $400,000 – Pete

Gianakas, (v) $100,000 – Raj Banghu, and (vi) $320,000 – Tony Veltri. <u>See</u> paragraphs 8, 14, 19, and 40.

50.      Based on Kane's testimony at the 2004 Exam and the Deposition, as reflected in the attached **Exhibit 5**, **Exhibit 13**, and **Exhibit 14**, Kane has admitted that he did not provide any documents supporting disposition of funds totaling approximately $8,574,994.43 that he received from various "private lenders" in the recent years leading up to his bankruptcy filing. <u>See</u> paragraphs 15, 29, and 30.

51.      Based on Kane's Initial Interrogatory Responses and his testimony at the Deposition, as reflected in the attached **Exhibit 8** and **Exhibit 16**, Kane has admitted to not maintaining any records or documentation supporting his gambling wins or loses, other than what is in his head, and cannot identify any bookies that he used. <u>See</u> paragraphs 37, 38, and 39.

52.      Based on representations made by Kane through his counsel as well as his testimony at the Deposition, as reflected in the attached **Exhibit 11** and **Exhibit 12**, Kane has admitted to not maintaining or preserving bank statements and other documentation associated with his various bank accounts and credit cards for any year prior to 2019 and only a minimal amount of bank statements and documentation for the year(s) 2020 and 2019. <u>See</u> paragraphs 24, 25, and 26.

53.      Based on Kane's testimony at the Initial 341 Meeting, 2004 Exam, and Deposition, as reflected in the attached **Exhibit 30**, **Exhibit 29**, and **Exhibit 13**, Kane admitted to not having documents and being unable to identify what he primarily spent his salary and wages on. <u>See</u> paragraphs 34, 46, and 47.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed on this 17th day of November, 2022, in Tampa, Florida.

*/s/ Andrew J. Ghekas*
Andrew J. Ghekas

# LIST OF EXHIBITS

| Exhibit No. | Description of Exhibits |
|---|---|
| 1. | Initial 341 Meeting Transcript, Pages 55-60 |
| 2. | Initial 341 Meeting Transcript, Pages 21-23 |
| 3. | Initial 341 Meeting Transcript, Page 78 |
| 4. | 2004 Exam Transcript, Pages 68-71 |
| 5. | 2004 Exam Transcript, Pages 31-34 and 65-68 |
| 6. | Initial Production Responses |
| 7. | Initial Admission Responses |
| 8. | Initial Interrogatory Responses |
| 9. | Defendant's Amended Responses to Plaintiff's First Request for Production of Documents, dated February 28, 2022 |
| 10. | February 2, 2022 and February 10, 2022, between Andrew J. Ghekas, Esquire and Stephen D. Finestone, Esquire |
| 11. | E-mails between Ryan A. Witthans, Esquire and Andrew J. Ghekas, Esquire, regarding Kane's documents responsive to request for production |
| 12. | Deposition Transcript, Pages 34, 38, 84, 102, 170, 174, 186, 189, and 200-202 |
| 13. | Deposition Transcript, Pages 22, 37, 51, 59-64, 67-69, 72-73, 77-78, 80-94, 102-119, 123-124, and 202-203 |
| 14. | Closing Statements |
| 15. | Declaration of Evander Kane in Support of Debtor's Opposition to Motion to Convert and for Appointment of Chapter 11 Trustee, filed in the Bankruptcy Case at Docket 65-1, dated March 18, 2021 |
| 16. | Deposition Transcript, Pages 13-20, 58, 90 |
| 17. | 2004 Exam Transcript, Page 85 |
| 18. | Initial 341 Meeting Transcript, Pages 27-28 |
| 19. | Deposition Transcript, Pages 143-152 |
| 20. | Deposition Transcript, Pages 154-200 |
| 21. | Bank Statements produced by Kane for the 0532 account |
| 22. | Bank Statements produced by Kane for the 5955 account |
| 23. | Excerpts from the Bank Statements associated with Kane's Wells Fargo account ending in 1607 |
| 24. | Deposition Transcript, Pages 154, 156, 157, 159, 161, 163, and 166-169 |
| 25. | Deposition Transcript, Pages 195-199 |
| 26. | Excerpts of the Bank Statements produced by Kane for Scotia Bank account ending in 28 |
| 27. | Excerpts of the Bank Statements produced by Kane for Scotia Bank account ending in 87 |
| 28. | 2018 and 2019 U.S. Individual Income Tax Return forms |
| 29. | 2004 Exam Transcript, Pages 15-20 and 99-102 |
| 30. | Initial 341 Meeting Transcript, Pages 79-80 |

# EXHIBIT "15"

Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
Tel.:    (415) 616-0466
Fax:    (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: jhayes@fhlawllp.com
Email: rwitthans@fhlawllp.com

Attorneys for Debtor,
Evander Frank Kane

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtor. | Case No. 21-50028-SLJ<br>Chapter 7<br><br>**DECLARATION OF EVANDER KANE IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION TO CONVERT AND FOR APPOINTMENT OF CHAPTER 11 TRUSTEE**<br><br>**Date:** March 30, 2021<br>**Time:** 11:00 a.m.<br>Via Zoom |

I, Evander Kane, declare as follows:

1.      I am 29 years old.  I am a professional hockey player, having started playing professional hockey at the age of 18.  I currently am under contract with the San Jose Sharks (the "Sharks").  I have played for the Sharks since 2018. I live in San Jose, California with my wife and our nine-month-old daughter.  I make this declaration in support of my opposition to the Motion to Convert to Chapter 11 and for Appointment of a Chapter 11 Trustee (the "Motion").  I could and would testify competently to the matters set forth below.

///

///

**Background to My Bankruptcy Filing:**

2.      Over several years I borrowed large sums from various lenders. With respect to Zions Bancorporation ("Zions"), which is the creditor bringing the Motion, on or about August 9, 2018, I signed several documents in connection with the loan. I executed a Business Loan Agreement with Zions providing for its making of the loan. Attached as Exhibit A is a true and correct copy of the Business Loan Agreement. I signed promissory notes and other documents related to the payment of the Zions' loan. I executed similar documents with other lenders and provided them with UCC-1 financing statements and other document related to their security for the loans. The loan documents did not contain any consumer disclosures or protections.

3.      These loans were arranged by Sure Sports, LLC ("Sure Sports") and its principal, Leon McKenzie ("McKenzie"). I believed at the time that Sure Sports/McKenzie were acting as a broker on my behalf and acting in my best interests. I paid large fees to Sure Sports for each loan, with the fees based upon the amount of a loan. By way of example, in connection with the $4.25 million loan from Zions, I paid Sure Sports approximately $67,000 as a fee.

4.      I later learned that at the same time as I was paying fees to Sure Sports for arranging various loans, the lenders were separately paying Sure Sports a fee for directing the loans their way. In fact, I am informed and believe, that after some of the loans went into default, Sure Sports and Mr. McKenzie provided advice to the lenders on how to collect on the loans, including recommending California counsel and suggested that all the lenders agree on a global approach to collecting, including contacting the Sharks and garnishing my wages. Sure Sports' conduct forms the basis of a cross-claim I filed against it in litigation pending in Miami, Florida.

5.      Because of concern over my ability to meet my debt obligations, I hired John Fiero of Pachulski Stang Ziehl & Jones in October 2019. The goal was to work with Mr. Fiero to come to an agreement with my primary creditors to provide for restructuring of my debts. The primary creditors/lenders were Zions, Centennial Bank, Professional Bank and South River Capital (collectively the "Lenders"). I also retained a Certified Public Accountant recommended

by Mr. Fiero to assist me and Mr. Fiero in figuring out what might be feasible in terms of a payment plan.

6. As discussed in Mr. Fiero's accompanying declaration, the effort to resolve things with the Lenders was unsuccessful. They filed suit against me and pursued aggressive collection efforts, including asserting that they had a security interest in my salary and were entitled to direct receipt of my paychecks.

7. On top of which, due to the Covid-19 pandemic, a portion of the National Hockey League season for 2019-2020 was canceled, which decreased my income for the season. I only receive salary for games played by the Sharks, and approximately 14 games were canceled in the 2019-2021 season.

8. Based on the ongoing litigation by the Lenders, including a lawsuit naming the Sharks as an additional defendant filed by Centennial in District Court in Miami, Florida, and the failure to make any progress in resolving things with the Lenders, I retained Finestone Hayes LLP to file the current bankruptcy case for me.

**Events Since Filing Bankruptcy:**

9. Since filing this case, I have worked diligently in responding to numerous requests for information from the Chapter 7 trustee, Fred Hjelmsted (the "Trustee") and the Office of the United States Trustee ("UST"). Among other things, I provided: bank statements for all bank accounts going back to January 2020, credit card statements, prior years' federal and state tax returns, mortgage statements, insurance information, information regarding various business entities and business ventures, a breakdown of the use of loan proceeds, an explanation of transactions reflected in bank statements and credit card statements, lease agreements, loan agreements and various other miscellaneous documents reflecting my debts or financial history.

10. I also provided access to my home in San Jose and real property in Vancouver, British Columbia to realtors selected by the Trustee to opine as to the current value of the real property assets.

11. I accepted the valuations provided by the Trustee's realtors in reaching the settlement with the Trustee regarding the real estate and funds on account. The Trustee has filed

KANE DEC RE MOTION TO CONVERT                                                     3

a motion seeking approval of that settlement and I have already made the first installment payment of $55,000 to the Trustee consistent with the terms of the settlement.

12.     I appeared for my initial Meeting of Creditors, which lasted approximately 2 ½ hours, and appeared for a continued meeting on February 25, 2021.  The continued meeting last approximately 30 minutes, after which time the Trustee concluded the meeting.

13.     Even after the meeting I have continued providing documentation to the Trustee and UST as requested. I have also stipulated with the UST and various creditors to extend the deadlines for filing complaints to determine dischargeability or object to my discharge.

**Response to Various Allegations in the Motion**

14.     The Motion makes various claims or accusations that are incorrect or baseless and I wish to correct the record for the Court.

15.     Regarding my salary with the Sharks, my Schedule I included a lengthy explanation of anticipated salary for the current season.  I believe the Lenders all had received copies of my current contract with the Sharks, which Zions filed with the Motion.  I have also provided copies of my employment contract to the Trustee and UST shortly after filing my case.

16.     The Motion ignores that under the current Collective Bargaining Agreement ("CBA") between the NHL owners and the Players' Association, significant sums are withdrawn from players' paychecks. First, an amount is withheld as an "Escrow".  This amount is related to revenue sharing between the owners and players.  If the league does not hit certain revenue targets for a season, the escrowed funds go back to the owners.  For the year 2020-2021, the escrowed amount is 20% of payroll, which amount is withheld from paychecks.  Due primarily to the Covid-19 pandemic, which limited the numbers of games played and has prevented fan attendance, the league did not hit its revenue targets in the 2019-2020 season and will not hit them for the 2020-2021 season.

17.     In addition to the Escrow amounts, pursuant to an amendment to the CBA signed shortly before the beginning of the current season, an additional amount of salary is withheld as deferred compensation (the "Deferral").  The Deferral withhold is 10%.  The Deferral is to be paid to the players in three equal installments (without interest) in October 2022, 2023 and 2024.

The Escrow and Deferral deductions have a significant effect on my pay. By way of example, I received my first paycheck for the current season at the end of January 2021. The gross earnings for the pay period were $213,905. After Escrow, Deferral, typical payroll deductions such as state and federal income taxes and other incidental deductions, my net pay was $38,709.

18.     Moreover, the players' salary is based upon games played, rather than a simple dividing up of an annual salary into semi-monthly paychecks. The Sharks have played 26 games this season but thus far have had three games postponed due to Covid-19 protocols. The players will not get paid for those games until and unless they are made up in the future.

19.     With respect to my gambling, it has been an issue in my past and it would be inaccurate to pretend it has not had a negative effect on my life, financially and otherwise. I have undergone and continue to receive personal therapy to deal with it and other matters and hope that the issue is behind me.

20.     The Motion is also critical of my pre-bankruptcy investment in tax reduction planning via a conservation easement. The Motion claims I borrowed $2.55 million for a "gamble". This is incorrect. I borrowed $750,000 to invest in the structure pursuant to various private placement memoranda. I was only required to pay an initial fee of $35,000 in connection with the investment, which I was advised should result in a tax refund of approximately $1.8 million. I made this investment at the time as a way to raise funds to pay back creditors. I have provided all the documents related to this investment to the Trustee and UST. If the investment pays off, the funds (beyond the loan amount) would go to the Trustee.

21.     The Motion also claims I was not being truthful by omitting the transfer of two Rolex watches in payment of debt. I did the best job I could in working with my counsel to prepare the initial bankruptcy filings. I did not have a CPA or financial advisor assist in the preparation. I have amended those filings several times to continue to make certain they accurately reflect the required information. At the Meeting of Creditors, I was asked numerous questions about items in my bank statements, which I had provided to the Trustee and UST. Often the entry in question involved payments to various creditors. The questions triggered my memory about repaying debt with the transfer of the watches and that was something I added to

the amended Statement of Financial Affairs. No one asked about any Rolex watches or whether I had ever paid a creditor via transfer of property.

22. The Motion also raised questions about the residence I own with my wife in San Jose (the "San Jose Property"). I provided the Trustee and UST with all documents related to the purchase of the San Jose Property and the debt against it. Lions Properties LLC ("Lions Properties") was the initial purchaser of the San Jose Property. Lions Properties is a limited liability company which my wife and I own. It has no creditors. I also provided the Trustee and UST with documents concerning the formation and ownership of Lions Properties. Lions Properties transferred title to the San Jose Property to me and my wife just before I filed this case. I provided the documents related to the transfer to the Trustee and UST.

23. As noted above, I provided the Trustee's realtor physical access to the San Jose Property during the pandemic despite the fact that I live there with my wife and our young daughter. The Trustee has assessed the value of the San Jose Property, which was not that far off from the value I placed on the Bankruptcy Schedules, and that value formed the basis of my settlement with the Trustee.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of March 2021 in San Jose, California.



Evander F. Kane
Evander F. Kane

KANE DEC RE MOTION TO CONVERT                                    6

# EXHIBIT A

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,250,000.00 | 08-09-2018 | 04-15-2023 | 9001 | CBT-3142664 | 0902799 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Evander Frank Kane
8012 Wiles Road
Coral Springs, FL 33067

**Lender:** ZB, N.A. dba California Bank & Trust
Century City Private Banking
1900 Avenue of the Stars, Suite 2350
Los Angeles, CA 90067-4510

**THIS BUSINESS LOAN AGREEMENT dated August 9, 2018, is made and executed between Evander Frank Kane ("Borrower") and ZB, N.A. dba California Bank & Trust ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of August 9, 2018, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) together with all such Related Documents as Lender may require for the Loan, all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Business Activities.** Borrower maintains an office at 8012 Wiles Road, Coral Springs, FL 33067. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the

Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.**

**Annual Personal Financial Statement.** As soon as available, but in no event later than May 15 of each year, Borrower's personal financial statements and any other financial information requested by Lender, in a form specified by Lender, on an annual basis or at any other time and from time to time upon Lender's request.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, beginning May 15 of each year, Borrower's federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender. If an extension(s) is filed, a copy of the extension(s) must be provided to the Lender within thirty (30) days of the extension(s) filing date.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Additional Requirements.**

**Debt Service Coverage Ratio.** Maintain a Debt Service Coverage Ratio of no less than **1.50** to **1.00**, measured on an annual basis as of December 31 of each year. As used in this Agreement:

"Debt Service Coverage Ratio" is defined as, as of any measurement date, the ratio of (a) Net Cash Available to Service Debt during the consecutive 12-month period ending on such measurement date, to (b) scheduled payments of principal and interest on all Indebtedness of Borrower (including without limitation on the loan evidenced by the Note) during the consecutive 12-month period ending on such measurement date.

"Net Cash Available to Service Debt" is defined as, for any measurement period, net cash flow from all sources available to service debt during such measurement period.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the

amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Deposit Account, Direct Deposit of Salary, Etc., Automatic Debit of Amounts Due.** Open and maintain with Lender a demand deposit account (the "Deposit Account") and arrange for the direct deposit of all salaries, wages, bonuses and other compensation paid to Borrower by any employer, including without limitation the San Jose Sharks, into the Deposit Account, from which Borrower hereby authorizes and instructs Lender to debit any and all sums and amounts due and payable under the Note (including without limitation those amounts set forth on the Payment Schedule attached to the Note) or otherwise in connection with the loan evidenced by the Note, including without limitation principal, accrued and unpaid interest, fees, charges, expenses and costs (including without limitation attorneys' fees).

In addition to and without limiting the generality of any provision in the section entitled "DEFAULT" hereinabove, Borrower hereby acknowledges and agrees that the covenants and agreements of Borrower in this section are a material inducement to Lender's agreement to extend the loan evidenced by the Note to Borrower and its other obligations under this Agreement, the Note and the Related Documents and any breach thereof or termination of the direct deposit arrangement, or Borrower's authorization and instruction to Lender to debit from the Deposit Account any and all payments due from Borrower under the Note, shall constitute an Event of Default.

**Death and Disgrace Insurance.** Maintain a policy of insurance (so-called "death, disgrace, and dishonor policy") against losses arising from the death of Borrower or any disgrace arising from the acts or omissions of Borrower, including without limitation any criminal acts, offensive behavior or other misconduct, which policy shall (i) name Lender as beneficiary or assured, (ii) provide for (A) coverage in an amount no less than $4,250,000.00 for the first year of such policy and in such amounts for subsequent years as Lender may require, but in no event shall such required coverage be less than the outstanding principal amount under the Note and (B) such other terms and conditions as may be required by Lender in its sole discretion and (iii) remain in full force and effect, at Borrower's sole cost and expense, so long as any principal balance is outstanding under the Note or Lender has any obligation to lend thereunder.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or

paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

### Additional Financial Restrictions.

**Indebtedness and Liens.** (1) Except for (a) indebtedness to Lender contemplated by this Agreement and the Note and (b) unsecured debt not exceeding an aggregate amount of **$150,000.00** and secured debt not exceeding an aggregate amount of **$250,000.00**, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will

become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**DEPOSIT ACCOUNT SECURITY.** Borrower hereby grants a security interest to Lender in any and all deposit accounts (checking, savings, money market or time) of Borrower at Lender, now existing or hereinafter opened, to secure the Indebtedness. This includes all deposit accounts Borrower holds jointly with someone else.

**DISPUTE RESOLUTION PROVISION. This Dispute Resolution Provision contains a jury waiver, a class action waiver, and an arbitration clause (or judicial reference agreement, as applicable), set out in four Sections. READ IT CAREFULLY.**

**SECTION 1. GENERAL PROVISIONS GOVERNING ALL DISPUTES.**

**1.1     PRIOR DISPUTE RESOLUTION AGREEMENTS SUPERSEDED. This Dispute Resolution Provision shall supersede and replace any prior "Jury Waiver," "Judicial Reference," "Class Action Waiver," "Arbitration," "Dispute Resolution," or similar alternative dispute agreement or provision between or among the parties.**

**1.2**      "DISPUTE" defined. As used herein, the word "Dispute" includes, without limitation, any claim by either party against the other party related to this Agreement, any Related Document, and the Loan evidenced hereby. In addition, **"Dispute" also includes any claim by either party against the other party <u>regarding any other agreement or business relationship between any of them, whether or not related to the Loan or other subject matter of this Agreement.</u>** "Dispute" includes, but is not limited to, matters arising from or relating to a deposit account, an application for or denial of credit, warranties and representations made by a party, the adequacy of a party's disclosures, enforcement of any and all of the obligations a party hereto may have to another party, compliance with applicable laws and/or regulations, performance or services provided under any agreement by a party, including without limitation disputes based on or arising from any alleged tort or matters involving the employees, officers, agents, affiliates, or assigns of a party hereto.

If a third party is a party to a Dispute (such as a credit reporting agency, merchant accepting a credit card, junior lienholder or title company), each party hereto agrees to consent to including that third party in any arbitration or judicial reference proceeding for resolving the Dispute with that party.

**1.3     Jury Trial Waiver.** Each party <u>waives their respective rights to a trial before a jury in connection with any Dispute</u>, and all <u>Disputes shall be resolved by a judge sitting without a jury.</u> If a court determines that this jury trial waiver is not enforceable for any reason, then at any time prior to trial of the Dispute, but not later than 30 days after entry of the order determining this provision is unenforceable, any party shall be entitled to move the court for an order, as applicable: (A) compelling arbitration and staying or dismissing such litigation pending arbitration ("Arbitration Order") under Section 2 hereof, or (B) staying such litigation and compelling judicial reference under Section 3 hereof.

**1.4     CLASS ACTION WAIVER.** If permitted by applicable law, <u>each party waives the right to litigate in court or an arbitration proceeding any Dispute as a class action, either as a member of a class or as a representative, or to act as a private attorney general.</u>

**1.5     SURVIVAL.** This Dispute Resolution Provision shall survive any termination, amendment or expiration of this Agreement, or any other relationship between the parties.

**SECTION 2. Arbitration IF JURY WAIVER UNENFORCEABLE (EXCEPT CALIFORNIA).** If (but only if) a state or federal court located outside the state of California determines for any reason that the jury trial waiver in this Dispute Resolution Provision is not enforceable with respect to a Dispute, then any party hereto may require that said Dispute be resolved by binding arbitration pursuant to this Section 2 before a single arbitrator. An arbitrator shall have no authority to determine matters (i) regarding the validity, enforceability, meaning, or scope of this Dispute Resolution Provision, or (ii) class action claims brought by either party as a class representative on behalf of others and claims by a class representative on either party's behalf as a class member, which matters may be determined only by a court without a jury. **By agreeing to arbitrate a Dispute, each party gives up any right that party may have to a jury trial, as well as other rights that party would have in court that are not available or are more limited in arbitration, such as the rights to discovery and to appeal.**

Arbitration shall be commenced by filing a petition with, and in accordance with the applicable arbitration rules of, National Arbitration Forum ("NAF") or Judicial Arbitration and Mediation Service, Inc. ("JAMS") ("Administrator") as selected by the initiating party. However, if the parties agree, arbitration may be commenced by appointment of a licensed attorney who is selected by the parties and who agrees to conduct the arbitration without an Administrator. If NAF and JAMS both decline to administer arbitration of the Dispute, and if the parties are unable to mutually agree upon a licensed attorney to act as arbitrator with an Administrator, then either party may file a lawsuit (in a court of appropriate venue outside the state of California) and move for an Arbitration Order. The arbitrator, howsoever appointed, shall have expertise in the subject matter of the Dispute. Venue for the arbitration proceeding shall be at a location determined by mutual agreement of the parties or, if no agreement, in the city and state where Lender or Bank is headquartered. The arbitrator shall apply the law of the state specified in the agreement giving rise to the Dispute.

After entry of an Arbitration Order, the non-moving party shall commence arbitration. The moving party shall, at its discretion, also be entitled to commence arbitration but is under no obligation to do so, and the moving party shall not in any way be adversely prejudiced by electing not to commence arbitration. The arbitrator: (i) will hear and rule on appropriate dispositive motions for judgment on the pleadings, for failure to state a claim, or for full or partial summary judgment; (ii) will render a decision and any award applying applicable law; (iii) will give effect to any limitations period in determining any Dispute or defense; (iv) shall enforce the doctrines of compulsory counterclaim, res judicata, and collateral estoppel, if applicable; (v) with regard to motions and the arbitration hearing, shall apply rules of evidence governing civil cases; and (vi) will apply the law of the state specified in the agreement giving rise to the Dispute. Filing of a petition for arbitration shall not prevent any party from (i) seeking and obtaining from a court of competent jurisdiction (notwithstanding ongoing arbitration) provisional or ancillary remedies including but not limited to injunctive relief, property preservation orders, foreclosure, eviction, attachment, replevin, garnishment, and/or the appointment of a receiver, (ii) pursuing non-judicial foreclosure, or (iii) availing itself of any self-help remedies such as setoff and repossession. The exercise of such rights shall not constitute a waiver of the right to submit any Dispute to arbitration.

Judgment upon an arbitration award may be entered in any court having jurisdiction except that, if the arbitration award exceeds $4,000,000, any party shall be entitled to a de novo appeal of the award before a panel of three arbitrators. To allow for such appeal, if the award (including Administrator, arbitrator, and attorney's fees and costs) exceeds $4,000,000, the arbitrator will issue a written, reasoned decision supporting the award, including a statement of authority and its application to the Dispute. A request for de novo appeal must be filed with the arbitrator within 30 days following the date of the arbitration award; if such a request is not made within that time period, the arbitration decision shall become final and binding. On appeal, the arbitrators shall review the award de novo, meaning that they shall reach their own findings of fact and conclusions of law rather than deferring in any manner to the original arbitrator. Appeal of an arbitration award shall be pursuant to the rules of the Administrator or, if the Administrator has no such rules, then the JAMS arbitration appellate rules shall apply.

Arbitration under this provision concerns a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. If the terms of this Section 2 vary from the Administrator's rules, this Section 2 shall control.

**SECTION 3.     JUDICIAL REFERENCE IF JURY WAIVER UNENFORCEABLE (CALIFORNIA ONLY).** If (but only if) a Dispute is filed in a state or federal court located within the state of California, and said court determines for any reason that the jury trial waiver in this Dispute Resolution Provision is not enforceable with respect to that Dispute, then any party hereto may require that Dispute be resolved by judicial reference in accordance with California Code of Civil Procedure, Sections 638, et seq., including without limitation whether the Dispute is subject to a judicial reference proceeding. **By agreeing to resolve Disputes by judicial reference, each party is giving up any right that party may have to a jury trial.** The referee shall be a retired judge, agreed upon by the parties, from either the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Service, Inc. (JAMS). If the parties cannot agree on the referee, the party who initially selected the reference procedure shall request a panel of ten retired judges from either AAA or JAMS, and the court shall select the referee from that panel. (If AAA and JAMS are unavailable to provide this service, the court may select a referee by such other procedures as are used by that court.) The referee shall be appointed to sit with all of the powers provided by law, including the power to hear and determine any or all of the issues in the proceeding, whether of fact or of law, and to report a statement of decision. The parties agree that time is of the essence in conducting the judicial reference proceeding set forth herein. The costs of the judicial reference proceeding, including the fee for the court reporter, shall be borne equally by the parties as the costs are incurred, unless otherwise awarded by the referee. The referee shall hear all pre-trial and post-trial matters (including without limitation requests for equitable relief), prepare a statement of decision with written findings of fact and conclusions of law, and apportion costs as appropriate. The referee shall be empowered to enter equitable relief as well as legal relief, provide all temporary or provisional remedies, enter equitable orders that are binding on the parties and rule on any motion that would be authorized in a trial, including without limitation motions for summary adjudication. Only for this Section 3, "Dispute" includes matters regarding the validity, enforceability, meaning, or scope of this Section, and (ii) class action claims brought by either party as a class representative on behalf of others and claims by a class representative on either party's behalf as a class member. Judgment upon the award shall be entered in the court in which such proceeding was commenced and all parties shall have full rights of appeal. This provision will not be deemed to limit or constrain Bank or Lender's right of offset, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien Bank or Lender may hold in property or to comply with legal process involving accounts or other property held by Bank or Lender.

Nothing herein shall preclude a party from moving (prior to the court ordering judicial reference) to dismiss, stay or transfer the suit to a forum outside California on grounds that California is an improper, inconvenient or less suitable venue. If such motion is granted, this Section 3 shall not apply to any proceedings in the new forum.

This Section 3 may be invoked only with regard to Disputes filed in state or federal courts located in the State of California. In no event shall the provisions in this Section 3 diminish the force or effect of any venue selection or jurisdiction provision in this Agreement or any Related Document.

**SECTION 4.   Reliance.** Each party (i) certifies that no one has represented to such party that the other party would not seek to enforce a jury waiver, class action waiver, arbitration provision or judicial reference provision in the event of suit, and (ii) acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, material reliance upon the mutual waivers, agreements, and certifications in the four Sections of this DISPUTE RESOLUTION PROVISION.

**INCREASED COSTS.** If any change in a law, rule or regulation, or the interpretation or application thereof, or Lender's compliance with any request, guideline or directive (whether or not having the force of law) of any governmental authority (collectively, a "Change in Law") shall (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against or with respect to the assets of, deposits with or for the account of or credit extended by Lender or (ii) impose on Lender any other condition affecting this Agreement or the loans hereunder or any letter of credit or participation therein and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any loan (or its commitment to make any such loan) or to increase the cost to Lender of issuing or maintaining any letter of credit or to reduce the amount of any sum received or receivable by Lender hereunder, then Borrower will pay to Lender such additional amount as will compensate Lender for such additional costs or reduction. If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on the capital of Lender or Lender's holding company from this Agreement or the loans or letters of credit made or issued by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount as will compensate Lender or Lender's holding company for any such reduction, as set forth in a certificate of Lender describing in reasonable detail the amount or amounts necessary to compensate Lender or its holding company. The amounts and description in such certificate shall be conclusive absent manifest error, and Borrower agrees to pay to Lender the amount shown in such certificate within ten (10) business days after receipt thereof. Failure or delay on the part of Lender to demand compensation pursuant to this section shall not constitute a waiver of Lender's right to demand such compensation.

**WAIVER OF DEFENSES AND RELEASE OF CLAIMS.** The undersigned hereby (i) represents that neither the undersigned nor any affiliate or principal of the undersigned has any defenses to or setoffs against any indebtedness or other obligations owing by the undersigned, or by the undersigned's affiliates or principals, to Lender or Lender's affiliates (the "Obligations"), nor any claims against Lender or Lender's affiliates for any matter whatsoever, related or unrelated to the Obligations, and (ii) releases Lender and Lender's affiliates, officers, directors, employees and agents from all claims, causes of action, and costs, in law or equity, known or unknown, whether or not matured or contingent, existing as of the date hereof that the undersigned has or may have by reason of any matter of any conceivable kind or character whatsoever, related or unrelated to the Obligations, including the subject matter of this Agreement. The foregoing release does not apply, however, to claims for future performance of express contractual obligations that mature after the date hereof that are owing to the undersigned by Lender or Lender's affiliates. As used in this paragraph, the word "undersigned" does not include Lender or any individual signing on behalf of Lender. The undersigned acknowledges that Lender has been induced to enter into or continue the Obligations by, among other things, the waivers and releases in this paragraph.

**DOCUMENT IMAGING.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, and items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this document and the Related Documents, and Lender may destroy or archive the paper originals. The parties hereto (i) waive any right to insist or require that Lender produce paper originals, (ii) agree that such images shall be accorded the same force and effect as the paper originals, (iii) agree that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agree that any executed facsimile (faxed), scanned, or other imaged copy of this document or any Related Document shall be deemed to be of the same force and effect as the original manually executed document.

**NOTICE OF FINAL AGREEMENT. BY SIGNING THIS DOCUMENT THE UNDERSIGNED REPRESENTS AND AGREES THAT; (A) THIS AND THE RELATED DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, (C) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**PLEDGES.** Lender shall at all times have the right to grant security interests in, to pledge and/or to hypothecate all or any portion of its interest

Case: 21-50506   Doc# 639-23   Filed: 03/18/22   Entered: 03/18/22 20:58:52   Page 74 of
of 165

in the Loan, including without limitation as collateral in connection with discount window advances, extensions of daylight credit or master account activity, or other programs of the Federal Reserve System or any Federal Reserve Bank.

**PROHIBITED DRUG LAW ACTIVITIES.** Notwithstanding any other provision in the Note or any other document, agreement or instrument relating to the loan evidenced by the Note or other financial accommodations extended by Lender to Borrower (collectively, the "Loan") or guaranty thereof, whether now existing or hereafter arising (collectively, the "Loan Documents"), regarding the use, occupancy or leasing of all or any portion of real property owned, occupied or used by Borrower (collectively, the "Premises") and without limiting the generality of any of the negative covenants of Borrower in the Loan Documents, Borrower shall not use or occupy, or permit the use or occupancy of, the Premises (or any portion thereof), or enter into any lease, license, sublease, occupancy agreement or other agreement (collectively, "Lease") involving or providing for the use or occupancy of the Premises (or any portion thereof), in any manner that would be a violation of any federal, state or local law relating to the use, sale, possession, cultivation or distribution of any controlled substances, including without limitation any activity (whether for commercial or personal purposes) regulated under the California Compassionate Use Act of 1996, the California Adult Use of Marijuana Act of 2016 or any other law relating to the medicinal or recreational use or distribution of marijuana (collectively, "Prohibited Drug Law Activities") or entering into a Lease with any Person engaged or intending to engage in any Prohibited Drug Law Activities.

Any Lease involving or providing for the use or occupancy of the Premises entered into by Borrower during the term of the Loan shall expressly prohibit the tenant or other occupant of the Premises (or any portion thereof) from engaging or permitting others to engage in any Prohibited Drug Law Activities. In the event that Borrower becomes aware that any tenant, occupant or other Person is or may be using, occupying or leasing the Premises (or any portion thereof) with the intent to engage or is engaged in any Prohibited Drug Law Activities, Borrower shall terminate its agreement with such tenant, occupant or other Person and take all actions permitted under applicable law to discontinue such activities in or on the Premises and shall immediately notify Lender regarding the Prohibited Drug Law Activities and Borrower's actions to terminate such agreement and the Prohibited Drug Law Activities. Borrower shall keep Lender advised of each action it takes or plans to take in compliance with the requirements of this section.

Compliance with this section is a material consideration and inducement to Lender in its agreement to extend the Loan and other financial accommodations to Borrower hereunder. Any failure of Borrower to comply with the requirements under this section shall constitute a non-curable Event of Default upon written notice by Lender to Borrower thereof and, notwithstanding any provision herein or in the Loan Documents with respect to the right to cure an Event of Default, upon the occurrence of any breach, default or non-compliance of or under this section, Lender shall have the right to immediately exercise any and all remedies to which it may be entitled hereunder, under any of the other Loan Documents or otherwise under law.

In addition and not by way of limitation, Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any loss, claim, damage or liability arising from or related to Borrower's breach or violation of the covenants set forth herein. Borrower shall, within ten (10) business days following a request from Lender, provide Lender with a written statement setting forth its efforts to comply with the provisions of this section and stating whether, to Borrower's knowledge, any Prohibited Drug Law Activities are or may be on-going or have occurred in, on or around the Premises.

For purposes of this section, "Person" means any natural person, corporation, division of a corporation, limited liability company, partnership, trust, joint venture, association, company, estate, unincorporated organization or government or any agency or political subdivision thereof.

**BENEFICIAL OWNERSHIP.** Borrower agrees to promptly notify Lender (A) of any change in direct or indirect ownership interests in the Borrower as reported in any beneficial ownership certification provided to Lender in connection with the execution of this Agreement or the Loan (the "Certification"), or (B) if the individual with significant managerial responsibility identified in the Certification ceases to have that responsibility or if the information reported about that individual changes. Borrower hereby agrees to provide such information and documentation as Lender may request during the term of the Loan to confirm or update the continued accuracy of the any information provided in connection with the foregoing.

**INTEREST RESERVE ACCOUNT.** So long as any Indebtedness is due and payable by Borrower under the Note or Lender has any obligation to lend thereunder, Borrower covenants and agrees to open and maintain with Lender a segregated deposit account, in addition to and separate from the Deposit Account and that shall be subject to an administrative hold or "blocked" (the "Interest Reserve Account"), for the sole purpose of satisfying Borrower's obligation to pay interest under the Note in accordance with the terms and conditions set forth herein. Borrower hereby authorizes and instructs Lender to (i) automatically fund the Interest Reserve Account each month from November to (and including) April of each year on the dates set forth on the Payment Schedule attached to the Note by debiting from the Deposit Account, and transferring to the Interest Reserve Account, the respective amount set forth in the column entitled "Interest Reserve" on the Payment Schedule corresponding to each such funding date and (ii) debit the Interest Reserve Account each month from May to (and including) October of each year on the dates set forth on the Payment Schedule in the respective amounts set forth in the column entitled "Interest Only Period" to satisfy Borrower's obligation to pay interest under the Note.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower

further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Evander Frank Kane and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means ZB, N.A. dba California Bank & Trust, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Promissory Note executed by Borrower in the original principal amount of $4,250,000.00 dated August 9, 2018, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement or any other subsequent Notes evidencing further Indebtedness.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED AUGUST 9, 2018.**

**BORROWER:**

X _____
  **Evander Frank Kane**

**LENDER:**

**ZB, N.A. DBA CALIFORNIA BANK & TRUST**

By: _____
  **Authorized Signer**

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2018.  All Rights Reserved.  - CA  C:\COMMLIOFILE\PLIC40.FC  TR-210099  PR-102



# EXHIBIT "16"

```
 1                  UNITED STATES BANKRUPTCY COURT
                   NORTHERN DISTRICT OF CALIFORNIA
 2                       (San Jose Division)

 3

 4
       In re:
 5                                        CASE NO:
       EVANDER FRANK KANE,                21-50028-SLJ
 6
           Debtor.                        Chapter 7
 7     _____/

 8     CENTENNIAL BANK, an Arkansas
       State chartered bank,
 9                                        Adv. No. 21-05016

           Plaintiff,
10
       Vs.
11
       EVANDER FRANK KANE,
12
           Defendant.
13     _____/

14

15

16     DEPOSITION OF:           EVANDER FRANK KANE

17     TAKEN:                   Pursuant to Notice by
                                Counsel for Plaintiff
18
       DATE:                    July 6, 2022
19
       TIME:                    12:30 p.m. to 8:05 p.m.
20
       STENOGRAPHICALLY
21     REPORTED BY:             CHERE J. BARTON, FPR

22     LOCATION:                ALL PARTIES ATTENDED
                                VIA VIDEOCONFERENCE
23

24

25
```

REGENCY REPORTING SERVICE, INC. (813) 244-5296

```
 1   APPEARANCES:

 2

     ANDREW J. GHEKAS, ESQUIRE
 3   Anthony & Partners, LLC
     100 South Ashley Drive
 4   Suite 1600
     Tampa, Florida  33602
 5
         Appeared for Plaintiff
 6

 7

 8   STEPHEN D. FINESTONE, ESQUIRE
     Finestone Hayes LLP
 9   456 Montgomery Street
     20th Floor
10   San Francisco, California  94104

11       Appeared for Debtor

12

13

     JONATHAN J. LEWIS, ESQUIRE
14   J. Lewis & Associates, APLC
     555 Corporate Drive
15   Suite 150
     Ladera Ranch, California  92694
16

17       Appeared for Hope Parker

18

19

20

21

22

23

24

25
```

1  right now?

2      A.  No, not that I can recall.

3      Q.  When did you last review your testimony from the

4  2004 Examination?

5      A.  A few days ago.

6      Q.  So because we've already had your testimony from

7  a 341 -- or Meeting of Creditors, sorry, and a 2004 Exam

8  I'm going to do my best to try not to duplicate any of

9  the topics that we may have already gone over.  There

10  may be some overlap just because of new information and

11  documents and how the case has progressed, but I am

12  going to attempt to be as efficient as possible today

13  with everyone's time.

14          So with that having been noted, I'm going to

15  share my screen or attempt to -- the last time I did

16  this I had a computer glitch so I'm hoping to not have

17  that now, but I'm going to share what we will mark as

18  Exhibit 1.

19              (Plaintiff's Exhibit No. 1 was marked.)

20      Q.  And I can zoom if that's helpful at all.

21              MR. FINESTONE:  Zoom out a little bit

22       actually.  There.  That's good.

23      Q.  (By Mr. Ghekas)  So I take it you can see what's

24  titled Defendant's Response to Plaintiff's First Set of

25  Interrogatories?

1    A.  Yes.

2    Q.  And do you recognize this document, Mr. Kane?

3    A.  Yes.

4    Q.  And if I were to go to the end of this document

5    is that your signature?

6    A.  Yes.

7    Q.  Okay.  And did you review this document prior to

8    signing the verification?

9    A.  I did.

10    Q.  And were you involved in the process providing

11    responses to these interrogatories?

12    A.  Yes, I was.

13    Q.  If we could, I'm going to scroll up to

14    interrogatory number 6, which is on page 20 of this

15    document.

16            MR. FINESTONE:  Counsel, can you just now

17        expand it a little bit?

18    A.  That's good, yeah.

19    Q.  Okay.  So in interrogatory number 6 it was

20    requested that the debtor, meaning Mr. Kane, identify

21    gambling losses from January 1, 2016 to present.  Do you

22    see that?

23    A.  Yep.

24    Q.  And in the response it says that -- I'm just

25    trying to highlight the places I want to focus on --

1   that you do not keep a regular tally of your wins and

2   losses; is that accurate?

3       A.  Yes.

4       Q.  And so this statement is true that you do not

5   regularly keep a tally of wins and losses when it comes

6   to gambling?

7       A.  No, I didn't keep a document and tally.

8       Q.  And you further indicate that your gambling

9   losses were primarily with bookies as opposed to

10  casinos; is that accurate?

11      A.  Is that what I said?

12      Q.  Right here, the highlighted part?

13      A.  Correct.

14      Q.  Do you maintain any records relating to your

15  dealings with these bookies?

16      A.  No, not documented.

17      Q.  What do you mean not documented?

18      A.  Well, I would know what I owe them in my head or

19  what would be up in my head, but either -- those

20  documents provided either way between either me or my

21  bookies in terms of wins and losses --

22      Q.  Are you able to identify any of the bookies?

23      A.  No.

24      Q.  So other than what's in your head you have no

25  records regarding what exactly the bet was, when it took

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 52 of 165

1    place, how much, how much you would have won or how much

2    you would have lost?

3       A.  Correct.

4       Q.  If we continue with this response, this section

5    here, it says typically Kane would withdraw some cash

6    from his bank account for use in gambling.  Is that an

7    accurate statement?

8       A.  Correct.

9       Q.  Is that a singular bank account or multiple

10    accounts?

11       A.  It's not a singular bank account, no.  It would

12    have been more than one bank account.

13       Q.  Are you able to identify what accounts those

14    would have been?

15       A.  I can't recall the exact accounts off the top of

16    my head, but they would have been my RBC checking

17    account and more likely than not some other accounts,

18    whether it's a credit card at the time or transferring

19    cash into my checking account from my credit card or

20    whatnot, withdrawing some in cash usually from the RBC

21    account but not all the time.

22       Q.  So would you have any records that would show

23    from what account cash was withdrawn or transferred or

24    credited?

25       A.  Well, I provided my bank statements to the -- I

1    can't think of his name.

2        Q.   The Trustee?

3        A.   To the Trustee, pardon me, to the Trustee.

4            MR. FINESTONE:  So I think we've provided

5        them to Mr. Ghekas as well, and so I think we

6        explained -- and I apologize if it was to the

7        Trustee and not to you, but I thought it was to you

8        as well, but Mr. Kane did not have -- after a

9        certain point he did not have access to his Wells

10       Fargo account information because that account got

11       closed, but I think we provided what -- the Wells

12       Fargo statement he had.

13           MR. GHEKAS:  I appreciate that.

14       Q.   (By Mr. Ghekas)  But other than the bank

15   statements that would have been provided, you have no

16   other records that would document from what account you

17   would have withdrawn funds or transferred funds for

18   purposes of gambling?

19       A.   No.

20       Q.   We skip the next sentence and go to the third

21   from the last, the results of his bets were settled in

22   cash.  Is that an accurate statement?

23       A.   Yes.

24       Q.   Did you deposit your settled bets in any

25   particular account?

REGENCY REPORTING SERVICE, INC. (813) 244-5296

```
1        A.   Do you mean when I won or --

2        Q.   Yes, when you won.  Yes.

3        A.   Did I deposit -- sometimes; sometimes I didn't.

4        Q.   And other than the bank statements that you would

5    have provided, would you have any other records that

6    would document winnings that would have been deposited

7    into specific accounts or not deposited?

8        A.   No, I don't.

9        Q.   Mr. Kane, do you recall in your -- what's titled

10   an Amended Statement of Financial Affairs for

11   Individuals that you estimated your gambling losses for

12   the year 2020 to be approximately $1,500,000?

13       A.   Yes.

14       Q.   All right.  Just for record purposes, I'm going

15   to put up what we'll mark as Exhibit 2.

16            (Plaintiff's Exhibit No. 2 was marked.)

17       Q.   And so do you see this document, Official Form

18   107, Statement of Financial Affairs for Individuals

19   Filing for Bankruptcy?

20       A.   Yes.

21       Q.   And do you see here in part 6 it lists certain

22   losses as I just sort of covered?

23       A.   Yes.

24       Q.   And so is this accurate?

25       A.   Yes.
```

1     Q.  Mr. Kane, how did you arrive at this number?

2     A.  Gambling.

3     Q.  I'm sorry.  Without -- if you didn't maintain any

4 records regarding your gambling losses, how did you

5 arrive at a number of $1,500,000?

6     A.  Well, you know, I did keep track of what I was up

7 and down in my head, and a lot of these online bookies

8 where you place your bets they keep a tally for you, you

9 see what you're down in your account and you see what

10 you're up in your account.  So that's how I in terms of

11 the bookies type betting, sports betting that's how I

12 would keep track along with just memorization what I was

13 up and down.

14     Q.  And what online bookies were these?

15     A.  I don't even know what they were called.  They're

16 just sites that bookies set up.  There's -- anyway it's

17 like sports bet -- they can probably tell you what they

18 are, there's thousands of different websites and they

19 just give you a password to use your name and you log

20 on.  And then when you're done betting with them they

21 close the account, so you have no contract of the

22 account, it's just something you can access as a better.

23     Q.  And you don't recall the name of any of these

24 bookies?

25     A.  No, I don't.

1    Q.  Now, this just reflects gambling losses for 2020;

2  correct?

3    A.  Correct.

4    Q.  Did you have gambling losses for any other years?

5    A.  I would assume, yes.

6    Q.  Do you know what your estimated gambling losses

7  would have been for any of those prior years?

8    A.  I can't say exactly what they would be, and I

9  don't want to guess, so --

10    Q.  Would you estimate that it would be higher or

11  lower or commensurate with your 2020 losses?

12    A.  Again, I don't want to guess.  I'm unsure of what

13  they would have been.

14    Q.  And you have no record that you could look at to

15  verify any losses?

16    A.  I do not, no.

17    Q.  Mr. Kane, are you familiar with an institution by

18  the name of Thrivest Specialty Funding?

19    A.  I recall the name, yes.

20    Q.  And what is it or who is it?

21    A.  I believe it's a lending entity, company.

22    Q.  So have you ever incurred a loan from Thrivest

23  Speciality Funding?

24    A.  Yes.

25    Q.  And do you recall why did you take out a loan

1  expenses that you used the loan for?

2     A.   To pay off existing debt.

3     Q.   All right.  And that would include potentially

4  gambling debt?

5     A.   Possibly.

6     Q.   Well, you testified previously at the Meeting of

7  Creditors that you utilized the proceeds of this loan to

8  pay a casino debt; correct?

9     A.   If that's what I said, then yes.

10    Q.   Are you in the business of gambling?

11         MR. FINESTONE:  Objection.  Calls for a

12   legal conclusion.  You can answer.

13    A.   I had a gambling problem.

14    Q.   Are you a professional gambler?

15    A.   I don't know what defines professional gambler.

16 You could say yes, you could say no.  I gamble to win

17 money, I don't gamble to lose money but to make money.

18       So, yeah, I see how gambling has really taken

19 over society, especially today and going online and on

20 TV and by a lot of different companies, so to tell what

21 the definition of what I specifically was I'm not sure,

22 but I don't think anybody gambles for the purpose of

23 losing money.

24    Q.   Just to clarify, the business related expenses

25 that are stated here would be to pay off prior debt?

REGENCY REPORTING SERVICE, INC. (813) 244-5296

1     Q.  Do you have any records to support this casino
2  debt?
3     A.  I don't have any records of it, no.
4     Q.  In addition to the pay off to DeAngelo Vehicle
5  Sales and the pay off of the casino debt $748,600 was to
6  be used to pay off a personal loan.  Do you see that?
7     A.  Yes.
8     Q.  Do you know what personal loan this is referring
9  to?
10    A.  I think there were a few people that had loaned
11 me money over the years and I was paying them back.  It
12 wasn't just one specific person.
13    Q.  Are you able to identify those people?
14    A.  No.
15    Q.  So they were loaning you money over the years,
16 for what purpose were they loaning you money?
17    A.  I don't recall.  I don't recall.
18    Q.  Then in addition to those three it's identified
19 that $140,000 was to pay off to Vinny.  Do you see that?
20    A.  Yes.
21    Q.  And who is Vinny?
22    A.  He's a bookie, but that's not like his real name,
23 it's just a name that was used.
24    Q.  Oh, Vinny is not his real name?
25    A.  I don't believe so.

1                    CERTIFICATE OF REPORTER

2

STATE OF FLORIDA        :

3

COUNTY OF HILLSBOROUGH :

4

5          I, CHERE J. BARTON, FPR, a Notary Public in and

6    for the State of Florida at Large, certify that I was

7    authorized to and did stenographically report the

8    foregoing proceedings; and that the transcript is a true

9    record of the testimony given by the witness.

10         I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties, nor

12   am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am I

14   financially interested in the action.

15         Dated this 19th day of July, 2022.

16

17

18

19
                       /s/ Chere J. Barton, FPR
20                     _____
                       CHERE J. BARTON, FPR
                       Notary Public
21                     State of Florida at Large
                       My Commission No:  #HH 033431
22                     My Commission Expires:  12/17/24

23

24

25

            REGENCY REPORTING SERVICE, INC. (813) 244-5296

# EXHIBIT "17"

1              UNITED STATES BANKRUPTCY COURT
               NORTHERN DISTRICT OF CALIFORNIA
2                    SAN JOSE DIVISION
                 CASE NO.: 21-50028-SLJ
3                      Chapter 7

4      In re

5      EVANDER FRANK KANE,

6          Debtor.
       _____/
7

8

9

       RULE 2004
10     EXAMINATION AND
       DUCES TECUM
11     DEPOSITION OF:        **EVANDER FRANK KANE**

12     TAKEN:                Pursuant to Notice by
                             Counsel for Centennial Bank
13
       DATE:                 March 24, 2021
14
       TIME:                 2:01 p.m. to 5:14 p.m. (EST)
15
       LOCATION:             Zoom videoconference
16
       REPORTED BY:          Melanie Keefe, FPR
17                           Notary Public
                             State of Florida at Large
18

19

20

21

22

23

24

25

────────REGENCY REPORTING SERVICE, INC. (813)224-0224────────

```
1    APPEARANCES:       ANDREW J. GHEKAS, ESQUIRE
                        Anthony & Partners, LLC
2                       100 South Ashley Drive
                        Suite 1600
3                       Tampa, Florida  33602

4                              Attorney for Centennial Bank

5                       STEPHEN D. FINESTONE, ESQUIRE
                        Finestone Hayes LLP
6                       456 Montgomery Street
                        20th Floor
7                       San Francisco, California  94104

8                              Attorney for the Debtor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    Q.   (By Mr. Ghekas)  Before we took a break, I wasn't

2    able to find a -- an example.  I didn't want to spend too

3    much time on it, but I did -- I want to move on.  And if you

4    go back to -- up to page 5 of the Wells Fargo 2020

5    statements, on January 16 there's a payment of $112,500 to

6    Clark County District Attorney.  Do you know what that was

7    for?

8    A.   Yeah.  That was to pay off a marker that I had

9    that was at the Clark County District Attorney's.

10   Q.   Okay.  And there's another entry on March 31.

11   Would that be for the same thing?

12   A.   Yeah.

13   Q.   Okay.  Mr. Kane, who is Bradley Lawson?

14   A.   Pardon me?

15   Q.   Who is Bradley Lawson, L-a-w-s-o-n?

16   A.   I don't recall.

17   Q.   All right.  Do you know who Devin [sic] White is?

18   A.   I don't recall that either.

19   Q.   Okay.  On your amended statement of financial

20   affairs, I believe we looked at it previously.  In the -- in

21   the folder, it was Doc 29.  I don't know if you still have

22   that up.  But if you turn to page 7 of that --

23   A.   You said Doc 29?

24   Q.   Yeah.  It's Centennial_Kane --

25   A.   Oh, Centennial.  Okay.

REGENCY REPORTING SERVICE, INC. (813)224-0224

```
1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA              )

3      COUNTY OF HILLSBOROUGH        )

4


5              I, Melanie Keefe, Court Reporter, certify that I
       was authorized to and did stenographically report remotely
6      the deposition of EVANDER FRANK KANE; that a review of the
       transcript was requested; and that the transcript, pages 5
7      through 102, inclusive, is a true and complete record of my
       stenographic notes.
8
               I further certify that I am not a relative,
9      employee, attorney, or counsel of any of the parties, nor am
       I a relative or employee of any of the parties' attorney or
10     counsel connected with the action, nor am I financially
       interested in the action.
11
                            s/ Melanie Keefe
12                          Melanie Keefe, FPR
                            Court Reporter
13     _____

14                     CERTIFICATE OF OATH

15     STATE OF FLORIDA              )

16     COUNTY OF HILLSBOROUGH        )

17             I, the undersigned authority, certify that
       EVANDER FRANK KANE personally appeared before me remotely
18     and was duly sworn.

19             WITNESS my hand and official seal this 8th day of
       April, 2021.
20

21                          s/ Melanie Keefe
                            Melanie Keefe, FPR
22                          Notary Public
                            State of Florida
23                          My Commission No.:  HH055410
                            Expires:  December 9, 2024
24

25
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

# EXHIBIT "18"

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

_____
                                        )
In re:                                  )
                                        )
EVANDER FRANK KANE          CH: 7       )   21-50028
                                        )
        Debtor.                         )
_____ )

                            U.S. Trustee
                            P.O. Box 4188
                            Mountain View, CA 94040

                            February 3, 2021


        BEFORE FRODE S. HJELMESET Chapter 7 Trustee

<u>APPEARANCES</u>:

For the Debtor:             Stephen Finestone
                            Finestone Hayes LLP
                            456 Montgomery St. 20th Fl.
                            San Francisco, CA 94104

For Chapter 7 Trustee:      Gregg S. Kleiner
                            Rincon Law LLP
                            268 Bush St. #3335
                            San Francisco, CA 94104

For Sure Sports:            Alan Wilmot
                            Heitner Legal
                            215 Henricks Isle
                            Fort Lauderdale, FL 33301

For Centennial Bank, N.A.:  Andrew J. Ghekas
                            Anthony & Partners, LLC
                            100 S. Ashley Dr., #1600
                            Tampa, FL 33602

For Newport Management:     Arthur Yellin
                            Keith Banner
                            Greenberg Glusker, LLP
                            2049 Century Park E, Suite 2600
                            Los Angeles, CA 90067

APPEARANCES:(Continued)

For South River Capital LLC:    David B. Rao
                                Law Offices of Binder and Malter
                                2775 Park Ave.
                                Santa Clara, CA 95050

For Zions Bancorporation,       Gerrick Warrington
N.A:                            Frandzel Robins Bloom & Csato,
                                LC.
                                1000 Wilshire Blvd., 19th Fl
                                Los Angeles, CA 90017

For Loan Shark, LLC:            Christopher Ribas

For Hope Parker:                Jonathan Lewis

For the United States           Marta E. Villacorta
Trustee:

Proceedings recorded by electronic sound recording;
transcript produced by The Record Xchange.

```
 1              THE TRUSTEE:  Oh, Wilmot.  Okay.  All right.  Alan

 2   Wilmot from Sure Sports.  Who else is on?

 3              MR. GHEKAS:  Yes, this is Andrew Ghekas on behalf of

 4   Centennial Bank.

 5              THE TRUSTEE:  Andrew Ghekas.

 6              MR. GHEKAS:  Ghekas, yes, sir.

 7              THE TRUSTEE:  Ghekas for Centennial.  Okay.  Thank

 8   you, Mr. Ghekas.

 9              Who else is on?

10              MR. YALLEN:  This is Arthur Yallen (phonetic),

11   Canadian counsel for Newport Sports Management.

12              THE TRUSTEE:  Okay.  Arthur Yallen for New Sports?

13              MR. YALLEN:  Newport.

14              THE TRUSTEE:  Oh, Newport, okay, Management.  Okay.

15   Thank you, Mr. Yallen.

16              And who else is on?

17              MR. BANNER:  This is Keith Banner, U.S. counsel for

18   Newport Sports Management.

19              THE TRUSTEE:  Keith Banner from Newport.  Okay.

20   Same.  Okay.  Thank you, Mr. Banner.

21              And who else is on?

22              MR. RAO:  David Rao for South River Capital.

23              THE TRUSTEE:  David Rao for South River, okay.  Good

24   morning, Mr. Rao.

25              Okay.  Who -- who else is on?
```

*TheRecordXchange*
www.therecordxchange.com  (800) 406-1290

1          MR. WARRINGTON:  Gerrick Warrington for Zions

2   Bankcorporation.

3          THE TRUSTEE:  Derrick Warren (sic) for Zion.

4          MR. WARRINGTON:  Gerrick Warrington.

5          THE TRUSTEE:  Oh, Warrington.  Okay.  Sorry, sir.

6   Derrick Warrington for Zion.  Okay.

7          And then I have to switch my sheet here.  Is there

8   anyone else on?

9          MR. RIBAS:  Chris Ribas, R-I-B-A-S, for Loan Shark,

10  LLC.

11         THE TRUSTEE:  Loan Shark.  And what was your first

12  name, sir?

13         MR. RIBAS:  Chris.  Christopher.

14         THE TRUSTEE:  Chris Ribas.  Okay, Ribas.

15         And who -- who else is on?  Okay.  Well --

16         MR. LEWIS:  Oh, I'm sorry, Jonathan Lewis (phonetic)

17  for Hope Parker (phonetic).

18         THE TRUSTEE:  Jonathan for Hope Parker?

19         MR. LEWIS:  Yes.

20         THE TRUSTEE:  Okay.  Great, sir.  Thank you,

21  Jonathan Lewis.

22         Okay.  And who else is a creditor that wants to ask

23  questions?

24         Okay.  All right.  So we got, 1, 2, 3, 4, 5, 6, 7, 8

25  creditors.  So I was -- so we're going to do -- let the

C E R T I F I C A T E

       I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT "19"

```
 1              UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                  (San Jose Division)

 3

 4
    In re:                              CASE NO:
 5                                      21-50028-SLJ
    EVANDER FRANK KANE,
 6
       Debtor.                          Chapter 7
 7  _____/

 8  CENTENNIAL BANK, an Arkansas
    State chartered bank,
 9                                  Adv. No. 21-05016

       Plaintiff,
10
    Vs.
11
    EVANDER FRANK KANE,
12
       Defendant.
13  _____/

14

15

16     DEPOSITION OF:         EVANDER FRANK KANE

17     TAKEN:                 Pursuant to Notice by
                              Counsel for Plaintiff
18
       DATE:                  July 6, 2022
19
       TIME:                  12:30 p.m. to 8:05 p.m.
20
       STENOGRAPHICALLY
21     REPORTED BY:           CHERE J. BARTON, FPR

22     LOCATION:              ALL PARTIES ATTENDED
                              VIA VIDEOCONFERENCE
23

24

25
```

REGENCY REPORTING SERVICE, INC. (813) 244-5296

```
1   APPEARANCES:

2

        ANDREW J. GHEKAS, ESQUIRE
3       Anthony & Partners, LLC
        100 South Ashley Drive
4       Suite 1600
        Tampa, Florida  33602
5
            Appeared for Plaintiff
6

7

8       STEPHEN D. FINESTONE, ESQUIRE
        Finestone Hayes LLP
9       456 Montgomery Street
        20th Floor
10      San Francisco, California  94104

11          Appeared for Debtor

12

13

        JONATHAN J. LEWIS, ESQUIRE
14      J. Lewis & Associates, APLC
        555 Corporate Drive
15      Suite 150
        Ladera Ranch, California  92694
16

17          Appeared for Hope Parker

18

19

20

21

22

23

24

25
```

REGENCY REPORTING SERVICE, INC. (813) 244-5296

1    A.  I don't really recall exactly when it comes to

2  those other entities.

3    Q.  All right.  So you don't -- so excluding then --

4  I believe you're referring to Professional Bank,

5  Centennial Bank, Zions and South River?

6    A.  Correct.

7    Q.  So excluding those four is it your testimony that

8  you don't recall whether or not the primary purpose of

9  these other loans that we went through today from these

10  other lenders was for business debt?

11    A.  Well, they were all very different types of

12  loans, and they were -- in terms of the dollar figure,

13  you know, there's a $50,000 loan and it was paid off the

14  next day, so sitting here today in 2022 I necessarily

15  can't speak to exactly what that was for.  So to

16  characterize each and every loan individually I couldn't

17  do that at this time, it just -- it would be a -- it

18  wouldn't make any sense.

19    Q.  And we saw when we looked through a lot of these

20  loan documents that you did in fact receive large

21  disbursements into your various accounts; correct?

22    A.  Correct.

23    Q.  And is it your testimony that you can't recall

24  what you utilized any of those disbursements for?

25    A.  It's a pretty vague question.  Any, no, I

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 75
of 165

1    wouldn't say that.

2        Q.  Well, we went through each one of those loans and

3    I asked you specifically as to any of the disbursements

4    that went into one of your bank accounts, and your

5    testimony I believe each time was that you can't recall

6    what those loan proceeds were for; correct?

7        A.  I don't believe that is correct.

8        Q.  You don't believe that each time we discussed a

9    specific disbursement into your bank account your

10   testimony wasn't that you don't recall what you used

11   those loan proceeds for?

12       A.  That's correct.

13       Q.  Let me pull up what is going to be marked as

14   Exhibit 34.

15           (Plaintiff's Exhibit No. 34 was marked.)

16       Q.  Are you familiar with this document, Mr. Kane?

17       A.  Yes.

18       Q.  And did you review this document and provide your

19   answers to it to your counsel?

20       A.  Yes.

21       Q.  I want to go to Request for Admission 20, and

22   Request for Admission 20 requested that you, "Admit that

23   the debt obligation the debtor owes to Raj Banghu as

24   listed in Section 4.18 of the debtor's amended schedule

25   E/F, Creditors Who Have Unsecured Claims (Docket 18), is

1   a consumer debt as the term is defined above in Section

2   1, paragraph 23."  Do you see that?

3       A.  Yes.

4       Q.  And ultimately your response was you denied that

5   admission; right?

6       A.  Yes.

7       Q.  Meaning when you denied it you believed that the

8   debt obligation that you owe to Raj Banghu is not a

9   consumer debt; correct?

10      A.  Correct.

11      Q.  Do you still maintain that position?

12      A.  Yes.

13      Q.  I'm going to bring up what we'll mark as Exhibit

14  35.

15          (Plaintiff's Exhibit No. 35 was marked.)

16      Q.  Have you seen this document before, Mr. Kane?

17      A.  I don't recall seeing this document.

18      Q.  This is a letter dated February 10, 2022 directed

19  to me, and it is signed by your counsel, Mr. Finestone.

20  Do you see that?

21      A.  Yes.

22      Q.  All right.  If we go to page 3 of this document

23  that I have in the screen, this relates to the same

24  Request for Admission number 20 that we just looked at.

25  Do you see that?

1    A.  Yes.

2    Q.  And in this document from your counsel it's

3  indicated that there was "a scrivener's error and Kane

4  hereby amends his answer to RFA 20 as follows," and you

5  changed it from denied to admitted.  Do you see that?

6    A.  Yes.

7    Q.  So do you stand by what's in your Request for

8  Admissions that we just looked to or what's presented in

9  your counsel's letter to me?

10    A.  Well, if my counsel's letter was provided to you

11  after that original answer, then I stand by what my

12  counsel wrote in his letter.

13    Q.  Well, I just asked you prior to going to the

14  letter whether or not you stood by your denial of

15  Request for Admission 20 and you said you did; correct?

16    A.  Correct, but when I saw this letter and my memory

17  was refreshed and you pointed out that my counsel

18  amended that answer, that's why I did.

19    Q.  What was the purpose of the debt obligation that

20  you owe to Mr. Banghu?

21    A.  Banghu?

22    Q.  Banghu.  Sorry.

23    A.  I don't necessarily understand what that means,

24  the question.

25    Q.  Why did you incur a debt obligation to Mr.

1  Banghu?

2     A.  I needed some money to pay some bills.

3     Q.  And what bills were those?

4     A.  Mortgage.

5     Q.  Is that it?

6     A.  Yeah, I was a few months late, so it added up.

7     Q.  Go to Request for Admission 17.  Who is Mr.

8  Hebron Shyng?

9     A.  A friend of the family.

10    Q.  And did you incur a loan that you owed to him?

11    A.  Yes.

12    Q.  Do you know when you incurred that loan?

13    A.  I don't, no.  It was definitely no later than

14 2018, but I'm not sure exactly when.

15    Q.  And do you know the amount of that loan?

16    A.  It was $500,000.

17    Q.  And do you recall the purpose of the $500,000

18 that you received from Mr. Shyng was used for?

19    A.  I don't exactly, no.  I don't recall.

20    Q.  So in Request for Admission number 17 we

21 requested that you admit that the debt obligation that

22 you owed to Mr. Shyng is a consumer debt.  Do you see

23 that?

24    A.  Yes.

25    Q.  And your response, you denied that request;

1    correct?

2       A.  Correct.

3       Q.  How could you deny that request if you don't

4    recall what the purpose was for you incurring that loan?

5       A.  Well, the purpose --

6               MR. FINESTONE:  I'm going to object as

7          argumentative.  What he recalls now is not

8          necessarily what he recalled when he responded to

9          the request for admissions.  You can go ahead and

10         answer the question if you can.

11      A.  Part of it was mortgage payments that I was

12   behind on and to cover bills.

13      Q.  And so you just testified that the purpose for

14   the debt that you owed to Mr. Banghu was also for

15   mortgage payments; correct?

16      A.  Correct.

17      Q.  So is the purpose for which you incurred the loan

18   from Mr. Shyng the same as the debt that you incurred

19   with Mr. Banghu?

20      A.  It was $500,000 I believe, so it was not in -- I

21   don't necessarily recall every single one but, you know,

22   I think part of it too is during COVID I wasn't having

23   any income for about ten months or nine months, whatever

24   it was, so that was part of it as well.

25      Q.  And so do you still believe that it was not a

1   consumer debt?

2       A.   That specific debt?

3       Q.   Yeah, the one with Mr. Shyng?

4       A.   I'm not sure.

5       Q.   Do you have any documents that would support what

6   you used the loan funds that you received from Mr. Shyng

7   for?

8       A.   No, not that I'm aware of.

9       Q.   And the same for Mr. Banghu, do you have any

10  documents that would support what you used those loan

11  proceeds for?

12      A.   Not that I'm aware of.

13      Q.   Let's go to Request for Admissions number 18.

14           THE WITNESS:  Sorry, can I take a break

15      real quick?

16           MR. GHEKAS:  Of course.

17         (There was a break in the proceedings.)

18      Q.   (By Mr. Ghekas)  Mr. Kane, who is Tony Veltri?

19      A.   He's a friend of mine.

20      Q.   And do you recall that you have him identified as

21  a creditor on your schedules?

22      A.   Yes.

23      Q.   Do you recall the amount of the loan that you

24  incurred from Tony Veltri?

25      A.   I don't recall right now.

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 81 of 165

1    Q.  Do you know when you incurred that loan?

2    A.  Over time.  He's -- I've loaned money off of him,

3  loaned different amounts of money off of him.

4    Q.  Do you know what the purpose of those loans were?

5    A.  The purpose of some of the loans were to pay

6  certain bills, there was attorney's fees or taxes, that

7  was a lot of it.

8    Q.  Do you have any documents that would support what

9  you used the loan funds you received from Tony Veltri

10  for?

11    A.  No.

12    Q.  Mr. Kane, who is Pete Gianakas?

13    A.  A friend of mine as well.

14    Q.  And did you take out a loan with Pete Gianakas?

15    A.  I did.

16    Q.  Do you recall the date in which you incurred that

17  loan?

18    A.  I do not.

19    Q.  Do you recall what the purpose of that loan was

20  for?

21    A.  Some of it was gambling.  That was also used to

22  pay attorney's fees.

23    Q.  And do you have documents that support what you

24  used the loan funds you received from Pete Gianakas for?

25    A.  No, I don't have any documentation on the loan

1  proceeds I received from Pete Gianakas.

2      Q.  And who is Mike Lispti?

3      A.  Yeah, Lispti.

4      Q.  Who is he?

5      A.  A friend of mine as well and -- yeah.

6      Q.  Did you incur a loan owed to Mike Lispti?

7      A.  I did, yes.

8      Q.  And do you recall the date in which you incurred

9  that loan?

10     A.  No, it wasn't one specific date, it was different

11 amounts over a period of time.

12     Q.  And do you recall what you utilized those monies

13 for?

14     A.  I do.  Some of it was tax related, some of it was

15 attorney related, some of it was gambling related.

16     Q.  And do you have any documents that would support

17 what you used the loan proceeds you received from Mike

18 Lispti for?

19     A.  Not to my knowledge, no.

20     Q.  Who is Mr. Davis Sanchez?

21     A.  A friend of mine.

22     Q.  Did you incur a loan owed to Mr. Sanchez?

23     A.  Yes.

24     Q.  Do you know when you incurred that loan?

25     A.  Again over time.

1    Q.   Do you recall what the purpose that you utilized

2  those loan funds for?

3    A.   Yes, some of it was for attorneys, legal fees,

4  some of it was for gambling and some of it was for

5  taxes.

6    Q.   Do you have any documents that would support what

7  you used the loan proceeds that you received from Mr.

8  Sanchez for?

9    A.   I do not.

10    Q.   I'll bring up what we'll mark as Exhibit 36.

11         (Plaintiff's Exhibit No. 36 was marked.)

12    Q.   Do you recognize this document, Mr. Kane, and

13  it's a composite document, but do you recognize more or

14  less what this represents?

15    A.   Yeah.

16    Q.   And is this -- or are these the bank statements

17  associated with the bank account that you maintain at

18  Wells Fargo?

19    A.   Maintained, yes.

20    Q.   Maintained?  So you no longer have this bank

21  account?

22    A.   Right.

23    Q.   And this is the account ending in 1607; correct.

24    A.   Correct.

25    Q.   I just want to focus on some of the withdrawals

```
1                    CERTIFICATE OF REPORTER

2
     STATE OF FLORIDA        :
3
     COUNTY OF HILLSBOROUGH :
4
5          I, CHERE J. BARTON, FPR, a Notary Public in and

6    for the State of Florida at Large, certify that I was

7    authorized to and did stenographically report the

8    foregoing proceedings; and that the transcript is a true

9    record of the testimony given by the witness.

10         I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties, nor

12   am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am I

14   financially interested in the action.

15         Dated this 19th day of July, 2022.

16

17

18

19
              /s/ Chere J. Barton, FPR
20            CHERE J. BARTON, FPR
              Notary Public
21            State of Florida at Large
              My Commission No:  #HH 033431
22            My Commission Expires:  12/17/24

23

24

25
```

REGENCY REPORTING SERVICE, INC. (813) 244-5296

# EXHIBIT "20"

```
 1              UNITED STATES BANKRUPTCY COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2                  (San Jose Division)

 3

 4
    In re:
 5                                      CASE NO:
    EVANDER FRANK KANE,                 21-50028-SLJ
 6
        Debtor.                         Chapter 7
 7  _____/

 8  CENTENNIAL BANK, an Arkansas
    State chartered bank,
 9                                      Adv. No. 21-05016

        Plaintiff,
10
    Vs.
11
    EVANDER FRANK KANE,
12
        Defendant.
13  _____/

14

15

16      DEPOSITION OF:        EVANDER FRANK KANE

17      TAKEN:                Pursuant to Notice by
                              Counsel for Plaintiff
18
        DATE:                 July 6, 2022
19
        TIME:                 12:30 p.m. to 8:05 p.m.
20
        STENOGRAPHICALLY
21      REPORTED BY:          CHERE J. BARTON, FPR

22      LOCATION:             ALL PARTIES ATTENDED
                              VIA VIDEOCONFERENCE
23

24

25
```

REGENCY REPORTING SERVICE, INC. (813) 244-5296

APPEARANCES:


    ANDREW J. GHEKAS, ESQUIRE
    Anthony & Partners, LLC
    100 South Ashley Drive
    Suite 1600
    Tampa, Florida  33602

        Appeared for Plaintiff



    STEPHEN D. FINESTONE, ESQUIRE
    Finestone Hayes LLP
    456 Montgomery Street
    20th Floor
    San Francisco, California  94104

        Appeared for Debtor



    JONATHAN J. LEWIS, ESQUIRE
    J. Lewis & Associates, APLC
    555 Corporate Drive
    Suite 150
    Ladera Ranch, California  92694


        Appeared for Hope Parker

1    at the time.

2         Q.   Do you have copies of any of the checks that you

3    would have written on the account of this Wells Fargo

4    account?

5         A.   I do not, no.

6         Q.   If we look just a couple down on January 8 there

7    appears to be an e-deposit in branch/store in the amount

8    of $120,000.  Do you see that?

9         A.   Yes.

10        Q.   Do you know what that $120,000 was for or where

11   it came from?

12        A.   I don't recall.  I know I went over a lot of

13   these statements with the Trustee when I had some time

14   and really thought about what those could be and went

15   over them, kind of correlated them with the transfer --

16   I'm not exactly sure.  It looks like --

17             MR. FINESTONE:  Is that -- I caution you

18        not to speculate.  If you have a good faith belief

19        what it might be or an estimate of what it would

20        have been --

21        A.   Yeah, because I don't know what e-deposit means,

22   so I really don't know.

23        Q.   Okay.  If we go down to January 13 here, the

24   description is purchase bank check or draft in the

25   amount of $5,000.  Do you know what that was for as a

1   withdrawal?

2       A.  Yeah, I don't.

3       Q.  And then that same day right under it there

4   appears to be a $2,002 withdrawal from a non Wells Fargo

5   ATM.  Do you see that?

6       A.  Yeah.

7       Q.  And do you know what that $2,002 withdrawal was

8   for?

9       A.  Probably just taking out some cash.

10      Q.  And then right under that, January 15, is a

11  $242,879.82 e-deposit in branch store.  Do you know

12  where that came from?

13      A.  Yes, that was a check -- or a paycheck I

14  received.

15      Q.  January 16, the next day I just want to confirm

16  because I believe we touched on this previously, but

17  there's a $102,500 withdrawal to Clark County District

18  Attorney.  That was for a gambling marker; correct?

19      A.  Correct.

20      Q.  And do you recall at what casino you incurred

21  that debt for?

22      A.  The Cosmo.

23      Q.  And do you have any documents that would support

24  that debt owed to the Cosmo?

25      A.  Possibly.  I'm not sure exactly.  Possibly.

1    Q.   What documents do you believe you may have?

2    A.   Maybe something from the district attorney's

3    office.

4    Q.   And if we were to continue on January 30th here

5    there's another deposit for $190,101.04.  Do you recall

6    where that deposit came from?

7    A.   Another paycheck.

8    Q.   Do you have your pay stubs from January 2020 on?

9    A.   I don't know if I do.  I know -- I believe that I

10   provided some pay stubs, I'm not sure exactly if they

11   were from 2020, but to the Trustee through my attorney.

12   Q.   Okay.  So if we were to continue on to February

13   of 2020, the same account, and if we look at February 3,

14   withdrawal made in branch store for $2,600, do you know

15   what that withdrawal was for?

16   A.   I don't, no.

17   Q.   And then the next day there's another $1,514.55

18   ATM withdrawal.  Do you recall what that was for?

19   A.   Probably just taking out some Canadian cash it

20   looks like.

21   Q.   Do you believe it's Canadian cash because of the

22   address right here, Calvary?

23   A.   Correct.

24   Q.   And if we were to continue to February 10 there's

25   an e-deposit in branch store for $15,060.  Do you recall

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 91
of 165

1   what that deposit was for or where it came from?

2      A.   I don't.

3      Q.   And then if we go to February 18 we have another

4   large $172,132.42 e-deposit.  Would that also be from

5   your salary?

6      A.   Correct.

7      Q.   Then February 21 there's another 113 withdrawal

8   to the Clark District Attorney, is that also for a

9   gambling related debt?

10     A.   It's all for the same debt.

11     Q.   Okay.

12     A.   I was making payments.

13     Q.   I got you.  Do you recall what the amount of the

14  total debt was?

15     A.   $550,000 I believe.  There's an extra $50,000

16  tacked on.

17     Q.   And then if we go to February 24 we see an

18  e-deposit for $37.00.  Do you recall where that deposit

19  came from?

20            MR. FINESTONE:  Counsel, just to correct

21       your record, you said 37.00; it's $37,000.

22            MR. GHEKAS:  Thank you.  37,000, I

23       apologize.

24     A.   I don't necessarily recall, no.  It looks like --

25  yeah, I made a payment to my attorneys there just above,

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 92
of 165

1  so I don't know -- I don't know.

2    Q.  And then if we go to the same day, an ATM

3  withdrawal for $2,005.99 do you recall what you utilized

4  those funds for?

5    A.  No, I don't know, probably just taking out cash

6  with an ATM.

7    Q.  And then two days later another withdrawal in the

8  same amount from a non WF ATM withdrawal, do you recall

9  what you utilized that money for?

10    A.  No, I don't.

11    Q.  And then February 28th there's two deposits here,

12  one for $132,991.92.  Do you recall where that deposit

13  came from?

14    A.  Yeah, those two deposits are included in the

15  $172,000, they're payroll checks.

16    Q.  Then the last for February, February 28th,

17  there's a $3,000 withdrawal made in a branch/store.  Do

18  you recall what the purpose of that withdrawal was?

19    A.  I don't.

20    Q.  Moving to March, March 12, $176,923.95 deposit.

21  Would that also be your salary?

22    A.  Yes, payroll.

23    Q.  And then we see that same day a $2,005.99 non WF

24  ATM withdrawal, do you recall what that money was used

25  for?

1    A.  I don't know.

2    Q.  That same day there's a $2,000 cash e-withdrawal

3    in branch/store.  Do you recall what that was for?

4    A.  No, I don't.

5    Q.  Then on March 16th there is an e-deposit in

6    branch/store for $3,176.33.  Do you know where that

7    deposit came from?

8    A.  No, I don't.

9    Q.  On March 16th there's a withdrawal made in a

10   branch store for $150,000.  Do you recall what that

11   withdrawal was for?

12   A.  I do not recall what it was for.  Oh, yes, I do

13   actually.  Sorry.

14   Q.  Okay.

15   A.  That was for -- so March 16th was like the day --

16   March 17th was the day I moved into the Richland address

17   home because the season had gotten cancelled because of

18   COVID and I didn't have the money to close on the house

19   at this time, but I wanted to get out of the apartment

20   because my wife at the time was pregnant and we were in

21   the apartment and COVID hit and nobody knew what it was

22   or how deadly it was or what was going on.  So I had to

23   deal with the owner of the property to do a lease to

24   buy, and I put a down payment for 150,000 on that house.

25   Q.  Do you have any documents supporting that?

1  A. Probably actually in the purchase agreement.

2  Q. And then on that same day March 16 another check

3 for $5,555, do you know what that was for?

4  A. Yeah, that was for, I believe, rent, there was a

5 $55 moving fee that she had tacked on to it.

6  Q. Then March 17 another check for $5,000, do you

7 know what that was for?

8  A. That was -- because I had moved out of the

9 apartment I had already prepaid for an extra month and I

10 had asked for that money back and they never gave it

11 back to me, so they deposited the check that I had

12 originally gave them for a security deposit.

13  Q. So this -- okay.  So when they deposited the

14 check do you mean the prior landlord deposited it in

15 their own account?

16  A. Correct.

17  Q. On March 30th there's an e-deposit in a branch

18 store for $222,746.06 would that also be your salary?

19  A. Yes.

20  Q. And then on the next day we see a purchase bank

21 check or draft for $5,911.79, do you know what that was

22 for?

23  A. I don't.

24  Q. And then moving on to April, April 1st another

25 check for $5,632.75, do you know what that check was

1  for?

2     A.  No.  I mean, I was -- I just moved in the house

3  so it could have been for blinds or -- actually I think

4  it was for blinds, to be honest, because I paid that guy

5  with a check, so -- and these are all -- I'm looking at

6  some of these -- I rarely wrote checks, so those are for

7  installations and stuff around the house.

8     Q.  What are you referring to?

9     A.  Just the ones on the two checks on the 1st, the

10 check on the 2nd, even the check on the 13th.

11    Q.  So the check on the 2nd, what was that for?

12    A.  I believe it was like some sort of electronic

13 installation, stuff for the house.

14    Q.  Do you have documents supporting that?

15    A.  I don't believe so, no.

16    Q.  And for the blinds would you have any documents

17 supporting the blinds purchase and installation?

18    A.  I don't think so either, no.

19    Q.  On 4/17 there's an e-deposit for $9,005.72.  Do

20 you know where this deposit came from?

21    A.  I don't know.

22    Q.  Then 4/20 there's another deposit for

23 $208,450.29.  Do you know what that deposit was for?

24    A.  Payroll.

25    Q.  So we've skipped the May and June 2020

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 96 of 165

1  statements.  Now we're at July, 2020 for the Wells Fargo

2  account, and on July 1st there's three deposits here,

3  one for $1,387,578.81, one for $30,000 and one for

4  $224,718.54.  Are all three of these related?

5      A.  Yeah, those are -- that was signing bonus money,

6  it was broken up into different checks instead of one

7  big check, so that's how it was.

8      Q.  And so all three of these were for your signing

9  bonus related to the contract that you had with the San

10  Jose Sharks?

11     A.  Yeah.

12     Q.  On that same day there's a $2,000 cash

13  e-withdrawal in branch.  Do you know what that $2,000

14  was for?

15     A.  I was probably just taking out some cash after I

16  deposited the checks.

17     Q.  And then July 6th there's a $19,000 purchase bank

18  check or draft withdrawal.  Do you know what that

19  $19,000 was for?

20     A.  I believe that was for my night nurse.

21     Q.  And then on July 7th there's a $100,000

22  withdrawal made in a branch/store.  Do you know what

23  that $100,000 was for?

24     A.  I don't recall.  I don't know.

25     Q.  There's another $9,000 withdrawal made in

1   branch/store.  Do you know what that $9,000 was for?

2       A.  No.

3       Q.  For the $19,000 on July 6th do you have any

4   documents that would support that this is for your night

5   nurse?

6       A.  No.  I mean, I might -- I'm assuming there would

7   have been a copy of a check that had her name on that or

8   a statement, but I don't have access to that right now.

9       Q.  So you don't have access to what?

10      A.  I don't have access to this account right now, so

11  I'm assuming there's a copy of it like online banking.

12      Q.  I got you.  Okay.  And then July 10th there's

13  another purchase bank check or draft for $13,819.39.  Do

14  you know what that was for?

15      A.  No, I don't.

16      Q.  For August 18th there are two checks here, one

17  for $810 -- I'm sorry, that's for August 14th, there's a

18  check for $810, and then for August 18 there's a check

19  for $3,350.  Do you recall what either of these checks

20  were for?

21      A.  I don't, no.

22      Q.  And on August 24 there's a $6,600 e-deposit in

23  branch store.  Do you know where that deposit came from?

24      A.  I don't recall.

25      Q.  Then on August 28 there's another check for

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 98 of 165

1   $3,060.  Do you know what that check was for?

2       A.  I don't.

3       Q.  Then on October 1 there's a $4,500 withdrawal and

4   the description, Venmo payment, but I believe -- it

5   appears to be a Venmo payment to yourself.  Do I have

6   that wrong?

7       A.  I don't -- I would imagine you have that part

8   wrong.  I don't know what -- I cannot remember what

9   Venmo -- I don't know if you can -- I rarely use Venmo,

10  so --

11      Q.  So you don't recall what the Venmo payment was

12  for?

13      A.  I think I was buying a -- yeah, because I see

14  another one down low.  I think that's when I bought a

15  card online, not online -- I bought a card off a guy, a

16  Pokemon card for Tony to pay back some of the money that

17  I owed him I think.

18          Venmo was -- he only accepted payment through

19  Venmo, and I didn't have an account that had been used

20  so I had to wait a week to be able to send the exact

21  same -- to be able to send the amount again because

22  there's a limit per week how much I could send, so I see

23  like a week later there's another $4,500, so I think

24  that was that, for that card.

25      Q.  So you purchased a Pokemon card?

1     A.   Yeah.

2     Q.   And do you know what the total purchase price for

3  the card was?

4     A.   It looks like it was $9,000, I think.

5     Q.   Do you recall what card it was?

6     A.   No.

7     Q.   October 13th there's another withdrawal for

8  $5,250, a purchase bank check or draft, do you know what

9  that was for?

10    A.   I don't know.

11    Q.   And then at the bottom another check on October

12  15 for $17,990.63, do you recall what that was for?

13    A.   Oh, yes, I do.  That was for the mortgage payment

14  on my San Jose property.

15    Q.   Is that the Richland property?

16    A.   Right.  Correct, yeah.

17    Q.   October 16th there's another $2,000 Venmo

18  payment.  Do you know what that was for?

19    A.   No, it might have been $9,000 then the total

20  price -- or $11,000, pardon me.  That was like another

21  week later, so I think it was just that.

22    Q.   So it's relating to the purchase of the Pokemon

23  card?

24    A.   Yeah.  Yeah, and that was the total.

25    Q.   And if we go to October 30th there is an

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 100
of 165

1    e-deposit in store for $1,251.81.  Do you recall what
2    that was for?
3         A.  I don't, no.
4         Q.  And then that same day there's another deposit
5    for $40,442.19.  Do you recall what that was for?
6         A.  No, I -- no.
7         Q.  All right.  In November -- on November 5th
8    there's an e-deposit for $164,368.89.  Do you know what
9    that deposit was for?
10        A.  What year is this?
11        Q.  2020.  November 5, 2020.
12        A.  We are in November?  Oh, yeah, a paycheck.
13        Q.  That was a paycheck?
14        A.  2020 of November, yeah, that must have been a
15   paycheck.
16        Q.  You received a paycheck even when the hockey
17   season was sort of stalled because of COVID?
18        A.  That's why I'm a little confused.  It might have
19   been -- I think the last paycheck we got was like April
20   they gave us like -- we didn't get -- we were supposed
21   to get two paychecks when the season hit, we only got
22   the one.
23             I think this was the escrow from the previous
24   year that the PA and the NHL agreed to do.  We were
25   going to forgo our last paycheck but we were -- those

players because just in fairness the guys that played
last year maybe didn't play this year, we were going to
take the escrow check out of the PA, so I think that's
what that was, but --

Q.  And then for November 6th there's another deposit
for $1,033.  Do you recall where that came from?

A.  No.

Q.  And then that same day there are two entries
identified as withdrawals made in a branch/store, one
for $20,000 and one for $10,000.  Do you recall what
those withdrawals were for?

A.  No, I don't.

Q.  And then November 9th there's another withdrawal
for another $10,000.  Do you recall what that was for?

A.  I don't know.  After the first time where I wrote
that check to my night nurse I was paying her and the
nanny we have during the day in cash, so some of those
might have been to have cash on hand because that's how
I paid them.  I don't know if you know the Silicon
valley area, it's quite expensive for a night nurse.

Q.  And do you have any documents that would support
that?

A.  No.

Q.  Moving on to November 24th there's a $9,000
e-deposit.  Do you recall what that was for?

1    A.  No.

2    Q.  And then on the 27th there's a $1,000 e-deposit.

3    Do you recall where that came from?

4    A.  No.

5    Q.  And then there's another e-deposit that same day

6    for $5,000.  Do you know where that came from?

7    A.  I don't.

8    Q.  And then that same day on the 27th there was a

9    withdrawal for $5,000, do you recall what the withdrawal

10   was for?

11   A.  Nope.

12   Q.  And then above that, purchase bank check or draft

13   for $3,200, do you recall what that was for?

14   A.  I don't.

15   Q.  And then on the 30th an e-deposit for $1,500, do

16   you recall what that was for?

17   A.  No.

18   Q.  Moving to December 2020, there's an e-deposit for

19   $3,100, do you recall what that was for?

20   A.  No.

21   Q.  Then that same day there was a purchase bank

22   check or draft for $6,500, do you recall what that was

23   for?

24   A.  I don't.

25   Q.  And then on the 10th of December there was a

1   $15,000 e-deposit, do you recall what that was for?

2       A.   I don't, no.

3       Q.   Then on the 11th there was another $5,000

4   e-deposit, do you recall what that was for?

5       A.   I do not.

6       Q.   And then on the 14th there's another e-deposit

7   for $9,009,37, do you recall what that was for?

8       A.   I do not, no.

9       Q.   And then on the 17th there's a cash e-withdrawal

10  for $2,000, do you recall what that withdrawal was for?

11      A.   Taking out some cash.

12      Q.   And on the 22nd there was an e-deposit for

13  $9,900, do you recall what that was for?

14      A.   I do not.

15      Q.   And last January of 2021, there's an e-deposit on

16  November 7th for $11,000, do you recall what that was

17  for?

18      A.   I don't.

19      Q.   Mr. Kane, we just went through, I believe, all of

20  your monthly bank statements for 2020 and then January

21  of 2021.  We did not receive any statements prior to

22  2020.  Is there a reason for that?

23      A.   Is there a reason for that?  No, I don't believe

24  so.

25      Q.   Do you have access to your bank statements from

1  2019?

2       MR. FINESTONE:  Sorry, you broke up,

3     counsel.

4       MR. GHEKAS:  Sorry.

5       MR. FINESTONE:  The problem was as Mr. Kane

6     testified is that his account was closed at some

7     point and he couldn't go back and get older

8     statements.  I think that was --

9  A.  Yeah, like there was -- I didn't understand --

10 well, I understood your question, no, there's no reason

11 why there wasn't anything provided.  It's just when it

12 was asked if there was any statements prior to that

13 they'd kind of already been closed and I couldn't go

14 back and gather those statements.

15 Q.  (By Mr. Ghekas)  So you have no statements

16 related to your Wells Fargo account for 2019; correct?

17 A.  Correct, yeah.

18 Q.  And you have no statements for your Wells Fargo

19 account for 2018; correct?

20 A.  Correct.

21 Q.  Would that be true for any year prior to 2020?

22 A.  For that account?

23 Q.  For that account, yes, for the Wells Fargo

24 account?

25 A.  Yes.

1    Q.  I'm going to bring up what we will mark as

2    Exhibit 37.

3         (Plaintiff's Exhibit No. 37 was marked.)

4    Q.  Mr. Kane, do you recognize this document?

5    A.  Yes.

6    Q.  And, again, this is a composite document of all

7    of your bank statements associated with your RBC Bank

8    account ending in 5955.  I just want to briefly go

9    through some of those specific entries that we have.

10   First beginning with January 13 here in 2020, who is

11   Benjamin Cary?

12   A.  He was a finance guy that my lawyer at the time

13   John Shero suggested I hire, so he was working with my

14   legal team.

15   Q.  And then if we go to January 17th I see there are

16   three online banking transfers, one for $18,000, one for

17   $40,000 and another for $40,000.  Do you know where the

18   banking transfers -- what account they were going to?

19   A.  I don't know.  There would have to be some

20   correlation.  It could have been going to a credit card

21   or out of my U.S. checking account or I'm not sure.

22   Q.  So your 5955 account that's the Canadian dollars

23   account; correct?

24   A.  Correct.

25   Q.  So for any money to be transferred from this

1   account to one of your American accounts isn't it true
2   that it would first have to be transferred to your 0532
3   RBC account?
4       A.   No.
5       Q.   No?  Okay.
6       A.   No, it wouldn't, but that's not what I meant in
7   terms of transferring it to like my accounts in the
8   U.S., I always needed my transfers in my U.S. dollar
9   account.
10      Q.   Oh, okay.  And that U.S. dollar account, is that
11  the 0532 account?
12      A.   Yes.  Yeah, I'm not saying that I went to that
13  account, I'm just saying it's an online transfer, so to
14  my knowledge I believe it had to stay within the RBC
15  account somewhere or be paying off a credit card.
16      Q.   Let's go to what I believe will be Exhibit 38.
17           (Plaintiff's Exhibit No. 38 was marked.)
18      Q.   These are the bank statements for the January 10,
19  2020 -- December 2020 RBC account ending in 0532.  Do
20  you see that?
21      A.   Yes.
22      Q.   So this is the U.S. dollars account; correct?
23      A.   Yes.
24      Q.   And so if you look back at the -- sorry, the 5955
25  account and look right above the three transfers we were

1  previously talking about to these two transfers, we see

2  that these have reference numbers, and so if we go back

3  into the U.S. dollars account we can match up that

4  reference number.  Do you see that?

5     A.  Yes.

6     Q.  And we have that one for the January 17,

7  $12,787.22 and then for the $51,488 it references 4130,

8  we see that one here; correct?

9     A.  Yes.

10    Q.  But we don't have reference numbers for the other

11 ones to verify that those went into your U.S. dollars

12 account; correct?

13    A.  Correct.  So therefore it could have went to -- I

14 could have been -- again, I'm not sure.  It would be

15 easy to, I would think, correspond that with any of my

16 accounts.

17       It's an online banking transfer, so I'm assuming

18 it's stating Canadian dollars.  It could have went to

19 possibly my Scotia Bank account.  It could have went to

20 paying off my RBC credit card.  I'm not sure.

21          MR. FINESTONE:  And I just caution the

22       witness not to speculate.  If you remember, you

23       remember, but don't guess.

24          THE WITNESS:  Yeah.

25    A.  I don't know.

1    Q.  (By Mr. Ghekas)  I don't believe we received any

2  credit card statements for your RBC account other than,

3  I believe, there were some statements June 26, 2020 and

4  later.  I don't believe we received anything earlier

5  than June 26th.  Is there a reason for that?

6    A.  June 26th?

7    Q.  Yes.

8        MR. FINESTONE:  June 2020 you mean?

9    Q.  No, sorry, I meant June 26, 2020.  I apologize.

10  That's the account statement started on June 26, 2020.

11    A.  Okay.

12    Q.  We didn't receive anything earlier than that.

13    A.  Yeah, it might have been because I didn't have

14  access to it.  I'm honestly not sure.

15    Q.  Then if we were to continue on, February 4

16  there's an a deposit for $25,100 BR to BR.  Do you see

17  that?

18    A.  Yeah.

19    Q.  Do you know where the deposit came from?

20    A.  I don't.  I mean -- I don't -- branch to branch,

21  but I don't understand necessarily what that means.

22    Q.  Would this have been money you deposited?

23    A.  I believe so, yeah.

24    Q.  And then the $25,100 that you believe you would

25  have deposited and where would that have come from?

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 109 of 165

1    A.   This is February 4, 2020?

2    Q.   Yes, February 4, 2020.

3    A.   I'm not sure but it could have been -- maybe it

4    wasn't like an in-person deposit because just going off

5    the dates like I would have been in season and not here.

6    We didn't go into Canada, we had new divisions because

7    of COVID, so like probably I would have been in Canada

8    going to that branch, right, so it could have been

9    something online.

10   Q.   Do you see on February 5 there's another $30,000

11   deposit, BR to BR.  Do you see that?

12   A.   Yeah.

13   Q.   Do you know where that $30,000 came from?

14   A.   I don't.

15   Q.   Then on February 4 there's two ATM withdrawals,

16   one for $903.03 and one for $2,003.50.  Do you know what

17   those would have been associated with?

18                  MR. FINESTONE:  March 2020 --

19   A.   Okay, so never mind.  So I could have been in

20   Canada -- Edmonton.  The $30,000 I think came from

21   casino winnings.

22   Q.   Do you have any documents supporting that?

23   A.   I don't, no.

24   Q.   Then so the withdrawals that we were talking

25   about, do you know what the withdrawals were for?

1    A.  Which one?

2    Q.  The two on February 4?

3    A.  I don't, no.

4    Q.  And then there's three ATM withdrawals on

5  February 5.  Do you see those?

6    A.  Yes.

7    Q.  Do you know what those are for?

8    A.  I think they were at the casino.

9    Q.  Do you know what casino that was?

10    A.  It looks like we were in Edmonton, so probably

11  there.

12    Q.  I'm not familiar with any casinos in Edmonton.

13  Do you know exactly which one it is?

14    A.  I don't, no.

15    Q.  Then there's another $11,000 withdrawal that same

16  day, cash withdrawal, branch to branch.  Do you know

17  what that withdrawal was for?

18    A.  I think it was possibly just taken out to gamble.

19  Like just because it's not sequenced properly I think

20  the $30,000 was what I did at the end of day.  I'm not

21  sure where that money came from.

22    Q.  Let's go to February 14 and there's another three

23  ATM withdrawals.  Do you recall what those were for?

24    A.  I don't, no.

25    Q.  And going to March 12, one withdrawal for

1    $2,836.85, do you know what that was for?

2        A.  I don't.

3        Q.  And then March 20th you see another ATM

4    withdrawal, do you know what that was for?

5        A.  I do not.

6        Q.  And then on March 23rd another ATM withdrawal, do

7    you know what that was for?

8        A.  I do not.

9        Q.  And then there's an online transfer to deposit

10   account 7397, $2,170.56.  Do you know what account that

11   is?

12       A.  I don't, no.

13       Q.  And that same day there's an online banking

14   transfer of $7,500.  Do you know where that was being

15   transferred to?

16       A.  I do not.

17       Q.  And then on the 26th you received a deposit from

18   an online banking transfer for $1,118.23.  Do you know

19   where that transfer was coming from?

20       A.  I don't.

21       Q.  And then on March 30th there's another $1,000

22   online banking transfer withdrawal.  Do you know what

23   account that transfer was going to?

24       A.  I do not.

25       Q.  And then if we go to March 31 there's an online

banking transfer being deposited into your account for

$100,000. Do you know where that was coming from?

  A. I'm assuming a paycheck.

  Q. On March 31, 2020 you believe you received a

paycheck into your Canadian 5995 account?

  A. No -- no, I believe that's for like the money

came from to make that deposit, I don't know how. I

don't know the sequence, but that's just -- it's the end

of the month, it's the 31st, COVID just happened, so we

got a paycheck I believe like at the Wells Fargo --

remembering the Wells Fargo statement we just looked at,

so that's what I'm assuming.

  Q. And we saw -- your paychecks you received from

the Sharks, did they always go into your Wells Fargo

account?

  A. No. I was getting physical paychecks, so I would

predominantly put them in my Wells Fargo account.

  Q. And if the paycheck did go into your Wells Fargo

account do you know what the sequence would be for it to

be transferred into your RBC 5955 account?

  A. I would wire -- I'd have to wire it from Wells

Fargo into my RBC U.S. dollar account, and then I would

convert the U.S. dollars into Canadian dollars and it

would be transferred into that Canadian dollar account.

  Q. So if there's not a corresponding transfer in

```
 1   your U.S. dollars account 0532 for this amount do you
 2   have any knowledge as to where else this transfer would
 3   have come from?
 4        A.   No.   And I'm not sure if there's always a
 5   reference in terms of like initially or once the money
 6   is in there and it's been -- maybe it was transferred to
 7   a different -- my savings account first and then --
 8   which I don't believe it would have been, but it could
 9   have been my Scotia Bank account too that I transferred
10   to; but I'd have to ask what online banking transfer
11   means and how -- what that exactly means and I can give
12   you a better answer, but I don't know.
13        Q.   And so if there was no transfer that actually
14   matched up with your Scotia Bank account would you have
15   any knowledge as to where this transfer would have come
16   from?
17        A.   Well, it had to come -- there had to be some sort
18   of -- because, again, I'm in San Jose, so it's not like
19   I'm making a deposit, so it says online transfer, so I
20   don't know.
21        Q.   I mean, is this a $100,000 that came from a third
22   party?
23        A.   No.   I don't believe so, no.
24        Q.   Would it have come from any other account other
25   than your Scotia Bank account or the 0532 account?
```

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 114 of 165

1    A.  No.

2    Q.  If we go to April here, we see an April 13 ATM

3    withdrawal for $1,447.53.  Do you know what this

4    withdrawal was for?

5    A.  No.

6    Q.  On the 17th there's another withdrawal in a

7    similar amount for $1,456.08.  Do you know what that

8    withdrawal was for?

9    A.  No.

10   Q.  And then there's a $25,000 withdrawal from your

11   account which is described as another online banking

12   transfer.  Do you know where that money was going?

13   A.  I do not.

14   Q.  And on the 17th of April there's a $5,000

15   withdrawal coming out of your account, the description

16   is cash withdrawal BR to BR.  Do you know where that was

17   going?

18   A.  I don't.

19   Q.  Do you know what that was for?

20   A.  I don't.

21   Q.  Then if we go to that same day, April 27th we see

22   there's another $10,000 cash withdrawal BR to BR.  Do

23   you know where that money was going?

24   A.  I do not.

25   Q.  Do you know what that money was for?

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 115 of 165

1    A.  I don't.

2    Q.  And then that same day there's another $65,258.22

3  withdrawal described as another online banking transfer.

4  Do you know where that was going?

5    A.  I don't.

6    Q.  Do you know what it was for?

7    A.  I don't.  I don't want to keep guessing.

8    Q.  And then on April 28th there's another online

9  banking transfer for $1,196.09 which is withdrawal on

10 account, do you know where that was going?

11   A.  No, I don't.

12   Q.  If we go to May now, you see on May 14th, 2020

13 there's a deposit into your account for $50,000 and the

14 description is credit memo.  Do you see that?

15   A.  Yes.

16   Q.  Do you know where that came from?

17   A.  I don't.

18   Q.  And then on that same day there's a $45,000

19 withdrawal which is described as a cash withdrawal BR to

20 BR.  Do you know where that was going?

21   A.  I don't.

22   Q.  Do you know what it was for?

23   A.  No.

24   Q.  And then if we look on May 25th there's a

25 $6,674.90 online transfer to deposit account.  Do you

1    know what that was for?

2        A.  No.

3        Q.  Do you know what account that was?

4        A.  No.

5        Q.  And on May 26th there's a deposit into your

6    account for $9,694.90, and that's described as online

7    banking transfer.  Do you know where that came from?

8        A.  No.

9        Q.  For June 30th there's another $1,000 deposit into

10   your account which is described as an online banking

11   transfer.  Do you know where that came from?

12       A.  No.

13       Q.  And the same for the one on July 3rd for

14   $850,000, do you know where what came from?

15       A.  No.

16       Q.  Then if we go to July 9th there's another

17   $100,000 deposit into your account, it is an online

18   banking transfer.  Do you know where that came from?

19       A.  I think that's my line of credit.

20       Q.  What makes you think that?

21       A.  Because I have a $100,000 line of credit.

22       Q.  So do you have any documents associated with your

23   line of credit?

24       A.  Documents, no.  I don't have any documents.

25       Q.  Would you have any documents that would confirm

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 117
of 165

1    that $100,000 came from your line of credit?

2       A.  I don't believe so.  I just -- like this is July

3    9th, right, 2020, so I'm not -- that money is getting

4    sent to go put the down payment on my house.

5          So I used money from my bonus checks to pay off a

6    preexisting -- or pardon me -- used the money from my

7    bonus checks to pay the down payment, and I needed

8    another $100,000 -- that's Canadian, because the house

9    is in U.S. dollars obviously, it's America, so that's

10   what I was doing.  I'm 99 percent sure that's from my

11   line of credit.

12      Q.  So that then would have had to have been -- when

13   you say it's a down payment for your home, is that the

14   Richland home?

15      A.  Correct.

16      Q.  So how would that money get from your Canadian

17   dollar account to the seller of the property?

18      A.  Well, I would transfer the Canadian -- the amount

19   in Canadian dollars to my U.S. dollar account and then

20   wire it from my Canadian -- pardon me -- my Canadian

21   U.S. dollar account to the seller.

22      Q.  Then if we go to July 10 there's a withdrawal for

23   $30,000 and the description is BR to BR.  Do you know

24   where that was going?

25      A.  I don't.

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 118 of 165

1    Q.  Then if we go to August 17th there's another

2    deposit for $144,664.71 and it's another online banking

3    transfer.  Do you know where that came from?

4    A.  No.

5    Q.  Then August 20th there's another deposit for

6    $100,000.  Do you know where that deposit came from?

7    A.  I don't.

8    Q.  And then on August 20th, that same day there's a

9    debit memo for $57,216.73, which is listed as a

10   withdrawal.  Do you know where that was going?

11   A.  I do not.

12   Q.  Then if we go to September 9th there's a deposit

13   for $88,070, which is described as a BR to BR.  Do you

14   know where that was coming from?

15   A.  No.

16   Q.  And then that same day there's a cash withdrawal,

17   BR to BR for $100,000.  Do you know what that withdrawal

18   was for?

19   A.  I don't.

20   Q.  If we go to September 16th there's another

21   deposit for $10,000 described as BR to BR.  Do you know

22   where that $10,000 came from?

23   A.  I don't.

24   Q.  I'm sorry?

25   A.  I don't.

1     Q.  And then October 5th there's another deposit for

2  $3,500 which appears to be an online banking transfer.

3  Do you know where that was coming from?

4     A.  No.

5     Q.  And then that same day there's another $9,500

6  deposit described as a BR to BR.  Do you know where that

7  was coming from?

8     A.  I don't.

9     Q.  And if we continue to October 14th there's two

10  deposits, both descriptions are credit memo, one is for

11  $51,000 and one is for $80,000.  Do you know where these

12  came from?

13     A.  No.

14     Q.  Mr. Kane, do you know what -- on October 14

15  there's a funds transfer to TOYNK TOYS, do you know what

16  that was for?

17     A.  Yes.  Yes.

18     Q.  What was that for?

19     A.  That was a wire I sent purchasing -- I think

20  there was three cards, Pokemon cards, from this company

21  for Tony.

22     Q.  Do you have any documents that would support

23  that?

24     A.  Other than what we see, no.

25     Q.  I want to show you what we'll mark as Exhibit 40.

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 120 of 165

1          THE COURT REPORTER:  Are you sure it's 40?

2          MR. GHEKAS:  No.

3          THE COURT REPORTER:  I think it's 39.

4          (Plaintiff's Exhibit No. 39 was marked.)

5     Q.  (By Mr. Ghekas)  So Exhibit 39, this is for the

6  same account 5955 at RBC starting at September 12, 2019.

7  Do you see that?

8     A.  Yes.

9     Q.  So Mr. Kane, we didn't receive any bank

10  statements for your RBC Bank account ending in 5955.  Is

11  that because you don't have any bank statements earlier

12  than that?

13     A.  I'm not sure.

14     Q.  So you may have bank statements predating

15  September 12, 2019 for your RBC account ending in 5955?

16     A.  No, actually I don't believe so.

17     Q.  And if we look on October 7th here of 2019

18  there's a deposit for $50,000, again the description if

19  BR to BR.  Do you know where that was coming from?

20     A.  I don't.

21     Q.  And then on October 16th there's another deposit

22  for $10,000 BR to BR.  Do you know where that was coming

23  from?

24     A.  I don't, no.

25     Q.  And then October 18th we see there's another

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 121 of 165

1  $40,000 deposit described as BR to BR.  Do you know

2  where that was coming from?

3      A.  No, I don't.

4      Q.  And on the 25th there's a withdrawal of $48,500

5  which is described as an online transfer to deposit

6  account.  Do you know where that was going?

7      A.  I don't, no.

8      Q.  Then looking at November 4th there's another

9  withdrawal for $2,817 described as online banking

10  transfer.  Do you know where that was going?

11      A.  No.

12      Q.  Then on November 29 we see a deposit for $35,000

13  and it's described as credit memo.  Do you know what

14  that was for?

15      A.  I do not.

16      Q.  Then December 9th there's a withdrawal for $1,600

17  and it's described as an online banking transfer.  Do

18  you know where that was going?

19      A.  No.

20      Q.  I'm sorry?

21      A.  I do not.

22      Q.  And then just to finish this statement, looking

23  at January 3, 2020 we see that there is a withdrawal for

24  $15,000 which is described as an online banking

25  transfer.  Do you know where that was going?

1    A.  No.

2    Q.  And then on January 8 there's another $10,000

3  withdrawal also described as an online banking transfer.

4  Do you know where that was going?

5    A.  No.

6    Q.  If we look at what was marked as Exhibit 38 again

7  this is your RBC Bank statements for your account 0532,

8  we see on January 17 there's three withdrawals that are

9  described as online banking foreign exchanges for

10  $10,000, $20,000 and $20,000.  Do you know where those

11  were going?

12    A.  I don't.

13    Q.  Then if we look on February 11 there's another

14  withdrawal described as an online banking foreign

15  exchange for $912.17.  Do you know where that was going?

16    A.  I don't.

17    Q.  And then on February 14 there's a deposit for

18  $29,802.95 which is described as a BR to BR.  Do you

19  know where that was coming from?

20    A.  I do not.

21    Q.  And if we skip to August here, on August 20 it

22  says a deposit for $40,056.68 described as a credit

23  memo.  Do you know where that money was coming from?

24    A.  I don't.  I mean, it got transferred out right

25  away to Chicago Title which is the title company for the

1 house on Richland.

2     Q. But you don't know where the money came from?

3     A. I don't know, I guess, where it came from, no.

4     Q. And then on September 6 there's another deposit

5 for $6,696.37 described as BR to BR. Do you where that

6 came from?

7     A. No.

8     Q. Then if we look at October 14 there's a

9 withdrawal for $38,977.71 described as a debit memo. Do

10 you know where that was going?

11     A. I don't.

12     Q. Then on December 1 there's a deposit for $30,000

13 described as BR to BR. Do you know where that money

14 came from?

15     A. I do not.

16     Q. Let's look at what we will now mark as Exhibit

17 40.

18         (Plaintiff's Exhibit No. 40 was marked.)

19     Q. These are your bank statements for that same

20 account 0532, and again we only received account

21 statements for the period September 12, 2019 and

22 forward, so we didn't receive any account statements

23 predating September 12, 2019. Is that because you no

24 longer have records predating September 12, 2019?

25     A. I don't believe so.

1    Q.  If we go to November 8 there's a withdrawal for

2    $40,000 and it says fund transfers to Evander Kane.  Do

3    you know where that would have been transferred to?

4    A.  I don't know exactly.

5    Q.  Then if we go to November 29 there's another

6    withdrawal of $26,623.06 and it's identified as a debit

7    memo.  Do you know what that withdrawal was for?

8    A.  I don't, no.

9    Q.  Then on December 31, 2019 there's a deposit for

10   $169,854.48 and that's described as BR to BR.  Do you

11   know where that came from?

12   A.  I don't know.

13              MR. FINESTONE:  Counsel, do you have a lot

14        more documents to review?

15              MR. GHEKAS:  Not a lot, but we still have

16        his Scotia Bank account statements and then his

17        credit card statements.

18              MR. FINESTONE:  Let's take a five-minute

19        break then if we could.

20              MR. GHEKAS:  Okay.

21          (There was a break in the proceedings.)

22   Q.  (By Mr. Ghekas)  I'm going to put up what we'll

23   mark as Exhibit 41.

24          (Plaintiff's Exhibit No. 41 was marked.)

25   Q.  Mr. Kane, these are bank statements relating to

1  your Scotia Bank account ending in 28, do you see that?

2    A.  Yes.

3    Q.  What was this account primarily used for?

4    A.  Well, when I opened up -- changed my mortgage

5  from Royal Bank of Canada to Scotia Bank they wanted me

6  to open up an account, so I did.

7    Q.  Is there a distinction between the account that

8  ends in 28 and the Scotia Bank account that ends in 87?

9    A.  Well, they're two different accounts.

10   Q.  Yeah, that was a bad question because obviously

11 there's a distinction.  What I meant is when we look at

12 the RBC account you had two, one was a U.S. dollars

13 account and the other was a Canadian dollars account.

14 Is that the same reason for the two Scotia Bank

15 accounts?

16   A.  No, it's just a checking and savings account they

17 call it.

18   Q.  Okay.  Do you know which one is the savings

19 account?

20   A.  Probably the one that's less used.

21   Q.  Okay.

22   A.  I'm not sure.

23   Q.  All right.  Then --

24   A.  Yeah, I think this is the checking account.

25   Q.  28?

1    A.  I could really tell you here in a minute.  Yeah,

2  the 28 is the checking and the 87 is the -- they call it

3  a Scotia power savings.

4    Q.  So turning to page 5 of this document, which is

5  the March statement, you have a March 5 withdrawal to a

6  credit card/LOC payment.  Do you know what credit card

7  or line of credit that would be?

8    A.  What year is this, sir?

9    Q.  This is 2020.

10    A.  I think -- I think this was originally the -- I'm

11  not sure, to be honest.

12    Q.  And then under that we have March 23rd, a

13  withdrawal for $3,500, and all that is put under the

14  transaction description which is MB-transfer to.  Do you

15  know where this is being transferred to?

16    A.  I don't.  I mean, if I had some better

17  descriptions like even going back to the other

18  statements I could possibly give you -- I could probably

19  give you answers for let's say, at least 40 percent of

20  what it was that I didn't give you answers for; but for

21  me to try to understand what -- how certain things

22  define certain transactions it makes it really hard to

23  try to pinpoint exactly where this money came from or

24  where that money went, to be honest.

25    Q.  So do you have any other records that would help

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 127
of 165

1   you other than the bank statements that have been
2   provided?
3       A.   I don't know.
4       Q.   You don't know as in --
5       A.   No.  I said I don't, no.
6       Q.   Thank you for that.  And so for the March 30th
7   withdrawal, again MB-transfer to, again you wouldn't
8   know what that was being transferred to?
9       A.   I don't.  I don't know what MB-transfer to means
10  here.
11      Q.   If we look at the April statement we see $1,000
12  withdrawal MB-transfer to -- it's the 87 account.  Do
13  you see that?
14      A.   Yes.
15      Q.   All right.  So when we see -- and, again, there's
16  another deposit from your 87 account to your 28 account,
17  and we see that here on April 25th; correct?
18      A.   Correct.
19      Q.   So when we have -- going back to the March
20  statement we looked at where there is no reference to an
21  account, does that mean that this was not a transfer to
22  an account you maintained?
23      A.   I don't know.
24      Q.   Let's go to the May statement, and there are
25  several entries on May 4, 5, 6 and 7 and they all have

1    -- they're all deposits into the 28 Scotia account and

2    they're all described as a sequence of numbers and then

3    MB-E-mail money Trf.  Do you know what that refers to?

4         A.  I don't.

5         Q.  And do you know where this money would have been

6    deposited from?

7         A.  No.  I mean, I could say like maybe I transferred

8    money -- because you can e-mail transfer like Zelle for

9    the U.S., so to e-mail money, I mean, again I'm just

10   sitting here guessing.  But the denominations are a

11   little strange too, like one is eight cents.

12        Q.  So the eight cents one that actually was a

13   transfer from your 87 account?

14        A.  Okay.

15             MR. FINESTONE:  And also the one above that

16        was too, is that what it's saying?

17        Q.  The one above that was this E-mail money Trf --

18        A.  It could have been -- they could have been -- if

19   they're deposits there could have been -- May -- e-mail

20   transfers from -- actually, you know, I think if -- I

21   think they might have been e-mail transfers from guys I

22   was golfing with.

23        Q.  Do you know who those individuals were?

24        A.  I don't know who I would have been playing with

25   that day.

1    Q.   On May 14th we see another deposit for $45,000

2    and all it says is deposit.  Do you know where that

3    money came from?

4    A.   I don't know.

5    Q.   Then on May 16 we see two -- I'm sorry, not May

6    16 -- May 25 and May 26 two withdrawals each for $3,000

7    and, again, we have this description of MB e-mail money

8    transfer.  Do you know where you would have been

9    transferring $3,000 to?

10   A.   I don't, no.

11   Q.   And then on June 5th we see another similar

12   $3,000 withdrawal again MB-E-mail money Trf.  Do you

13   know where that would have been going?

14   A.   I don't.

15   Q.   Then again the same question for June 8th and

16   June 26th, there's another $3,000 withdrawal and a

17   $2,000 withdrawal.  Do you know where those would have

18   been going?

19   A.   No.

20   Q.   Would your answer be the same for any of these

21   withdrawals that had that sort of description?

22   A.   Yes.

23          MR. FINESTONE:  Thank you for the expedited

24     question.

25   Q.   (By Mr. Ghekas)  On July 3rd here there's a

REGENCY REPORTING SERVICE, INC. (813) 244-5296

1    withdrawal for $1,963.16 to a credit card.  Do you know

2    what credit card that would be?

3        A.  I'm not sure, no.

4        Q.  That sped up that set of statements.  That might

5    speed up these next few ones as well.

6            Sticking with this same account I'm going to show

7    you what we'll mark as Exhibit 42.

8            (Plaintiff's Exhibit No. 42 was marked.)

9        Q.  This is for 2019, and I believe we did receive

10   for the Scotia Bank 28 account 2019 statements, so I

11   just want to quickly to go through these and to

12   hopefully expedite the questions a little bit.

13           For any description where it was a transfer to

14   credit card such as we see here on February 6th and

15   again on February 8th and also on February 11th, would

16   you know what credit card that is?

17       A.  I don't.

18       Q.  And would that be the same if I were to show you

19   other entries where all it says is credit card?

20       A.  Yeah.  The descriptions are just so unhelpful

21   like I don't even know what MB stands for when the bank

22   is called Scotia Bank.

23       Q.  And then if we go to March 18 here we see a

24   $4,388.80 MB-transfer to, and that's it.  Do you know

25   where that was going?

1    A.  No.

2    Q.  Would that be the same for any entry that says

3  MB-transfer to?

4    A.  Yeah, because again like if it has transfer to

5  where then it would be so much easier to remember or,

6  you know, have a much more educated guess on what these

7  transactions were.

8    Q.  And you have no other documents that would help

9  you in identifying exactly what these transactions were?

10    A.  No.  I mean, that's why people use online banking

11  is to document, it's right there for you, so that's all

12  I have.

13    Q.  All right.  So then if we skip ahead here to

14  August, I think there are only two more here, August 9

15  there's a withdrawal for $35,000 and the description is

16  debit memo draft purchase.  Do you know what that refers

17  to?

18    A.  I don't know -- August -- is this 2019 still?

19    Q.  Yes.

20    A.  Clearly -- I mean, I don't want to say clearly --

21  but it seems like it was a bank draft, I don't know what

22  it would be for again.  Usually there's a thing where

23  you click on and see who it was made out to and whatnot,

24  but I'm not sure.

25    Q.  Okay.  Do you have the capability of doing that?

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 132 of 165

1    A.  I don't.

2    Q.  Then if we go to October skipping the rest of

3  August and September we see a deposit on October 25th

4  for $49,000.  Do you know where that deposit came from?

5    A.  I don't.

6    Q.  We're done now with Exhibit 42 and I'll show you

7  what we'll mark as Exhibit 43.

8         (Plaintiff's Exhibit No. 43 was marked.)

9    Q.  I may be able to speed this one up too.  These

10 are the bank statements for your Scotia Bank 87 account

11 for the 2020 time period, and just again to confirm,

12 were any transactions such as we see here on January 13

13 and January 17 where all it says is MB-transfer to

14 credit card, you wouldn't know what credit card that is?

15   A.  I don't.

16   Q.  And then also for any transfer -- any transaction

17 description where all it says is MB-transfer to, you

18 wouldn't know exactly where that was going?

19   A.  No.

20   Q.  Bear with me, I may be able to get through this

21 one a lot quicker.  So then the only other one I have on

22 this then is October 5th there's a withdrawal of

23 $10,000, it says cash.  Do you know why you withdrew

24 $10,000?

25   A.  I don't, no.

```
1        Q.  We got through that document, and the next one is

2   maybe just as quick.  This is your same account, Scotia

3   Bank ending in 87.

4               THE COURT REPORTER:  Is this Exhibit 44?

5               MR. GHEKAS:  Yeah, sorry.

6          (Plaintiff's Exhibit No. 44 was marked.)

7        Q.  (By Mr. Ghekas)  And just to confirm again, Mr.

8   Kane, for any transaction where it would say MB-transfer

9   to credit card, you wouldn't be able to identify what

10  credit card that is?

11       A.  Correct.

12       Q.  Then if we go to March 14, again for any

13  transactions where it says MB-transfer to, you wouldn't

14  know where that was being transferred?

15       A.  Correct.

16       Q.  For March 7th we see a deposit here for $123,000

17  from Alexandra Duggan.  Do you know what that deposit

18  was for?

19       A.  Give me a second.

20       Q.  Who is Alexandra Duggan?

21       A.  Well, that's what I'm trying to figure out here

22  so I can give you a better idea.  March 7, 2020?

23       Q.  2019.

24       A.  I'm drawing a complete blank.

25       Q.  Do you know what you would have utilized that
```

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 134 of 165

1   money for?  Do you know if it was a loan?

2       A.   It looks like I made some payments shortly after

3   that, a week later with that money, transfers, but I'm

4   just trying to figure out who Alexandra Duggan is.  You

5   can try to Google them.  I don't know.

6       Q.   Okay.  That speeds up that document.

7            I believe we identified this document before and

8   now I just forget what it was, but early on this was the

9   Statement of Financial Affairs.  I believe it was

10  Exhibit 2, but it might have been 3.

11           But I just want to focus on -- sorry, that's not

12  even the right document.  It's your amended -- no, yeah

13  it is.  Okay.  Right here, yes.  So in Part 3 of the

14  Statement of Financial Affairs you have listed two

15  credit cards with American Express, one of them is

16  designated as American Express with Wells Fargo, which I

17  believe you testified about earlier.  Did you have a

18  second American Express card?

19      A.   Yes.

20      Q.   Do you have any documents associated with this

21  specific American Express card?

22      A.   I don't.  That card was shut down along with the

23  Wells Fargo American Express too.

24      Q.   Okay.  And then for the Wells Fargo American

25  Express we did receive some documents, I believe the

<u>CERTIFICATE OF REPORTER</u>

STATE OF FLORIDA         :

COUNTY OF HILLSBOROUGH :

          I, CHERE J. BARTON, FPR, a Notary Public in and

for the State of Florida at Large, certify that I was

authorized to and did stenographically report the

foregoing proceedings; and that the transcript is a true

record of the testimony given by the witness.

          I further certify that I am not a relative,

employee, attorney or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

          Dated this 19th day of July, 2022.




                    /s/ Chere J. Barton, FPR
                    _____
                    CHERE J. BARTON, FPR
                    Notary Public
                    State of Florida at Large
                    My Commission No:  #HH 033431
                    My Commission Expires:  12/17/24




REGENCY REPORTING SERVICE, INC. (813) 244-5296

# EXHIBIT "21"



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From September 12, 2019 to October 11, 2019

RBPDA10020_6530043_138 E D 012 00920          01428
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| Your account number: | ████0532 |
|---|---|

| How to reach us: | 1-800 ROYAL® 1-1 |
|---|---|
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on September 12, 2019 | $0.00 USD |
| Total deposits into your account | + 0.00 USD |
| Total withdrawals from your account | - 0.00 USD |
| **Your closing balance on October 11, 2019** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| - | No activity for this period | - | - | - |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.
If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.
Please retain this statement for your records.
™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.
® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.
Royal Bank of Canada GST Registration Number: R105248165
Royal Trust Corporation of Canada GST Registration Number: R104646666
The Royal Trust Company GST Registration Number: R105248264







**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From October 11, 2019 to November 12, 2019

RBPDA10020_6904212_031 E D 012 00920     00195

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| **Your account number:** | ██████0532 |
|---|---|

| **How to reach us:** | 1-800 ROYAL® 1-1 |
|---|---|
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ██████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on October 11, 2019 | $0.00 USD |
| Total deposits into your account | + 265,976.94 USD |
| Total withdrawals from your account | - 263,125.54 USD |
| **Your closing balance on November 12, 2019** | **= $2,851.40 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Opening Balance | | | 0.00 USD |
| 1 Nov | Funds transfer credit  TT EVANDER FRAN | | 180,000.00 | |
| | Funds transfer fee  TT EVANDER FRAN | 17.00 | | |
| | Online Banking foreign exchange Ref 6WW433051115320 | 100,000.00 | | 79,983.00 USD |
| 4 Nov | Funds transfer  BENJAMIN CARY | 20,020.00 | | |
| | Funds transfer  PACHULSKI STANG | 50,020.00 | | |
| | Funds transfer fee  BENJAMIN CARY | 34.27 | | |
| | Funds transfer fee  PACHULSKI STANG | 34.27 | | |
| | Online Banking foreign exchange Ref 6WW903080740150 | 3,000.00 | | |
| | Online Banking foreign exchange Ref 6WW183080739400 | 6,000.00 | | 874.46 USD |
| 5 Nov | Telephone Banking transfer Ref 018543093149130 | | 3,000.00 | |
| | Telephone Banking transfer Ref 018543093139660 | | 6,000.00 | 9,874.46 USD |

**1 of 2**

RBPDA10020_6904212_031 - 0149554 HRI - 00 - 1 - 240 - 18 -  366



# Your RBC personal banking account statement — U.S. funds
Keena GB-004578

From October 11, 2019 to November 12, 2019

---

## Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|-----------------|--------------|-------------|
| | Online Banking foreign exchange<br>Ref 6WW493091038440 | 9,000.00 | | 874.46 USD |
| 6 Nov | Telephone Banking transfer<br>Ref 018543102816290 | | 9,000.00 | 9,874.46 USD |
| | Credit memo | | 6,000.00 | |
| | Online Banking foreign exchange<br>Ref 6WW163100711020 | 6,000.00 | | |
| | Online Banking foreign exchange<br>Ref 6WW543100856400 | 9,000.00 | | 874.46 USD |
| 7 Nov | Online Banking foreign exchange<br>Ref 6WW713111624100 | | 11,976.94 | |
| | Online Banking foreign exchange<br>Ref 6WW083110805460 | | 50,000.00 | 62,851.40 USD |
| | Online Banking foreign exchange<br>Ref 6WW103110905430 | 20,000.00 | | 42,851.40 USD |
| 8 Nov | Funds transfer EVANDER KANE | 40,000.00 | | 2,851.40 USD |
| | **Closing Balance** | | | **$2,851.40 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_6904212_031 - 0149554  367

**2 of 2**

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 140 of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From November 12, 2019 to December 12, 2019

RBPDA10020_7590655_013 E D 012 00920     03459
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| **Your account number:** | ███████0532 |
| --- | --- |

| **How to reach us:** | 1-800 ROYAL® 1-1 |
| --- | --- |
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████ 0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
| --- | --- |
| Your opening balance on November 12, 2019 | $2,851.40 USD |
| Total deposits into your account | + 55,001.49 USD |
| Total withdrawals from your account | - 57,852.89 USD |
| **Your closing balance on December 12, 2019** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
| --- | --- | --- | --- | --- |
| | Opening Balance | | | 2,851.40 USD |
| 15 Nov | Online Banking foreign exchange<br>Ref 6WW733191139530 | 2,351.40 | | 500.00 USD |
| 29 Nov | Funds transfer credit  TT EVANDER KANE | | 55,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Debit memo | 26,623.06 | | |
| | Online Banking foreign exchange<br>Ref 6WW993331940340 | 18,859.94 | | 10,000.00 USD |
| 2 Dec | Deposit interest | | 0.01 | 10,000.01 USD |
| 9 Dec | Online Banking foreign exchange<br>Ref 6WW353430825290 | | 1.48 | 10,001.49 USD |
| | Online Banking foreign exchange<br>Ref 6WW173430825410 | 1.49 | | |

**1 of 2**

RBPDA10020_7590655_013 - 0063055 HRI - 00 - 1 - 4237 - 14 -   6271

Kane CB-004524

# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| | Online Banking foreign exchange | | | |
| | Ref 6WW303430825070 | 10,000.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_7590655_013 - 0063055   6272



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From December 12, 2019 to January 10, 2020

RBPDA10020_8211998_055 E D 012 00920          03646
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| **Your account number:** | ▮▮▮▮▮0532 |
|---|---|

| **How to reach us:** | 1-800 ROYAL® 1-1 |
|---|---|
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ▮▮▮▮0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on December 12, 2019 | $0.00 USD |
| Total deposits into your account | + 333,715.43 USD |
| Total withdrawals from your account | - 319,715.43 USD |
| **Your closing balance on January 10, 2020** | **= $14,000.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 0.00 USD |
| 17 Dec | Funds transfer credit  TT EVANDER KANE | | 45,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Online Banking foreign exchange Ref 6WW603511215440 | 40,000.00 | | 4,983.00 USD |
| 18 Dec | Online Banking foreign exchange Ref 6WW543521124280 | 4,983.00 | | 0.00 USD |
| 31 Dec | BR TO BR - 7922 | | 169,854.48 | |
| | Funds transfer  PROFESSIONAL BA | 91,626.00 | | |
| | Funds transfer fee  PROFESSIONAL BA | 34.75 | | 78,193.73 USD |
| 3 Jan | Funds transfer  EVANDER KANE | 15,020.00 | | |
| | Funds transfer fee  EVANDER KANE | 34.68 | | |
| | Online Banking foreign exchange Ref 6WW600031347290 | 68,000.00 | | - 4,860.95 USD |
| 6 Jan | Online Banking foreign exchange Ref 6WW230040719050 | | 4,860.95 | 0.00 USD |
| 8 Jan | Funds transfer credit  TT EVANDER KANE | | 100,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 143 of 165

## Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Online Banking foreign exchange<br>Ref 6WW000081525300 | 99,983.00 | | 0.00 USD |
| 10 Jan | Online Banking foreign exchange<br>Ref 6WW360101855570 | | 14,000.00 | 14,000.00 USD |
| | **Closing Balance** | | | **$14,000.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_8211998_055 - 0272488 6681



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From January 10, 2020 to February 12, 2020

RBPDA10020_9013556_031 E D 012 00920    02768

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| **Your account number:** | ▇0532 |
|---|---|

**How to reach us:**   1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ▇0532

**Royal Bank of Canada**

1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on January 10, 2020 | $14,000.00 USD |
| Total deposits into your account | + 220,008.77 USD |
| Total withdrawals from your account | - 234,008.77 USD |
| **Your closing balance on February 12, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 14,000.00 USD |
| 13 Jan | Funds transfer  BENJAMIN CARY | 8,166.83 | | 5,833.17 USD |
| 15 Jan | Online Banking foreign exchange | | | |
| | Ref 6WW060142349220 | 5,833.17 | | 0.00 USD |
| 16 Jan | Funds transfer credit  TT EVANDER KANE | | 100,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | 99,983.00 USD |
| 17 Jan | Online Banking foreign exchange | | | |
| | Ref 6WW740170209540 | 9,983.00 | | |
| | Online Banking foreign exchange | | | |
| | Ref 6WW390170420230 | 10,000.00 | | |
| | Online Banking foreign exchange | | | |
| | Ref 6WW290170406160 | 20,000.00 | | |
| | Online Banking foreign exchange | | | |
| | Ref 6WW830170357100 | 20,000.00 | | |
| | Online Banking foreign exchange | | | |
| | Ref 6WW100170244130 | 40,000.00 | | |
| | Overdraft interest | 8.76 | | - 8.76 USD |
| 20 Jan | Online Banking foreign exchange | | | |
| | Ref 6WW120181322140 | | 8.76 | 0.00 USD |

**1 of 2**

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 145
of 165


## Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| 31 Jan | Funds transfer credit  TT EVANDER KANE | | 25,000.00 | |
| | Funds transfer credit  TT EVANDER KANE | | 95,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | 119,966.00 USD |
| 3 Feb | Online Banking foreign exchange<br>Ref 6WW420341817590 | 80,000.00 | | 39,966.00 USD |
| | Deposit interest | | 0.01 | 39,966.01 USD |
| 6 Feb | Funds transfer  EVANDER KANE | 20,000.00 | | 19,966.01 USD |
| 10 Feb | Funds transfer  PACHULSKI STANG | 19,020.00 | | |
| | Funds transfer fee  PACHULSKI STANG | 33.84 | | 912.17 USD |
| 11 Feb | Online Banking foreign exchange<br>Ref 6WW290421405210 | 912.17 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

* Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

Case: 21-05016   Doc# 39-3   Filed: 11/17/22   Entered: 11/17/22 16:58:52   Page 146
of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From February 12, 2020 to March 12, 2020

RBPDA10020_1481433_031 E D 012 00920          O2817

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

**Your account number:** ▮0532

**How to reach us:** 1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ▮0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on February 12, 2020 | $0.00 USD |
| Total deposits into your account | + 157,530.52 USD |
| Total withdrawals from your account | - 157,530.50 USD |
| **Your closing balance on March 12, 2020** | **= $0.02 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 0.00 USD |
| 14 Feb | BR TO BR - 0007 | | 29,802.95 | 29,802.95 USD |
| 18 Feb | Overdraft interest | 0.01 | | 29,802.94 USD |
| 24 Feb | Online Banking foreign exchange | | | |
| | Ref 6WW340550729160 | | 3,707.55 | 33,510.49 USD |
| | Funds transfer  CHICAGO TITLE C | 33,020.00 | | |
| | Funds transfer fee  CHICAGO TITLE C | 33.94 | | 456.55 USD |
| 27 Feb | Online Banking foreign exchange | | | |
| | Ref 6WW580581437380 | 456.55 | | 0.00 USD |
| 2 Mar | Funds transfer credit  TT EVANDER KANE | | 99,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Online Banking foreign exchange | | | |
| | Ref 6WW240621708590 | 98,983.00 | | 0.00 USD |
| | Deposit interest | | 0.02 | 0.02 USD |
| 4 Mar | Online Banking foreign exchange | | | |
| | Ref 6WW210640958270 | | 25,000.00 | 25,000.02 USD |
| | Credit memo | | 20.00 | |

**1 of 2**

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 108
of 165

RBPDA10020_1481433_031 - 0152039 HRI - 00 - 1 - 3434 - 9 - 3 -     5139

## Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| | Funds transfer  GENOVESE JOBLOV | 25,020.00 | | 0.02 USD |
| | **Closing Balance** | | | **$0.02 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

TM Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

* Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 148 of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From March 12, 2020 to April 9, 2020

RBPDA10020_2132686_170 E D 012 00920          03439
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

<table>
<tr><td><strong>Your account number:</strong></td><td>██████0532</td></tr>
<tr><td><strong>How to reach us:</strong></td><td>1-800 ROYAL® 1-1<br>(1-800-769-2511)<br>www.rbcroyalbank.com/deposits</td></tr>
</table>



## Summary of your account for this period

**U.S. Personal™ Private Banking** ██████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on March 12, 2020 | $0.02 USD |
| Total deposits into your account | + 80,006.99 USD |
| Total withdrawals from your account | - 80,007.01 USD |
| **Your closing balance on April 9, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Opening Balance | | | 0.02 USD |
| 26 Mar | Online Banking foreign exchange<br>Ref 6WW480861703340 | | 6.99 | 7.01 USD |
| | Online Banking foreign exchange<br>Ref 6WW070861703460 | 7.01 | | 0.00 USD |
| 31 Mar | Funds transfer credit  TT EVANDER KANE | | 80,000.00 | |
| | Funds transfer  EVANDER KANE | 4,983.00 | | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Online Banking foreign exchange<br>Ref 6WW270911401120 | 75,000.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |



RBPDA10020_2132686_170 - 0844872 HRI - 00 - 1 - 4148 - 21 - - 7240

**1 of 2**

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 149
of 165



# Important information about your account

In these uncertain times, it's important we continue to come together as a community to support one another. We created the RBC Client Relief Program to provide immediate and long-term financial assistance to our clients who have been impacted by COVID-19. As the situation continues to evolve, we encourage you to sign up for Online Banking to stay in touch, receive your e-statements and manage your finances. For more information, go to **rbc.com/covid-19** or book a call with an advisor at **rbc.com/appointment**.

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_2132686_170 - 0844872  7241



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From April 9, 2020 to May 12, 2020

RBPDA10020_2852421_049 E D 012 00920          00780

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

<table>
<tr><td><b>Your account number:</b></td><td>██████0532</td></tr>
<tr><td><b>How to reach us:</b></td><td>1-800 ROYAL® 1-1<br>(1-800-769-2511)<br>www.rbcroyalbank.com/deposits</td></tr>
</table>



## Summary of your account for this period

**U.S. Personal™ Private Banking** ██████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on April 9, 2020 | $0.00 USD |
| Total deposits into your account | + 165,000.00 USD |
| Total withdrawals from your account | - 165,000.00 USD |
| **Your closing balance on May 12, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Opening Balance | | | 0.00 USD |
| 22 Apr | Funds transfer credit  TT EVANDER KANE | | 66,000.00 | |
| | Funds transfer credit  TT EVANDER KANE | | 99,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | 164,966.00 USD |

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 151 of 165



# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| 23 Apr | Online Banking foreign exchange | | | |
| | Ref 6WW951140849330 | 164,966.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_2852421_049 - 0239974   1402



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From May 12, 2020 to June 12, 2020

RBPDA10020_3539725_139 E D 012 00920     01533
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

**Your account number:** █████0532

**How to reach us:**
1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on May 12, 2020 | $0.00 USD |
| Total deposits into your account | + 0.00 USD |
| Total withdrawals from your account | - 0.00 USD |
| **Your closing balance on June 12, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| - | No activity for this period | - | - | - |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.
If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.
Please retain this statement for your records.
™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.
® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.
Royal Bank of Canada GST Registration Number: R105248165
Royal Trust Corporation of Canada GST Registration Number: R104646666
The Royal Trust Company GST Registration Number: R105248264

**1 of 1**

RBPDA10020_3539725_139 - 0689170 HRI - 00 - 0 - 1909 - 20 - 3 -   2842

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 153
of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From June 12, 2020 to July 10, 2020

RBPDA10020_4180397_056 E D 012 00920 01088
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC V6P 6R8

**Your account number:** [redacted]0532

**How to reach us:** 1-800 ROYAL® 1-1 (1-800-769-2511) www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking [redacted]0532**

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on June 12, 2020 | $0.00 USD |
| Total deposits into your account | + 750,000.00 USD |
| Total withdrawals from your account | - 750,000.00 USD |
| **Your closing balance on July 10, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Opening Balance | | | 0.00 USD |
| 3 Jul | Funds transfer credit TT EVANDER KANE | | 700,000.00 | |
| | Funds transfer fee TT EVANDER KANE | 17.00 | | |
| | Online Banking foreign exchange Ref 6WW091851614360 | 99,983.00 | | |
| | Online Banking foreign exchange Ref 6WW001851612420 | 250,000.00 | | |
| | Online Banking foreign exchange Ref 6WW161851613450 | 250,000.00 | | 100,000.00 USD |
| 9 Jul | Online Banking foreign exchange Ref 6WW171910853320 | 100,000.00 | | 0.00 USD |
| 10 Jul | Funds transfer credit TT EVANDER KANE | | 50,000.00 | |
| | Funds transfer fee TT EVANDER KANE | 17.00 | | |





Case: 21-05016 Doc# 39-3 Filed: 11/17/22 Entered: 11/17/22 16:58:52 Page 154 of 165

# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| | Online Banking foreign exchange<br>Ref 6WW821921508000 | 49,983.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_4180397_056- 0275066  2024



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From July 10, 2020 to August 12, 2020

RBPDA10020_4889457_031 E D 012 00920          04130

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| | |
|---|---|
| **Your account number:** | ████0532 |
| **How to reach us:** | 1-800 ROYAL® 1-1 |
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on July 10, 2020 | $0.00 USD |
| Total deposits into your account | + 300,910.27 USD |
| Total withdrawals from your account | - 300,910.27 USD |
| **Your closing balance on August 12, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 0.00 USD |
| 3 Aug | Deposit interest | | 0.02 | 0.02 USD |
| 12 Aug | Royal Foreign Exchange deposit | | | |
| | Ref 00033442939 | | 300,910.25 | 300,910.27 USD |
| | Funds transfer  EVANDER KANE | 300,910.27 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.
If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.
Please retain this statement for your records.
™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.
® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.
Royal Bank of Canada GST Registration Number: R105248165
Royal Trust Corporation of Canada GST Registration Number: R104646666
The Royal Trust Company GST Registration Number: R105248264

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 156
of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From August 12, 2020 to September 11, 2020

RBPDA10020_5547442_120 E D 012 00920          04802

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| **Your account number:** | ███ 0532 |
| --- | --- |

**How to reach us:**   1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ███ 0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
| --- | --- |
| Your opening balance on August 12, 2020 | $0.00 USD |
| Total deposits into your account | + 49,753.05 USD |
| Total withdrawals from your account | - 44,753.05 USD |
| **Your closing balance on September 11, 2020** | **= $5,000.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
| --- | --- | --- | --- | --- |
| | Opening Balance | | | 0.00 USD |
| 20 Aug | Credit memo | | 43,056.68 | |
| | Funds transfer CHICAGO TITLE C | 43,056.68 | | 0.00 USD |
| 9 Sep | BR TO BR - 6520 | | 6,696.37 | 6,696.37 USD |
| 11 Sep | Online Banking foreign exchange Ref 6WW492551138110 | 1,696.37 | | 5,000.00 USD |
| | **Closing Balance** | | | **$5,000.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.
If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.
Please retain this statement for your records.
™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.
® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.
Royal Bank of Canada GST Registration Number: R105248165
Royal Trust Corporation of Canada GST Registration Number: R104646666
The Royal Trust Company GST Registration Number: R105248264

Case: 21-05016    Doc# 39-3    Filed: 11/17/22    Entered: 11/17/22 16:58:52    Page 157
of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From September 11, 2020 to October 9, 2020

RBPDA10020_6182919_171 E D 012 00920       02069

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| | |
|---|---|
| **Your account number:** | ███████0532 |

**How to reach us:**
1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ██████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---|
| Your opening balance on September 11, 2020 | $5,000.00 USD |
| Total deposits into your account | + 17,100.00 USD |
| Total withdrawals from your account | - 12,100.00 USD |
| **Your closing balance on October 9, 2020** | **= $10,000.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---|---|---|
| | Opening Balance | | | 5,000.00 USD |
| 1 Oct | Online Banking foreign exchange<br>Ref 6WW762750755310 | | 300.00 | |
| | Online Banking foreign exchange<br>Ref 6WW442750754520 | | 1,700.00 | 7,000.00 USD |
| | Funds transfer  PROFESSIONAL BA | 6,760.59 | | 239.41 USD |
| 5 Oct | Online Banking foreign exchange<br>Ref 6WW552791114470 | | 100.00 | |
| | Online Banking foreign exchange<br>Ref 6WW142791031160 | | 15,000.00 | 15,339.41 USD |
| | Online Banking foreign exchange<br>Ref 6WW552770049390 | 239.41 | | 15,100.00 USD |

**1 of 2**



RBPDA10020_6182919_171 - 0849510 HRI - 00 - 1 - 2543 - 16 - - 3778

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 158 of 165

# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|-----------------|--------------|-------------|
| 9 Oct | Online Banking foreign exchange | | | |
| | Ref 6WW772830541100 | 5,100.00 | | 10,000.00 USD |
| | **Closing Balance** | | | **$10,000.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

TM Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_6182919_171 - 0849510  3779



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From October 9, 2020 to November 12, 2020

RBPDA10020_6902379_013 E D 012 00920    04258

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| Your account number: | ███████0532 |
|---|---|

| **How to reach us:** | 1-800 ROYAL® 1-1 |
|---|---|
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ███████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on October 9, 2020 | $10,000.00 USD |
| Total deposits into your account | + 120,000.01 USD |
| Total withdrawals from your account | - 125,000.01 USD |
| **Your closing balance on November 12, 2020** | **= $5,000.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 10,000.00 USD |
| 13 Oct | Online Banking foreign exchange<br>Ref 6WW362870902500 | 5,000.00 | | 5,000.00 USD |
| 14 Oct | Online Banking foreign exchange<br>Ref 6WW642881134530 | | 50,000.00 | 55,000.00 USD |
| | Debit memo | 38,977.71 | | 16,022.29 USD |
| 15 Oct | Online Banking foreign exchange<br>Ref 6WW672891628490 | 16,022.29 | | 0.00 USD |
| 2 Nov | Deposit interest | | 0.01 | 0.01 USD |
| 9 Nov | Funds transfer credit  TT EVANDER KANE | | 70,000.00 | |
| | Funds transfer fee  TT EVANDER KANE | 17.00 | | |

**1 of 2**



# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| | Online Banking foreign exchange | | | |
| | Ref 6WW203140708250 | 64,983.01 | | 5,000.00 USD |
| | **Closing Balance** | | | **$5,000.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 161 of 165



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From November 12, 2020 to December 11, 2020

RBPDA10020_7549547_056 E D 012 00920     00708
EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| Your account number: | ██████0532 |
|---|---|

**How to reach us:**
1-800 ROYAL® 1-1
(1-800-769-2511)
www.rbcroyalbank.com/deposits



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
|---|---:|
| Your opening balance on November 12, 2020 | $5,000.00 USD |
| Total deposits into your account | + 60,000.00 USD |
| Total withdrawals from your account | - 65,000.00 USD |
| **Your closing balance on December 11, 2020** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|---|---|---:|---:|---:|
| | Opening Balance | | | 5,000.00 USD |
| 24 Nov | Online Banking foreign exchange<br>Ref 6WW263290034440 | 5,000.00 | | 0.00 USD |
| 1 Dec | BR TO BR - 6520 | | 30,000.00 | |
| | Online Banking foreign exchange<br>Ref 6WW333361426510 | 20,000.00 | | 10,000.00 USD |
| 7 Dec | Online Banking foreign exchange<br>Ref 6WW493411347180 | 10,000.00 | | 0.00 USD |
| 10 Dec | Funds transfer credit  TT DEANNA SARA | | 30,000.00 | |
| | Funds transfer fee  TT DEANNA SARA | 17.00 | | |



RBPDA10020_7549547_056- 0274705 HRI - 00 - 1 - 855 - 23 -  - 1279

**1 of 2**

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 162
of 165

# Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|-----------------|--------------|-------------|
| | Online Banking foreign exchange<br>Ref 6WW713451825190 | 29,983.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_7549547_056 - 0274705   1280



**Royal Bank of Canada**
P.O. Bag Service 2650
Calgary AB T2P 2M7

# Your RBC personal banking account statement - U.S. funds

From December 11, 2020 to January 12, 2021

RBPDA10020_1505234_032 E D 012 00920     01543

EVANDER KANE
8447 ISABEL PL
VANCOUVER BC  V6P 6R8

| Your account number: | ████████0532 |
| --- | --- |
| **How to reach us:** | 1-800 ROYAL® 1-1 |
| | (1-800-769-2511) |
| | www.rbcroyalbank.com/deposits |



## Summary of your account for this period

**U.S. Personal™ Private Banking** ████████0532

**Royal Bank of Canada**
1055 W GEORGIA ST-5TH FLR, VANCOUVER, BC V6E 3P3

| | |
| --- | --- |
| Your opening balance on December 11, 2020 | $0.00 USD |
| Total deposits into your account | + 105,000.00 USD |
| Total withdrawals from your account | - 105,000.00 USD |
| **Your closing balance on January 12, 2021** | **= $0.00 USD** |

## Details of your account activity

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
| --- | --- | --- | --- | --- |
| | Opening Balance | | | 0.00 USD |
| 16 Dec | Funds transfer credit  TT DEANNA SARA | | 75,000.00 | |
| | Funds transfer fee  TT DEANNA SARA | 17.00 | | 74,983.00 USD |
| 17 Dec | Online Banking foreign exchange Ref 6WW373520617290 | 74,983.00 | | 0.00 USD |
| 24 Dec | Funds transfer credit  TT DEANNA SARA | | 30,000.00 | |
| | Funds transfer fee  TT DEANNA SARA | 17.00 | | |

Case: 21-05016     Doc# 39-3     Filed: 11/17/22     Entered: 11/17/22 16:58:52     Page 164 of 165

## Details of your account activity - continued

| Date | Description | Withdrawals ($) | Deposits ($) | Balance ($) |
|------|-------------|----------------:|-------------:|------------:|
| | Online Banking foreign exchange<br>Ref 6WW713591402200 | 29,983.00 | | 0.00 USD |
| | **Closing Balance** | | | **$0.00 USD** |

Please check this Account Statement without delay and advise us of any error or omission within 45 days of the statement date.

If you opted to receive cheque images, only images of the front of your cheques have been sent to you with this Account Statement. An image included on this Account Statement does not indicate that a cheque has been successfully processed as of the statement date.

Please retain this statement for your records.

™ Trademarks of Royal Bank of Canada. RBC and Royal Bank are registered trademarks of Royal Bank of Canada.

® Registered trade-mark of Royal Bank of Canada. Royal Trust Corporation of Canada and The Royal Trust Company are licensees of the trade-mark.

Royal Bank of Canada GST Registration Number: R105248165

Royal Trust Corporation of Canada GST Registration Number: R104646666

The Royal Trust Company GST Registration Number: R105248264

RBPDA10020_1505234_032 - 0155936  2883