Stephen D. Finestone (SBN 125675)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
Tel.:   (415) 421-2624
Fax:    (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: rwitthans@fhlawllp.com

Attorneys for Evander Frank Kane,
Debtor and Defendant

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re EVANDER FRANK KANE, Debtor. | Case No. 21-50028-SLJ<br>Chapter 7 |
| HOPE PARKER, Plaintiff,<br><br>v.<br><br>EVANDER FRANK KANE, Defendant. | Adv. Proc. No. 21-5008 |
| CENTENNIAL BANK, Plaintiff,<br><br>v.<br><br>EVANDER FRANK KANE, Defendant. | Adv. Proc. No. 21-5016<br><br>**DEFENDANT'S POST-TRIAL BRIEF**[1, 2]<br><br>Trial:<br>Date:  January 23 and 25, 2023<br>Time:  9:00 a.m.<br>Place:  Courtroom 9<br>          United States Courthouse<br>          280 South First Street<br>          San Jose, CA 95113 |

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. "BK" references are to the docket in the underlying bankruptcy case. "AP" references are to the docket in *Centennial v. Kane*, Adv. Proc. No. 22-5016. When native and file stamped page numbers diverge, citations are to the Court's CM/ECF file stamped page numbers.

[2] After reviewing the Court's orders, procedures, and applicable rules, Kane is unaware of any page limitation applying to this post-trial brief. Kane has tried to shorten this brief to the extent possible, while also comprehensively addressing the multiple issues in the case and citing to relevant testimony.

DEFENDANT'S POST-TRIAL BRIEF                                                                i

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 1

    A.   Kane's Early Life ........................................................................................... 1

    B.   Kane's Professional Hockey History .............................................................. 2

    C.   Kane's Gambling History ............................................................................... 3

    D.   Kane's Loan History ....................................................................................... 4

    E.   Background to Kane's Bankruptcy Filing ....................................................... 5

    F.   Post-Petition Events ....................................................................................... 6

        1.   Bank Statements Provided by Kane ....................................................... 6

        2.   Chapter 7 Trustee and United States Trustee ......................................... 6

        3.   Centennial's Discovery .......................................................................... 8

III.  LEGAL ARGUMENT ............................................................................................ 8

    A.   General Rule Applying to Objections to Discharge ........................................ 8

    B.   Centennial's § 727(a)(2)(A) Claim Is Withdrawn .......................................... 9

    C.   Centennial Limited Its § 727(a)(4)(A) Claim ................................................ 9

        1.   False Statement or Omission ................................................................ 10

        2.   Regarding a Material Fact .................................................................... 13

        3.   Knowingly and Fraudulently ............................................................... 14

        4.   Other Alleged False Oaths ................................................................... 15

    D.   Centennial's § 727(a)(3) Claim ................................................................... 16

        1.   Bank and Credit Card Statements ........................................................ 19

        2.   Kane's Compensation and Expenses .................................................... 21

        3.   The Lenders' Loans and Previous Loans .............................................. 22

        4.   The Individual Lender Loans ................................................................ 24

        5.   Gambling Winnings and Losses ........................................................... 25

        6.   Justification ......................................................................................... 27

        7.   Discovery Issues .................................................................................. 34

    E.   Centennial and Parker's § 727(a)(5) Claim ................................................. 35

IV.   CONCLUSION .................................................................................................... 38

Case: 21-05016    Doc# 57    Filed: 03/14/23    Entered: 03/14/23 22:37:11    Page 2 of 43

# TABLE OF AUTHORITIES

### Cases

*Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279 (9th Cir. 1996) ............................................. 9

*Burchett v. Myers*, 202 F.2d 920 (9th Cir. 1953) .................................................................... 33

*CadleRock Joint Venture, L.P., v. Sauntry (In re Sauntry)*, 390 B.R. 848 (Bankr. E.D. Tex. 2008) .................................................................................................................................... 25

*Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755 (9th Cir. 2008) passim

*Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399 (9th Cir. 1990) ....................................... 16, 28

*Davis v. Battistella (In re Battistella)*, 2016 Bankr. LEXIS 1964 (Bankr. N.D. Cal. May 9, 2016) ........................................................................................................................................ 37

*Davis v. Macway (In re Macway)*, 667 F. App'x 658 (9th Cir. 2016) ..................................... 31

*Devers v. Bank of Sheridan (In re Devers)*,759 F.2d 751 (9th Cir. 1985) ............................. 15

*First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339 (9th Cir. 1986) ............................. 15

*Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58 (B.A.P. 9th Cir. 1999) ...... 10, 13

*Grogan v. Garner*, 498 U.S. 279 (1991) ................................................................................... 8

*Hewitt v. Lemieux (In re Lemieux)*, Adv. Proc. No. 16-03065, 2017 Bankr. LEXIS 3272 (Bankr. N.D. Cal. Sep. 27, 2017) ........................................................................................................ 37

*In re Aubrey*, 111 B.R. 268 (B.A.P. 9th Cir. 1990) ................................................................. 13

*In re Kasler*, 611 F.2d 308 (9th Cir. 1979) ............................................................................... 9

*In re Nevett*, 2021 Bankr. LEXIS 1781, 2021 WL 2769799 (B.A.P. 9th Cir. July 1, 2021) .. 18, 30

*Khalil v. Developers Surety and Indemnity Co. (In re Khalil)*, 379 B.R. 163 (B.A.P. 9th Cir. 2007), *aff'd*, 578 F.3d 1167 (9th Cir. 2009)............................................................ 9, 10, 13

*Kistler v. Fader (In re Fader)*, 414 B.R. 640 (Bankr. N.D. Cal. 2009) ..................... 17, 24, 33, 37

*Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294 (9th Cir. 1994) ............................................ passim

*Manning v. Watkins*, 474 B.R. 625 (N.D. Ind. 2012) ................................................................ 9

*Miles v. Makishima (In re Makishima)*, 2008 Bankr. LEXIS 3045 (Bankr. E.D. Cal. Nov. 10, 2008) ......................................................................................................................................... 10

*Moffett v. Union Bank*, 378 F.2d 10 (9th Cir. 1967) ........................................................... 17, 25

*Murtaza v. Sigmund (In re Murtaza)*, 2016 Bankr. LEXIS 1092 (B.A.P. 9th Cir. Apr. 5, 2016) 13

*Ng v. Poole (In re Poole)*, 2022 Bankr. LEXIS 332 (Bankr. N.D. Cal. Feb. 8, 2022) .......... 32, 33

*Olympic Coast Invest, Inc. v. Wright (In re Wright)*, 364 B.R. 51 (Bankr. D. Mont. 2007)......... 35

*Peterson v. Scott (In re Scott)*, 172 F.3d 959 (7th Cir. 1999) ................................................... 17

*Radecki v. Snider (In re Snider)*, 2019 Bankr. LEXIS 683, 2019 WL 5883623 (Bankr. D. Nev. Feb. 28, 2019) ......................................................................................................................... 35

*Rafsanjani v. Kuchecki (In re Kuchecki)*, 2010 Bankr. LEXIS 5045, 2010 WL 6259966 (B.A.P. 9th Cir. Nov. 29, 2010) ........................................................................................................... 34

*Retz v. Samson*, 606 F.3d 1189 (9th Cir. 2010) ............................................................... 15, 35

*Rhoades v. Wikle*, 453 F.2d 51 (9th Cir. 1971) ....................................................................... 34

*Roberts v. Erhard (In re Roberts)*, 331 B.R. 876 (B.A.P. 9th Cir. 2005) .................................. 14

*Salehi v. Glob. Auto. Grp., Inc. (In re Salehi)*, B.A.P. No. EC-13-1171-TaKuJu, 2014 Bankr. LEXIS 2649 (B.A.P. 9th Cir. June 9, 2014) .............................................................................. 34

*Schindler v. Milliron (In re Milliron)*, 629 B.R. 893 (Bankr. D. Alaska 2021)............................ 10

*Sfadia v. Bongkuk Int'l, Inc. (In re Sfadia)*, 2007 Bankr. LEXIS 4933, 2007 WL 7540987 (B.A.P. 9th Cir. Sep. 5, 2007) ............................................................................................................ 17

*Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824 (Bankr. N.D. Ohio 2004) ............................ 35

*Takhtayeva v. Bulgucheva (In re Bulgucheva)*, 2018 Bankr. LEXIS 2253 (Bankr. N.D. Cal. July 31, 2018) .................................................................................................................................. 36

Case: 21-05016    Doc# 57    Filed: 03/14/23    Entered: 03/14/23 22:37:11    Page 3 of 43

*United States Trs. v. Hong Minh Tran (In re Hong Minh Tran)*, 464 B.R. 885 (Bankr. S.D. Cal. 2012) .................................................................................................................. 17, 32

*Ward v. Thompson (In re Thompson)*, 2009 Bankr. LEXIS 4530, 2009 WL 7751298 (B.A.P. 9th Cir. Apr. 20, 2009) ............................................................................................ 36, 38

*Zhen Chen v. United States Tr. (In re Zhen Chen)*, 2017 Bank. LEXIS 3643, 2017 WL 4768104 (B.A.P. 9th Cir. Oct. 17, 2017) ................................................................................ 31

**Statutes**

11 U.S.C. § 101 ......................................................................................................... 14

11 U.S.C. § 707 ............................................................................................. 11, 13, 14

11 U.S.C. § 727 ................................................................................................... passim

26 U.S.C. § 165(d) .................................................................................................... 33

**Rules**

Fed. R. Bankr. P. 2004 ........................................................................................... 8, 34

Fed. R. Bankr. P. 4005 ......................................................................................... 16, 27

## I. INTRODUCTION

Defendant Evander Frank Kane ("Kane" or the "Defendant") submits this post-trial brief following a two-day trial on the complaints objecting to discharge filed by plaintiffs Centennial Bank ("Centennial") and Hope Parker ("Parker").[3] This brief discusses testimony and documentary evidence submitted at trial as applied to the relevant case law.

Centennial pursued claims under §§ 727(a)(2), (a)(3), (a)(4) and (a)(5). At the commencement of trial, Centennial announced it was dropping its § 727(a)(2) claim, which alleged that Kane either concealed his ownership interest in a condominium located in Vancouver, British Columbia, Canada, and/or transferred his alleged interest without disclosing it. Centennial also stated that it was no longer pursuing its § 727(a)(4) claims as to Kane's alleged failure to disclose gifts to his family on his Statement of Financial Affairs ("SOFA"), the listing of his income on Schedule I, and the alleged failure to list the Vancouver condominium on Schedule A/B. Centennial, however, said it was intending to use these statements to demonstrate a "totality of the circumstances" regarding Kane's case. Centennial went forward on its § 727(a)(4) claim only with respect to Kane's checking of the boxes in Petition question 16 as to the nature of his debts. Centennial also proceeded on its § 727(a)(3) and (a)(5) claims.

At trial, Centennial called Kane as its only witness. Kane testified in his own defense, as did his parents and the Chapter 7 trustee, Fred Hjelmeset (the "Trustee"). As discussed below, Centennial failed to establish any of its claims by a preponderance of the evidence and Kane is entitled to judgment in his favor.

## II. STATEMENT OF FACTS

### A. Kane's Early Life

Kane is the oldest of three children of Perry and Sheri Kane. Day 1 Trial Transcript ("T1") at 168:24–25; Day 2 Trial Transcript ("T2") at 10:15–11:2, 19:21–24. Kane was raised on the east side of Vancouver, which at the time was a lower-class area of the city. T1 at 169:1–8.

---

[3] Parker filed an objection to discharge under § 727(a)(5) in *Parker v. Kane*, Adv. Proc. No. 21-5008. Parker's claim is joined with Centennial's claim. Parker appeared at trial but did not submit any evidence or question any witnesses. This brief primarily focuses on Centennial's claims and only relates to Parker's claim when it addresses § 727(a)(5).

DEFENDANT'S POST-TRIAL BRIEF 1

His father Perry sold cars and baked bread for a living. T1 at 169:9–13. His mother Sheri was a stay-at-home mother when Kane and his sisters were growing up because they could not afford daycare, and eventually she went back to school to become a dental assistant. T1 at 170:19–171:4. Kane's family struggled financially when he was growing up. T2 at 20:16–19.

When Kane was about twelve years old, his father started teaching him hockey. T1 at 169:20–24, 170:13–15. Kane trained for hours as a kid, going to bed early and getting up early. T2 at 20:20–21. He was already playing professional major junior hockey by the time he was in high school. T1 at 172:8–14. He hired his first sports agent when he was fifteen years old and relied upon agents to handle all his business and financial affairs. T1 at 174:4–19. At the age of seventeen, Kane was drafted out of high school into the National Hockey League ("NHL") by the Atlanta Thrashers. T1 at 17:23–25; 173:10–24. In 2009, within three months of finishing high school, Kane moved to Atlanta to play hockey professionally. T1 at 172:5–20, 173:16–21, 175:20–25.

After Kane's first year in the NHL, he returned home to live with his family, sharing a bedroom with his sisters in the same rented flat he grew up in. T1 at 172:12–24. Kane wanted his mother to retire and early in his career he said he would financially support her and his family. T1 at 171:6–10; T2 at 20:20–25. In the summer of 2011, Kane was able to purchase a house for his family at 8447 Isabel Place (the "Isabel Place" property) in Vancouver. T1 at 23:4–17.

B. Kane's Professional Hockey History

Kane signed his first deal, a standard three-year rookie contract, with the Atlanta Thrashers in 2009. T1 at 17:23–25, 18:11–14. The Thrashers then moved to Winnipeg, Canada, under new ownership. *Id*. When Kane's rookie contract expired, Kane signed a new six-year deal with the Winnipeg Jets in 2012. T1 at 18:15–17. However, about an hour after Kane signed this six-year deal, the NHL entered into a lockout that ultimately stretched into 2013. T1 at 181:22–23; T2 at 178:12–16. Even though Kane had just signed a contract that would pay him substantially more than he was making as a rookie, Kane would not get paid until the lockout ended and he did not know when that would happen. T1 at 60:16–21.

Case: 21-05016   Doc# 57   Filed: 03/14/23   Entered: 03/14/23 22:37:11   Page 6 of 43

While still under his six-year contract, Kane was traded to the Buffalo Sabres and eventually to the San Jose Sharks (the "Sharks"). T1 at 18:15–25. Kane then signed a new contract with the Sharks in July 2018. Pl. Ex. 85. He currently plays for the Edmonton Oilers franchise, which he joined in January of 2022. T1 at 13:9–112.

C. Kane's Gambling History

After the NHL entered its lockout in 2012, Kane was uncertain about his future, how he was going to support himself and his family, and how he was going to stay current on his bills (including payments on the Isabel Place property). T1 at 181:21–182:11. He "viewed gambling as a way to make money quick." T1 at 182:10–11. He had some early success, which led him to initially believe that gambling was financially worthwhile and a way to supplement his income. T1 at 182:20–183:23. Ultimately, however, while there were times when Kane was "up," he often had trouble walking away with his winnings and ended up losing more than he had won. *Id.*; T2 at 81:5–82:10. This pattern would typify Kane's gambling over the next several years. T2 at 81:22–82:14.

There were periods when Kane would stop gambling for months, lulling him into a belief that he did not have an issue with gambling, but inevitably he would begin again. T2 at 83:17–84:1. Kane's gambling addiction, the need to service his loans, and the necessity to generate extra income for the off season led him to continue gambling to win back his losses and also caused him to enter into a series of expensive loans that were used, in part, to repay those losses. *See, e.g.*, T2 at 82:11–83:4; T1 at 85:12–86:13; Pl. Ex. 54 (paying off personal loans and a bookie, in addition to a previous loan balance); T2 at 56:6–21; Pl. Ex. 55 (Seneca Gaming Corp.); T2 at 58:6–25; Pl. Ex. 64 (Cosmopolitan); T2 at 59:1–16; Pl. Ex. 68 (Cosmopolitan); T2 at 68:5–69:15 (MGM Las Vegas); T2 at 86:24–87:24 (Mike Lipsti and Pete Gianakas).

The 2012–13 NHL lockout lasted about half the regular season and cost Kane half of his $3 million salary for that season, which was further reduced by taxes and the contractually required escrow to a net of approximately $625,000. T2 at 178:22–179:4. His deal with the Winnipeg Jets was structured to pay him more money towards the back end of the contract than at the beginning. T1 at 19:6–8. Meanwhile, Kane's venture into casino gambling during the

DEFENDANT'S POST-TRIAL BRIEF 3

lockout saw him up by over $400,000 three weeks in a row in Las Vegas, only to lose everything and another $85,000 or so on top of that. *See* T1 at 183:7–184:15; T2 at 81:10–18. Around the same time, in 2012 or 2013, Kane was ensnared by a bookie who extended him credit and introduced him to online sports betting through anonymous websites. T2 at 70:7–71:13. All this activity left Kane "behind the eight-ball" and in a difficult spot financially. T1 at 184:8–15. The summer prior, Kane had saved up enough money to put a deposit down to buy a house that his family could live in. T1 at 178:6–11. He had just come off his rookie contract when he was not making a lot and had not received any money on his new six-year deal. T1 at 184:8–15. He had lost a lot of money that he did not have at the time. *Id*. The already shortened 2012–13 season ended in early April 2013 for Kane, and he did not have enough money to get through the summer off-season to stay current on his bills. T2 at 103:8–12.

      D.  <u>Kane's Loan History</u>

      In early 2014, Kane met Leon McKenzie ("McKenzie") of Sure Sports, LLC ("Sure Sports"),[4] who assured Kane that he could get a loan as an advance on his salary. T2 at 101:2–102:18. Beginning in May 2014, and continuing through 2020, Sure Sports arranged a series of costly loans with various lenders. Each new loan would pay down one or more earlier loans, but would also cost tens of thousands of dollars in fees to Sure Sports and various other third parties, including required "death and disability" insurance, each time adding to Kane's mounting debts and only occasionally leaving Kane with a relatively small amount of loan proceeds to meet ongoing expenses. By 2019, Kane was trapped in a vicious cycle, taking out new loans to pay off prior loans in an effort to get out from years of accumulated debt. *See*, *e.g.*, T1 at 153:23–154:12. With McKenzie/Sure Sports acting as brokers on Kane's behalf, Kane entered into approximately 26 loans. *See* **Attachment 1**; Pl. Ex. 36–38, 40–46, 48, 50–56, 58, 60–62, 64, 66–68, 70, 72, 74, 78, 80, 82, 84.

---

[4] The Trustee filed suit against Sure Sports, alleging wrongdoing in its representation of and business dealings with Kane. *See Hjelmeset v. Sure Sports*, Adv. Proc. No. 22-5033.

DEFENDANT'S POST-TRIAL BRIEF                                                             4

E. <u>Background to Kane's Bankruptcy Filing</u>

Kane filed his voluntary Chapter 7 bankruptcy petition on January 9, 2021 (the "Petition Date"). Though under contract with the Sharks as of the Petition Date, and having earned a sizeable sum over his career, Kane was hopelessly in debt. This debt did not arise overnight. Kane was living beyond his means, had a gambling problem that negatively affected his life,[5] and had entered into a vicious cycle of loans from aggressive lenders. In 2020, Kane became a father for the first time, was seeing his paychecks evaporating to service his loans, and realized that something needed to change and that he needed help. T2 at 152:10–16.

Ultimately, Kane was unable to pay back the last series of loans. *See* Pl. Ex. 3. Kane confided in both his agent at the time and the general manager of the Sharks about his situation. T2 at 152:17–21. Kane retained John Fiero at Pachulski Stang Ziehl & Jones, along with an accountant recommended by Mr. Fiero, in October 2019. T2 at 152:21–153:25. The goal was to reach a restructuring agreement with Kane's primary creditors. *Id*. The primary creditors were Zions Bancorporation ("Zions"), Centennial, Professional Bank, and South River Capital ("South River") (collectively, the "Lenders"). *See* Pl. Ex. 3. Kane's efforts to reach a resolution with the Lenders was unsuccessful. The Lenders filed suit against Kane and pursued aggressive collection efforts, including asserting security interests in Kane's salary. *See* Pl. Ex. 5 at 4–5.

In addition to pressure from the Lenders, a portion of the 2019–20 NHL season was canceled due to the COVID-19 pandemic, resulting in a significant decrease to Kane's income for the season. *See* T1 at 16:14–24; T2 at 143:12–14; Pl. Ex. 1 at 39–41 (Schedule I). Based on the ongoing litigation by the Lenders and the failure to make any progress in resolving matters with the Lenders, Kane decided to file the instant bankruptcy case despite his personal embarrassment, the scrutiny that fell upon him because of the filing, and the significant negative press and responses to his situation. T2 at 154:5–156:2.

---

[5] Kane has received, and continues to receive, professional therapy for his gambling problem. T2 at 84:2–18.

DEFENDANT'S POST-TRIAL BRIEF

5

F. Post-Petition Events

    *1. Bank Statements Provided by Kane*

Kane closed his bank accounts when he filed for bankruptcy. T1 at 45:1–2. When requested to provide account statements, Kane was only able to access statements going back to approximately 2019.[6] *Id.* Kane provided the Trustee and Centennial with copies of all bank account statements and other financial statements that he had access to. Neither Centennial nor any other party subpoenaed any statements predating those produced by Kane.

There were previous bank accounts in Kane's name at East West Bank and Zions. *See*, *e.g.*, T2 at 109:20–25, 110:3–6 (East West Bank); T2 at 110:3–6, 151:7–24 (Zions). However, these bank accounts were set up by those lenders as assignment of deposit accounts, and Kane did not have any access to them. *Id.* Those accounts were entirely managed by the lenders and Kane's accountant at the time, Tony Chiricosta. Kane neither received nor kept any records from those accounts. *Id.*

    *2. Chapter 7 Trustee and United States Trustee*

Kane's bankruptcy case attracted considerable attention and scrutiny. Kane received voluminous requests for documents from the Chapter 7 Trustee and the Office of the United States Trustee ("UST"). Kane appeared for an initial meeting of creditors that lasted about two and a half hours and appeared for a continued meeting lasting less than an hour, after which time the Trustee concluded the meeting. *See* T2 at 157:17–25.

Following the meetings of creditors, the Trustee continued to question Kane regarding his finances. The Trustee testified at trial that his document requests to Kane were more extensive than in a typical Chapter 7 case due to several pieces of real property, numerous bank accounts, and large amounts of money that went through the bank accounts, in order to determine his past dealings and current financial situation. T2 at 33:7–10, 34:15–20, 35:17–20. Among other things, Kane provided what the Trustee described as an "enormous volume" of statements for his bank

---

[6] Back to January 1, 2019, for ScotiaBank accounts; to August 22, 2019, for Bank of America accounts; to September 12, 2019, for Royal Bank of Canada accounts; and to January 1, 2020, for Wells Fargo accounts. *See* Pl. Ex. 21–34.

DEFENDANT'S POST-TRIAL BRIEF    6

accounts and credit cards, prior years' federal and state tax returns, mortgage statements, insurance information, information regarding various business entities and business ventures, a breakdown of the use of loan proceeds, an explanation of hundreds of transactions reflected in bank statements and credit card statements, lease agreements, loan agreements, and various other documents reflecting his debts and financial history. *See*, *e.g.*, T1 at 48:23–49:16; T2 at 35:21–37:9, 168:17–169:6. Kane testified that the UST's document requests were even more in depth than the Trustee's requests, and Kane responded to those separate requests. T2 at 169:9–19.

Kane testified that in response to the Trustee's questions about certain transactions, he sat down with his attorneys for three to six hours each time, spreading the statements out side-by-side by bank account and referencing his work and personal calendars to determine where he was at the time to correlate transactions and provide explanations for the Trustee. T2 at 170:1–12, 171:3–8. Kane reviewed hundreds of statements and thousands of transactions with his attorneys to respond to the Trustee's questions as best he could. T2 at 170:18–171:11. The Trustee testified that Kane provided answers to the Trustee's questions in annotated comments next to each transaction on copies of the bank statements. T2 at 39:14–40:8. Kane also provided the Trustee with documentation to support the explanations. T2 at 49:17–25. In addition, Kane amended his Schedules and SOFA several times to provide additional disclosures and information. *See* Pl. Ex. 2–8.

The Trustee attested at trial that Kane was a "very cooperative debtor." T2 at 36:11. The Trustee testified that Kane's responses were complete in terms of what was requested. T2 at 37:7–9. The Trustee also testified that he was satisfied with Kane's responses to the numerous questions the Trustee had regarding Kane's various bank account entries, and that there were no documents or information that Kane failed to provide. T2 at 46:8–15. When asked if it is "fair to say Mr. Kane was forthcoming in terms of his responses" to the Trustee's requests, the Trustee responded, "Absolutely." T2 at 46:16–20.

Kane stipulated to numerous extensions of time with the Trustee to enable the Trustee to review information and decide whether to object to Kane's discharge. BK 68, 104, 149, 197, 235, 252; T2 at 46:21–47:7. The Trustee, who was experienced in objecting to discharge as a

Case: 21-05016    Doc# 57    Filed: 03/14/23    Entered: 03/14/23 22:37:11    Page 11 of 43

trustee and in his private legal practice predating his becoming a trustee, and who was represented by very experienced counsel, did not pursue an objection to discharge. T2 at 47:8–10. Neither did the UST pursue an objection.

### 3. Centennial's Discovery

Kane also sat for Centennial's Bankruptcy Rule 2004 examination, which lasted roughly four to six hours and included a sizeable document production; as well as a deposition in connection with this adversary proceeding that lasted a full day. T2 at 157:25–158:5.

Kane provided the Trustee and Centennial with copies of the same bank statements. While the Trustee asked for written explanations regarding specified transactions appearing on Kane's statements and allowed Kane time to review and cross-check his records and formulate detailed responses, Centennial took a different approach. Centennial asked disconnected and scattershot questions about random transactions years in the past, demanded oral responses (at his Bankruptcy Rule 2004 examination, deposition, and at trial), and did not allow Kane time to review other records to refresh his memory. *See* T1, generally. If Kane answered that he did not remember the details of a certain transaction, Centennial would move on. If Kane recalled additional details, Centennial would often assert that he failed to recall those details in the past.

Centennial did not ask for written explanations for specific transactions appearing on Kane's bank account statements, nor did their discovery demands encompass copies of the annotated statements that Kane provided to the Trustee. Given Centennial's approach, it seems that Centennial was not interested in discovering useful information about Kane's finances. Instead, it placed Kane in high-stress situations and peppered him with random questions in an attempt to show that Kane could not recall random details about his past transactions.

## III.    LEGAL ARGUMENT

### A.    General Rule Applying to Objections to Discharge

A central purpose of the Bankruptcy Code is "to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (internal

DEFENDANT'S POST-TRIAL BRIEF                                                                          8

quotations removed). "[E]xceptions to dischargeability should be strictly construed in order to serve the Bankruptcy Act's purpose of giving debtors a fresh start." *Lansdowne v. Cox (In re Cox)* ("*Cox II*"), 41 F.3d 1294, 1297 (9th Cir. 1994) (quoting *In re Kasler*, 611 F.2d 308, 310 (9th Cir. 1979)). Or stated conversely, "courts should construe § 727 liberally in favor of debtor and strictly against parties objecting to discharge." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996).

Centennial twice tried unsuccessfully to dismiss Kane's Chapter 7 case. BK 83, 152, 172, 269. Some courts measure § 727(a)-relevant conduct against the standards applied to determine dismissal of a bankruptcy petition on the ground that it was filed in bad faith. *See Manning v. Watkins*, 474 B.R. 625, 642 (N.D. Ind. 2012). That standard is essentially whether, in reviewing the debtor's conduct as a whole in relation to the case, the court is left with the impression that the debtor sought to thwart creditors, trustees, or the Court. *Id.* As the evidence has shown, Kane did not.

B. Centennial's § 727(a)(2)(A) Claim Is Withdrawn

As a preliminary matter, Centennial's trial brief failed to address its § 727(a)(2) claim that Kane, "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed … property of the debtor, within one year before the date of the filing of the petition." *See* AP 28, 47. At trial, Centennial acknowledged that it was abandoning and withdrawing its § 727(a)(2) claim, and that claim is withdrawn. T1 at 5:15–6:11.

C. Centennial Limited Its § 727(a)(4)(A) Claim

Section 727(a)(4)(A) provides the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Khalil v. Developers Surety and Indemnity Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), *aff'd*, 578 F.3d 1167 (9th Cir. 2009) (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R.

DEFENDANT'S POST-TRIAL BRIEF                                                                 9

58, 63 (B.A.P. 9th Cir. 1999)). A plaintiff objecting to a debtor's discharge under § 727(a)(4)(A) bears the burden to prove by a preponderance of the evidence that "(1) [the d]ebtor made … a false statement or omission, (2) regarding a material fact, and (3) did so knowingly and fraudulently." *Khalil*, 379 B.R. at 172 (internal citations omitted).

Centennial's Amended Complaint set forth numerous allegedly false oaths made by Kane, including (1) indicating that his debts are primarily business debts (Petition question 16); (2) failing to list payments made in support of his family as transfers to insiders within one year prior to the Petition Date (SOFA question 8) or as "gifts" (SOFA question 13); (3) failing to disclose the ownership or transfer of certain real property within the two years prior to the Petition Date (SOFA question 18); and (4) underreporting his monthly income (Schedule I). AP 28 at ¶¶ 18–22. At the commencement of trial, Centennial indicated that it was abandoning allegations 2 through 4 of the above list, and only proceeding on its § 727(a)(4)(A) claim as it related to Kane's checking of the boxes in Petition question 16 regarding the nature of his debts. T1 at 6:12–10:8, 163:10–164:2. Centennial added that, while it was not pursuing a § 727(a)(4)(A) claim based upon issues 2 through 4, it would raise those allegations as "circumstantial evidence" to show "the totality of the circumstances." T1 at 7:2–5.

As shown below, Centennial has not established that Kane knowingly made a false oath regarding a material fact in this bankruptcy case. Nor did Centennial provide any evidence at trial as to issues 2 through 4. The evidence adduced at trial on those matters made it clear that Centennial's allegations were untrue.

### 1. False Statement or Omission

As to the first element, a plaintiff must allege a "particular false statement." *Schindler v. Milliron (In re Milliron)*, 629 B.R. 893, 913 (Bankr. D. Alaska 2021) (citing, *e.g.*, *Miles v. Makishima (In re Makishima)*, 2008 Bankr. LEXIS 3045, at *7 (Bankr. E.D. Cal. Nov. 10, 2008)). At trial, Centennial expressly limited its § 727(a)(4)(A) claim to Kane "checking the wrong box" in response to question 16 of the Petition, indicating that his debts are not primarily consumer debts but rather primarily business debts. T1 at 6:12–10:8, 163:10–164:2.

Case: 21-05016   Doc# 57   Filed: 03/14/23   Entered: 03/14/23 22:37:11   Page 14 of 43

To begin with, the question in the Petition is at odds with the language of the Bankruptcy Code, rendering the response of questionable significance. Nothing in § 707(b) refers to "business debts," and the statutory language does not set up a distinction between "consumer debts" and "business debts." The relevant dichotomy in the Bankruptcy Code is between consumer debt and non-consumer debt. At trial Centennial recycled the same failed argument it used in its motion to dismiss Kane's case, which this Court denied. *See* BK 83, 152.

Centennial failed to prove that Kane falsely "checked the wrong box." It did not prove that the boxes Kane checked were wrong, let alone that he checked the boxes with fraudulent intent. When the Court previously considered the issue, it identified the following relevant debts:

1. $4,230,000 to Scotia Bank across two first-position mortgages on two properties Kane owns in Canada ("Scotia Bank Debts")[7];
2. $2,320,000 to Pacific Private Holdings, secured by Kane's then-residence in San Jose, California;
3. $486,000 to 1000568 B.C. Ltd., secured by a second mortgage on the Canadian properties;
4. $8,340,000 to Centennial;
5. $3,740,305 to Zions, $1,354,541.79 to Professional Bank, and $1,101,429.87 to South River, totaling $6,196,276.66; and
6. $715,000 to Lone Shark Holdings, LLC ("Loan Shark").

BK 152 at 2–3. Kane previously agreed that debts 2 and 3 listed above are consumer debts. BK 152 at 3:2. The remaining debts total $18,599,685.81, which represent more than half of Kane's overall debt (which the Court previously concluded totaled $28,191,340).[8] *Id*. at 2–3.

Centennial did not address the Loan Shark debt in its trial brief or at trial. *See* AP 47; T1, generally. The Court previously determined, and Centennial conceded, that this debt was incurred to purchase an interest in the tax attributes of Ascher Capital II and III LLC, which was an investment and thus not a consumer debt. BK 152 at 13:12–20.

---

[7] These are the Isabel Place property and property located at 3457 West 35th Avenue in Vancouver, British Columbia, Canada (the "West 35th Avenue" property, and together with the Isabel Place property, the "Canadian Properties").

[8] Centennial's motion to dismiss did not provide an estimate of Kane's debt, and Centennial still has not provided or established the total amount of Kane's debt in its trial brief or at trial. The stated total amount of Kane's debts comes from the Court's independent review of Kane's Schedules and the claims register. BK 152 at 2 n.3.

DEFENDANT'S POST-TRIAL BRIEF                                                                 11

Likewise, Centennial failed to discuss the Scotia Bank Debts in its motion to dismiss, *see* BK 152 at 14:1–2; offered no further argument about the Scotia Bank Debts in its trial brief, *see* AP 47; and barely addressed the Scotia Bank Debts at trial, *see* T1, generally. The only instance that the Scotia Bank Debts came up at trial was in connection with the financing of the West 35th Avenue property, T1 at 22:13–23:2, which Sheri Kane testified she purchased with Kane as a rental investment property, T2 at 22:10–15. Furthermore, Kane's purchase of the Isabel Place property was also an investment. BK 121 at 6–10 (Kane purchased the property as an investment and has never lived in it); T1 at 175:20–25, 177:4–8 (Kane lived on his own and not at the Isabel Place property, where his parents currently reside). The Court previously found that the Scotia Bank Debts were incurred to purchase investment properties and are therefore not consumer debts. BK 152 at 13:21–14:4.

Kane testified that he had been advised by McKenzie, Sure Sports, and eventually Tony Chiricosta to take out a series of loans to pay down existing loans with the eventual stated goal of getting out of high-interest loans and into lower-interest loans. *E.g.*, T1 at 155:3–6; T2 at 146:6–12, 149:13–150:6, 150:21–25. With the last set of loans from Centennial, Zions, Professional Bank, and South River, Kane had transitioned to more traditional lenders with more favorable interest rates and longer repayment terms. T2 at 146:18–147:13. As discussed in more detail below (and in Attachment 1), nearly all of the Lenders' loans are attributable to refinancing other existing loans. As this Court concluded in its order denying Centennial's motion to dismiss, Kane's transactions with the Lenders were made with an eye towards economic gain, were not associated with consumption, and were at least connected with Kane's business of being a professional hockey player. BK 152 at 9–13. Centennial provided no evidence at trial to contest the Court's previous findings. As such, the Lenders' debts were not incurred for consumer purposes.[9]

---

[9] In addition, the Zions and South River loan documents characterize the loans as business loans, Pl. Ex. 68, 70, 84; the South River loan documents state the loan proceeds will be used for "Business related expenses," Pl. Ex. 68 at 3, 84 at 36; and the Lenders' loans purported to take a security interest in Kane's future income and required death and disgrace insurance, Pl. Ex. 68, 70, 72, 74, 78, 80, 82, 84.

DEFENDANT'S POST-TRIAL BRIEF                                                                 12

1    The Loan Shark debt and Scotia Bank Debts were incurred as investments, and the

2    Lenders' loans were not incurred for consumer purposes. More importantly, Kane understood

3    that the Petition question 16 presented legal questions, and he checked the boxes that his debts

4    were not primarily consumer debts and were primarily business debts in consultation with his

5    counsel. T1 at 58:3–5 ("Well, I'm not a lawyer and—and it's kind of a legal question. And

6    with—you know, I rely on my—or part of it is I rely on my counsel's advice that he gives me.").

7    Centennial failed to establish that by checking the boxes in consultation with his counsel, as

8    Kane testified, he is liable for a falsehood.

9            *2.  Regarding a Material Fact*

10    A false statement or omission must involve a material fact. *Khalil*, 379 B.R. at 172.

11    Materiality is "conceived of broadly, as including any fact that bears a relationship to the

12    debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or

13    the existence and disposition of the debtor's property." *Murtaza v. Sigmund (In re Murtaza)*,

14    2016 Bankr. LEXIS 1092, at *10 (B.A.P. 9th Cir. Apr. 5, 2016). *See also Khalil*, 379 B.R. at

15    173; *Wills*, 243 B.R. at 62. While the definition of materiality is broad, the purpose of the

16    requirement for the debtor to make truthful and complete disclosures is to "insure that the trustee

17    and creditors have accurate information without having to conduct costly investigations." *Khalil*,

18    379 at 172 (quoting *Wills*, 243 B.R. at 63). *See also In re Aubrey*, 111 B.R. 268, 274 (B.A.P. 9th

19    Cir. 1990). Thus, a false statement or omission that would not assist or impede the trustee or

20    creditors in this endeavor is not material. *Id.*

21            Centennial presented no evidence or argument about the materiality of Kane allegedly

22    "checking the wrong box," other than the suggestion that Kane's indication "that his debts are

23    primarily business debts" is likely "a preemptive and premeditated effort to avoid the means

24    [test] under Bankruptcy Code § 707(b) by arguing his debts are not primarily consumer debts."

25    AP 28 at ¶ 19. However, the Court has already determined that Centennial has not shown that

26    Kane's debts are primarily consumer debts, and Centennial presented no compelling reason to

27    revisit that finding. *See* BK 152. Moreover, as mentioned above, the Bankruptcy Code does not

28    discuss "business debts." *See* § 707. Rather, it permits a court to dismiss a Chapter 7 "case filed

DEFENDANT'S POST-TRIAL BRIEF                                                                                    13

1  by an individual debtor under this chapter whose debts are *primarily consumer debts*" if the court

2  finds granting the debtor relief would be an abuse of the provisions of Chapter 7. § 707(b)(1)

3  (emphasis added). *See* § 101(8) (defining "consumer debt" as "debt incurred by an individual

4  primarily for a personal, family, or household purpose."). As the Court noted previously,

5  "whether a debt was incurred to purchase or fund a business or real estate investment is relevant

6  to the consumer debt inquiry, as such debts certainly fall outside the Code's definition. But

7  nothing in the Code or case law prevents other debts from not being consumer debts." BK 152 at

8  4–5. Furthermore, regarding the questions presented by the Petition, the Court commented that

9  "the form is not very precise." T1 at 165:13–18.

10      Even if Kane's responses to question 16 were false (which they were not), they are not

11  material. His disclosures did not impede the Trustee, UST, or creditors from having accurate

12  information about his finances. Kane voluntarily disclosed his debts and the nature of his

13  indebtedness in his Schedules and amendments thereto (as well as in the loan documents he

14  entered into with the Lenders, and which were provided to Centennial). Centennial was free to

15  conduct its own inquiry into the nature of Kane's debts, and this issue has been extensively

16  litigated by the parties. Centennial may ultimately disagree with the boxes Kane checked, as well

17  as with the Court's previous determination that Kane's debts are not primarily consumer debts,

18  but this does not establish materiality.

19          *3. Knowingly and Fraudulently*

20      "A person acts knowingly if he or she acts deliberately and consciously." *Roberts v.*

21  *Erhard (In re Roberts)*, 331 B.R. 876, 883 (B.A.P. 9th Cir. 2005). The fraud provision of

22  § 727(a)(4)(A) is similar to common law fraud,[10] except that materiality replaces the elements of

23  reliance and proximate damage. *Id.* at 884. Thus, a creditor must show that the debtor made false

24  statements or omissions, knew they were false, and had the intention and purpose of deceiving

25

26      [10] To prove common law fraud, a creditor must show that (1) the debtor made the
    representations; (2) that at the time he knew they were false; (3) that he made them with the
27  intention and purpose of deceiving the creditors; (4) that the creditors relied on such
    representations; (5) that the creditors sustained loss and damage as the proximate result of the
28  representations having been made. *Roberts*, 331 B.R. at 884.

DEFENDANT'S POST-TRIAL BRIEF                                                                    14

creertors. *Id*. The debtor's intent must be actual, not constructive, and may be established by circumstantial evidence or by inferences from course of conduct. *Id*. (citing *Devers v. Bank of Sheridan (In re Devers)*,759 F.2d 751, 753 (9th Cir. 1985)). "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *Retz v. Samson*, 606 F.3d 1189, 1199 (9th Cir. 2010) (quoting *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)). "However, the debtor's reliance must be in good faith." *Id*.

When asked why he checked certain boxes in question 16 of the Petition, Kane acknowledged his selection and added "it's more of a legal question," T1 at 149:20–21; and that he relied on the advice of counsel in providing his answer, T1 at 58:3–5. This is not the case where counsel's advice was obviously erroneous, and the error should have been evident to Kane. Rather, Kane relied on his counsel's advice in good faith, and his understanding and description of the nature of his debts was not false. *See* III.C.1, *supra*. Moreover, the Court has already found that Kane's debts were not consumer debts, which is in line with Kane's responses to question 16 on his Petition. BK 152. The imprecision of the form provides further evidence that Kane did not act knowingly or fraudulently, and instead relied upon his understanding of the nature of his loans and on his counsel's advice in providing an accurate response to a poorly worded form concerning a complicated area of law.

### 4. Other Alleged False Oaths

Although Centennial declined to pursue § 727(a)(4)(A) claims on its allegations that Kane omitted transfers or gifts to his family, failed to disclose real property, and underreported his income, it contended that those allegations establish a "totality of the circumstances" regarding Kane's approach to his bankruptcy filing. T1 at 6:12–7:5. However, Centennial failed to address those allegations at trial. Nevertheless, Kane presented evidence to rebut each of these allegations.

Kane rebutted Centennial's allegation that he failed to disclose transfers or gifts to his family. Kane disclosed $15,000 in monthly support payments to his family from the start in the original Schedule J filed with his Petition. Pl. Ex. 1. Sheri Kane's testimony was consistent with

her son's, noting that Kane sent money home every month, some of which was used for family expenses and some of which was used for the operation of the West 35th Avenue rental property. T2 at 22:22–23:15. She confirmed that she considered Kane's payments as "support" and not a "gift." *Id*. Kane also testified that the payments provided to his family were support and not gifts. T2 at 171:19–24.

Kane also established that he never owned or had any interest in property at 902-8488 Cornish Street in Vancouver, which Centennial once alleged was undisclosed. Perry Kane testified at trial that he is the sole owner of a one-bedroom condominium at 902-8488 Cornish Street, title has been in his name only since he purchased the property, the tax bill and assessments are addressed only to him, and he pays the costs and expenses associated with that property. T2 at 11:11–17:25; Def. Ex. VV, WW, XX, YY. Further, Perry Kane confirmed that his son has never been on title to and has never owned any interest in the property. T2 at 17:14–21.

Finally, while Centennial never addressed Kane's income as of the Petition Date at trial, the attachment to Schedule I filed on January 9, 2021, explained in detail how the COVID-19 pandemic affected Kane's income. Pl. Ex. 1 at 41.

D.  Centennial's § 727(a)(3) Claim

Section 727(a)(3) acts to deny a discharge to a debtor who "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The purpose of § 727(a)(3) is to require a debtor to "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Cox v. Lansdowne (In re Cox)* ("*Cox I*"), 904 F.2d 1399, 1402 (9th Cir. 1990). The initial burden of proof under § 727(a)(3) is on the plaintiff. Bankruptcy Rule 4005. To state a prima facie case under § 727(a)(3), the plaintiff must show "(1) that the debtor failed to maintain and preserve

DEFENDANT'S POST-TRIAL BRIEF                                                                 16

adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Cox II*, 41 F.3d at 1296.

As there are no allegations that Kane concealed, destroyed, mutilated, or falsified records; the issue is whether he failed to keep sufficient records and information. A debtor must only "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008). A debtor's "duty to keep records is measured by what is necessary to ascertain [his] financial status." *Moffett v. Union Bank*, 378 F.2d 10, 11 (9th Cir. 1967). Section 727(a)(3) does not require absolute completeness in the records, but a debtor must keep and preserve records that will enable his creditors to accurately ascertain his financial condition and business transactions. *Kistler v. Fader (In re Fader)*, 414 B.R. 640, 645 (Bankr. N.D. Cal. 2009) (Montali, J.). Moreover, the B.A.P. noted that "[d]ebtors are required to keep records for a 'reasonable' period of time for § 727(a)(3) purposes, and a court's determination of 'reasonableness' depends on the particular facts and circumstances of each case." *Sfadia v. Bongkuk Int'l, Inc. (In re Sfadia),* 2007 Bankr. LEXIS 4933, at *31, 2007 WL 7540987 (B.A.P. 9th Cir. Sep. 5, 2007).

In evaluating the reasonableness of Kane's financial records, the Court must undertake a case-by-case determination. *See United States Trs. v. Hong Minh Tran (In re Hong Minh Tran)*, 464 B.R. 885, 893 (Bankr. S.D. Cal. 2012). The Court should take into consideration Kane's sophistication and the type of transactions in which he engaged. *Id*. For the average person who is not engaged in sophisticated financial transactions, tax records, wage records, and bank and credit card statements may suffice. *Id*. When the debtor is sophisticated and carries on a business involving substantial assets, "creditors have an expectation of greater and better record keeping." *Caneva*, 550 F.3d at. 762 (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 970 (7th Cir. 1999)). While Kane's debts are primarily non-consumer debts and this case involves above-average amounts, Kane is *not* a sophisticated business debtor and has always relied on hired professionals to advise him and manage his financial affairs. *See* III.D.6, *infra*. The Court must

DEFENDANT'S POST-TRIAL BRIEF 17

view the adequacy of the Kane's recordkeeping according to what others in like circumstances would ordinarily keep.

Centennial's inquiry focuses on the $18,081,019.87 in non-priority creditor claims disclosed in Kane's Schedules. AP 47 at 2:6–18. Practically all of this unsecured debt results from the Lenders' loans and a handful of individual lenders (the "Individual Lender Loans," *see* III.D.4, *infra*).[11] The evidence at trial established that the Lenders' loans were the last in a long series of loans arranged by McKenzie/Sure Sports. Kane's testimony at trial also established that the Individual Lender Loans went to pay off debts (including gambling debts) and to stay current on bills. The financial documents Kane provided to Centennial were sufficient to reasonably ascertain Kane's financial condition and follow his past dealings for a reasonable period, considering all the facts of this case.

The unpublished B.A.P. decision of *In re Nevett*, 2021 Bankr. LEXIS 1781, at *12–13, 2021 WL 2769799 (B.A.P. 9th Cir. July 1, 2021), provides persuasive guidance on how to determine the limits of a reasonable lookback period. Though the debtor's discharge in *Nevett* was ultimately denied, the B.A.P. affirmed the bankruptcy court's finding that the debtor was justified in not keeping records pertaining to a certain loan that was comparatively small, that was taken out five years before his bankruptcy petition, and that had been largely repaid. This limitation undercuts Centennial's arguments that the lookback period should be expanded to cover twelve or more years of Kane's financial documents. AP 47 at 14–15. *See also* Pl. Ex. 16 (Centennial's request for production) at, *e.g.*, Requests 35–36 (seeking seven years of documents), 51–53 (twelve years), 40, 46 (no time limitation).[12] Furthermore, Kane provided detailed documents regarding *all* of the Lenders' loans, *all* of the institutional loans predating the Lenders' loans (beginning with his first loan arranged by McKenzie/Sure Sports in 2014), and copies of *all* financial statements to which Kane had access, dating back to approximately 2019.

---

[11] There are also miscellaneous claims for taxes, professional fees, credit card debt, and the disputed claims of Parker and Rachel Kuechle.

[12] Centennial never sought to compel production of additional documents from Kane and never independently subpoenaed third-party records.

DEFENDANT'S POST-TRIAL BRIEF                                                                 18

Furthermore, the detailed records regarding Kane's loans provided precise explanations of how the loan funds were disbursed.

### 1. Bank and Credit Card Statements

Centennial alleges that Kane failed to keep adequate bank and credit card records because he only produced statements going back to approximately 2019 and no statements prior to 2019. Pursuant to the Court's March 17, 2021, *Order Approving Stipulation Regarding Centennial Bank Rule 2004 Examination*, Kane produced to Centennial all the documents he produced to the Trustee and the UST. BK 61.

In discovery, Centennial made myriad additional requests for Kane's financial documents, which in many cases were overbroad, both in respect to time and scope. For example, Centennial's request for production sought documents from the past seven years, Pl. Ex. 16 at Requests 35–36; twelve years, *id.* at Requests 51–53; and with no time limitation, *id.* at Requests 40, 46. Centennial's requests were not supported by a showing of relevance or compelling need, and Kane objected to the requests as broad, harassing, seeking irrelevant documents, not reasonably limited in time or scope, and unduly burdensome, among other things. *See id.* Kane agreed to produce non-privileged documents from the two years prior to the Petition Date that were in his possession, custody, and control that could be located by a reasonable search. *See id.* Centennial "[b]racket[ed] for the moment," but did not revisit, the issue of the length of the lookback period in discovery. *See* Pl. Ex. 20.

After a reasonable search, Kane produced the following bank and credit card statements to Centennial:[13]

1. Bank of America ("BofA") 0171 – August 22, 2019, to January 20, 2021;
2. Wells Fargo 1607 – January 1, 2020, to January 31, 2021;
3. Scotiabank 6228 (Checking) – January 1, 2019, to January 31, 2021;
4. Scotiabank 6287 (Savings) – January 1, 2019, to June 29, 2019; August 1, 2019, to January 31, 2020; and March 1, 2020, to January 31, 2021;
5. RBC 5955 (Can$ Checking) – September 12, 2019, to January 12, 2021;
6. RBC 0532 (US$ Checking) – September 12, 2019, to January 12, 2021;
7. Wells Fargo American Express 64004 (Credit Card) – September 5, 2020, to December 7, 2020;

---

[13] Kane also disclosed RBC 5963 in his amended Schedule A/B, which had a negative balance as of the Petition Date. Pl. Ex. 8 at 6.

DEFENDANT'S POST-TRIAL BRIEF 19

8. Wells Fargo 2528 (Credit Card) – January 31, 2020, to January 31, 2021; and
9. RBC 4741 (Credit Card) – June 26, 2020, to August 25, 2020; and September 26, 2020, to December 29, 2020.

As explained above, Kane had limited access to statements due to the closure of his accounts when he filed for bankruptcy. T1 at 45:1–2. Furthermore, Kane never had access to the East West Bank and Zions deposit accounts that were set up and entirely managed by those lenders and Tony Chiricosta. *E.g.*, T2 at 109:20–25, 110:3–6 (East West Bank); T2 at 110:3–6, 151:7–24 (Zions).

Kane provided Centennial with copies of all statements that he had access to, and Centennial did not subpoena any statements predating those produced by Kane. Rather than engaging in a good faith effort to follow Kane's transactions for the relevant period (as the Trustee did), Centennial engaged in examination by ambush, hopscotching through Kane's various statements and asking Kane to recall miscellaneous transactions in isolation and on the spot. *See* II.F.3, *supra*.

Kane's financial statements are fairly mundane, albeit with larger amounts than might be seen with typical debtors (though still totaling much less than the amounts attributable to the institutional loans). The statements show deposits of Kane's salary, transfers between his accounts (including between Canadian and U.S. Dollar accounts), and payments for various bills and living expenses (including payments to service his debts with the Lenders). *See* generally, Pl. Ex. 21–25, 28, 30; Def. Ex. EEE–GGG, III–KKK. Moreover, Kane's testimony supports Kane's typical use of his accounts, including making transfers between accounts to pay various expenses, entering descriptions for transactions when allowed by his banking apps, and his accessing of financial statements via those apps. *E.g.*, T2 at 88:3–90:15 (general use of accounts); T2 at 90:16–92:2 (management of account statements); T2 at 64:2–19, 95:17–96:4, 97:7–16 (entering descriptions for transactions). Centennial fails to allege what information is missing from Kane's financial picture based on the statements he provided, what Centennial would gain if it had access to earlier statements, or why it is "impossible" to ascertain Kane's financial information without additional statements.

DEFENDANT'S POST-TRIAL BRIEF 20

1

### 2. Kane's Compensation and Expenses

2    Centennial contends that "the documentation produced by Kane does not support the

3  dissipation of nearly $22 million in gross compensation" in the years leading up to his

4  bankruptcy filing. AP 47 at 11:4–9. *See also* T1 at 14:11–17:18 (Centennial's erroneous

5  estimation that Kane received at least $19 million from 2018–2020). Centennial inflates Kane's

6  income by looking only at gross income, without acknowledging various other factors that

7  reduced his net pay.

8    Kane established that he was not taking home anything close to the amounts suggested by

9  Centennial. He explained that there are about twelve to thirteen pay periods in a season, and he

10  estimated that he received between $160,000 to $210,000 per pay period. T1 at 16:23–17:2.

11  Thus, on the high end of this estimate, Kane received only about $2,730,000 of his

12  approximately $6,000,000 salary over the course of a recent season.[14] This range is consistent

13  with Kane's testimony that he typically took home less than 50% of his gross salary. T2 at

14  136:13–20. *See also* Pl. Ex. 25 at 35; T2 at 132:9–137:5 (Kane received approximately $1.64

15  million of his $3 million signing bonus and would receive approximately 45% of his gross salary

16  due to increased tax, escrow, and agency fees that were not fully charged on bonuses).

17    In addition to taxes, Kane's salary was further decreased by NHL escrow deductions. The

18  NHL withholds a percentage of each player's salary as part of a revenue sharing agreement with

19  the owners. T2 at 135:7–136:12. The escrow amount fluctuates every year. *Id*. Kane estimated

20  that over the course of his fourteen years in the NHL, escrow averaged 18%. *Id*. Kane's

21  Attachment to Schedule I indicated that the escrow for the 2020–2021 season was 20%. Pl. Ex. 1

22  at 41. Kane testified that he received perhaps 2.5% of that back in only a handful of seasons, and

23  there were seasons when he got none of the escrow withholdings back. T2 at 135:23–136:5.

24  Additionally, escrow is calculated on Kane's total salary and signing bonus amount but taken out

25  of his salary portion only. T2 at 134:17–135:6. On top of that, Kane paid his agent a fee ranging

26  from 3–6% of his salary. T2 at 136:19–137:17, 175:1–5.

27

28    _____

[14] On the low end, Kane's estimate suggests he received as little as $1,920,000 based on a
$6,000,000 salary.

DEFENDANT'S POST-TRIAL BRIEF                                                    21

Kane also testified to the impact of the COVID-19 pandemic, which caused the NHL to cancel games and pause the season and the Sharks to miss multiple pay periods. T1 at 6:14–23; T2 at 143:11–14. Kane explained that the regular season typically starts in mid-October and usually ends in the first two weeks of the following April. T1 at 176:3–11. Kane recounted multiple times that he struggled financially in the off-season and did not have enough cash to live on and pay his bills until his next paycheck when the season started in October. *See, e.g.*, T1 at 79:2–6. Kane explained McKenzie/Sure Sports arranged so-called "bridge loans" to get him through the summer to his next paycheck. T1 at 79:23–80:11. The pandemic strained Kane's finances severely in 2020. As set forth in the Attachment to Schedule I, a typical season includes 82 regular season games. Pl. Ex. 1 at 41. However, due to the pandemic, the 2020–2021 season was reduced to 56 games scheduled to begin as late as January 14, 2021. *Id*. While Kane's contract provided for him to earn $3,000,000 in the 2020–2021 season, Kane's salary is based upon the number of games played, and the reduction of scheduled games due to the pandemic meant a reduction in his salary and ultimate take home pay. *Id*. *See also* Pl. Ex. 85. This means Kane did not receive a paycheck for his salary as a professional hockey player from about April 2020 until January 2021.

By comparison, Kane's amended Schedule J estimated his monthly expenses as of the Petition Date at approximately $93,214.46. Pl. Ex. 6. At trial, Centennial calculated Kane's expenses around $1,116,000 a year and did not dispute this amount. T1 at 157:6–16. Thus, there is no unexplained dissipation of Kane's compensation (especially not unexplained dissipation of up to or more than $22 million) and no missing records related to any alleged dissipation. Centennial failed to dispute or challenge any of Kane's testimony regarding the amount of salary he actually received. Centennial's use of gross amounts was neither helpful nor accurate.

### 3. The Lenders' Loans and Previous Loans

Kane maintained and produced documentation for each of the Lenders' loans. *See* Attachment 1, Pl. Ex. 68, 70, 72, 74, 78, 80, 82, 84. Regarding the Lenders' loans, they were disbursed as follows:

DEFENDANT'S POST-TRIAL BRIEF                                                              22

1        1.  Zions: Of the $4.25 million loaned, Kane received $67,083.33. In addition to various

2             fees and expenses totaling $154,903.33, the loan was disbursed to pay Thrivest

3             ($359,964.55) and Seven Isles Capital ($3,660,395.12). Attachment 1; Pl. Ex. 70.

4        2.  Centennial: Of the $8 million loaned, Kane received precisely $0. In addition to

5             various fees and expenses, the loans were disbursed to pay Thrivest ($3,665,215.93,

6             $1,504,767.76, and $374,625), South River ($401,807.13, $247,359.16, and

7             $1,917,500) and East West Bank ($399,847.55 which is listed as paid to Kane but

8             was deposited into an East West Bank account to which Kane had no access or

9             control, T2 at 161:8–162:11). Attachment 1; Pl. Ex. 72, 74, 78, 82.

10       3.  Professional Bank: Of the $1.5 million loaned, Kane also received $0. In addition to

11           various fees and expenses, the loan was disbursed to pay Democracy Capital

12           ($1,237,222) and South River ($134,309.11). Attachment 1; Pl. Ex. 80.

13       4.  South River: There were two loans. Of the $1.85 million loaned pursuant to the first

14           loan, Kane received $554,675. In addition to various fees and expenses, the remainder

15           of this loan was disbursed to East West Bank ($412,934.24), Cosmopolitan

16           ($300,000), and Alexander Zoltan Zabori ($163,000, which was a payment directed

17           by creditor Davis Sanchez, T2 at 59:17–58:7). Attachment 1; Pl. Ex. 68. Of the

18           $600,000 second loan, Kane received $520,774. Pl. Ex. 84; Def. Ex. EEE at 3. Kane

19           used these funds to pay off various debts. Def. Ex. EEE at 6 ($135,315.75 to

20           American Express); Def. Ex. EEE at 6, GGG at 1, FFF at 1 (tracing funds to show

21           Can$200,000 payment to Davis Sanchez); T2 at 130:13–132:4 (same); T1 at 156:8–

22           10; T2 at 129:7–19 (payment of gambling debt).

23   Thus, Kane accounted for the entirety of the Lenders' loan funds.

24        Kane also provided documentation and explanations for *all* loans arranged by

25   McKenzie/Sure Sports that preceded the Lenders' loans, totaling 26 loans dating back to May 14,

26   2014. Attachment 1; Pl. Ex. 36–38, 40–46, 48, 50–56, 58, 60–62, 64, 66–68, 70, 72, 74, 78, 80,

27   82, 84. The loan documents themselves state the use of approximately 85% of the total loan

28   proceeds. *See* Attachment 1 (Kane received $6,964,707.14 of the total $48,010,000 loaned, and

DEFENDANT'S POST-TRIAL BRIEF                           23

the remainder was paid to prior lenders as specified in the loan documents). Certainly, these documents are adequate and sufficient to ascertain Kane's financial condition and material business transactions for a reasonable time in the past.

### 4. The Individual Lender Loans

Centennial argues Kane failed to keep documentation regarding his receipt and use of proceeds from the Individual Lender Loans, identified as follows:

1. Tony Veltri – $320,000;
2. Davis Sanchez – $150,000;
3. Raj Banghu – $100,000;
4. Hebron Shyng – $430,000;
5. Mike Lispti – $750,000; and
6. Pete Gianakas– $400,000.

*See* Pl. Ex. 3; *see also* AP 47 at 9:18–20. Kane provided testimony regarding these loans, but given that these were largely personal friends and acquaintances of Kane, there was little documentation behind them. T2 at 84:22–88:2.

As Judge Montali remarked in *Fader*, "without adequate records, the debtor must provide adequate explanations." 414 B.R. at 645 (citing *Caneva*, 547 F.3d at 1087). Kane's trial testimony, as well as his previous descriptions, provide adequate explanations:

1. Tony Veltri is Kane's good friend and someone Kane has known for thirteen to fourteen years (*i.e.*, since approximately the time he began playing professional hockey), and who has always supported Kane. T2 at 85:1–7. Kane explained that he used personal loans from Mr. Veltri to pay certain bills. T1 at 52:22–53:9.

2. Davis Sanchez is someone from whom he borrowed money over time, which he deposited into his account to pay bills. T1 at 48:18–49:11; T2 at 59:25–60:4. Bank statements introduced at trial also evidenced payments to or on account of debts to Mr. Sanchez.

3. Raj Banghu is a friend that Kane has known for five or six years. T2 at 85:17–20. Kane explained that he used the funds to pay bills and stay current. T1 at 52:3–14. Mr. Banghu filed his own claim in the case including statements verifying his loan to Kane. Claim 6.

DEFENDANT'S POST-TRIAL BRIEF                                                    24

4. Hebron Shyng is a family friend whom Kane met through Kane's parents, and Kane's parents have known him for most of their adult lives. T2 at 85:25–86:6. Kane explained that Mr. Shyng had lent Kane money to purchase the West 35th Avenue property, and that in fact there was documentation of that loan and the instant loan to pay off debt and stay current on bills and credit card debt signed by Kane and his parents. T2 at 86:13–23; T1 at 49:16–50:4.

5. Kane testified that Mike Lispti and Pete Gianakas worked for bookies to whom Kane owed money, and that these two individuals loaned Kane money to pay off the bookies and Kane in turn became indebted to them. T2 at 86:24–87:24.

The Individual Lender Loans account for a small portion—approximately 7.6%—of Kane's total debt.[15] Centennial has not challenged the accuracy of Kane's testimony or the amounts of the Individual Lender Loans as stated in Kane's Petition, but instead argues that there is no documentation to support these loans. However, Kane's testimony provides adequate explanations that allows creditors to reasonably ascertain his financial condition and material transactions.

### 5. Gambling Winnings and Losses

Several courts have recognized that § 727(a)(3) does not impose a duty on a debtor who gambles to keep a win/loss diary in order to receive a discharge, requiring only what is necessary to ascertain a debtor's financial status. *E.g.*, *Moffett*, 378 F.2d at 11. *See also CadleRock Joint Venture, L.P., v. Sauntry (In re Sauntry)*, 390 B.R. 848, 856 (Bankr. E.D. Tex. 2008) (collecting cases).

Centennial alleges that Kane failed to keep a tally of his gambling activity or to identify the online bookies who he used. AP 47 at 10:9–18. Kane's SOFA states that within one year before the Petition Date, he incurred losses of approximately $1,500,000 from gambling at casinos and sports betting through bookies. Pl. Ex. 1 at 51. The $1,500,000 in gambling losses were incurred primarily with bookies. T1 at 30:19–31:2. Kane also disclosed that he lost money

---

[15] This is calculated as $2.25 million of Kane's overall $28,191,340 in debt. Pl. Ex. 1 at 24–33; BK 152 at 2 n.3.

gambling in the years prior to 2020. T1 at 34:11–14. Kane gambled at both casinos and with bookies, and the two forms of gambling were quite different.

Regarding gambling at casinos, Kane had a player's card and an account number at the casinos, and he understood that they tracked all bets internally. T1 at 35:14–36:6. While Kane did not personally keep a ledger of his wins and losses, he maintained loan documents and financial statements that reflect payoffs to various casinos over the years. T1 at 34:15–25, 36:3–14. Kane produced documents showing payoffs to Seneca Gaming Corporation ($100,000 on March 2, 2017, Pl. Ex. 54, 55); Cosmopolitan ($500,000 on September 28, 2017, Pl. Ex. 64; and $300,000 on March 22, 2018, Pl. Ex. 68); and testified that he paid a $750,000 marker to the MGM in Las Vegas (T2 at 68:5–14, 174:7–10). Kane also introduced bank statements showing payments to the Clark County District Attorney for an overdue gambling debt owed to the Cosmopolitan from about April 2019. Pl. Ex. 25 at 5, 11, 17; T2 at 60:8–61:18, 62:1–63:20. *See also* Def. Ex. MMM, LLL; T2 at 66:1–67:1 (further description of payments and documents reflecting the dismissed lawsuit). Other bank statements showed deposits from winnings at the Four Seasons hotel and casino in St. Louis, Missouri ($120,000 on January 8, 2020), the Sugar House casino in Philadelphia, Pennsylvania ($37,000 on February 24, 2020), and various other winnings ($25,100 on February 4, 2020; $30,000 on February 5, 2020; and two deposits of $51,000 and $80,000 on October 14, 2020). Pl. Ex. 24, 25; T1 at 120:6–121:21, 135:4–11. As with the bank statements and credit card statements, Centennial chose not to subpoena any documents from the casinos.

Documentation regarding Kane's interactions with the bookies is harder to come by because, due to their legal status, bookies operate in a manner designed to elude record-keeping. Kane provided a thorough explanation of his use of bookies for gambling and the systems utilized by them. He explained that he placed bets with bookies through websites, and that the website addresses and his login information would automatically change every two to six months. T1 at 32:25–33:20; T2 at 71:6–13, 76:6–22. *See also* T2 at 71:14–17 (Kane accessed the websites on his phone almost exclusively). The websites would show how much Kane was up or down, but Kane explained that he could not print or save that information. T1 at 28:1–13; T2 at

DEFENDANT'S POST-TRIAL BRIEF 26

77:3–13. Kane did not personally keep track of his individual bets, and doing so would be impractical due to the high volume of his bets. *See* T2 at 78:10–25 (up to fifty bets per day during Kane's peak usage). Kane did, however, keep track of his day-to-day account balance, which was prominently displayed on the bookies' websites. T2 at 72:5–8, 76:25–77:2, 175:5–12. Occasionally Kane and the bookies would "square up" with the bookies, regardless of whether he was up or down. T2 at 73:12–75:17, 77:14–22. When Kane was down, he would pay the bookies with cash or by wire transfer, cashier's check, bank draft, or even with jewelry. *Id.* On the rare occasion that Kane was up, bookies paid him in cash, which he deposited into his bank, used to pay off other debts, or gambled with at casinos. T2 at 69:16–24, 73:12–75:17, 77:14–22. Though the bookies' practices were resistant to documentation, Kane nevertheless provided documents substantiating his bookie-related transactions. These include a $748,600 loan disbursement to pay off a gambling-related "Personal Loan," Pl. Ex 54 at 19; T1 at 86:3–10; a $140,000 payment to "Vinny," a bookie, Pl. Ex. 54 at 19; T1 at 86:11–17; and the transfer of two Rolex watches valued at $75,000 on November 16, 2020, as payment to a bookie. Pl. Ex. 5 at 7; T2 at 165:23–166:10. Kane also produced bank statements for the years prior to the Petition Date reflecting gambling-related transactions. *E.g.*, Pl. Ex. 21–34.

Though Kane's records are not complete, his detailed testimony along with those records provides an adequate explanation of his gambling practices and history. *See Fader*, 414 B.R. at 645. Centennial has not challenged the accuracy or truthfulness of Kane's documents or testimony, and Kane provided adequate information by which creditors can reasonably ascertain his financial condition and transactions.

### 6. Justification

Kane provided ample records and information from which his financial condition and material transactions can be reasonably ascertained. As set forth above, Centennial failed to meet its initial burden to show both (1) that Kane failed to maintain adequate records and (2) that this failure makes it *impossible* to ascertain his financial condition and material business transactions. *See Cox II*, 41 F.3d at 1296; Bankruptcy Rule 4005. However, if the Court were to find that any inadequacies exist in Kane's recordkeeping, they are justified under the circumstances.

DEFENDANT'S POST-TRIAL BRIEF                                                                 27

Justification for a debtor's failure to keep or preserve books or records hinges on "whether others in like circumstances would ordinarily keep them." *Cox II*, 41 F.3d at 1299. The Court should consider all circumstances of the case to determine if a failure to keep records was justified. *Cox I*, 904 F.2d at 1403.[16] In Kane's case, relevant factors include: (1) the debtor's intelligence and educational background; (2) his experience in business and financial matters; (3) the extent of his involvement in managing his business and financial affairs; (4) his reliance on other individuals to keep records; (5) the nature of his relationship with those other individuals; and (6) any recordkeeping or inquiry duties imposed upon him by state law.

The uncontroverted evidence establishes that Kane is not a financially sophisticated debtor. Kane was drafted by his first team when he was seventeen years old, and he began playing professional hockey straight out of high school at the age of eighteen. T1 at 172:17–173:21. He has never taken any college or college-level courses, nor any courses or training about accounting, money management, or business development (and the NHL does not provide any financial education to its players). T1 at 172:21–173:9. Although Kane became a highly compensated athlete in his fourteen-year career, he was raised in a working-class family that never owned a home, struggled financially, and lived month-to-month. T2 at 20:17–19. His financial decisions were driven in part by the uncertainty of his sport, from the 2012–2013 NHL lockout, the long summer off-seasons when he went without a paycheck, and the COVID-19 pandemic, which raised constant doubts about when he would get his next paycheck, how he would support himself and his family, and what he could do to stay current on his bills. *See*, *e.g.*, T1 at 61:5–12, 79:20–80:11, 181:21–182:11.

Kane's financial decisions were also driven by the professionals Kane hired to manage his affairs. Kane has employed agents and other professional financial advisors since he was

---

[16] In the case of a debtor who had relied on her husband to keep records, the Ninth Circuit identified factors including: (1) debtor's intelligence and educational background; (2) her experience in business matters; (3) extent of her involvement in business for which discharge is sought; (4) reliance on her husband to keep records, including what, if anything, debtor saw or was told that indicted that her husband was keeping records; (5) nature of marital relationship; and (6) any recordkeeping or inquiry duties imposed upon debtor by state law. *Cox I*, 904 F.2d at 1403 n.5; *Cox II*, 41 F.3d at 1297–98.

DEFENDANT'S POST-TRIAL BRIEF 28

fifteen years old. T1 at 173:22–175:19. Kane's agents helped him sign his first NHL contract and provided him with financial management services including setting up his bank accounts and credit cards, paying certain bills, handling his taxes, obtaining a mortgage, and generally monitoring his finances. T1 at 173:22–175:19, 177:19–178:5, 179:14–21. Eventually, Kane retained McKenzie/Sure Sports, who acted as Kane's advisors and representatives in relations with various lenders. *See, e.g.*, T2 at 101:10–13, 150:21–25. Kane also hired Tony Chiricosta as his accountant, which was required by East West Bank and McKenzie/Sure Sports to obtain certain loans. T2 at 110:6–25. Kane testified that he "relied on Tony [Chiricosta] and Leon [McKenzie], who were [his] representatives, to make sure that things were in order" with the loan papers, and that he signed under their direction without detailed review. T2 at 147:18–149:12. As Kane's accountant, Tony Chiricosta took over most communications with McKenzie/Sure Sports, managed and filed all of Kane's taxes, obtained an American Express credit card for Kane, worked with McKenzie/Sure Sports to obtain new loans to pay off existing loans, and managed accounts with lenders in Kane's name (to which Kane had no access or control). T2 at 109:22–25; 150:11–25.

Kane noted several accounts that were opened in his name, but to which he had no (or severely limited) access or control. These include an East West Bank account opened in Kane's name in connection with a loan, to which Kane never had any access or control, T2 at 109:8–110:17, 111:1–3, and a Zions account opened in connection with a loan, to which Kane never had any access or control, and to which Kane's paychecks would be deposited with disbursements being directed towards loan payments, T2 at 152:1–24. *See also* AP 28 at ¶ 10 (describing a similar account for Centennial's loan).

As for Kane's other accounts, he explained that he never received physical monthly statements for at least the last six years, and that he accessed his accounts online from his phone to monitor activity and balances. T2 at 90:16–91:2. Kane testified that, when asked to provide financial statements in connection with his bankruptcy case, he downloaded whatever statements were available at the time with his phone and forwarded them to his attorneys. T2 at 91:3–21. Kane confirmed that he produced all statements that he had access to, and that any non-

production within the two years before the Petition Date was attributable to the statements not being in Kane's possession or control. T1 at 42:1–19. Moreover, Kane explained that he no longer had access to his Wells Fargo and BofA account statements beyond what he already produced after those accounts were closed shortly after the Petition Date. T2 at 99:15–100:19. Centennial chose not to subpoena any financial records predating those produced by Kane, though it had plenty of time to do so.

Centennial cites *Nevett*, 2021 Bankr. LEXIS 1781, to support denial of Kane's discharge for alleged failure to keep and maintain records of the disposition of loan proceeds, especially those related to the Individual Lender Loans. AP 47 at 9–10. However, *Nevett* is distinguishable. Unlike Kane, the debtor in *Nevett* was a sophisticated businessperson who held a bachelor's degree in real estate finance from the University of Southern California, held a stockbroker's license for several years, and had over thirty years' experience as a stockbroker and founder of his own consulting and investment services companies. *Nevett*, 2021 Bankr. LEXIS 1781 at *2. The bankruptcy court in *Nevett* considered, among other things, the amount and nature of the transactions, the nature of the debtor's overall business dealings, the millions of dollars in loans and investment funds the debtor managed during the course of his career, the types of records he typically kept, and his overall level of sophistication, education, and experience—all of which are entirely distinguishable from Kane's case. *Id*. at *27. Centennial also cites *Caneva*, 550 F.3d at 764, in support of its case. AP 47 at 9–10. However, the debtor in *Caneva* was another sophisticated businessperson who owned or controlled numerous business entities, recreational vehicle parks, mobile home parks, and an airplane. *Id.* at 759. Centennial also points to *Cox II*, 41 F.3d at 1299. But in that case, the Ninth Circuit reversed the bankruptcy court's ruling that the debtor was not justified in relying upon her debtor-spouse to maintain proper records of their finances. *Id.* at 1300.

Here, Kane acknowledged that he did not produce agreements or ledgers documenting his loans from Tony Veltri, Davis Sanchez, and Raj Banghu (although Kane provided banking records and Mr. Banghu filed a proof of claim that support these debts). However, this is justified because Kane is not a financially sophisticated debtor and because these loans were

from close friends with which he had ongoing personal relationships. While Kane testified to documents supporting his debt to Hebron Shyng, the lack of production of those one-page promissory notes is justified by Mr. Shyng's close relationship with Kane's parents (and with Kane himself) as well as Kane's clear testimony regarding the circumstances of the loan and the use of the funds. *E.g.*, T2 at 85:25–86:23. Finally, Kane's lack of documentation regarding loans from Mike Lispti and Pete Gianakas is justified because those individuals were essentially middlemen between Kane and bookies. *See* III.D.4–5, *supra*.

Centennial contends that Kane's alleged failure to keep and maintain records of his gambling is another basis to deny his discharge. AP 47 at 10:9–10. Centennial cites three cases in support of this argument—each of which involved an objection to discharge by the UST. The first case cited by Centennial on this point is *Davis v. Macway (In re Macway)*, 667 F. App'x 658 (9th Cir. 2016). In that case, the UST objected to the discharge of a debtor who was "a well-educated, sophisticated international businessman with experience keeping financial records" who "should have understood the need to maintain and preserve business records for his gambling syndicate activities." *Id.* at 659. The debtor in *Macway* conceded that he did not keep adequate records of his gambling losses but argued that the court could ascertain his financial condition based on the evidence he presented at trial. *Id.* The Ninth Circuit affirmed the bankruptcy court's denial of discharge because, among other things, his evidence was internally inconsistent and unreliable. *Id.* By contrast, Kane is not a financially sophisticated person, and yet his evidence was clear, consistent, and not rebutted.

Centennial's second case is *Zhen Chen v. United States Tr. (In re Zhen Chen)*, 2017 Bank. LEXIS 3643, 2017 WL 4768104 (B.A.P. 9th Cir. Oct. 17, 2017), in which the B.A.P. affirmed the bankruptcy court's grant of summary judgment to deny the debtor's discharge under § 727(a)(3). The debtor in *Zhen Chen* provided no documentation from which the UST could verify the details of several transactions or trace the debtor's dealings. *Id.* at *16–18. Since the UST showed that no genuine disputes of material fact existed as to its prima facie case, the burden shifted to the debtor. *Id*. at *19. The debtor submitted only her declaration justifying her failure to keep or preserve records in opposition to summary judgment, which the bankruptcy

DEFENDANT'S POST-TRIAL BRIEF                                                                 31

court found was merely bald assertions without specifics and did not address the records that she failed to keep. *Id*. at *20–21. Most importantly, the court found the debtor was educated, had a bookkeeping certificate and experience with business and financial matters, and therefore failed the objective test regarding what others in like circumstances would ordinarily have kept. *Id*. at *21. Here, Kane did not have the benefit of higher education, relied on others for many financial matters, and was not sophisticated in financial matters, but nonetheless produced voluminous documentation and information such that Centennial (as well as the Trustee and UST) could ascertain his financial condition and material transactions.

Finally, Centennial relies on *Hong Minh Tran*, 464 B.R. at 888, a case in which the debtor's debts arose from credit card cash advances and purchases of valuable assets that he sold and then gambled away the proceeds. The debtor failed to schedule most of these purchased assets and did not document the sale of these assets or his gambling losses. *Id*. The court understood that the reasonableness of records is evaluated on a case-by-case determination. *Id.* at 893. The court found that the debtor's records were not reasonable, in part because no records were available because the debtor played poker (which is played against other players and not the house). *Id*. at 894. Kane's preferred casino games, on the other hand, were baccarat and blackjack, in which he was playing against the house and the casinos tracked all his bets. *See* T1 at 35:20–36:1; T2 at 52:10–15. Moreover, Kane fully disclosed his assets, liabilities, and relevant transactions in his Schedules and SOFA and filed several amendments as necessary to ensure that his disclosures were complete and accurate. And despite gambling records not being available from bookies, Kane provided loan documents dating back to 2014 and bank statements for a reasonable period that show withdrawals and deposits from gambling winnings. The bank statements and loan documents provide evidence of Kane's gambling losses, and Kane provided clear and unrefuted testimony supporting his gambling history and practices.

Another case worth discussing is *Ng v. Poole (In re Poole)*, 2022 Bankr. LEXIS 332 (Bankr. N.D. Cal. Feb. 8, 2022), in which Judge Novack found that the debtor was *not* financially sophisticated. *Id.* at *29. While the court stated it could "move past" a failure to document gambling activity if the debtor was a "casual or infrequent" gambler, Judge Novack

DEFENDANT'S POST-TRIAL BRIEF                                                      32

ultimately denied the debtor's discharge because (1) the court lacked evidence to determine the extent of her gambling; (2) her tax returns inaccurately reported her gambling income and deductions and she did not seek to amend them; (3) her financial statements did not accurately account for the funds that flowed through her hands; and (4) she did not justify her failure to keep or maintain records.[17] *Id.* at *33–34. Of course, *Poole* is not binding on this court, but aside from that, multiple facts set Kane's case apart from *Poole*. While Kane acknowledges that he has issues with gambling, he also testified that there were periods when he stopped and went months at a time without gambling. T2 at 83:17–84:1. Kane further testified that he lost money gambling, on balance, and that his agents and accountant managed and filed all of his taxes.[18] T1 at 34:11–14, 175:12–19; T2 at 150:11–17.

As Judge Montali remarked in *Fader*, where debtors are "without adequate records," they are allowed to "provide adequate explanations." 414 B.R. at 645. To the extent that Kane failed to personally maintain a diary of his gambling winnings and losses, he explained that casinos kept records of all his bets and that bookies eschewed any form of accessible record-keeping. Kane testified in detail regarding his gambling history and practices, which testimony was supported by the financial statements, loan documents, and other documentation that Kane produced. These explanations provide sufficient grounds to justify any failure to keep or maintain records related to Kane's gambling.

The policy underlying § 727(a)(3) is that accurate documentation and full disclosure "removes the risk to creditors of 'the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.'" *Caneva*, 550 F.3d at 762 (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir. 1953)). This is not a case where Kane has hidden anything. As the Trustee stated at trial, Kane is a "very cooperative debtor" who has been

---

[17] Judge Novack also noted that the debtor's Schedules and SOFA were replete with misstatements, leading to denial of discharge under § 727(a)(4). *Poole*, 2022 Bankr. LEXIS 332 at *36–38.

[18] "Taxpayers generally may deduct their gambling losses on their tax return, but this deduction is capped by their gambling wins for that tax year." *Poole*, 2020 LEXIS 332 at *30 (citing 26 U.S.C. § 165(d)).

DEFENDANT'S POST-TRIAL BRIEF                                                                    33

"absolutely" forthcoming in terms of his responses to the Trustee's requests and provided the Trustee with all the documents and information that were requested. T2 at 36:13–37:9, 46:16–20. Centennial did not introduce any evidence to suggest that any assets were concealed or withheld and has not argued so. Centennial seeks to deny Kane his discharge due to alleged failures to keep and preserve records, but these are based on overly broad and unduly burdensome discovery requests. *See* Pl. Ex. 16. Despite Centennial's assertions, the statute "does not require absolute completeness in making or keeping records." *Caneva*, 550 F.3d at 761 (citing *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971)). Kane produced sufficient documents and information such that his financial condition and material transactions can be reasonably ascertained, and any gaps in his recordkeeping were adequately explained and justified.

### 7. *Discovery Issues*

Centennial complained that Kane failed to provide complete responses to its irrelevant, overly broad, and unduly burdensome discovery requests. *See* AP 47 at 14–15; AP 43; Pl. Ex. 16 at Requests 35–36 (seeking seven years of documents), 51–53 (twelve years), 40, 46 (no time limitation). However, a failure to produce documents in response to a discovery request, standing alone, does not justify denial of discharge under § 727(a)(3). *Salehi v. Glob. Auto. Grp., Inc. (In re Salehi)*, 2014 Bankr. LEXIS 2649, at *25–27, 2014 WL 2726149 (B.A.P. 9th Cir. June 9, 2014). In *Salehi*, the B.A.P. explained that the creditor could have obtained written copies of the debtor's bank records through formal discovery in the adversary proceeding if it was not satisfied with what he produced in response to his Bankruptcy Rule 2004 examination. *Id*. at *27. And in *Rafsanjani v. Kuchecki (In re Kuchecki)*, 2010 Bankr. LEXIS 5045, 2010 WL 6259966 (B.A.P. 9th Cir. Nov. 29, 2010), the debtor produced only eight months of bank statements and the creditor asserted at trial (and on appeal) that the records produced by the debtor were insufficient to ascertain his true financial condition. The bankruptcy court stated, and the B.A.P. affirmed, that this was mere speculation. *Id*. at *23–24. The creditor provided no explanation as to how more complete bank statements were needed to ascertain the debtor's financial condition. *Id*. at *24. The creditor did not seek to obtain additional documents through discovery, and even if he did and the debtor "did not have them, they were likely available through [the debtor's] bank."

DEFENDANT'S POST-TRIAL BRIEF                                                                                    34

*Id*. Other courts have held the plaintiff must show *how* the missing records would enable the debtor's financial condition or business transactions to be ascertained under the circumstances of the case, as that is the ultimate connection between the first two elements of proof. *See*, *e.g.*, *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 833 (Bankr. N.D. Ohio 2004).

Centennial has never explained, beyond conclusory speculation, how its overly broad document requests are relevant to Kane's assets and liabilities at issue in this case, or how they are necessary to ascertain Kane's financial condition and follow his material transactions for a reasonable period of time. Instead, Centennial sat on its argument and failed to bring its dispute to the Court's attention until four days before the close of discovery. *See* AP 39 (motion for summary judgment). As discussed above, Centennial approached the case as if it was uninterested in discovering useful information about Kane's finances, and instead was focused on its efforts to deny Kane's discharge by any means possible. Kane provided significant documentation and explanations, including an accounting for the use of the loan proceeds from the Lenders and a history of loan disbursements through 26 loans stretching back to 2014. Centennial has not established the elements for a claim under § 727(a)(3).

E. <u>Centennial and Parker's § 727(a)(5) Claim</u>

Section 727(a)(5) provides that a debtor may be denied a discharge for failing to "explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." The Ninth Circuit set forth the analysis for a claim under § 727(a)(5) in *Retz*: "an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets." 606 F.3d at 1205 (quoting *Olympic Coast Invest, Inc. v. Wright (In re Wright)*, 364 B.R. 51, 79 (Bankr. D. Mont. 2007)). Centennial and Parker have not set forth a prima facie case under § 727(a)(5). A debtor's testimony may provide satisfactory evidence to explain the disposition of assets. *Radecki v. Snider (In re Snider)*, 2019 Bankr. LEXIS 683, 2019 WL 5883623 (Bankr. D. Nev. Feb. 28, 2019). Whether a debtor satisfactorily explains a loss of

DEFENDANT'S POST-TRIAL BRIEF
35

assets is a question of fact. *Ward v. Thompson (In re Thompson)*, 2009 Bankr. LEXIS 4530, at *15, 2009 WL 7751298 (B.A.P. 9th Cir. Apr. 20, 2009) (citations omitted). The Court has a great deal of discretion in determining whether an explanation is satisfactory so as to defeat the objection. *Id*.

   As a threshold issue, Centennial and Parker failed to argue or establish that Kane "at one time, not too remote from the bankruptcy petition date, owned identifiable assets." They have not asserted what the "identifiable assets" are. *Cf. Takhtayeva v. Bulgucheva (In re Bulgucheva)*, 2018 Bankr. LEXIS 2253, *16–17 (Bankr. N.D. Cal. July 31, 2018) (J. Efremsky) ("Glaringly absent at trial was any evidence of identifiable assets that went missing and/or were unaccounted for. No evidence was introduced that this issue was raised by Plaintiff or the chapter 7 Trustee at the meeting of creditors, nor any other time while the case was being administered by the chapter 7 Trustee."). Centennial pointed to the $22,000,000 in gross wages that Kane allegedly received between 2018 through 2020 and the "over $10,000,000" in net loan proceeds that Kane purportedly obtained from lenders and individuals in the five to six years before the Petition Date. AP 47 at 13:15–20. But Centennial made no effort to substantiate its calculation of the actual amounts received by Kane as reflected in the documents and information he provided. As discussed above, Centennial questioned Kane regarding his salary at trial. T1 at 14:11–19:19. Centennial's misunderstanding of basic accounting was on display:

> Q: And so from the, at least the six-year deal that you immediate— that you had prior to signing the 2018 contract with the Sharks and from 2018 to 2020 while you were playing with the Sharks under the contract that we just looked at, you would have earned over $50 million. Is that accurate?
>
> A: That's accurate in the sense that that's what I made on paper, yes.
>
> Q: Okay. And you filed Chapter 7 bankruptcy petition on January 9, 2021. Correct?
>
> A: Yes.
>
> Q: And at the time that you filed your petition, you didn't have $50 million worth of assets or cash. Correct?
>
> A: No. At no point in time have I ever had $50 million worth of assets or cash.

DEFENDANT'S POST-TRIAL BRIEF             36

T1 at 19:12–20:1. However, Kane provided unrefuted testimony regarding significant deductions and withholdings from his salary, as well as nonpayment due to cancelled games, resulting in significantly less than $50 million in compensation that he actually received. *See* III.D.2, *supra*. Furthermore, Kane received far less than the "over $10,000,000" that Centennial asserts he obtained from the loans. *See* Attachment 1 (calculating the amount at $6,964,707.14). Centennial failed to establish, through Kane's testimony or any expert testimony, what funds he actually received. Nor did it identify any assets that Kane obtained that went missing. Centennial also overlooks the fact that Kane spent considerable sums servicing the loans from the Lenders. *E.g.*, T1 at 154:4–8, 158:24–159:7; T2 at 139:23–140:7 ($112,663 payment to Professional Bank); Pl. Ex. 25 at 6, 16, 36, 41, 61 (other payments).

"On an objection to discharge the debtor is entitled to a strict construction of the statutory grounds for objection because of the policy of giving debtors a fresh start." *Fader*, 414 B.R. at 644 (citing *Cox II*, 41 F.3d at 1294, further citations omitted). Application of this policy is evident in *Fader*, where the court held that even without adequate records, the debtor credibly explained how he expended significant cash proceeds to run his business and pay personal expenses. *Id.* at 645–46. This policy was honored in *Hewitt v. Lemieux (In re Lemieux)*, a case in which Judge Blumenstiel found that a debtor adequately explained the disposition of corporate funds that were withdrawn and spent on the owner's personal expenses.[19] 2017 Bankr. LEXIS 3272, at *31 (Bankr. N.D. Cal. Sep. 27, 2017). And in *Davis v. Battistella (In re Battistella)*, Judge Jaroslavsky rejected the UST's § 727(a)(5) argument that the debtor could not satisfactorily explain the loss of $1.6 million he received from investors, remarking that it did not take much of a "leap of faith" to believe a car dealer debtor who testified that he sustained large losses while trying to keep his business afloat at the height of the Great Recession, and the court did not believe the assets were "stuffed in a mattress somewhere." 2016 Bankr. LEXIS 1964, at

---

[19] The court further stated the debtor's poor accounting skills did not justify denial of his discharge, particularly where the debtor's methods for estimating those expenses were reasonable. *Lemieux*, 2017 Bankr. LEXIS 3272 at *31 ("[Section] 727(a)(5) is not appropriately used to deny a discharge to business operators who through inadvertence, lack of competence, or both, maintain less than pristine financial records.").

DEFENDANT'S POST-TRIAL BRIEF 37

*5 (Bankr. N.D. Cal. May 9, 2016). Finally, in *Thompson* the B.A.P. considered the debtor's testimony at trial and found no clear error in the bankruptcy court's decision that the debtor sufficiently explained how, while he was out of work, the debtor used refinance proceeds to pay bills and make mortgage payments. 2009 Bankr. LEXIS 4530 at *16–18.

Kane's explanation of his financial circumstances and his deficiency of assets to meet his liabilities is even more clear than in the cases cited above. Kane has credibly and consistently described where his income and loan proceeds went. At trial, Kane established that his salary was ultimately insufficient to meet the high expenses of his day-to-day life, which Centennial identified as being approximately $1.2 million annually. *See* II.C–E, *supra*. He admitted to his concerns about not having enough money to stay current on his bills and cover his obligations as they became due. *Id.* Kane testified that he viewed gambling as a way to make money quickly, but that overall, he lost money and developed a problem for which he sought and continues to receive professional help. *Id.*; T2 at 84:2–21. Kane testified that he relied upon the advice of hired professionals who steered him to take out a string of expensive loans to make ends meet (and, mostly, to pay off existing loans while compensating those professionals handsomely). *See* II.D–E, *supra*. Kane testified that he sought out legal help to work out a resolution with the Lenders, and that the failure of those efforts forced him to file for bankruptcy. *Id.* Once in bankruptcy, Kane has been cooperative, honest, and forthcoming with the Trustee, UST, and creditors. *See* II.F, *supra*. Kane produced voluminous documents to Centennial and sat for multiple examinations. *Id.* The Trustee testified that he was satisfied with Kane's responses to the numerous questions the Trustee asked, and he decided that an objection to discharge was not warranted in this case. *Id.* Kane and the Trustee's testimony was not rebutted by Centennial or Parker.

## IV.    CONCLUSION

For the reasons set forth above, Kane respectfully requests the Court find in favor of Defendant and against Centennial and Parker on all causes of action.

Case: 21-05016    Doc# 57    Filed: 03/14/23    Entered: 03/14/23 22:37:11    Page 42 of 43

Dated March 14, 2023                    FINESTONE HAYES LLP

                                        _/s/ Stephen D. Finestone_
                                        Stephen D. Finestone
                                        Attorneys for Evander Frank Kane,
                                        Debtor and Defendant