1 ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (FL SBN 0731013)
2   janthony@anthonyandpartners.com
ANDREW J. GHEKAS (FL SBN 0119169)
3 *Both Appearing Pro Hac Vice*
   aghekas@anthonyandpartners.com
4 100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
5 Telephone: 813.273.5616
Facsimile: 813.221.4113
6
NIESAR & VESTAL LLP
7 PETER C. CALIFANO (SBN 129043)
   pcalifano@nvlawllp.com
8 JOHN A. KELLEY (SPN 194073)
   jkelley@nvlawllp.com
9 90 New Montgomery St. 9th Floor
San Francisco, California 94105
10 Telephone: 415.882.5300
Facsimile: 415.882.5400
11
Attorneys for Plaintiff
12 CENTENNIAL BANK

**UNITED STATES BANKRUPTCY COURT**
13 **NORTHERN DISTRICT OF CALIFORNIA**
**[San Jose Division]**
14

| | |
|---|---|
| 15 In re | CASE NO. 21-50028 SLJ |
| 16 EVANDER FRANK KANE,<br> Debtors. | Chapter 7 |
| 17 ——————————————— | Adv. No. 21-5008 |
| 18 HOPE PARKER,<br> Plaintiff, | |
| 19 v. | |
| 20 EVANDER KANE,<br> Defendant. | |
| 21 ——————————————— | |
| 22 CENTENNIAL BANK, | Adv No. 21-05016 |
| 23 Plaintiff, | **CENTENNIAL BANK'S CLOSING BRIEF** |
| 24 v. | Trial Date: January 23 and 25, 2023 |
| 25 EVANDER KANE,<br> Defendant. | Time: 9:00am<br>Judge: Chief Judge Stephen L. Johnson<br>Place: Courtroom 10 |
| 26 | 280 South First Street<br>San Jose, CA 95113 |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

BRIEF STATEMENT OF FACTS ...................................................................... 1

LEGAL ARGUMENT ......................................................................................... 2

    A. CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C. § 727(A)(3) ................................................................................................. 3

    B. CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C. § 727(A)(5) ............................................................................................... 15

    C. CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C. 727(A)(4)(A) .......................................................................................... 20

    D. TRUSTEE'S TESTIMONY IS ENTIRELY IRRELEVANT ....................................... 22

CONCLUSION ................................................................................................. 23

Case: 21-05016    Doc# 58    Filed: 03/14/23    Entered: 03/14/23 23:07:05    Page 2 of 33

# TABLE OF AUTHORITIES

**Cases**

Bell v. Stuerke (In re Stuerke), 61 B.R. 623 (9th Cir. BAP 1986)....................................................15

Blackwell Oil Co. v. Potts (In re Potts), 501 B.R. 711 (Bankr. D. Colo. 2013) .............................14

Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755 (9th Cir. 2008) ...... 3, 4

Cohen v. de la Cruz, 523 U.S. 213 (1998) ...................................................................................... 2

Dolin v. N. Petrochemical Co. (In re Dolin), 799 F.2d 251 (6th Cir. 1986) ...................................15

F.T.C. v. Stefanchik, No. C04-1852RSM, 2007 WL 4570879 (W.D. Wash. Feb.15, 2007) ........ 22

Farouki v. Emirates Bank Inter., Ltd., 14 F.3d 244 (4th Cir. 1994)................................................. 2

Hawley v. Cement Indus., Inc. (In re Hawley), 51 F.3d 246 (11th Cir. 1995) ...............................13

In re Artem Koshkalada, 2020 WL 2730782 (9th Cir. BAP May 26, 2020) ...................................11

In re Brandenfels, BAP No. OR-14-1145-FJuKi, 2015 WL 5883317 (9th Cir. BAP 2015) 3, 10, 11

In re Chen, Adv. No. 16-01166-TWD, 2017 WL 4768104 (9th Cir. BAP Oct. 17, 2017)...... passim

In re Cox, 904 F.2d 1399 (9th Cir. 1990)......................................................................................... 3

In re Fader, 414 B.R. 640 (Bankr. N.D.Cal. 2009) ........................................................................15

In re Ferguson, 2021 WL 5029387 (Bankr. N.D. Ill. Oct. 29, 2021)...............................................16

In re Gordon, 526 B.R. 376 (10th Cir. BAP 2015) .......................................................................... 2

In re Hermanson, 273 B.R. 538 (Bankr. N.D. Ill. 2002)..................................................................14

In re Hong Minh Tran, 464 B.R. 885 (Bankr. S.D. Cal. 2012).................................................. 2, 16

In re Johnson, 68 B.R. 193 (Bankr. D.Or. 1986) ...........................................................................15

In re Khalil, 379 B.R. 163 (9th Cir. BAP 2007) ..............................................................................20

In re Kresock, 2020 WL 7133510 (Bankr. D. Ari. Nov. 24, 2020) ..................................................11

In re Long, 2:19-ap-01086-ER, 2020 WL 8184203 (Bankr. C.D. Cal. Nov. 30, 2020) .......... 15, 17

In re Mcdonald, 29 F.4th 817 (6th Cir. 2022) .................................................................................13

In re Nevett, 2021 WL 2769799 (9th Cir. BAP July 1, 2021) ............................................... 4, 13, 14

In re Novatel Wireless Sec. Litig., No. 08cv1689 AJB (RBB), 2012 WL 5463214 (S.D. Cal. Nov. 8, 2012)...................................................................................................................................23

In re Poole, Adv. No. 20-4022, 2022 WL 389514 (Bankr. N.D. Cali. Feb. 8, 2022) ............ 4, 5, 12

In re Potts, 501 B.R. 711 (Bankr. D. Col. 2013) ............................................................................15

In re Racer, 580 B.R. 45 (Bankr. E.D.N.Y. Jan. 19, 2018) ............................................... 15, 16, 17

In re Steffensen, 534 B.R. 180 (Bankr. D. Utah 2015) .............................................................. 3, 10

In re Stiff, 512 B.R. 893 (Bankr. E.D. Ky. 2014) ............................................................................14

iii

In re Tan, BAP No. NC-06-1372-RSD, 2007 WL 7541007 (9th Cir. BAP Sept. 28, 2007) ...... 3, 13

In re Wills, 243 B.R. 58 (9th Cir. BAP 1999) .......................................................................... 20

In re Wiseman, No. 07-10976, 2008 WL 5341023 (Bankr. W.D. Wash. July 18, 2008) .............. 15

Lansdowne v. Cox (In re Cox), 41 F.3d 1294 (9th Cir. 1994) ("Cox II") ................................ 3, 13

May v. Shepherd (In re Shepherd), 2005 WL 5157868 (Bankr. D. Kan. Oct. 7, 2005) .......... 16, 17

Meters v. Michael (In re Michael), 433 B.R. 214 (Bankr. N.D. Ohio 2010) ................................ 11

Miller v. Pulos (In re Pulos) 168 B.R. 682 (Bankr. D.Minn. 1994) .............................................. 3

Retz v. Sanson (In re Retz), 606 F.3d 1189 (9th Cir. 2010) ................................................... 14, 21

Rhoades v. Wikle, 453 F.2d 51 (9th Cir. 1971 ............................................................................... 3

Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia), BAP No. CC-06-1176-MaBPa, 2007 WL 7540987
   (9th Cir. BAP Sept. 5, 2007) ..................................................................................................... 15

Sonders v. Mezvinsky (In re Mzvinsky), 265 B.R. 681 (Bankr. E.D.Pa. 2001) .......................... 17

State Bank of India v. Sethi (In re Sethi), 250 B.R. 831 (Bankr. E.D.N.Y. 2000) ..................... 3, 10

U.S. v. Kras, 409 B.R. 434 (1973) ................................................................................................. 2

United States Tr. v. Hong Minh Tran (In re Hong Minh Tran), 464 B.R. 885 (Bankr. S.D. Cal.
   2012) ................................................................................................................................... 13, 19

Wiles v. Dep't of Educ., Nos. 04-004422 ACK-BMK, 05-00247 ACK-BMK, 2008 WL 4225846
   (D. Haw. Sept. 11, 2008) ........................................................................................................... 22

**Statutes**

11 U.S.C. § 727(a)(4)(A) ...................................................................................................... 19, 21

11 U.S.C. § 727(a)(5) ............................................................................................................. 14, 19

11 U.S.C. §727(a)(3) ..................................................................................................................... 3

iv

Plaintiff, Centennial Bank, an Arkansas state-chartered bank ("Centennial"), creditor and party in interest, through its undersigned counsel of record, and pursuant to this Court's instructions at the conclusion of the trial held on January 23 and 25, 2023 (the "Trial"), hereby submits its "Closing Argument" with respect to the claims set forth in its Complaint.

**BRIEF STATEMENT OF FACTS**

Evander Frank Kane ("Kane") is a professional ice hockey player, playing in the National Hockey League, and has been employed as such since 2009. [Day 1, 13:2-8]. At the time of filing his Petition [Ex. 1], Kane was under contract with the San Jose Sharks pursuant to a "National Hockey League Standard Player's Contract" (the "Player's Contract"). [Ex. 85]. Under the Player's Contract, Kane is scheduled to earn a total of $29,000,000 in total compensation from and after his initiation of the Bankruptcy Case. Id. In just the three years immediately preceding Kane's filing of the Petition, he admittedly earned over $19,000,000 in total compensation. [Day 1, 17:16-18].

Despite this reality, Kane has filed his chapter 7 Petition, signaling that he wishes to pay his creditors nothing, while maintaining his prolific pre-petition lifestyle. As proven at trial and explained more fully below, Kane has admitted to failing to maintain and keep financial documentation associated with (i) his various American and Canadian checking accounts, savings accounts, line of credit(s), and credit cards, (ii) his gambling activities at casinos and with bookies, (iii) his use of $2,150,000 received from various individuals (the "Individual Lenders"), (iv) his use of over $10,000,000 in net loan proceeds received from various institutional lenders (the "Institutional Lenders"), and (v) the vast majority of the $50,000,000 Kane earned as a professional athlete. What is more, Kane's explanation at trial for the loss of the loan proceeds and earnings he has received was vague, indefinite, and unsatisfactory, and at times, contradicted by past testimony or the exhibits admitted into evidence.

Separate and apart from Kane's failure to preserve or maintain documents to support the disposition of substantial assets totaling nearly $40,000,000, is the fact that in order to avoid the Means Test, Kane swore under penalty of perjury that his debts were primarily business debts, or

those "debt that [Kane] incurred to obtain money for a business or investment or through the operation of a business or investment." This gross misrepresentation only solidifies that Kane is not the honest but unfortunate debtor deserving of a discharge.

With all of the exhibits admitted at trial, through Centennial's Trial Brief and Centennial's evidence at trial, Centennial has met its burden of showing that Kane (i) has failed to maintain and preserve adequate records, (ii) cannot satisfactorily explain the loss of substantial assets (cash and loan proceeds) beyond the most vague, indefinite, and generalized manner, and (iii) intentionally made a material false statement under oath that he knew to be false.

Where did all of Kane's assets go? Kane simply does not provide a credible response, and the lack of documentation and records to support the disposition of the same is shocking. Having failed to offer any meaningful justification or response, Kane's discharge should be denied. Kane can afford to pay his creditors from his substantial salary as a professional athlete and he should be required to do so.

## LEGAL ARGUMENT

The Supreme Court has noted "affording relief only to an 'honest but unfortunate debtor'" is "a basic policy animating the [Bankruptcy] Code." Cohen v. de la Cruz, 523 U.S. 213, 217 (1998) (quoting Grogan v. Garner 498 U.S. 279, 287 (1991)). There is no constitutional right to obtain a discharge of one's debts in bankruptcy. U.S. v. Kras, 409 B.R. 434, 441 (1973). Instead, "to be entitled to a discharge, the debtor must deal fairly with creditors and with the court. This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a)." In re Gordon, 526 B.R. 376, 387-88 (10th Cir. BAP 2015). Section 727 prohibits discharge for those who "play fast and loose with their assets or with the reality of their affairs." Farouki v. Emirates Bank Inter., Ltd., 14 F.3d 244, 249 (4th Cir. 1994) (quoting In re Tully, 818 F.2d 106, 110 (1st Cir. 1987). While "[c]ompulsive gambling is not a bar to bankruptcy discharge, [] it does not lower the bar" either. In re Hong Minh Tran, 464 B.R. 885, 896 (Bankr. S.D. Cal. 2012) (citing Dolin v. Northern Petrochemical Co. (In re Dolin), 799 F.2d 251, 254 (6th Cir. 1986)).

2

1
2
3
**A.** **CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C.**
4     **§ 727(A)(3)**
5
6     Section 727(a)(3) of the Bankruptcy Code states in pertinent part:
7     (a) The court shall grant the debtor a discharge, unless - -
8         (3) debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
        preserve any recorded information … from which the debtor's financial
9         condition or business transactions might be ascertained, unless such act or
        failure … was justified under all of the circumstances of the case.
10
11    11 U.S.C. §727(a)(3).  The purpose of this statute is "to make the privilege of discharge dependent
12    on a true presentation of the debtor's financial affairs." In re Cox, 904 F.2d 1399, 1401 (9th Cir.
13    1990) ("Cox I").  The Ninth Circuit has held that a debtor has an affirmative duty to maintain and
14    preserve information by presenting sufficient written evidence to enable creditors to reasonably
15    ascertain a debtor's present financial condition and to follow his transactions for a reasonable period
16    in the past. Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 761 (9th Cir.
17    2008) (quoting Rhoades v. Wikle, 453 F.2d 51, 53 (9th Cir. 1971)); In re Brandenfels, BAP No.
18    OR-14-1145-FJuKi, 2015 WL 5883317, at *6 (9th Cir. BAP 2015); In re Tan, BAP No. NC-06-
19    1372-RSD, 2007 WL 7541007 at *12 (9th Cir. BAP Sept. 28, 2007) ("This language places an
20    affirmative duty on the debtor to create books and records accurately documenting his business
21    affairs.") (internal citations omitted).  "[A] debtor must keep and preserve records commensurate
22    with the complexity of his financial condition." In re Steffensen, 534 B.R. 180, 198 (Bankr. D. Utah
23    2015) (citing State Bank of India v. Sethi (In re Sethi), 250 B.R. 831, 839 (Bankr. E.D.N.Y. 2000)
24    ("[T]he more complex the debtor's financial situation, the more numerous and detailed the debtor's
25    financial records should be."); Miller v. Pulos (In re Pulos) 168 B.R. 682, 692 (Bankr. D.Minn.
26    1994) (same)).
27        The Ninth Circuit has recognized that "[a] creditor states a prima facie case under § 727(a)(3)
28
3

by showing " '(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." Caneva, 550 F.3d at 761 (quoting Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1299 (9th Cir. 1994) ("Cox II")). It is Centennial's burden to establish a prima facie case for denial of discharge under § 727(a)(3). The burden then shifts to Kane to come forward with an explanation for the lack of recorded information. Id. Centennial need not prove that Kane intended to defraud creditors or conceal his financial condition to prevail under section 727(a)(3). Cox II, 41 F.3d at 1297; accord Sterling Int'l, Inc. v. Thomas (In re Thomas), Adv. No. 01-06321, 2003 WL 21981707, at *9 (Bankr. D. Idaho July 17, 2003)).

In Caneva, the Ninth Circuit affirmed the bankruptcy court's denial of a discharge under section 727(a)(3) upon finding that the debtor had failed to provide records accounting for a $500,000 payment of fee to a third-party. 550 F.3d at 762. The Ninth Circuit agreed that the absence of records related to this payment made it impossible to determine the debtor's financial condition and business transactions. Id. The Ninth Circuit held that "when a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer or the fact that the payment actually took place establishes a prima facie violation of 11 U.S.C. § 727(a)(3)." Id.

In In re Nevett, 2021 WL 2769799 (9th Cir. BAP July 1, 2021), the Bankruptcy Appellate Panel of the Ninth Circuit (the "Ninth BAP"), affirmed the bankruptcy court's denial of the debtor's discharge under section 727(a)(3) based upon the debtor's admitted failure of keeping no records to support his disposition of approximately $925,000 in loan proceeds received from various individual lenders. Nevett, 2021 WL 2769799, at *9. The Ninth BAP held that "[g]iven the substantial amount at issue, there was no genuine dispute that this amount required documentation" and that "Mr. Nevett conceded he had not kept any records for these three loans." Id.

In In re Chen, Adv. No. 16-01166-TWD, 2017 WL 4768104 (9th Cir. BAP Oct. 17, 2017), the Ninth BAP affirmed the bankruptcy court's denial of the debtor's discharge under section 727(a)(3) finding that the debtor's compulsive gambling did not absolve her of failing to keep and

4

maintain financial records, and her admitted failure in not maintaining or preserving adequate records made it impossible to ascertain her true financial condition. Chen, 2017 WL 4768104 at *9.

In In re Poole, Adv. No. 20-4022, 2022 WL 389514 (Bankr. N.D. Cali. Feb. 8, 2022) (J. Novack), this Court denied the debtor her bankruptcy discharge under section 727(a)(3) finding that the debtor "has not justified her failure to keep or maintain better and more accurate records" regarding "her gambling activity" in light of the fact that the debtor "won and purportedly lost hundreds of thousands of dollars in the years before he November 2019 bankruptcy filing, and she did not seek, keep or maintain documentation relating to the bulk of these gambling wins/losses." In re Poole, 2022 WL 389514 at *10-11.

The evidence is unrefuted that Kane failed to keep and maintain adequate bank records, credit card records, records of cash transactions, records of gambling wins and losses, accountings, or virtually any of the other records one would expect considering the substantial amount of money that passed through Kane's various accounts. Indeed, Kane admitted to being a highly compensated professional ice hockey player [Day 1, 13:2-8], having earned over $50,000,000 in the nine years leading to his bankruptcy filing, $19,000,000 of which Kane received in the three years preceding his bankruptcy filing. [Day 1, 16:8-17:18, Ex. 85; Day 1 19:4-11; Doc. 20 at ¶¶13-17]. And yet, on the Petition Date, he disclosed only having $2,500 in cash on hand [Day 1, 26:4-8], and $38,895.65 in his various checking and savings accounts [Day 1, 26:13-20]. And Kane's Schedules do not reflect a substantial amount of unencumbered assets[1] that would support the dissipation of his vast wealth.[2] This begs the question, "Where did the money go?" Kane's failure to maintain and

_____

[1] Kane's only assets at the time of his filing consisted largely of three properties, each of which was separately and fully encumbered by mortgages unaffiliated with the Individual Lenders or Institutional Lenders, as follows: (i) Richland House, purchased in August 2019 [Ex. 8; Day 1, 21:17-24]; (ii) 3457 West 35th Avenue property, purchased in April 2017 [Id.; Day 1, 22:13-19]; and (iii) 8447 Isabel Place property, purchased in July 2011 [Id.; Day 1, 23:14-14].

[2] Kane testified that as of the Petition Date he (i) held no interest in any cars, vans, trucks, tractors, sports utility vehicles, or motorcycles [Day 1, 23:21-24:8], (ii) held no interest in any watercrafts, aircrafts, motor homes, ATVs or any other recreational vehicle [Day 1, 24:9-14], (iii) held no collectibles of value [Day 1, 24:15-19], (iv) did not possess any jewelry, rings, watches, gold, or silver [Day 1, 24:20-22], (v) did not own any bonds, mutual funds, or interests in any publicly traded stock [Day 1, 24:23-25:4], (vi) held no interest in any business-related property [Day 1, 25:16-21], (vii) owned no patents, copyrights, trademarks, trade secrets, or any other intellectual property [Day 1, 25:22-25], and (viii) held no trusts or equitable future

preserve adequate records, however, makes it impossible to ascertain his financial condition and transactions.

With respect to his various financial accounts, Kane testified that he held bank accounts at Royal Bank of Canada ("RBC"), ScotiaBank, Bank of America ("BOA"), Wells Fargo, and an RBC USA account. [Day 2, 88:11-18; Ex. 8]. Kane's testimony was that his RBC accounts were his main accounts. [Day 2, 89:22-90:3]. Despite this, Kane's testimony confirms that he did not maintain – and therefore did not produce – any bank statements, credit card statements, or account history for any of his accounts predating 2019 [Day 1, 44:23-45:2], as he did not have statements predating prior to midway through 2019. [Day 1, 41:16-42:19; Ex. 20]. As for his Wells Fargo account ending in -1607, Kane testified that he only produced statements from January 1, 2020, to January 31, 2021, as he had no statements for 2019 or any year predating 2020. [Day 1, 38:19-12, 43:2-13]. And for his two RBC accounts ending in -5955 and -0532 – that were Kane's "main accounts" – Kane testified that he only produced statements from September 2019 to January 12, 2021, and had no statements predating September 12, 2019. [Day 1, 38:16-22, 43:14-44:3]. Additionally, Kane testified that (i) he only produced statements from September 3, 2020 to December 7, 2020 for his Wells Fargo American Express credit card and had no documents predating September 2020 [Day 1, 39:13-15, 44:16-22], (ii) he produced no statements relating to his American Express credit card unaffiliated with any institution [Day 1, 39:16-18, 44:8-15], and (iii) he produced no documents predating June 6, 2020, for his RBC credit card [Day 1, 39:19-21, 44:4-7]. And while Kane historically maintained an account at RBC USA ending in -0046, Kane testified that he closed this account a year or two prior to the Petition Date [Day 1, 47:6-19, 63:13-16] and had no records regarding the same [Day 1, 63:17-19]. Kane also testified that although he had an account in his name at East West Bank ("EWB"), Kane never attempted to gain access to the same. [Day 2, 177:12-13]. In this case, it is clear that Kane has not produced comprehensive banking and financial records.

With respect to Kane's reported gambling, Kane estimated that his gambling losses for the year preceding his bankruptcy filing totaled $1,500,000. [Day 1, 27:18-25; Ex. 5]. Kane testified

---

interest in any property [Day 1, 26:1-30.

that he did not know the exact dollar figure of his gambling losses for the years preceding 2020 [Day 1, 34:6-14] as he did not keep records of his gambling wins and losses himself. [Day 1, 36:3-24]. Kane testified that he gambled both at casinos and with "bookies." [Day 1, 27:18-25; Ex. 5]. Kane maintained no tally of his gambling wins and losses. [Day 1, 28:1-3, 28:10-13]. Kane testified that (i) he could not identify any of the bookies that he used [Day 1, 33, 18-20], (ii) did not recall the online sites that he used for sports betting [Day 1, 32:25-33:2], (iii) produced no documents related to the online sites used for sports betting [Day 1, 34:4-6], and (iv) did not retain a ledger or any documentation to keep track of his activity with his bookies [Day 2, 175:2-8]. As for his gambling at casinos, Kane testified that he would receive a "marker" that required him to sign documentation but he did not maintain a copy of the same. [Day 2, 173:3-11]. Kane further testified that although he did not maintain a ledger of when he was up or down at a casino, he believed the casinos would have an accounting of his activity, but he never subpoenaed any casino to obtain the same. [Day 2, 173:12-22]. Kane produced no corroborating witnesses to testify as to his gambling losses.

With respect to the $2,150,000 in loan proceeds Kane received from the Individual Lenders [Doc. 44 at ¶20], Kane testified that he has no documents evidencing what he did with any of the loan proceeds. [Day 1, 53:21-23]. And for six out of the seven loans, Kane testified that there was no written documentation or agreement evidencing the transaction. [Day 1, 48:25-49:2 (Sanchez), 50:25-51:2 (Lipski), 51:21-23 (Gianakas), 52:15-17 (Banghu), and 53:10-12 (Veltri)]. For the combined $1,150,000 in loan proceeds that Kane received from Lipski and Gianakas, Kane testified that this was money he received to pay back bookies that he owed. [Day 2, 86:24-87:8]. In addition to being inconsistent with Kane's prior deposition testimony, Kane testified that he had no paperwork to show what he owed to said bookies [Day 2, 87:25-88:2] and did not even know who the bookies were [Day 1, 50:22-24 (Lipski), 51:19-20 (Gianakas)].

In addition to the $2,150,000 in loan proceeds Kane received from the Individual Lenders, Kane testified that he received approximately $48,210,000 in loan proceeds from the Institutional Lenders between 2014 and 2019. Kane testified that he had no documents or records to support his use of the $11,633,177.94 that he received in addition to the sums he received and used to pay off

7

prior loans that he had incurred [Day 1, 99:15-24]. Kane largely speculated that his bank statements would show what he did with the various loan proceeds [Day 1, 100:6-13]; however, this ignores the fact that Kane further testified that he did not keep and maintain bank records predating 2019 and made no effort to obtain the same from other sources. Kane himself testified that he never created or maintained any sort of personal ledger to document his receipt and use of these loan proceeds. [Day 1, 99:25-100:5]. A chart detailing the various loans Kane entered into with the Institutional Lenders, including the date, entity name, exhibit number, total amount of loan, amount of loan to repay prior loans received by Kane from one of the Institutional Lenders, net loan proceeds disbursed into Kane's various accounts, testimony of Kane regarding his lack of documentation to support use of funds, and testimony of Kane offering only the most vague and generalized explanation of purported use of loan funds is attached hereto as Exhibit "A."

　　　　With respect to the substantial wages Kane is fortunate to receive as a professional athlete, documents have not been produced to support the loss of said earnings. This is in large part due to the fact that Kane failed to keep and maintain account statements for his various bank accounts. Kane testified that when he was playing in the United States – as he was when he was playing for the Buffalo Sabers and San Jose Sharks in the years leading up to his filing – he needed a United States bank account for the money to be direct deposited to, as the league would not allow his earnings to be deposited into a Canadian/U.S. checking account. [Day 2, 89:22-90:9]. However, Kane did not produce any account statements for his Wells Fargo account predating 2020. And Kane's schedules do not reflect either the amount or quality of assets that would support the lack of income. [Ex. 1, 5, and 8]. Moreover, Kane confirmed that his historic monthly expenses were lower than the estimated $93,214.46 Kane listed on his Schedules. [Day 1, 156:22-157:16; Ex. 6]. This is intuitive given that Kane's estimated monthly expenses includes (i) $17,990.63 in "rental or home ownership expenses" for the Richland property Kane did not purchase until August 2020, (ii) $20,000 in "Mortgages on other property" which includes the Isabel Place home Kane purchased in 2011 and the W 35th Avenue property Kane purchased in 2017, and (iii) $12,000 in "childcare and children's education costs" for Kane's daughter who was born shortly before Kane's bankruptcy

filing [See Day 2, 51:16-24]. But even at $93,214.66 a month, Kane would have expected to net, after expenses, anywhere from approximately "a little shy of a million dollars" and over two million dollars. [Day 1, 158:4-16]. This income, however, is unaccounted for.

In addition to all of the foregoing, even in the limited bank records Kane was capable of producing, there were a litany of holes and guesswork as to where money was being transferred out of Kane's account and where money being transferred into Kane's accounts were coming from. For instance, in his RBC -0532 account, Kane had three separate transfers totaling $50,000 designated as "online banking, foreign exchange" leaving his account. Kane guessed that this would have gone into his RBC-5955 account, however, a review of those statements refuted this testimony. [Ex. 22; Day 1, 102:3-17]. After being confronted with this reality, Kane altered his testimony to speculate that it would have gone to his RBC credit card, American Express credit card, or his ScotiaBank account. [Day 1, 103:9-105:18]. Of course, Kane produced no records for his RBC credit card [Day 1, 106:5-12], no records for his American Express credit card [Day 1, 105:11-15], and again changed his testimony that it would not have gone to his ScotiaBank account [Day 1, 106:17-107:2]. Kane had similar issues with his RBC -5955 account, where $58,000 was being transferred out of his account to an unknown location. [Ex. 24; Day 1, 119:14-20]. These were not isolated events. There were numerous entries of monies coming and going to unidentified sources that Kane could not offer an explanation. [See Day 1, 107:3-11; 109;13-110:7; 110:10-21; 120:6-23; 123:9-21; 124:2-8; 124:9-125:7; 125:8-126:6; 126:7-14; 126:18-127:16; 127:17-128:1; 128:2-23; 128:24-129:6; 129:12-130:11; 130:12-19; 131:14-18; 131:19-132:14; 132:14-21; 132:22-133:10; 133:11-134:8;134:9-135:3; 135:4-20; 113:4-114:14; 114:17-115:6; 115:7-15; 115:25-1169:20; 116:21-117:3; 117:4-11; 117:12-118:10; 118:13-119:1; 137:11-18; 137:23-138:8; 138:9-24; 139:1-5; 139:6-11; 139:15-22: 139:23-140:9; 140:21-143:9; 137:1-10; 147:21-148:2; 148:3-15]. And in certain instances where Kane attempt to speculate, this testimony contradicted Kane prior sworn deposition testimony. [See Day 1, 120:6-23; 124:9-125:7; 125:8-126:6; 126:18-127:16; 129:12-130:11; 132:22-133:10; 113:4-114:14; 114:17-115:6; 117:12-118:10; 118:13-119:1]. In response, Kane simply complains about either the description in the bank record being unhelpful or that it was

Case: 21-05016   Doc# 58   Filed: 03/14/23   Entered: 03/14/23 23:07:05   Page 13 of 33

hard to know looking just at the statements. But this is all the records and documentation that Kane produced. If Kane is unable to figure it out looking at his own documents, how does he expect his creditors or this Court to? Moreover, Kane has had two years to figure out where this money was coming and going.

Kane's evidence does not sufficiently explain his failure to provide recorded information. While section 727(a)(3) does not require a debtor to provide perfect or even complete records, it does require Kane to provide his creditors with enough information to ascertain the debtor's financial condition and to track his financial dealings with substantial completeness and accuracy for a reasonable period past to present. <u>Brandenfels</u>, 2015 WL 5883317, at *6. "A debtor's 'duty to keep records is measured by what is necessary to ascertain [his] financial status,' and the degree and extent of the required record keeping depends, <u>inter alia</u>, on the nature of the debtor's employment, business operations (if any), education, and financial sophistication." <u>In re Poole</u>, 2022 WL 389514 at *8 (quoting <u>Hussain v. Malik (In re Hussain)</u>, 508 B.R. 417, 424 (9th Cir. BAP 2014)). Although Kane has no college education, he is a sophisticated debtor by all accounts. Kane is a highly compensated salaried employee who entered into twenty-six different lending arrangements between 2014 to 2019 [Doc. 44 at ¶¶ 29-54]. So many, that Kane could only estimate that he entered into fourteen different loans [Day 1, 59:9-17] and testified that the process "became so repetitive and generic." [Day 2, 148:22-149:9]. While his educational pedigree may not be the same as other professional debtors, given the complexity of his financial situation and the sheer volume of assets that traversed through his accounts, one would generally expect Kane's record keeping to be more numerous and detailed than other chapter 7 debtors. <u>See</u> <u>In re Steffensen</u>, 534 B.R. at 198; <u>In re Sethi</u>, 250 B.R. at 839. Kane is no ordinary consumer debtor, and he elected to file his chapter 7 Petition as a "business" case.

While Kane testified that he produced all documents in his possession pertaining to his financial accounts [Day 1, 40:11-41:12], merely producing documents in the debtor's possession is not sufficient to satisfy the requirements of section 727(a)(3). <u>See</u> <u>In re Caneva</u>, 550 F.3d at 763; <u>see also</u> <u>In re Chen</u>, 2017 WL 4768104 at *8 (citing <u>Desiderio v. Devani (In re Devani)</u>, 556 B.R.

37, 43-44 (Bankr. E.D.N.Y. 2016) (debtor's assertion that he produced what was available to him in his possession is not a sufficient justification for his failure to produce financial records as he could have requested them from the relevant banks). In <u>Brandenfels</u>, 2015 WL 5883317, at *6, the Ninth BAP denied the debtor a discharge under section 727(a)(3) where the debtor argued

> that her records were complete because she provided nearly 1,500 pages of her financial records, which "include all of the relevant bank accounts, tax returns, and profit and loss statements, and the Quickbooks detail for these accounts of her transactions….Every material transaction is accounted for." She argues that Ticor was able to "fully scrutinize" her records, because it asked her to admit that "almost all of the deposits to the account were payable to 'Oregon Holly' or to 'Oregon Holly Company.'" She states that "[t]he tax returns accounted for all of the money that the defendant had any access to."

<u>Id.</u> In rejecting the debtor's argument, the Ninth BAP held that "[i]t is not enough for Ms. Brandenfels to provide records about her overall financial situation; she must also provide records adequate to allow creditors to trace all of her transactions." <u>Id.</u>

In his trial brief [Doc. 46], Kane relied upon <u>Salehi v. Glob. Auto. Grp., Inc. (In re Salehi)</u>, B.A.P. No. EC-13-1171-TaKuJu, 2014 WL 2726149 (9th Cir. BAP June 9, 2014) for the proposition that if the creditor was unsatisfied with the debtor's Rule 2004 examination, it could have requested formal discovery through the adversary proceeding. [Doc. 46 at ¶12]. In <u>Salehi</u>, the debtor had been unemployed when he filed for bankruptcy and had been unemployed for the two years prior to filing, and the debtor went to his bank to obtain his bank statements, obtained a copy of it, but did not bring it to the Rule 2004 examination because it was negative for the prior two to three years. 2014 WL 2726149. Here, Kane was not unemployed, Centennial did conduct formal discovery on Kane, and in response, Kane admitted through discovery responses, through counsel, and in testimony at Trial, that he did not have the requisite documents. Moreover, Kane made no attempts to obtain them. It is not Centennial's duty to obtain records from third-parties. <u>In re Chen</u>, 2017 WL 4768104 at *8; <u>In re Artem Koshkalada</u>, 2020 WL 2730782, at *6 (9th Cir. BAP May 26, 2020); <u>In re Kresock</u>, 2020 WL 7133510, at *15 (Bankr. D. Ari. Nov. 24, 2020); <u>Meters v. Michael (In re Michael)</u>, 433 B.R. 214, 225 (Bankr. N.D. Ohio 2010).

11

Kane testified that the reason for his failure in producing more documents for his Wells Fargo and BOA accounts was that the accounts closed shortly after he filed bankruptcy and therefore no longer had access to the same. [Day 2, 99:25-100:19]. But filing for bankruptcy was Kane's own doing. Moreover, Kane admitted to not subpoenaing any of his financial institutions to obtain more records. [Day 2, 176:4-6]. Similarly, Kane testified that he did not subpoena his accountant, Tony Chiricosta, to obtain records that he may have held. [Day 2, 177:14-16]. And while Kane testified that he believed the casinos he patroned would have maintained an accounting of his wins and losses, he testified that he did not subpoena the casinos in order to obtain this documentation. [Day 2, 173:12-22]. Nor did Kane ever attempt to subpoena the "bookies" he primarily utilized as part of his gambling activities. [Day 2, 176:14-16].

In re Chen, the evidence showed that (i) the debtor received and transferred substantial sums of money to third parties for which she provided no documentation, (ii) the debtor admitted to frequently borrowing and loaning money to friends for gambling, but conceded that she had no documentation for any of the transactions, (iii) the debtor admitted that she failed to keep all documents that would show her gambling expenses, (iv) the debtor testified that she used the $30,000 in proceeds from the sale of her 2013 Lexus to repay a gambling debt, but the debtor had no documentation of any debt actually being owed or that the same was repaid from the sale proceeds, (v) a potential interest in a property where the documentation was inadequate, and (vi) lack of documentation to support the use and dissipation of proceeds received from the sale of the debtor's home that the debtor testified was used to pay gambling debts. 2017 WL 4768104 at *7. The Ninth BAP held that "the records produced were incomplete and raised more questions than they answered" and that "[i]t was impossible for Trustee or any other party in interest to ascertain any meaningful picture of Chen's financial position." Id. at *8.

In Poole, the debtor produced her "credit union account statements for the relevant years, which listed numerous cash withdrawals from ATMs located in or near casinos; [] the W-2G and 1099 Misc. Statements from the Cache Creek, Graton and San Pablo Lytton casinos, which were [the debtor's] local casinos of choice; and [] her federal tax returns for several years." 2022 WL

12

389514 at *10. Despite this, this Court held that "[c]ollectively, these documents do not come close to capturing Poole's gambling over the relevant years, and as a result, [the creditor] has demonstrated that it is impossible to ascertain Poole's present financial condition." Id. Indeed, this Court reasoned that "[i]f Poole was a casual or infrequent gambler, the court could move past her failure to reasonably document her gambling activity. Yet Poole won and purportedly lost hundreds of thousands of dollars in the years before her November 2019 bankruptcy filing, and she did not seek, keep or maintain documentation relating to the bulk of these gambling wins/losses." Id. at *11. This Court found that "a reasonable person would have made a better effort to document their wins (to ensure that they accurately report their income) and, perhaps more importantly, their losses (to offset the wins and lower their tax liability)." Id. And that the debtor "has not justified her failure to keep or maintain better and more accurate records." Id. This Court denied the debtor's chapter 7 discharge under section 727(a)(3). Id.

Here, the documents produced by Kane are even more inadequate than those produced by the debtor in Poole and are more akin to the lack of supporting documentation that was present in Chen. But instead of "hundreds of thousands of dollars a year" in gambling wins/losses, Kane estimated his losses – just in the year immediately preceding his bankruptcy filing – to be $1,500,000. Kane's alleged gambling problem – to extent offered by Kane as an excuse for his present financial predicament – "does not absolve [him] from keeping records." Chen, 2017 WL 4768104 at *7 (citing United States Tr. v. Macway (In re Macway), No. 14-16680, 2016 WL 4039745 (9th Cir. July 28, 2016) (affirming denial of discharge where debtor failed to maintain records for his gambling activities); Dolin v. N. Petrochemical Co. (In re Dolin), 799 F.2d 251 (6th Cir. 1986) (chemical dependence and compulsive gambling did not excuse the debtor's failure to keep adequate records); United States Tr. v. Hong Minh Tran (In re Hong Minh Tran), 464 B.R. 885 (Bankr. S.D. Cal. 2012) (denying discharge where debtor provided no contemporaneous personal or casino records of his gambling wins or losses). Instead, as held by the Ninth BAP in Chen, "[t]his is the price [Kane] pays for seeking bankruptcy protection and the privilege of a discharge." Id. at 9 (citing In re Macway, 2014 WL 3817103, at *3).

Kane has previously attempted to argue that this Court should limit its focus to the two years immediately preceding his bankruptcy filing and therefore Kane should be excused from maintaining the level of documentation that is required. Even under this narrowed review, Kane's records and documentation would be utterly lacking. But regardless, section 727(a)(3), like section 727(a)(5), has no lookback period. "Presumably, had Congress wanted such a lookback period to be specified, it would have included such a period in the statute – as it did in other sections of the same statute. See § 727(a)(2) (one year lookback period for assets concealed before the petition's filing)." In re Mcdonald, 29 F.4th 817, 823 (6th Cir. 2022); see also Hawley v. Cement Indus., Inc. (In re Hawley), 51 F.3d 246, 248 n.1 (11th Cir. 1995) (noting that § 727(a)(5) does not support a specific lookback period). The same non-exclusive factors that inform the court's decision was to whether a debtor was justified in keeping and preserving adequate documents and records, see Tan, 2007 WL 7541007, at *12 and Cox II 47 F.3d at 1299, also "inform the court's decision regarding how far back it is reasonable to expect a debtor to keep records regarding his financial transactions." Nevett, 2021 WL 2769799, at *10 (citing Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia), BAP No. CC-06-1176-MaBPa, 2007 WL 7540987, at *11 (9th Cir. BAP Sept. 5, 2007) ("Debtors are required to keep records for a 'reasonable' period of time for § 727(a)(3) purposes, and a court's determination of 'reasonableness' depends on the particular facts and circumstances of each case."). The existence of "lost assets of substantial value relative to debtors' liabilities" often warrants the extension of such two-year period. In re Stiff, 512 B.R. 893 (Bankr. E.D. Ky. 2014). Accordingly, in light of the substantial volume of money that is unaccounted for, coupled with Kane's admitted practice of entering into loan after loan to pay off other loans, this Court should not restrict itself to a fixed two-year look back period. See e.g. In re Nevet, 2021 WL 2769799, at *10 (the Ninth BAP affirming the bankruptcy court's summary judgment order in favor of the United States Trustee denying the debtor a discharge under Section 727(a)(3) involving $1,500,000 of loan proceeds received six years pre-petition); Blackwell Oil Co. v. Potts (In re Potts), 501 B.R. 711 (Bankr. D. Colo. 2013) (denying debtor's discharge in a case involving $1,400,000 million of unaccounted-for funds and assets in debtor's business four to seven years before petition); In re Hermanson, 273 B.R. 538, 551-52

(Bankr. N.D. Ill. 2002) (denying debtor's discharge for failure to account for approximately $1,300,000 million loan proceeds obtained six years before bankruptcy); In re Racer, 580 B.R. 45, 52-53 (Bankr. E.D.N.Y. Jan. 19, 2018) denying debtor's discharge for failure to account for approximately $1,500,000 in informal loans from family members that were incurred five to six years pre-petition.

Kane's failure to maintain records of millions of dollars in loan proceeds, salary, and purported gambling transactions is wholly inexplicable and inexcusable. Based on the foregoing, Centennial has met its burden of proof and Kane's discharge must be denied on that basis.

**B.    CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C. § 727(A)(5)**

Section 727(a)(5) provides: "The court shall grant the debtor a discharge, unless … the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). As this Court already held at the dismissal stage, loan proceeds and salary compensation are identifiable assets for purposes of section 727(a)(5). [Doc. 19 at ¶13 (citing Retz v. Sanson (In re Retz), 606 F.3d 1189, 1200 (9th Cir. 2010)]. While the Ninth Circuit has not defined what constitutes "substantial" assets, bankruptcy courts in the Ninth Circuit have found a wide range of assets to be substantial enough to require an explanation of the loss thereof by a debtor. In re Fader, 414 B.R. 640, 644 (Bankr. N.D.Cal. 2009) ($210,000 of income); In re Wiseman, No. 07-10976, 2008 WL 5341023, at *4 (Bankr. W.D. Wash. July 18, 2008) ($65,000 of trust funds); In re Johnson, 68 B.R. 193, 200 (Bankr. D.Or. 1986) ($39,000 of income during one year prior to filing). And like section 727(a)(3), this Court is not bound by a fixed look-back period. See, supra.

Under section 727(a)(5) the debtor cannot overcome the prima facie case by general assertions that money was spent on living expenses or other "vague and indefinite explanations of losses based on estimates uncorroborated by documentation." Bell v. Stuerke (In re Stuerke), 61 B.R. 623, 626 (9th Cir. BAP 1986); see also In re Long, 2:19-ap-01086-ER, 2020 WL 8184203 (Bankr. C.D. Cal. Nov. 30, 2020) (denying discharge under §727(a)(5) where the debtor had failed

to explain her loss of assets by failing to provide documents to fully explain what happened to the entirety of the "Borrowed Funds" totaling $112,500 and the debtor's admitted that she "cannot explain the loss."); see also In re Racer, 580 B.R. 45, 55 (Bankr. E.D.N.Y. 2018) ("Courts have noted that 'explanations of such generalized, vague, indefinite nature such as assets being spent on 'living expenses,' unsupported by documentation, are unsatisfactory."). "Equally unavailing is mere identification of a person with knowledge, such as an accountant or other individual who handled the financial affairs of the debtor." In re Potts, 501 B.R. 711, 725 (Bankr. D. Col. 2013) (quoting Sonders v. Mezvinsky (In re Mzvinsky), 265 B.R. 681, 689 (Bankr. E.D.Pa. 2001)).

In In re Racer, 580 B.R. 45 (Bankr. E.D.N.Y. Jan. 19, 2018), the bankruptcy court denied the debtor's discharge under section 727(a)(5) finding that the plaintiff met its burden by showing that the debtor had received and disposed of loan proceeds, and the only explanation offered by the debtor was the "loan proceeds were used primarily to pay bills, living expenses and medical bills." The bankruptcy court found that the debtor had failed to explain satisfactorily the loss of substantial assets and failed to offer any justification that would excuse such failure, noting that the debtor had not substantiated his asserts with any checks, bills or bank statements. The bankruptcy court noted that "[c]ourts have noted that 'explanations of generalized, vague, and indefinite nature such as assets being spent on 'living expenses,' unsupported by documentation, are unsatisfactory." Id. at 54 (quoting In re Mezvinsky, 265 B.R. at 696 and citing In re Sharp, 244 B.R. 889, 895 (Bankr. E.D. Mich. 2000) (denying discharge under § 727(a)(5) because the only evidence concerning sale proceeds of a car is debtor's testimony that he used the proceeds to "pay bills and expenses.").

In In re Ferguson, 2021 WL 5029387 (Bankr. N.D. Ill. Oct. 29, 2021), a bankruptcy court denied a debtor's discharge under section 727(a)(5) upon finding that the debtor was unable to explain the loss of $70,159.22 despite the debtor claiming the money was lost gambling. The bankruptcy court found that "the Defendant's testimony alone was insufficient in quality, perceived veracity, specificity and narrative to satisfactorily explain his loss of funds." 2021 WL 5029387 at *4. And although the debtor had provided records of ATM withdrawals at casinos and bank records showing the dates of bank cash withdrawals that happened around the time the debtor testified to be

at casinos gambling, the court found the explanation to be unsatisfactory. Id. In its ruling, the bankruptcy court held that "[t]he lack of even a basic accounting of gambling wins and losses (beyond simply what was withdrawn in cash) makes it impossible for the court to determine whether the cash was really lost gambling or was hidden away to avoid creditors." Id. at *5 (citing McBee v. Sliman, 512 F.2d 504, 506 (5th Cir. 1975); In re Tran, 464 B.R. at 892). The court noted:

> While "[n]othing in the [Bankruptcy Code] or controlling case law condemns gamblers to denial of discharge per se," gamblers in bankruptcy, like all other debtors, must explain their losses. Absent such a requirement, a claim of gambling losses would become a convenient defense, one where the paucity of evidence would be explained away by the nature of the loss. That would open an avenue to abuse for unethical debtors. Thus, the bankruptcy court must be vigilant in enforcing the need for corroborating evidence.

Id. (citing In re Tran, 464 B.R. at 895).

In another case, May v. Shepherd (In re Shepherd), 2005 WL 5157868 (Bankr. D. Kan. Oct. 7, 2005), a bankruptcy court denied a debtor's discharge under section 727(a)(5) upon finding that the debtor had been unable to account for $37,629.93 withdrawn as cash advances on his credit card. The court noted:

> Shepherd has provided no information relating to where, when and to whom the money was transferred. He does not offer the affidavit of any witness who was the recipient of this money, nor does he provide financial account records showing receipt of the cash or receipts showing the use of the money. He does not even try to provide estimated amounts used for any time It is clear that at one time, Shepherd maintained two bank accounts, but apparently abandoned use of that form of record keeping at or about the time he made all these cash advances. Thus, Shepherd has not provided any information that would allow the Trustee or a creditor to attempt to track down any assets that should be part of the bankruptcy estate, other than the matters already noted.

Id. at *4.

Centennial has established that during the five to six years leading to Kane's filing of the Petition, he was the direct recipient of over $11,000,000 in net loan proceeds stemming from the loans he volitionally incurred from the Institutional Lenders. This is in addition to the $2,150,000 Kane received from the Individual Lenders. Additionally, the evidence confirms that Kane received no less than $19,000,000 in gross wages from 2018 through 2020 in connection with his employment

17

as a professional ice hockey player.  And the undisputed facts as to Kane's receipt of nearly $30,000,000 is that it is no longer in his possession, as his Schedules reflected a total of approximately $40,000 in cash and in his various checking accounts.  Kane has failed to satisfactorily explain the loss of assets to meet his liabilities.  Given the amount of assets he has disposed of in the five years before his bankruptcy filing – an amount that exceeds Kane's total liabilities – the failure to account for any of this is not justified.  Kane can only offer the vaguest and indefinite explanation.  Kane's primary explanation is that the money was either used to pay bills, living expenses, or pay gambling debts.  This is the sort of unsatisfactory explanations that the bankruptcy courts do not condone.  The lack of explanation and ability to recall what Kane used the money for is only compounded by the lack of books and records that would corroborate his stories.  Accordingly, Kane is not entitled to discharge pursuant to Section 727(a)(5).  In re Long, 2:19-ap-01086-ER, 2020 WL 8184203 (Bankr. C.D. Cal. Nov. 30, 2020) (denying discharge under Section 727(a)(5) where the debtor had failed to explain her loss of assets by failing to provide documents to fully explain what happened to the entirety of the "Borrowed Funds" totaling $112,500 and the debtor admitted that she "cannot explain the loss").  And although Kane offered testimony that he would have used some, not all, of his net salary – as calculated above – to pay back his loans, this is belied by the loan documents themselves. See Exhibit A.  Kane consistently took out larger loans that would pay off the prior loan – with there being no reduction in principal – and then net additional funds to Kane.  Moreover, many of the loans did not require monthly interest payments[3] and others had interest reserves in place to cover the monthly interest. See Exhibit A.

Moreover, Kane was unable to account for hundreds of thousands of dollars in various withdrawals/transfers and deposits in and out of his various accounts, including a $100,000 deposit Kane received on August 20, 2020 [Day 1, 120:12-19; 131:14-18] and an $88,070 transfer Kane received on September 9, 2020 [Day 1, 132:14-21][4].  And at times when Kane offered testimony as

---

[3] See Ex. 40 at p. 24; Ex. 46 at p. 49; Ex. 48 at p.9; Ex. 54 at p.13; Ex. 56 at p.12; Ex. 60 at p.12; Ex. 62 at p.4; Ex. 64 at p.18; Ex. 68 at p.10; and Ex. Z at p.2.

[4] The two entries are just an example.  Most typical consumers would know where they received nearly $200,000 worth of funds.

to where or for what purpose this money was received or being transferred out of his account, such testimony contradicted Kane's prior deposition testimony of "he did not know." This is all the more troubling given that Kane testified that he spent several hours going through hundreds of bank statements with the chapter 7 Trustee to discuss these exact entries prior to his deposition and testimony at trial. [Day 2, 170:13-171:8, 181:16-182:2, 181:3-5]. And even so, Kane testimony is either inconsistent or he lacks the requisite knowledge to offer a satisfactory explanation.

In his trial brief [Doc. 46], Kane relied heavily upon United States Tr. v. Rojas (In re Rojas), 2011 WL 66129 (Bankr. S.D. Cal. Jan. 3, 2011) for the proposition that deposits and withdrawals, standing alone, were insufficient to establish evidence that a certain amount of assets existed at a certain point in time. [Doc. 46 at ¶¶15-16]. Rojas is factually inapposite. There, the court – at summary judgment – found that "[i]t appears undisputed that many, if not most, of the deposits identified by Plaintiff were simply transfers from one of Debtor's accounts to another" to where there did not appear to be a net gain. 2011 WL 66129 at *4. This is not the case here where Kane was unable to explain where deposits and withdrawals were coming from and being transferred to. Additionally, in Rojas, the court held that "[t]his is not a situation where a debtor received a chunk of money from an outside source prepetition and was unable to account for it as of the petition date. Rather, this Debtor was operating two d.b.a.'s, and apparently made numerous transfers between them and herself." 2011 WL 66129 at *5. Here, Kane operates no business, and did receive chunks of money prepetition – tens of millions of dollars' worth of chunks – from outside sources that were not present as of the Petition Date. Thus, not only is it not binding on this Court, it is not even persuasive.[5]

Kane also testified of having two Rolex watches worth approximately $75,000 that he

---

[5] Kane further relied upon the decision in In re LeMieux, 2017 WL 4325563 (Bankr. N.D. Cal. Sept. 27, 2017) for the proposition that the debtor adequately explained the disposition of withdrawals towards his personal expenses. [Doc. 46 at ¶16]. In LeMieux, the court was faced with $20,292 worth of unexplained withdrawals, an amount the court questioned was even "substantial." Here, this Court is faced with the disappearance of millions of dollars, including hundreds of thousands in unexplained withdrawals. Moreover, the unexplained funds were withdrawals from the debtor's wholly owned company, that the debtor "credibly" testified went to pay his expenses and that he did not have money left over. Here, Kane admitted that he would have netted a million dollars or more each year after taking into consideration taxes and his monthly expenses, and yet, none of that money was accounted for as of the Petition Date.

Case: 21-05016    Doc# 58    Filed: 03/14/23    Entered: 03/14/23 23:07:05    Page 23 of 33

transferred on account of a gambling debt. However, Kane did not know the name of the bookie he gave his two Rolexes to, even though this occurred in the ninety days preceding his bankruptcy filing. [Day 2, 181:11-15].

As Kane has not met his burden of providing a satisfactory explanation as to how millions and millions of assets are unaccounted for, his discharge should be denied under 11 U.S.C. § 727(a)(5).[6]

## C. CENTENNIAL HAS PROVED THAT DISCHARGE SHOULD BE DENIED PURSUANT TO 11 U.S.C. 727(A)(4)(A)

The Bankruptcy Code further provides that this Court may deny the discharge of the debtor if: "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath." 11 U.S.C. § 727(a)(4)(A). To prevail on a section 727(a)(4)(A) claim, the plaintiff must show that (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact. In re Wills, 243 B.R. 58, 62 (9th Cir. BAP 1999). "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." In re Khalil, 379 B.R. 163, 172 (9th Cir. BAP 2007) (internal citations omitted). "An omission or misstatement that 'detrimentally affects administration of the estate' is material." In re Retz, 606 F.3d 1189, 1198 (9th Cir. 2010) (internal citations omitted).

Statements made with reckless indifference to or disregard of the truth may be regarded as intentionally false and support the denial of discharge under section 727(a)(4)(A). In re Khalil, 379 B.R. at 177. Moreover, "[m]otive can support a finding of knowing and fraudulent intent … [although] the court might never know the debtor's motive, [] the number of misstatements or omissions, or the size or nature of a single one, might suffice to support that a debtor knowingly and fraudulently made a false oath or account." Id. at 176.

---

[6] While the issue of gambling permeated Kane's testimony elicited by his counsel, Kane not only lacks corroborating documentation, but does not actually commit to testifying that he lost all of his assets gambling. [See Day 2, 67:18-68:4 "Q: …But just over this period of time, we're looking 2017 through this payment, which was in April of 2020, over 1.4 million. And what I'm talking about again is not limited to the year before bankruptcy. But just in general, were these the total losses, or were there additional losses that you would've had at the casinos? A: There would have been additional losses at the casino and on – on – betting on – through the bookie. At the same time, again, I didn't lose every time. I won. So – as well, the odd time. So it – a lot of the time, it would even out, but there were probably some additional losses to the period of time, yes."]. If Kane won, or it would "even out," then what is the explanation for the loss of his assets?

20

Case: 21-05016   Doc# 58   Filed: 03/14/23   Entered: 03/14/23 23:07:05   Page 24 of 33

"The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." Retz, 606 F.3d at 1199. "A debtor cannot merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." Id.

Here, Kane was in the throes of his financial crisis. But, Kane knew that his substantial income as a professional ice hockey player would make him a poor candidate for a chapter 7 consumer bankruptcy. In these regards, in filing his Petition under oath, Kane checked the box that his debts were "primarily business debts", thereby swearing under oath that his debts "were debts incurred to obtain money for business or investments, or through the operation of the business or investment." [Ex. 1, Day 1, 149:17-21]. Although provided the opportunity to check the box that his debts were both non-business and non-consumer, Kane left this section blank. [Id., Day 1, 149:22-150:2]. Thus, Kane continues to take the position that his debts are primarily consumer debts. [Day 1, 150:3-14]. This is false.

As for the loans received from the Individual Lenders, as shown above, despite not having any documentation to corroborate his testimony, Kane testified that the loans were incurred to pay bills, pay gambling debt, and stay current. Despite this, Kane has taken the position that the debt he incurred with Messrs. Sanchez, Shyng, Lipski, Gianakas, and Veltri, are all non-consumer debt. [Day 1, 55:19-25]. However, Kane does admit that the debt he incurred with Mr. Banghu is a consumer debt. [Day 1, 55:19-25]. But, the reality is, the Banghu debt was incurred for the same purpose as the debt he incurred from Sanchez, Shyng, Lipski, Gianakas, and Veltri. Thus, by Kane's own admission, these are all consumer debts, and he knew that at the time of his filing.

Similarly, as for the Institutional Loans, Kane used the various loan proceeds to pay off pre-existing loans that he had incurred. And with the regards to the $11,000,000 in net loan proceeds he received, Kane either (i) could not recall what he did with the loan funds, (ii) speculated that he used it to pay off gambling debt, or (iii) was in desperate need for cash and used it to survive. In fact, Kane testimony was that these were "an advance, essentially, on my salary." [Day 2, 102:12-15]. Thus, Kane has always known that the majority of his debt was not, and never has been, "debt

incurred to obtain money for business or investments, or through the operation of the business or investment."

This is a consumer case that Kane wrongfully, fraudulently, and intentionally filed as a business case so that Kane could skirt the Means Test. While that may have gotten Kane past the dismissal stage, it requires this Court to deny Kane his discharge. He is not the "honest but unfortunate debtor" the bankruptcy code is intended to protect.

In this case, Centennial has shown that Kane flouted his duty in bankruptcy by knowingly making, under oath, a false statement under oath that related materially to the bankruptcy case as it detrimentally affected the administration of the estate, and he did so with fraudulent intent. Therefore, Kane's discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

**D.    TRUSTEE'S TESTIMONY IS ENTIRELY IRRELEVANT**

Kane is likely to suggest to this Court that simply because the Chapter 7 Trustee elected not to bring an objection to discharge – after Centennial had already initiated this lawsuit – that this has some bearing on this Court's decision. This is entirely preposterous and not supported by any authority. Moreover, the Chapter 7 Trustee's entire testimony was irrelevant to Kane's admitted failure to maintain and preserve adequate records, his failure to explain satisfactorily his loss of tens of millions of dollars in assets above the most vague and generalized explanation, or Kane's knowingly fraudulent misstatement that his debts were primarily business debts in order to get around the Means Test. To the extent the Chapter 7 Trustee's testimony can be considered at all, it cannot be considered as evidence that his opinion to not bring an objection to discharge somehow controls. See e.g. F.T.C. v. Stefanchik, No. C04-1852RSM, 2007 WL 4570879, at *1 (W.D. Wash. Feb.15, 2007) (holding that expert's opinion that defendant's materials are not unfair, false, misleading or deceptive was an impermissible legal conclusion); Wiles v. Dep't of Educ., Nos. 04-004422 ACK-BMK, 05-00247 ACK-BMK, 2008 WL 4225846, at *1 (D. Haw. Sept. 11, 2008) ("[W]hile an expert witness generally may give opinion testimony that embraces an ultimate issue to be decided by the trier of fact, that expert may not express a legal opinion as to the ultimate legal

22

issue."); <u>In re Novatel Wireless Sec. Litig.</u>, No. 08cv1689 AJB (RBB), 2012 WL 5463214, at *5 (S.D. Cal. Nov. 8, 2012) ("While an expert witness may testify as to an ultimate issue of fact the jury will decide, the general rule is that an expert may not testify as to what the law is, because such testimony would impinge on the trial court's function.").

Additionally, the Chapter 7 Trustee's testimony is that, although he could not "recall specifics", believed that he only requested "at least one year" of information from Kane. [Day 2, 49:4-6]. This of course is inadequate even under Kane's theory that this Court should be limited to a two-year lookback period.

**CONCLUSION**

Centennial has demonstrated that Kane failed to keep or preserve recorded information from which his financial condition or transactions might be ascertained and has failed to provide any justification for such failure. Centennial has also demonstrated that Kane knowingly and fraudulently made a false oath or account, which false oath was material to the case. Finally, Centennial has proved that Kane failed to explain the loss of substantial assets, which assets might have been available to pay Kane's creditors. Kane's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(3), (a)(4)(A), and (a)(5).

DATED: March 14, 2023          ANTHONY & PARTNERS, LLC


                               By: _____/s/ Andrew J. Ghekas_____
                                   Andrew J. Ghekas
                                   Attorneys for Plaintiff
                                   CENTENNIAL BANK

DATED: March 14, 2023          NIESAR & VESTAL LLP


                               By: _____/s/ Peter C. Califano_____
                                   Peter C. Califano
                                   Attorneys for Plaintiff
                                   CENTENNIAL BANK

24

**EXHIBIT "A" to Centennial Bank's Closing Brief**

| DATE | LENDER | LOAN AMT. | EX # | LOAN PAYOFF | NET TO KANE | TESTIMONY |
|---|---|---|---|---|---|---|
| 5/14/2014 | Capital Financial Partners | $600,000 | 36 | - | $562,500 [Day 1, 59:22-60:5; Doc. 44 at ¶29] | Used for everyday living expenses [Day 1, 61:13-16]<br><br>No records regarding use of funds [Day 1, 61:17-21] |
| 6/20/2014 | American Bank | $1,000,000 | 37 | $627,000 to payoff Capital Financial Partners | $261,419.39 [Day 1, 63:23-25; Doc. 44 at ¶30] | Does not recall what he utilized loan funds for [Day 1, 64:1-5]<br><br>No records regarding use of funds [Day 1, 64:6-18] |
| 7/15/2015 | East West Bank | $1,750,000 | 38 | $1,000,000 to American Bank | $736,875 [Doc. 44 at ¶31] | Primary Purpose of Loan was personal, family, or household purpose, personal investment; specifically, to repay existing indebtedness [Day 1, 67:9-68:3] |
| 8/30/2015 | Tenacity 7401 New Hampshire LLC | $500,000 | 40 | - | $450,948.50 [Day 1, 69:2-19] | Does not recall what he used the loan proceeds for [Day 1, 69:20-22]<br><br>No documents regarding use of loan funds [Day 1, 70:1-4] |
| 9/11/2015 | East West Bank | $550,000 | 42 | $505,000 to Tenacity | $42,000 [Day 1, 70:23-71:17] | Primary Purpose of Loan was personal, family, or household purpose, personal investment [Day 1, 71:24-71:19; 73:1-7] |
| 1/23/2016 | Thrivest Specialty Funding | $3,300,000 | 44 | $2,082,451.30 to East West Bank | $931,549 [Day 1, 74:1-22] | Assumes used to pay off some gambling debt [Day 1, 74:23-75:1]<br><br>No documents regarding use of loan funds [Day 1, 75:2-8] |

1

# EXHIBIT "A" to Centennial Bank's Closing Brief

| DATE | LENDER | LOAN AMT. | EX # | LOAN PAYOFF | NET TO KANE | TESTIMONY |
|---|---|---|---|---|---|---|
| 7/6/2016 | Now Playing LLC | $50,000 | 46 | - | $39,809 [Ex. 46 at p. 27] | Speculates that used money to pay bills and be able to live [Day 1, 77:1-9]<br><br>No documentation regarding use of the loan funds [Day 1, 77:12-14] |
| 7/7/2016 | SCL-D, LLC | $200,000 | 48 | $50,050 to Now Playing | $133,000 (Day 1, 81:15-82:15; Doc. 44 at ¶36) | Speculates that he was desperate for money and used it to get through off-season [Day 1, 78:25-79:8; 80:6-11]<br><br>No records regarding use of funds [Day 1, 80:12-14] |
| 10/6/2016 | DeAngelo Vehicle Sales | $4,150,000 | 50 | $207,500 to SCL-D, LLC<br><br>$3,300,000 to Thrivest | $242,271 [Day 1, 81:15-82:23; Doc. 44 at ¶37]<br><br>$20,700 interest reserve | Does not recall what he used the loan proceeds for [Day 1, 82:16-18]<br><br>No records regarding use of funds [Day 1, 82:19-21] |
| 12/23/2016 | DeAngelo Vehicle Sales | $580,000 | 52 | - | $505,912.63 [Day 1, 83:11-23]<br><br>$23,200 interest reserve | Speculates that he utilized loan proceeds for down payment on West 35th Home in purchased in April 2017 [Day 1, 84:7-85:1]<br><br>No records regarding use of funds [Day 1, 85:2-11] |
| 3/2/2017 | Thrivest Specialty Funding | $1,975,000 | 54 | $574,200 to DeAngelo Vehicle Sales | $901, 886.48 [Day 1, 87:5-88:14]<br><br>$118,500 interest reserve | Speculates that $748,600 would payoff "personal loans" that were probably gambling related debt that he had no records to support. [Day 1, 86:6-10, 86:21-24] |

Case: 21-05016   Doc# 58   Filed: 03/14/23   Entered: 03/14/23 23:07:05   Page 30 of 33

| DATE | LENDER | LOAN AMT. | EX # | LOAN PAYOFF | NET TO KANE | TESTIMONY |
|---|---|---|---|---|---|---|
| | | | | $100,000 to Seneca Gambling Corporation | | Speculates that $140,000 would have been to payoff "Vinny" who is a bookie, but not sure if that is his real name. Has no documents to support amount owed to Vinny. [Day 1, 86:11-20].<br><br>Has no copies of cashier's check to support payoff to Vinny. [Day 1, 88:15-18] |
| 4/7/2017 | Thrivest Specialty Funding | $1,225,000 | 56 | - | $898,661.40 [Day 1, 89:7-90:1]<br><br>$61,250 interest reserve | Speculates that he would have used some of the loan proceeds to pay off line of credit and some credit cards. [Day 1, 90:2-7]<br><br>Has no records of what he used loan proceeds for [Day 1, 90:2-20] |
| 6/20/2017 | East West Bank | $2,000,000 | 58 | $1,212,750 to Thrivest<br><br>$415,112 to DeAngelo Vehicle Sales | $251,666.68 [Ex. 58, p. 23] | |
| 7/5/2017 | Seven Isles Capital | $3,550,000 | 60 | $2,534,638 to DeAngelo Vehicle Sales | $838,987 [Day 1, 91:7-92:11] | Speculates that anywhere from $250,000 to $500,000 would have been used to pay off a gambling marker owed to the Cosmopolitan [Day 1, 92:10-18] |

3

| DATE | LENDER | LOAN AMT. | EX # | LOAN PAYOFF | NET TO KANE | TESTIMONY |
|---|---|---|---|---|---|---|
| | | | | | | Has no records regarding use of the funds [Day 1, 92:19-22] |
| 7/5/2017 | Thrivest Specialty Funding | $3,000,000 | 62 | $1,955,250 to Thrivest | $300,655.50 (Day 1, 94:22-95:14]  $390,000 interest reserve | Does not recall what he utilized loan proceeds for [Day 1, 94:6-8]  Has no records regarding use of the loan funds [Day 1, 94:9-11] |
| 9/28/2017 | Thrivest Specialty Funding | $4,850,000 | 64 | $2,700,000 to Thrivest | $721,801.89 [Day 1, 94:22-95:15]  $636,562.50 interest reserve | Speculates that a portion of the funds would have been used to pay off a bookie in Toronto [Day 1, 95:15-18]  Does not know purported bookies name [Day 1, 95:19-20]  Has no documentations or records to support use of these funds [Day 1, 95:21-24] |
| 12/18/2017 | Democracy Capital Corporation | $1,250,000 | 66 | - | $895,261.75 [Day 1, 97:1-11] | Speculates that funds were use to pay off existing loan, does not name loan. [Day 1, 97:6-11] |
| 3/22/2018 | South River Capital | $1,850,000 | 68 | $412,934.24 to East West Bank  $300,000 to Cosmopolitan | $554,675 (Doc. 44, at ¶46]  $138,750 interest reserve | Speculates that he would have used proceeds in connection with his occupation s a professional ice hockey player. [Day 1, 98:17-20]  Has no records to support his use of the loan proceeds [Day 1, 98:20-22] |
| 8/9/2018 | Zions Bancorporation N.A | $4,250,000 | 70 | $3,660,395.12 to Seven Isles Capital | | Personally took out in own name to pay off existing loans and get rid of or attempt to get rid of the |

4

| DATE | LENDER | LOAN AMT. | EX # | LOAN PAYOFF | NET TO KANE | TESTIMONY |
|---|---|---|---|---|---|---|
| | | | | $359,964.55 to Thrivest | | hard money lenders that he had at the time [Day 1, 153:12-154:1] |
| 9/5/2018 | Centennial Bank | $3,900,000 | 72 | $3,655,215.93 to Thrivest | | Used to pay off or down existing loans that he had at the time [Day 1, 151:21-23] |
| 10/17/2018 | Centennial Bank | $2,000,000 | 74 | $1,504,767.76 to Thrivest<br><br>$401,807 to South River Capital | | Used to pay off or down existing loans that he had at the time [Day 1, 151:21-23] |
| 12/28/2018 | Thrivest Specialty Funding | $405,000 | Z | $263,000 to Democracy Capital | $42,535 interest reserve | |
| 2/28/2019 | Centennial Bank | $715,000 | 78 | $374,625 to Thrivest<br><br>$247,359.16 to South River | | Used to pay off or down existing loans that he had at the time [Day 1, 151:21-23] |
| 8/26/2019 | Professional Bank | $1,500,000 | 80 | $1,237,222 to Democracy Capital<br><br>$134,309.11 to South River | | Used loan proceeds to pay off debt that he had incurred with high-interest loans [Day 1, 154:16-155:6] |
| 4/30/2019 | Centennial Bank | $2,460,000 | 82 | $1,917,500 to South River | $399,014.22 | |
| 5/11/2019 | South River Capital | $600,000 | 84 | - | $520,774 [Day 2, 129:25-130:12] | Believed he used loan proceeds to pay off a casino debt [Day 1, 155:7-156:10] |
| **Total:** | 26 different loans | $48,210,000 | | **$31,733,051.17** | **$11,633,177.94** | |

5