**Entered on Docket**
**May 18, 2023**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



The following constitutes the order of the Court.
Signed: May 18, 2023

_____
**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re EVANDER KANE, | Case No. 21-50028 SLJ |
| Debtor. | Chapter 7 |
| HOPE PARKER, | Adv. Proc. No. 21-5008 |
| Plaintiff, | |
| v. | |
| EVANDER KANE, | |
| Defendant. | |
| CENTENNIAL BANK, | Adv. Proc. No. 21-5016 |
| Plaintiff, | |
| v. | |
| EVANDER KANE, | |
| Defendant. | |

## ORDER FOLLOWING TRIAL

Plaintiffs Hope Parker ("Parker") and Centennial Bank filed complaints objecting to the entry of a discharge for Defendant Evander Kane ("Kane"). The complaints were filed in the cases noted above but were consolidated for trial because they overlapped in fact and law. ECF 24 (21-5008), ECF 33 (21-5016). The complaints contend the court should deny

ORDER FOLLOWING TRIAL

Kane a discharge under 11 U.S.C. § 727(a)(3)(failure to keep and maintain records), (4)(false oaths), and (5)(failure to explain satisfactorily the loss of assets).[1]

The matter came on for trial on January 23 and 25, 2023. Parker was represented by John Lewis. Centennial Bank was represented by John Anthony, Andrew Ghekas, and Peter Califano. Kane was represented by Stephen Finestone and Ryan Witthans. The parties submitted post-trial briefs on March 14, 2023, and the matter was taken under submission.

For the reasons stated below, the court will enter judgment in favor of Kane.

## I.  FACTUAL BACKGROUND

### A.  Defendant Evander Kane

Kane is a professional hockey player, currently employed by the Edmonton Oilers, a Canadian team in the National Hockey League. He resides in Edmonton, Alberta, with his partner and two children.

Kane grew up in Vancouver, British Columbia, the eldest of three children. His was a family of modest means. The Kanes lived in rented accommodation in which the three children shared a bedroom. T1, 176:20–24. His father sold cars and baked and distributed bread for his living. When the children were small, his mother stayed home. Later, she trained and worked as a dental assistant. T1, 169:1–171:10.

Kane's formal education stopped with his graduation from high school. He has not taken college classes. He has not studied business, economics, accounting, or financial management. T1, 172:3–173:2.

Kane excelled at hockey. When he was 17, he signed his first professional hockey contract with the NHL franchise in Atlanta, Georgia, the Thrashers. Following his high school graduation, at the age of 18, he moved to Atlanta, Georgia. T1, 172:3–173:2. His agents Don Meehan and Craig Oster took responsibility for Kane's "financial management." Initially, his agents set up his bank accounts for both the United States and Canada, managed his taxes, and paid his bills. T1, 175:12–22. Kane lived on his own in an apartment. T1,

---

[1] Hope Parker only asserts a claim under § 727(a)(5).

ORDER FOLLOWING TRIAL

175:20–25. At the end of his first season, he returned home to live with his parents in the house he grew up in. T1, 176:12–23.

### B. Kane's Professional Hockey Career

Kane's professional hockey career began with a three-year rookie deal with the Thrashers. After his second season, though, the team was moved to Winnipeg, Manitoba. He played under his original contract for the Winnipeg Jets. He signed a new six-year contract with the Jets after his first year. He was later traded to a franchise in Buffalo, New York, the Sabres. He played for the Sabres until he was traded to a franchise in San Jose, California, the Sharks. When he joined the Sharks, he was still playing under a contract he negotiated with the Jets. After his first season, he negotiated a new contract with the Sharks. T1, 17:19–19:5. He now plays for the Edmonton Oilers franchise. T2, 51:5–12.[2]

### C. Gambling

Kane's bankruptcy schedules indicate that in the year prior to filing a bankruptcy petition, he lost $1.5 million gambling at casinos and on sports betting. Case 21-50028 ECF 29, Question 15. The testimony at trial demonstrated that Kane has a profound gambling addiction. Kane admits as much, describing his gambling as "volatile." Summarizing his problem, he testified:

> I just got to a point where I was desperate for money. I knew I was not in a good financial situation or a situation that I ever wanted to be in. I was trying to win money to pay off my debt. And sometimes it worked. A lot of times it didn't.
>
> And, you know, with the stress and the addiction and the -- the rush and the desperation to try to get out of this financial predicament, it drove to some real high levels of volatility when it came to placing bets.
>
> . . . .
>
> At the same time, I realized I wasn't going to win that in one day, you know. I was trying to put out as many fires as I could

---

[2] All citations to "T2" refer to the Amended Transcript regarding hearing held on January 25, 2023. Case No. 21-5016 ECF 54.

ORDER FOLLOWING TRIAL

3

at any particular time. A lot of the times, using gambling as a
way to survive, where it got to that type of a point. And there
were times where, you know, it did help me survive, and there
were times where it buried me, as it has today.

T2, 79:1–25. Kane sought professional assistance to deal with his addiction both before and
after filing his bankruptcy case. T2, 84:2–18.

Kane used two principal means to gamble. He made extensive use of casinos. The
casinos lent Kane substantial sums which took the form of markers. These are a form of
casino credit. Kane believes the amount a gambler is allowed to borrow is based on "who
you are and what your income is, most of the time, and then also your relationship with the
casino." T2, 53:8–10. He had markers at different casinos for $100,000, $250,000, $500,000,
and $750,000. T2, 53:22–54:5. He could use the markers to ask for chips to use in the casino.
T2, 53:11–21. If he won, he would use his winnings to pay down his marker before leaving
the casino. If he lost money, he was given thirty days to pay the casino debt.

Kane also used "bookies" to gamble beginning as early as 2012. T2, 71:3–5. Bookies
work through websites. In most instances, the bookie would give Kane a username and
password to a gambling site. T2, 71:6–17. This was accomplished almost entirely on Kane's
smartphone (e.g., 95% of the time). *Id.* The site would always indicate how much credit he
was being given. T2, 71:24–72:8. The site listed all the leagues, types of games, and the
variety of wagers permitted. T2, 71:18–23. Kane testified that the amount a person is allowed
to borrow on the system is determined by their relationship with the bookie, whether they
pay when their bets come due, and the level of trust the gambler established with them. T2,
72:9–23. Increases in the limit were routine and were sometimes initiated by Kane and
sometimes by the bookie. T2, 72:24–73:11. Squaring up – or paying the bookie – generally
took place when Kane had exhausted his line of credit. T2, 73:12–74:3. If he could, he would
pay the bookie with cash, a wire transfer, cashier's checks, bank drafts, and sometimes
jewelry. T2, 74:7–12, 74:25–75:6. If he could not pay the bookie, he would sometimes
request his line of credit to be increased to try and win some of the money back. T2, 74:11–
17.

ORDER FOLLOWING TRIAL

Kane testified that his use of bookies was very extensive. On some days, he bet on only one game. On other days, though, he might bet on as many as 50 games at the same time. T2, 78:13–25. Kane also testified that the bookies' websites changed frequently while he was using them. When this occurred, he would be given a new username and password and told to use the new site. T2, 76:6–77:2. He has no records for any of the bookie sites because they were transient and operated online only.

### D. Kane's Income

Kane earned substantial sums as a professional hockey player. Kane disclosed gross earnings of $7 million in 2020 and 2019, and $6 million in 2018. Case No. 21-50028 ECF 29. His net earnings were far less than the amount stated in his contracts. Each year at least 18% of his salary was escrowed. T2, 135:7–20. These funds were used to cover the team owner's losses during a season. *Id.* Often, only 2-3% of those funds was refunded to the players at season's end. T2, 135:23–25. At least once, nothing was refunded. T2, 136:1–5. Kane also paid taxes. Kane testified that taxes and the escrow charge consumed 45% of his paychecks. T2, 136:13–19. He also paid his agent's fee from his salary, which in Kane's case was 3%. T2, 136:21–137:5. Kane's salary was impacted by NHL player lock outs. One of these occurred in 2012–13. He also lost substantial salary during the Covid-19 pandemic because the NHL did not operate. T1, 16:20–24.

### E. Kane's Pattern of Borrowing Money and Refinancing Loans

Kane's gambling, personal expenses, and investments outpaced his income from hockey. From 2014 on, Kane commenced borrowing substantial sums to cover the shortfalls. Kane testified about ten loans, but the evidence shows that the number of loans Kane took out is close to 27, if one counts all the borrowing, re-borrowings, and refinancings. T1, 152:1–3.

Kane testified that he worked with his agent, Leon McKenzie ("McKenzie"), at a company called Sure Sports Lending, LLC, and a certified public accountant, Tony Chiricosta ("Chiricosta"), to secure and manage these loans. T2, 101:2–102:2; T2, 110:1–17; T1, 152:18–23. He stated that the goal of each of the refinancings was to find loans with

ORDER FOLLOWING TRIAL

1    lower interest rates from banks (or, conventional lenders). T1, 152:10–17. His advisors were

2    paid substantial sums for their work. T2, 57:3–60:1.

3    The evidence at trial showed that at no point after 2014, was Kane free from

4    substantial debts to these lenders. In the interest of judicial economy, the court will not

5    identify and explore each and every one of these loans. Instead, it presents a typical

6    borrowing and refinancing situation which, based on its review of the entirety of the

7    financings and the evidentiary record, fairly exemplifies Kane's borrowing in the years before

8    he filed his bankruptcy petition.

9    The court begins by noting that by 2017, Kane owed millions of dollars to a variety

10   of lenders. Commencing in September 2018, with help from his financial advisors (Sure

11   Sports, McKenzie, and Chiricosta), Kane sought to borrow from Plaintiff Centennial Bank

12   to pay off some of these obligations. Over a period of just eight months, Centennial Bank

13   lent Kane a total of $8 million. There were four separate borrowings or amended borrowings

14   to comprise this total.[3]

15   The majority of the money Kane borrowed from Centennial Bank paid down prior

16   debts, including multiple loans from Thrivest Specialty Funding ($3,665,215.93,

17   $1,504,767.76, and $374,625), and South River Capital, LLC ($401,807.13, $247,359.16, and

18   $1,917,500). Notably, the payoffs on the Thrivest Specialty Funding and South River Capital

19   loans consumed 98% of the money that Kane borrowed from Centennial Bank.[4]  The bank

20   would have been aware that Kane was using the proceeds of his loan to pay off prior loans

21   as each loan had a closing statement that showed the use of funds.[5]

22

23

24   [3] According to the Amended Proof of Claim filed December 17, 2021, this was
     composed of an original borrowing of $3.9 million on September 5, 2018, increased on
25   October 17, 2018, February 28, 2019, and April 30, 2019 to a total of $8 million. *See* Proof of
     Claim, Exs. 2, 8, 72, 74, 78, and 82.
26
     [4] Calculated as loans paid $7.86 million divided by money borrowed $8.0 million. Ex.
27   72, p. 1 ($3,665,215.93); Ex. 74, p. 1 ($1,504,767.76); Ex. 78, p. 3 ($374,625); Ex. 74, p. 1
     ($401,807.13); Ex. 78, p. 1 ($247,359.16); Ex. 82, p. 1 ($1,917,500).
28
     [5] *See* Defendant Kane's Exs. 72, 74, 78, and 82.

ORDER FOLLOWING TRIAL

6

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

On many occasions, Kane received no money from the refinancing of his debts: the new loan simply paid an old loan and a lot of attendant expenses, including fees, and unexplained insurance premiums.[6] Sometimes, the loans had "interest reserves" but Kane testified that he did not have access to these funds, and they were handled by third parties, including East West Bank and Zions Bank. T2, 116:20–117:1.

F. Kane's Real Property Assets

Kane owned three real properties at the time of the bankruptcy filing. The first is located at 8447 Isabel Place in Vancouver, British Columbia. Kane purchased this home for his family after his second professional hockey season. T1, 178:6–25. Kane saved for the down payment to purchase this property. T1, 179:3–15. He financed the balance due. *Id.*

He also owns 3547 West 35th Avenue, Vancouver, British Columbia, a rental property. T2, 22:10–21. He purchased this property as an investment in 2017 for $3.88 million Canadian dollars. T1, 180:1–11. He borrowed both the down payment and the balance on the contract price. T1, 180:12–21. This property is managed by his mother. T1, 180:25–181:5.

---

[6] An example of the Loan Closing Statement for the Centennial Bank loan of $2 million is shown below. It shows Kane received no proceeds from that loan personally. The proceeds paid fees, costs, insurance, and the existing loans from Thrivest and South River.

**LOAN CLOSING STATEMENT FOR AMENDMENT TO LOAN**

| | |
|---|---|
| BORROWER: | EVANDER KANE |
| LENDER: | CENTENNIAL BANK |
| EFFECTIVE CLOSING DATE: | OCTOBER 17, 2018 |
| LOAN NUMBER: | 2757571221 |

| | |
|---|---|
| EXISTING BALANCE OF LOAN PRIOR TO AMENDMENT | $3,900,000.00 |
| PRINCIPAL BALANCE OF LOAN AS OF EFFECTIVE DATE | $5,900,000.00 |
| AVAILABLE BALANCE PRIOR TO CLOSING | $2,000,000.00 |

1. **LENDER FEES, EXPENSES & HOLDBACK**

| | |
|---|---|
| Lender's Fee | $ 15,000.00 |
| Lender's Attorney Fees to Joseph B. Helmovics, P.A. | $ 1,350.00 |
| 10-day Interest Reserve Supplement | $ 3,611.11 |

2. **AMOUNTS TO BE PAID TO OTHERS ON BORROWER'S BEHALF**

| | |
|---|---|
| Legal/Closing Fee to Sure Sports Lending, LLC | $ 8,000.00 |
| Partial Payment of Underwriting Fee to Sure Sports Lending, LLC | $ 30,000.00 |
| Ins. Premium for Death & Disgrace coverage to Exception Risk Advisors for $2 million increase | $ 35,464.00 |

3. **PAYOFF TO EXISTING LENDERS**

| | |
|---|---|
| Payment to Thrivest Specialty Funding for partial payoff of Loan dated 9/28/2017 | $1,504,767.76 |
| Payment to South River Capital, LLC for partial payoff of Loan dated 3/22/2018 | $ 401,807.13 |
| **TOTAL FEES, EXPENSES AND PAYOFFS** | **$2,000,000.00** |
| CASH DUE BORROWER FROM LENDER: | $ 0.00 |

ORDER FOLLOWING TRIAL

7

Kane purchased 2301 Richland Avenue, San Jose, California, in August 2020, as his principal residence. T1, 21:17–24. He borrowed the money to purchase this property. *Id.* It was sold by the trustee during the chapter 7 case, generating $692,371.45 in proceeds. Case 21-50028 ECF 231. Kane has claimed an exemption under California law in part of those proceeds.

## II.  DISCUSSION[7]

### A.  Ground Rules for Consumer Bankruptcy and the Availability of a Discharge of Debts

Kane chose to file bankruptcy under Chapter 7. That chapter is sometimes called a straight liquidation. The process was summarized eloquently by Justice Ginsburg in *Harris v. Viegelahn*, 575 U.S. 510, 514 (2015):

> Chapter 7 allows a debtor to make a clean break from his financial past, but at a steep price: prompt liquidation of the debtor's assets. When a debtor files a Chapter 7 petition, his assets, with specified exemptions, are immediately transferred to a bankruptcy estate. § 541(a)(1). A Chapter 7 trustee is then charged with selling the property in the estate, § 704(a)(1), and distributing the proceeds to the debtor's creditors, § 726. Crucially, however, a Chapter 7 estate does not include the wages a debtor earns or the assets he acquires *after* the bankruptcy filing. § 541(a)(1). Thus, while a Chapter 7 debtor must forfeit virtually all his prepetition property, he is able to make a "fresh start" by shielding from creditors his postpetition earnings and acquisitions.

The "clean break" the court refers to is the discharge of debts provided by § 727(a) of the Bankruptcy Code. § 727(a). The discharge of debts "frees the debtor from all debts existing at the commencement of the bankruptcy proceeding other than obligations § 523 of the

---

[7] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Civil Rule" references are to the Federal Rules of Civil Procedure and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. "Civil L.R." and "B.L.R." references refer to the applicable Civil Local Rules and Bankruptcy Local Rules.

ORDER FOLLOWING TRIAL

1   Code excepts from discharge. § 727(b)." *Kontrick v. Ryan*, 540 U.S 443, 447 (2004). Section

2   727(b) itself provides extensive relief from prepetition obligations:

> Except as provided in section 523 of this title, a discharge under subsection (a) of this section *discharges the debtor from all debts that arose before the date of the order for relief under this chapter*, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

10   § 727(b)(emphasis added).

11       The Ninth Circuit has held that: "In keeping with the 'fresh start' purposes behind

12   the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly

13   against parties objecting to discharge." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281

14   (9th Cir. 1996). Those objecting to the entry of a debtor's discharge are tasked with meeting

15   the burden of proof and must show by a preponderance of the evidence that the debtor's

16   discharge should be denied. *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163,

17   172 (B.A.P. 9th Cir. 2007), *aff'd*, 578 F.3d 1167, 1168 (9th Cir. 2009).

18       B.   Centennial Bank's 727(a)(4)(A) Claim – Knowing and Fraudulent False Oath

19       Centennial Bank contends that the court should deny Kane a discharge because he

20   made a false oath regarding the nature of his debts in violation of § 727(a)(4)(A).[8]

21   Specifically, Centennial Bank claims Kane checked a box on his Voluntary Petition stating

22   that his debts were primarily business debts, question 16b. Centennial Bank contends Kane

23   did so to circumvent the means test in Section 707(b), which only applies to debtors with

24   primarily consumer debts. Case 21-50028 ECF 1.

25       Bankruptcy Code § 727(a)(4)(A) says the court should grant a debtor a discharge

26   unless he:

---

28   [8] Prior to trial Centennial Bank alleged several instances of Kane making false oaths but at trial conceded it was only pressing the claim associated with the bankruptcy petition.

ORDER FOLLOWING TRIAL

[K]nowingly and fraudulently, in or in connection with the case *made a false oath or account*; presented or used a false claim; gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]

(emphasis added). The point of this statute is to ensure that parties in interest are being given an accurate picture of the debtor's finances.

"To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: '(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.'" *In re Retz*, 606 F.3d 1189, 1196–97 (9th Cir. 2010). Centennial Bank did not argue all of the elements of its § 727(a)(4)(A) claim in its closing brief but in the interest of completeness, the court will examine them.

### 1. *Whether Kane Made a False Oath in Connection to the Bankruptcy Case*

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *Id.* at 1196.

Centennial Bank argues that Kane's response to question 16b was wrong. To justify this assertion, Centennial Bank classifies Kane's financial obligations as either "institutional loans" or "individual loans." Centennial Bank contends that these refinanced loans were paying off prior obligations that were consumer obligations. Centennial Bank says these obligations are not business debts, as Kane indicated on his Voluntary Petition, because Kane did not use the proceeds to "obtain money for business or investments, or through the operation of the business or investment."

The trouble with Centennial Bank's argument is the loan documents themselves. While the loans Centennial Bank gave Kane were not denominated as business loans, the funds were used to restructure and consolidate prior business loans. At least ten loans were categorized *by the lenders* as "Business loan agreements" or expressly state that they were made with a "business" or "commercial" purpose. By example, all the loan agreements

ORDER FOLLOWING TRIAL

between East West Bank and Kane were classified as "Business Loan Agreements" and included "Commercial Pledge Agreements." Ex. 38; Ex. 42; Ex. 58. Three other loans contained "Business Affidavits" showing that Kane was in the business of being a professional ice hockey player and the loan proceeds would be used for off season training expenses and other related business expenses. Ex. 46, p. 51; Ex. 48, p. 26; Ex. 50, p. 38.

Adding to the confusion, some of the loan documents included a "Disbursement Request and Authorization" form that indicated that the primary purpose of the loan was for "personal, family, or household purposes or personal investment." Ex. 38, p. 30; Ex. 42, p. 21; Ex. 58, p. 23. That's obviously inconsistent with the other forms providing otherwise. The point is this: even the documents Kane signed reflect a substantial confusion as to whether the loans were business, consumer, or neither.

Aside from the confusing loan documents, the court was not given substantial or detailed testimony about how the loan proceeds were used. It's pretty clear that many of the loans outstanding on the day of the petition were primarily refinancings of earlier loans. In other words, the new lender (e.g., Centennial Bank) was paying off the existing lender (e.g., Thrivest Specialty Funding). To the extent there was testimony about the specifics of how the money was spent, it came from Kane, the only witness on this point. He testified he used the proceeds for a variety of purposes including personal expenses, professional expenses, to pay off earlier loans, and to make real estate investments. He testified that he incurred expenses that are typical for hockey pros like expensive ice time fees, equipment, travel, accommodations, and coaching. T1, 98:12–19. The documents also show he used the proceeds to pay agent fees. Ex. 52, p. 53. He used the loan from Loan Shark Holdings, LLC to purchase an investment pertaining to the tax attributes of Ascher Capital II and III, LLC. Case No. 21-50028 ECF 152, p. 13:12–20. And in 2017, he used money from a "hard money lender" to make a down payment on real property held for investment in Canada, 3547 West 35th Avenue. T1, 180:1–24.

By the time Centennial Bank came on the scene, Kane's refinancings were not generating much free cash for him. Indeed, the record shows that Kane did not receive any

ORDER FOLLOWING TRIAL

loan proceeds from six of the last seven loans. All the proceeds went to paying off other lenders or to prepay interest on the loans themselves. T2, 122:8–10; T2, 123:21–23; T2, 125:8–10; T2, 127:18–20; T2, 129:1–2.

It is not hard to see that Kane's method of repeatedly borrowing millions of dollars from multiple sources did not fit well within a normal consumer borrower profile. Kane testified that his agent Sure Sports advised him to take out numerous loans to "get [him] out of these high interest [hard money] loans." T1, 152:8–9. Many of these loans included "Business Loan Agreements" or had a "business purpose," including interest at 12%. Ex 46; Ex. 50; Ex. 52. Some loans that were categorized as business loans had interest rates up to 18%. Ex. 60; Ex. 66. Later, Kane entered into loans with lower interest rates, including some at 6.25%–6.5%. Ex. 72; Ex. 80. Kane's decision to continuously refinance his loans is at least akin to a strategy that resulted in an economic gain for him because he ultimately secured loans with lower interest rates and longer repayment terms.

Centennial Bank did not meet its burden of proof to show that Kane falsely checked the wrong box stating that his debts were primarily business debts.

### 2. Whether the False Oath was Related to a Material Fact

"A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material." *In re Retz*, 606 F.3d at 1198 (internal quotations and citations omitted).

Centennial Bank has not shown that Kane in fact "checked the wrong box" for the reasons outlined above. Assuming for the sake of argument that he had done so, the court does not have grounds to conclude that Kane's action detrimentally affected the administration of the estate. First, Kane worked cooperatively with the chapter 7 trustee, Frode Hjelmeset, and attended repeated § 341(a) meetings of creditors at which he was examined under oath. T2, 32:2–33:10; T2, 34:10–; T2, 157:13–158:5. Mr. Hjelmeset testified that Kane provided a voluminous set of documents that showed his financial condition. He

ORDER FOLLOWING TRIAL

was examined by creditors at the meeting of creditors. Thus, Kane participated in an extensive and in-depth bankruptcy process. This is the same process that Kane would have gone through if he checked any other box in his Petition. Centennial Bank did not satisfy the element of materiality.

Second, Centennial Bank's contention that Kane checked the "business debts" box to avoid the application of the "means test" was not proven a trial. That test is found in § 707(b) and involves a complicated calculation. The means test is supposed to determine whether providing a discharge in chapter 7 to a debtor would constitute a "substantial abuse" of the bankruptcy system. Assuming that one qualifies from an income standpoint, which seems to be Centennial Bank's contention, the balance of the test requires a detailed analysis of a debtor's expense and debt profile. Of interest here, the test specifically permits a court to add payments due to secured creditors to the debtor's list of allowable expenses. *See* § 707(b)(2)(A)(iii)(II). That provision significantly expands the number of debtors who qualify for relief, even assuming their income is comparatively high.

In short, Centennial Bank did not address how the means test might actually apply to Kane's case. That is an important oversight because Centennial Bank, among other creditors, claimed its debt is secured.[9] It is speculation to say how that test might apply to Kane's unusual situation, and the court will not assume for the purposes of this decision that the argument is correct.

### 3. *Whether Kane Knowingly Made the Statement*

"A debtor acts knowingly if he or she acts deliberately and consciously." *In re Retz*, 606 F.3d at 1198.

Kane knowingly made this statement because he testified that he personally marked the box claiming that his debts were primarily business debts. Centennial Bank met this element.

---

[9] Case 21-50028, Claim 5-2, box 9 ("The claim is secured by a lien on property.") The court has noted even this assertion is questionable. Case No. 21-50028 ECF 101, p. 15 & n. 9.

ORDER FOLLOWING TRIAL

### 4. *Whether Kane Fraudulently Made the Statement*

To demonstrate fraudulent intent, Centennial Bank must show that Kane made the false oath with the "intention and purpose of deceiving the creditors." *Id.* at 1198–99. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." *Id.* at 1199 (citations omitted).

"Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *Id.* (citations omitted).

Centennial Bank argues that Kane fraudulently "checked the wrong box" describing the nature of his debts with the intent to avoid the means test. As mentioned above, Centennial Bank did not provide any direct evidence to support this proposition. At trial, Kane testified that he checked the box that stated his debts were primarily business debts under the advice of his counsel. It was Kane's understanding that the determination of his debts was "more of a legal question." T1, 149:17–21.

Centennial Bank argues that Kane cannot hide behind his counsel's advice, but the evidence shows that Kane checked the box in good faith. It was reasonable for Kane to think that his debts were primarily business debts because many of the loans included "Business Loan Agreements," "Commercial Pledge Agreements," and included business purposes related to Kane being a professional ice hockey player. The loans he received from institutional lenders with business purposes exceeded the debt Kane incurred from individual lenders that, Kane testified, were used for consumer purposes.

Centennial Bank argued that circumstantial evidence supported a conclusion that Kane acted with fraudulent intent. It asked Kane to examine under oath a long list of loans and repeatedly asked Kane what the proceeds were used for. Kane testified that he did use some loan proceeds for his living expenses, to pay bills, and gambling debt. However, Kane

ORDER FOLLOWING TRIAL

1  also stated that he used a portion of the loan proceeds to acquire investment properties and

2  provide for his off-season training and business expenses.

3  Kane showed that he did not have a reckless disregard for the truth. Centennial Bank

4  points to Kane's amended schedules and statement of financial affairs to show that Kane did

5  not provide complete information when he commenced the bankruptcy case. The court

6  concludes otherwise—that the amendments show that it was important to Kane to provide

7  as much accurate information as possible. For example, Kane testified credibly that during

8  the meeting with creditors he was asked if he had owned any jewelry prior to filing for

9  bankruptcy. He then remembered that he had used two Rolex watches to pay off a bookie

10  on a gambling debt. He filed an amended schedule documenting that transfer once he

11  remembered. T2, 166:1–10. This is the type of honest behavior the bankruptcy process

12  encourages.

13  In conclusion, Centennial Bank did not prove that Kane "checked the box" stating

14  his debts were primarily business debts with fraudulent intent. The court denies Centennial

15  Bank's request to deny Kane his discharge under § 727(a)(4)(A).

16      C.  <u>Centennial Bank's and Parker's 727(a)(5) Claim – Failed to Explain Satisfactorily</u>

17          <u>Any Loss of Identified Assets</u>

18        1.  *§727(a)(5)*

19  Section 727(a)(5) says the court should grant Defendant a discharge unless he "has

20  failed to explain satisfactorily, before determination of denial of discharge under this

21  paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" "Under

22  § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate: (1)

23  debtor at one time, not too remote from the bankruptcy petition date, owned identifiable

24  assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor

25  no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not

26  reflect an adequate explanation for the disposition of the assets." *In re Retz*, 606 F.3d at 1205

27  (citations omitted).

28

ORDER FOLLOWING TRIAL

15

"Once the creditor has made a prima facie case, the debtor must offer credible evidence regarding the disposition of the missing assets." *Id.* (citing *Denvers v. Bank of Sheridan, Montana (In re Denvers)*, 759 F.2d 751, 754 (B.A.P. 9th Cir. 1985). "Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory." *Bell v. Stuerke (In re Stuerke)*, 61 B.R. 623, 626 (B.A.P. 9th Cir. 1986) (citation omitted). "Whether a debtor has satisfactorily explained a loss of asset is a question of fact for the bankruptcy court . . . ." *In re Retz*, 606 F.3d at 1205 (citations omitted). "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under [§] 727(a)(5)." *Id.*

It is important to note that the law does not necessarily require a paper record to show where every cent was paid. The caselaw indicates instead that a debtor may *explain* the loss of assets, and that explanation itself may compensate for the absence of a complete paper trail.

### 2. *Parties' Contentions*

Centennial Bank and Parker argue that the court should deny Kane's discharge because he failed to explain the loss of substantial assets. Centennial Bank claims that Kane lost about $30,000,000 in the five to six years leading to Kane's bankruptcy filing. Centennial Bank identifies the following amounts as lost assets: $19,000,000 in gross wages from 2018 to 2020; $11,000,000 in net loan proceeds from what it terms institutional lenders; $2,150,000 in loans from individual lenders; and two Rolex watches worth approximately $75,000.

Parker claims that Kane is unable to satisfactorily explain the loss of $519,830.37 from twelve transactions in 2020.

Kane contests this characterization. He says Centennial Bank and Parker are asserting that he should have to account for his gross salary and loan proceeds. He claims that is improper because he never had possession of his full salary and did not receive all loan funds personally.

ORDER FOLLOWING TRIAL

16

3. *Given the Amount Kane Earned as a Professional Hockey Player, it Appears Assets are Missing*

Plaintiffs' argument at bottom is that Kane earned millions of dollars as a hockey player and has little to show for it, meaning assets are missing. It is true that in *Retz*, "large amounts of money were transferred into and out of Retz's personal bank accounts and he very rarely had any explanations for where the money went. There is also evidence in the record that Retz went on a spending spree just before filing for bankruptcy to benefit both himself and [his company], purchasing computers, office furniture, servers, luxury cars, a helicopter and hangar, and making gambling trips where he lost thousands of dollars." 606 F.3d at 1200. And this was enough for the court to conclude assets were missing.

Excepting the Rolex watches, Centennial Bank and Parker do not so much identify missing assets as they do missing income or loan funds. This would appear to minimally satisfy their burden of proving a prima facie case for relief under § 727(a)(5). The burden shifts to Kane to provide a satisfactory explanation for the loss.

4. *Kane has a Satisfactory Explanation for the Missing Assets*

a. *What is a Satisfactory Explanation?*

The caselaw under § 727(a)(5) does not provide a precise answer to how the court should determine whether an explanation is satisfactory. It seems clear that vague and indefinite statements, that are otherwise unsupported, and particularly about living expenses, do not satisfy the standard. A good example is found in *In re Racer*, 580 B.R. 45, 55 (Bankr. E.D.N.Y 2018). In that case, the court found that the debtor failed to back up his testimony about using loan proceeds to pay his living expenses and medical bills with records of those expenses. In *In re Ferguson*, the court denied a debtor's discharge because it found that debtor failed to explain gambling losses of $71,159.22 despite having provided records of ATM withdrawals at casinos. No. 20AP00426, 2021 WL 5029387 (Bankr. N.D. Ill. Oct. 29, 2021). The court also recognized that "gambling typically leaves little in the way of documentary evidence" but expected debtor to produce additional documentation that corroborated his gambling to enhance his credibility. *Id.* at *4–5.

ORDER FOLLOWING TRIAL

What is a satisfactory explanation under § 727(a)(5) if it is not based entirely on a documentary record? The court concludes that an explanation can be satisfactory if it is composed of detailed testimony that is credible and can be corroborated by documentation.

The story Evander Kane told about his financial predicament may not have pleased his creditors. But Kane's testimony was thoughtful, coherent, and consistent with the extensive evidentiary record in this case.

The court has little difficulty distinguishing Kane's circumstances and his explanation from the cases cited by Centennial Bank and Parker. Unlike the debtor in *Racer*, Kane's version of why he had so few assets and how he came to seek bankruptcy protection was borne out by the records he produced, including copies of bank statements for multiple checking accounts, credit card statements, and the loan documentation including promissory notes, security instruments, and payment schedules. The documentation supported Kane's testimony that he spent his salary and net loan proceeds to pay bills, living and business expenses, loans, and gambling debt.

The *Ferguson* case is facially similar to Kane's because the debtor's problems seemed to stem from gambling. But the case is easily distinguishable. The court in *Ferguson* did not find the debtor credible and said his testimony "was insufficient in quality, perceived veracity, specificity, and narrative." 2021 WL 5029387, at *4–5. Here, by contrast, the court finds Kane provided consistent and appropriately detailed explanations of his income, his use of loan funds, and his spending patterns.

Kane's explanation of his financial situation was amply corroborated by years and years of loan and disbursement records. It was not a perfect explanation, but it was satisfactory and that is all the law requires.

The court will examine the principal points of contention.

> b. *$19,000,000 in Gross Wages*

Centennial Bank claims that Kane failed to satisfactorily explain the loss of $19,000,000 in gross wages from 2018 to 2020. Kane correctly notes that this calculation

ORDER FOLLOWING TRIAL

18

fails to account for standard tax deductions, NHL escrow withholdings, and agent fees, which he estimated at 45%. So, the Plaintiffs' income figure is grossly overstated.

The evidence at trial showed that Kane's earnings varied from $5,250,000 to $8,000,000 a year. T1, 157:17–23. After taxes, Kane's net income was between $2 million to $3.75 million. T1, 158:4–9. The NHL reduced that sum by an escrow withholding. T2, 135:7–136:16. According to Kane, the average league escrow was 18%, but it went up to 20% during Covid-19 because so many games were cancelled, and owners were losing significant amounts of money during those seasons. T2, 135:9–136:12. A decrease in the number of games he played also impacted his income negatively. He also paid his agent a 3% fee per paycheck. T2, 136:13–137:17.

Kane was not completely in control of these funds. He testified that his monthly paycheck after tax deductions, NHL escrow, and agent fees was deposited into a Deposit Account under his name at Zions Bank for some time prior to his bankruptcy filing. T2, 151:1–152:16. He said this arrangement was a condition of one of the loans Kane took out. T2, 151:16; Ex. 70, p. 3. Zions Bank had the authority to:

> [D]ebit any and all sums due and payable under the Note (including without limitation those amounts set forth on the Payment Schedule attached to the Note) or otherwise in connection with the loan evidenced by the Note, including without limitation principal, accrued and unpaid interest, fees, charges, expenses and costs (including without limitation attorneys' fees).

Ex. 70, p. 3. So it seems that Zions Bank acted as a sort of clearing house for the other lenders, Centennial Bank and Professional Bank.

Zions Bank would disperse loan payments from Kane's paycheck to itself, Centennial Bank, and Professional Bank. Kane testified that he had limited information on the distribution of his monthly paycheck because he did not have control of the Deposit Account and did not see the transactions conducted by Zions Bank, Centennial Bank, or Professional Bank with his paycheck. T2, 151:1–152:2. He entered into this arrangement on

ORDER FOLLOWING TRIAL

19

August 9, 2018 and ceased it later because he saw his "paychecks evaporating." T2, 152:8–16. The court has no contrary evidence on these points.

I find Kane's explanation about the disposition of the $19,000,000 in gross wages satisfactory. First, that figure represents Kane's gross income, not his net income, which was substantially lower. Plaintiffs' argument also fails to consider the arrangement that called for Zions Bank to take and distribute Kane's salary to other lenders before turning a balance over to Kane. *See* Ex. 70. In other words, the banks were paying themselves from Kane's salary before disbursing the rest to him. Finally, Kane testified that the money he got *after* the bank's distribution scheme was complete was too small to cover his living expenses.

> ### c. *$11,000,000 in Net Loan Proceeds from "Institutional Lenders"*

Centennial Bank claims that Kane unsatisfactorily explained the loss of $11,000,000 in net loan proceeds from a group of banks it calls the institutional lenders.[10] Kane counters, indicating that he received only $6,964,707.14 from 2014 to 2019 from these loans, principally due to miscellaneous charges[11] and expenses.

---

[10] The term "institutional lender" is used by Centennial Bank, in apparent contrast with "individual lenders." The court does not subscribe to these terms. It uses them only because that is Centennial Bank's nomenclature in its motion. But it is worth noting that the range of Kane's creditors was extremely broad, including such entities as Thrivest Specialty Funding, LLC, Tenacity 7401 New Hampshire Avenue, Capital Financial Partners, LLC, DeAngelo Vehicle Sales, LLC, Democracy Capital Corporation, Now Playing, LLC, SLC-D LLC, and Seven Isles Capital, LLC. Admittedly, he also borrowed from individuals, and these would appear easier to identify.

[11] Kane was charged a total of $1,174,517.54 in underwriting fees from 2014 to 2019. *See* Ex. 35, p. 23 ($24,000 underwriting fee); Ex. 37, p. 1 ($40,000 underwriting fee); Ex. 38, p. 34 ($17,500 underwriting fee); Ex. 40, p. 25 ($25,000 underwriting fee); Ex. 42, p. 1 ($3,000 underwriting fee); Ex. 44, p. 2 ($132,000 underwriting fee); Ex. 46, p. 1 ($4,000 underwriting fee); Ex. 48, p. 1 ($8,000 underwriting fee); Ex. 50, p. 22 ($41,500 partial underwriting fee); Ex. 52, p. 3 ($23,200 underwriting fee); Ex. 54, p. 2 ($79,000 underwriting fee); Ex. 56, p. 2 ($49,000 underwriting fee); Ex. 58, p. 26 ($80,000 underwriting fee); Ex. 60, p. 30 ($115,375 underwriting fee); Ex. 62, p. 1 ($97,500 underwriting fee); Ex. 64, p. 2 ($74,000 underwriting fee); Ex. 66, p. 31 ($50,000 underwriting fee); Ex. 68, p. 29 ($74,000 Sure Sports Lending fee); Ex. 70, p. 24 ($63,750 underwriting fee); Ex. 72, p. 1 ($58,500 partial underwriting fee); Ex. 74, p. 1 ($30,000 partial underwriting fee); Ex. 77, p. 2 ($13,162.50 underwriting fee); Ex. 78, p. 1 ($23,280.04 underwriting fee); Ex. 80, p. 1 ($48,750 underwriting fee).

ORDER FOLLOWING TRIAL

Kane provided evidence, both documentary and testimonial, showing the money he received and how it was spent. Kane's post-trial brief included a summary of the loans (corroborated by evidence admitted at trial) that documented the amount of each loan, the purpose of the loan, and the net proceeds Kane received. Among other things, Kane correctly notes that Centennial Bank failed to mention Kane spent substantial funds servicing the loans he took.

It should be noted that Kane personally received most of the loan funds that Centennial Bank is referencing—all but about $600,000—before 2018, when Centennial Bank made its first loan to him. Centennial Bank would have been aware of this situation when it lent him money.

Kane used most of this money to pay bills, living and business expenses, and gambling debts. Kane testified that his monthly expenses at the time he filed the bankruptcy petition were about $93,214, which is approximately $1,116,000 a year. T1, 157:6–11. Centennial Bank did not challenge this number. Although his monthly expenses were not always this high, a large portion of the net loan proceeds would have gone to supporting his expenses. As he stated, his "paychecks [were] evaporating." Kane's credit card statements verify that Kane's monthly expenses were high. On July 3, 2020, for example, Kane paid $81,525.64 of his balance on his RBC credit card #4741. Ex. 31, p. 1. In November 2020, Kane made multiple payments to his AMEX credit card #64004 totaling $63,979.22. Ex. 32, p. 37. On December 17, 2020, Kane paid $76,591.75 to pay down the balance in his RBC credit card #4741. Ex. 31, p. 6.

Even using the lowest amount for monthly expenses, $63,979.22, when multiplied by twelve months shows that Kane's average yearly expenses could equal approximately $767,750.63. That amount multiplied by six years, to account for net loan proceeds received between 2014 to 2019, equals $4,606,503.78; an amount which accounts for more than 50% of the net loan proceeds Kane received. Kane consistently stated that he was "behind the eight-ball" financially and needed extra money to pay his bills, living expenses, and debts. Kane also testified that he incurred expensive business expenses as a professional ice hockey

ORDER FOLLOWING TRIAL

player, such as training, expensive ice time fees, equipment, travel, accommodations, video coaches, and other different coaches. T1, 98:12–19. The court can infer from the credit card statements, bank statements, loan documents, along with Kane's testimony that he incurred high monthly living and business expenses and used net loan proceeds to cover them because his salary was not enough to cover those expenses.

Kane provided other explanations for how he used net loan proceeds throughout the years. On December 23, 2016, Kane entered into a loan and security agreement with DeAngelo Vehicle Sales, LLC in the amount of $580,000. T1, 82:22–83:7; Ex. 52. Kane received $505,912.63 in net loan proceeds from this loan. T1, 83:11–15. The money was distributed to his RBC Canada account #0532. T1, 83:17–23. Kane explained that he used the majority of the $505,912.63 net loan proceeds to pay a substantial portion of the $850,000 (Canadian dollars) down payment on the 3457 West 35th Avenue property in Canada. T1, 84:7–24. Kane did not have records to support the use of these net loan proceeds, but he explained that the money was transferred to the RBC Canada account #0532 because that was his Canadian RBC U.S. dollar account. T1, 85:2–8. He testified without contradiction that the money would have been sent to that account and then moved to the trustee for the house to pay the down payment. *Id.*

Kane also used net loan proceeds to pay off debts he had with bookies and casinos for gambling losses. T2, 77:14–19. He provided extensive and detailed explanations of how he placed sporting bets via bookies on different online platforms. T2, 70:3–79:25. Kane testified that one of the bookies he owed money to was named Vinny, although he was not sure if that was his real name. T1, 86: 11–15. The loan Kane took out on March 2, 2017 from Thrivest Specialty Funding, LLC, identifies Kane's debt to Vinny of $140,000. Ex. 54, p. 19. Many of the other loan disbursement forms listed casinos as entities that would receive loan proceeds. These included a wire to Seneca Gambling Corporation for $100,000, Ex. 54, p. 20, and a payment to Cosmopolitan casino for $500,000, Ex. 64, p. 22. Kane also provided copies of a complaint from the District Attorney of Clark County seeking $500,000 owed to Cosmopolitan on November 19, 2019. Ex. MMM.

ORDER FOLLOWING TRIAL

Case: 21-05016   Doc# 61   Filed: 05/18/23   Entered: 05/18/23 16:32:53   Page 22 of 38

I find Kane's explanation of the disposition of $6,964,707.14 in net loan proceeds satisfactory and corroborated by sufficient documentation.

### d. $2,150,000 in Net Loan Proceeds from Individual Lenders

Centennial Bank claims that Kane unsatisfactorily explained the loss of $2,150,000 unsecured loans from certain individuals, including (1) $150,000 from Davis Sanchez; (2) $430,000 from Hebron Shyng; (3) $750,000 from Mike Lipsti; (4) $400,000 from Pete Gianakas, (5) $100,000 from Raj Banghu; and (6) $320,000 from Tony Veltri. Kane explains that these loans were used to pay off bills that were due, to make credit card payments, and to pay off other people that Kane was indebted to. T1, 48–53.

Although he did not have records for every transaction, Kane provided a satisfactory explanation for the disposition of these funds because his testimony was neither vague nor indefinite. Kane borrowed money from Davis Sanchez on multiple occasions. Kane explained that he deposited the money he borrowed into his account and used it to pay bills. T1, 49:3–11. Bank statements admitted at trial show that Kane was paying debts back to or on account of Davis Sanchez. Ex. 24, pp. 4, 8; T2, 59:17–60:7; Ex. 68, p. 29.

Hebron Shyng is a longtime family friend. He lent money to Kane to purchase the 3457 West 35th Avenue property. T2, 85:25–86:17. Shyng, Kane, and Kane's parents signed a one-page document documenting the loan. T2, 86:18–23.

Kane testified that Mike Lipsti and Pete Gianakas lent him money to pay off bookies. T2, 86:24–88:2. Kane described Lipsti and Gianakas as middlemen who were responsible for paying off bookies. Kane reimbursed Lipsti and Gianakas using cash, wire transfers, cashier's check, bank drafts, or jewelry. T2, 74:25–75:4. When Kane won, they paid Kane in cash. T2, 74:23–24. Nine times out of ten, Kane would deposit his winnings into his bank account. T2, 75:11–15. The specific details Kane provided make up for the lack of documentation of these loans.

Kane explained that he borrowed funds from two friends to pay bills. Raj Banghu had been Kane's friend for five to six years. T2, 85:17–24. Tony Veltri had been a friend for

ORDER FOLLOWING TRIAL

23

thirteen to fourteen years. T2, 85:1–7. Kane explained that he used personal loans from Banghu and Veltri to stay current on his bills. T1, 52:9–14; T1, 52:23–53:9.

In *In re Fader*, Judge Montali stated that "[w]ithout adequate records, the debtor must provide adequate explanations." 414 B.R. 640, 645 (Bankr. N.D. Cal. 2009)(citation omitted). Documentation that shows how Kane used the net loan proceeds from individual lenders is sparse, but Kane's detailed explanations, and admission that many of his obligations arose out of his spending habits and gambling, are satisfactory. The court finds Kane's explanation for the disposition of $2,150,000 in net loan proceeds from individual lenders to be satisfactory.

### e. *Rolex Watches*

Centennial Bank claims that Kane failed to satisfactorily explain the transfer of two Rolex watches because he did not recall the name of the bookie he gave them to. Kane, however, did remember that he transferred the two Rolex watches worth about $75,000 on account of a gambling debt. T2, 165:23–166:10. His amended schedule, filed on February 17, 2021 shows that he transferred these watches on November 16, 2020. Ex. 5, p. 7. These facts are consistent with Kane's previous testimony about paying bookies with jewelry. T2, 74:25–75:4. The court finds Kane's explanation of the transfer of two Rolex watches satisfactory.

### f. *$519,830.37 from Twelve Transactions in 2020*

In her closing brief, Parker lists twelve transactions in 2020 that total $519,830.37 and claims that the court should deny Kane's discharge based on an unsatisfactory explanation of what happened to these assets. Parker cites *Retz*, for the proposition that the bankruptcy court denied a debtor's discharge for failing to satisfactorily explain what happened to $80,000. Parker claims that if being unable to explain what happened to $80,000 is sufficient to deny a discharge, surely Kane not being able to explain where $519,830.37 went warrants denial of discharge as well.

What Parker omits to mention is that in *Retz*, the court found debtor had the requisite fraudulent intent to deceive creditors because debtor knew his bankruptcy

ORDER FOLLOWING TRIAL

schedules and statement of financial affairs were incomplete when he signed and filed them. 606 F.3d at 1199. Despite three years passing, between the time he filed the bankruptcy petition and trial, debtor failed to amend those important documents. *Id.* at 1197. It is little wonder that a court would deny a discharge to a debtor who failed both to file accurate bankruptcy documents and explain where his assets could be found.

Kane's case is different. To begin, the court does not find Kane's bankruptcy schedules were inaccurate. Rather, Kane amended his schedules and statement of financial affairs several times in an effort to present the court, the Trustee, and his creditors with an accurate picture of his finances. The Trustee was satisfied that Kane was forthcoming in his responses to the Trustee's requests. T2, 46:16–20.

Kane provided explanations for many of the transactions Parker refers to. Kane stated that the following amounts likely were used to pay off his credit cards: (1) $98,000 (three withdrawals combined) online banking transfer on January 17, 2020; (2) $65,258.22 online banking transfer on April 27, 2020; (3) $19,377.71 transfer on November 10, 2020. T1, 119:14–120:2; T1, 124:9–124:21; T1, 139:23–140:9. These amounts are credible because they resemble the amounts that are reflected in Kane's other credit card statements.

Kane also explained that the $57,216.73 transaction on August 20, 2020 was used to pay the Chicago Title Company for property he bought in San Jose that same day. T1, 107:14–108:5. After reviewing Kane's RBC account #5955 and RBC U.S. account #0532, it is clear that Kane transferred $57,216.73 Canadian dollars from RBC account #5955 to his RBC U.S. account #0532. Ex. 24, p. 22. On that same day, the August 2020 bank statement for RBC U.S. account #0532 shows a credit memo for $43,056.68. Ex. 22, p. 13. Kane transferred that exact amount to the Chicago Title Company that same day. Ex. 22, p. 13. The court can infer that the difference between the amounts, $57,216.73 in the RBC account #5955 and $43,056.68 in the RBC U.S. account #0532, is due to the exchange rate between Canadian dollars to U.S. dollars.

On September 9, 2020, Kane withdrew $100,000 in cash from his RBC account #5955. Ex. 24, p. 23. Kane explained that he thinks a portion of that money could have been

ORDER FOLLOWING TRIAL

used to pay gambling debt. T1, 132:22–133:3. This aligns with Kane's previous testimony that he paid bookies in cash and the amount resembles similar gambling losses Kane testified about.

During trial, Kane admitted that he could not recall certain transactions, including (1) $25,000 online banking transfer on April 17, 2020 (Ex. 24, p. 10); (2) $10,000 transfer on April 25, 2020 (Ex. 30, p.5); (3) $20,000 (combined) transfer on April 27, 2020 (Ex. 30, p. 5); (4) $45,000 cash withdrawal on May 14, 2020 (Ex. 24, p. 14); (5) $30,000 withdrawal on July 10, 2020 (Ex. 24., p. 19); (6) $10,000 "Debit memo Cash Other" withdrawal on October 5, 2020 (Ex. 30, p. 17); and (7) $38,977.71 "Debit memo" withdrawal on October 14, 2020 (Ex. 22, p. 16). He told Centennial Bank's counsel that he would need to review the bank statements with additional documents to be able to explain the transactions.

After reviewing and cross-referencing all the admitted exhibits, as Kane suggested that Centennial Bank might do, explanations surfaced. On October 5, 2020, the October bank statement for Kane's Scotiabank account #87 shows a "debit memo cash other" withdrawal for $10,000. On that same day, Kane made a deposit of $9,500 to his RBC Canadian account #5955. On October 14, 2020, Kane withdrew $38,977.71 from his RBC U.S. account #0532. Ex. 22, p. 16. The reference note on the bank statement says: "Debit memo." Ex. 22, p. 16. Kane's RBC Canadian account #5595 has an entry on October 14, 2020 for $51,000 Canadian dollars with a reference note that says: "Credit memo." The court can infer that difference in amounts is because of the exchange rate.

It is also important to note that all these transactions occurred in 2020. Kane testified that he lost a significant portion of his salary during the pandemic because NHL escrow increased to 20 percent, meaning about 55% of his salary was withheld. T2, 136:6–137:7. Kane also explained that his wife gave birth in 2020, that he purchased a home for his family in San Jose, and that he needed money to pay for childcare and other expenses. T2, 138:23–139:15. The court finds Kane's explanation of the disposition of $519,830.37 in 2020 to be satisfactory.

ORDER FOLLOWING TRIAL

Although Centennial Bank and Parker met their prima facie case, Kane explained satisfactorily the disposition of assets. The court denies Centennial Bank and Parker's request to deny Kane his discharge under § 727(a)(5).

D. Centennial Bank's § 727(a)(3) Claim – Failed to Keep or Preserve Any Recorded Information

Section 727(a)(3) says that Kane should get a discharge unless he "has concealed, destroyed, mutilated, falsified, or failed to or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" Section 727(a)(3) is strictly construed to serve the Bankruptcy Code's purpose of giving debtors a fresh start. *In re Caneva*, 550 F. 3d 755, 761 (quoting *Matter of Kasler*, 611 F.2d 308, 310 (9th Cir. 1979)).

To succeed on a § 727(a)(3) claim, Plaintiff must show: "(1) that [Defendant] failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain [Defendant's] financial condition and material business transactions." *Id.* (internal quotation marks omitted) (quoting *Cox II*, 41 F.3d at 1296). Once the prima facie case is established, the burden of proof shifts to the debtor "to justify the inadequacy or nonexistence of the records." *Id.* (citation omitted).

1. *Reasonable Look-back Period*

The first order of business is to determine what the appropriate "look-back" period should be for this case. Centennial Bank requested many years of records, and it argues that this court should not restrict itself to a fixed two-year look-back period because of "the substantial volume of money that is unaccounted for." Kane argues that Centennial Bank's request for twelve to seven years of documents is excessive.

Turning to the law, the Bankruptcy Appellate Panel provides some assistance. It said, "Debtors are required to keep records for a 'reasonable' period of time for § 727(a)(3) purposes, and a court's determination of 'reasonableness' depends on the particular facts and circumstances of each case." *Sfadia v. Dongkuk, et al (In re Sfadia)*, No. ADV. 03-01404-GM,

ORDER FOLLOWING TRIAL

1   2007 WL 7540987, at * 11 (B.A.P. 9th Cir. Sept. 5, 2007). The decision is not published. But

2   relying on the facts of the case makes sense and avoids setting up a standard that is

3   impossible for debtors to meet and may be irrelevant to their current financial picture.

4        Based on the record, a shorter look-back period is appropriate. Centennial Bank is

5   the only creditor pressing a § 727(a)(3) claim. It lent money to Kane commencing no earlier

6   than September 5, 2018. It would have been appropriate and entirely conventional for

7   Centennial Bank to underwrite its loan of $3.9 million to Kane before lending him the

8   money. Banks usually review a financial statement, bank records, and other data to

9   determine whether the loan meets their prudential lending standards. The court draws the

10  reasonable inference that a bank that lends $3.9 million to a borrower is satisfied with his

11  financial picture, particularly when the lender later increases the loan by $2.0 million,

12  $715,000, and $2.46 million.[12] The last loan Kane took from Centennial Bank was on April

13  30, 2019. Ex. 82. Beginning the analysis with the period *after* Kane obtained the Centennial

14  Bank loan is proper under the circumstances.[13]

15        2. *Debtor Failed to Maintain Adequate Records*

16        "[T]he purpose of § 727(a)(3) is to make discharge dependent on the debtor's true

17  presentation of his financial affairs." *In re Caneva*, 550 F. 3d at 761(citation omitted). "The

18  statute does not require absolute completeness in making or keeping records." *Id.* (citing

19  *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971)). For records to be adequate, "the debtor

20  must present sufficient written evidence which will enable his creditors reasonably to

21

22

23        [12] Centennial Bank included a § 523(a)(2) claim in its original complaint, Case No. 21-
24  5016 ECF 1 (Count I), but the court dismissed that claim as untimely on Kane's motion and
    with Centennial Bank's agreement. Case No. 21-5016 ECF 19, p. 6:3–6.

25        [13] It is important to observe that starting the period subject to examination running
26  before Centennial Bank lent Kane the money would create incorrect incentives. Were it
    otherwise, a lender could lend money to a debtor who was not creditworthy and maintained
    poor records. If a bankruptcy case ensued, the lender could resort to an action under
27  § 727(a)(3) to deny that debtor a discharge based on that same poor recordkeeping. But
28  § 727(a)(3)'s rule that debtors should keep records was not meant to substitute for good
    underwriting practices by lenders.

ORDER FOLLOWING TRIAL

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1   ascertain his present financial condition and to follow his business transactions for a

2   reasonable period in the past." *Id.*

3          Centennial Bank argues that Kane failed to satisfy his affirmative duty to "keep" or

4   "maintain" adequate bank records, credit card records, records of cash transactions, records

5   of gambling wins and losses, and accountings because it was impossible to ascertain his

6   financial condition. Centennial Bank, however, does not provide legal authority explaining

7   what "keep" or "maintain" means in a time when documents are readily available via online

8   platforms or smartphones. Centennial Bank simply concludes that Kane did not meet his

9   duty to "keep" or "maintain" because he did not produce several documents without

10  considering that Kane provided a significant number of other documents and hired agents to

11  manage his finances.

12         Centennial Bank makes the blanket assertion that Kane provided virtually no

13  documents. The record, however, shows that Kane provided bank and credit card

14  statements for nine different accounts, his NHL Standard Player's Contract (Case No. 21-

15  50028 ECF 33-1), and copies of all the institutional loan documents between 2014 to 2019

16  that included references to his gambling debts. Despite the voluminous amount of records

17  Kane provided, the court concedes the records are not adequate.

18         Centennial Bank demonstrated gaps in Kane's recordkeeping within the look-back

19  period. Kane's bank and credit card statements were spotty and incomplete. For example,

20  Kane was missing bank statements from his RBC Canadian dollar checking account #5955

21  and RBC U.S. dollar checking account #0532 from January 2019 to August 2019. He was

22  also missing bank statements from his Scotiabank savings account #6287 for July 2019 and

23  February 2020. Kane also did not produce copies of his Wells Fargo American Express

24  credit card account #64004 from January 2019 to August 2020. Kane did not provide any

25  credit card statements for the year 2019 for his Wells Fargo account #2528. And he did not

26  produce credit card statements for his RBC account #4741 for the following months:

27  January 2019 to May 2020, and July 2020.

28

ORDER FOLLOWING TRIAL

Although a copy of Kane's NHL Standard Player's Contract is available, Kane failed to provide copies of deposit accounts at East West Bank and Zions Bank where he received direct deposits for his monthly salary. Kane testified, without contradiction, that he never had access to the deposit accounts. T2, 109:16–110:8 (East West Bank); T2, 151:1–24 (Zions Bank), Ex. 70 (direct deposit form Zions Bank).

Centennial Bank also showed that Kane had no written records for six out of the seven loans he took from friends, which totaled $2,150,000. Kane only had documentation for a loan he received from Hebron Shyng, a family friend, which was used to purchase the 3547 West 35th Avenue property. T2, 85:25–86:23.

Centennial Bank also showed that Kane did not provide complete records for the $1,500,000 in gambling losses that he disclosed in his statement of financial affairs. Kane testified that he did not keep a personal tally of his gambling winnings or losses. T1, 28:1–4.

Centennial Bank satisfied the first element of § 727(a)(3) by showing that Kane did not maintain adequate financial records.

### 3. Kane's Failure to Maintain Adequate Records does not make it Impossible to Ascertain his Financial Condition

The second element of the § 727(a)(3) analysis requires Centennial Bank to prove that Kane's recordkeeping failures render it impossible to ascertain his financial condition. Centennial Bank has not shown this.

The record shows that despite his high earnings over many years, Kane had limited assets when he filed a bankruptcy petition. He owned three real properties, but each was encumbered by loans. He had a small amount of cash. He had little else of value. There is no claim here that Kane was secreting assets which might violate § 727(a)(2) or (4).[14]

So, the issue becomes: what has happened to Kane's earnings as a professional ice hockey player? The extensive documentary record and Kane's testimony in this case answers this question.

---

[14] The § 727(a)(4) claim here alleges a mischaracterization of debts, not missing assets.

ORDER FOLLOWING TRIAL

The evidence indisputably showed that Kane regularly borrowed staggering sums of money from a range of lenders. He used the proceeds to pay existing lenders, to cover his living expenses, and to invest in real property. He refinanced his loans almost endlessly. Sometimes, he obtained credit extensions from existing lenders—including Centennial Bank, whose loan increased from $3.9 to over $8 million over the short period of eight months. The evidence showed that near the end of this merry-go-round of borrowing, Kane was receiving little actual cash from the lenders, which he used, to pay his credit cards and living expenses. In fact, near the end, Kane stated he lost control over his paychecks. He testified without contradiction that his paychecks were deposited directly to Zions Bank and it controlled payment to both Centennial Bank and Professional Bank, giving him only what was left. *See* Ex. 70, p. 49.

Kane also had a significant gambling problem, perhaps best exemplified by his multiple lines of credit (markers) with casinos, numerous large payments to casinos from his borrowing, and his payment of at least $500,000 to the Clark County, Nevada, District Attorney for an unpaid debt at a casino. He testified to an extensive history of betting using bookies, and the record shows he paid those bookies with loan proceeds and Rolex watches.

The evidence also showed that Kane spent huge sums every month on his credit cards. Again, many of the loan documents in the record reflect payments by the lenders to Kane that he testified he used to pay down credit card balances.

Kane's recordkeeping practices were spotty at best. But his failure to "keep and maintain" the records Centennial Bank sought does not prevent the court from carefully assessing his very poor financial condition.

### 4. *Kane was Justified in Not Keeping and Maintaining Records*

Even if the court could not assess Kane's financial condition, the Ninth Circuit has held that the courts must evaluate the debtor's production of records with a view to the debtor's circumstances which may explain and justify the situation. *Cox II*, 41 F.3d at 1298–99.

ORDER FOLLOWING TRIAL

The courts can consider factors such as the debtor's (1) intelligence and educational background; (2) the debtor's experience in business matters; (3) involvement in the businesses for which discharge is sought; (4) reliance on other individuals to keep records, including what debtor saw or was told indicating that records were being kept; (5) the nature of the debtor's relationship with the other individuals; and (6) any recordkeeping or inquiry duties imposed on the debtor by state law. *Id.* at 1297–98. The Ninth Circuit has held that the "'[j]ustification for [a] bankrupt's failure to keep or preserve books or records will depend on . . . whether others in like circumstances would ordinarily keep them.'" *In re Caneva*, 550 F.3d at 763. "[T]he justification must indicate that because of unusual circumstances, the debtor was absolved from the duty to maintain records . . . ." *Cox II*, 41 F.3d at 1297. The evidence shows that Kane's circumstances justify his failure to maintain adequate records for four reasons.

### a. Kane was Not Financially Sophisticated

Centennial Bank argued that Kane is a sophisticated financial debtor, reasoning that he "is a highly compensated salaried employee who entered into twenty-six different lending agreements between 2014 to 2019." Case No. 21-5016 ECF 58, p. 14:14–16. But being highly paid and overextended does not compel a conclusion of sophistication. In fact, the court cannot conclude on this record that Kane was sophisticated in financial matters.

Kane's upbringing was modest. He left home in Canada to play professional ice hockey in the United States at only 18 years of age. He has no advanced schoolwork or financial training. Kane also testified that the NHL does not provide any financial literacy education for players. T1, 173:3–5. The evidence shows Kane was not sophisticated in finance matters.

### b. Kane Hired Professionals for Financial Advice

Kane's job was to play professional ice hockey. Kane hired agents, business advisors, and a certified public accountant to take care of his financial matters. Indeed, Kane employed his first agent at the age of 15, before he signed his first professional contract. T1, 174:5. Kane testified that he relied on these agents, business advisors, and a certified public

ORDER FOLLOWING TRIAL

1  accountant, Chiricosta, to manage his finances. Given the sums Kane was paying for that

2  guidance, it is hardly surprising that Kane did not keep better records: he paid other people

3  to do that.

4      The bankruptcy court recognized a similar justification in *In re Brenes*, 261 B.R. 322

5  (Bankr. D. Conn. 2001). The debtor in *Brenes* was a physician that owned a complex medical

6  practice and associated businesses but failed to maintain adequate financial records.

7  Although his financial condition could not be ascertained, the bankruptcy court did not deny

8  his discharge because it found that, while he was focused on the medical side of his practice,

9  debtor "delegated and reasonably relied upon and expected others—business managers,

10  accountants and attorneys—to manage the business and financial affairs of his medical

11  practice and related business enterprises." *Id.* at 333.

12      *c.  Kane's Finances were Unduly Complex*

13      Kane's effort to stay afloat financially was almost mind-numbingly complicated. He

14  relied on multiples streams of funding to cover his expensive lifestyle and gambling

15  addiction; including his salary, loans from "hard-money" lenders, and cash he received from

16  individual lenders and gambling winnings. On top of that, Kane managed most of his

17  finances either by delegating the responsibilities to his agents or by accessing his accounts via

18  his smartphone in a paperless manner.

19      Centennial Bank cited numerous categories of documents that Kane failed to

20  produce, including bank statements for several accounts. Kane testified that he did not

21  receive physical statements in the last six years for any of his bank accounts because he

22  "would just go on [his] phone" to check his account activity and balance. T2, 89:17–91:2. No

23  evidence demonstrated that practice was unwarranted or inappropriate. And Kane was able

24  to access his existing bank accounts to download statements for a period before he filed his

25  bankruptcy case. Kane corroborated this practice by describing, in detail, how he manually

26  downloaded each bank statement from his smartphone to the "Notes" storage section of his

27  phone and then sent an email from his "Notes" section to his counsel. T2, 91:3–21.  He

28

ORDER FOLLOWING TRIAL

downloaded each monthly bank statement for each separate account because he never received physical copies of his monthly bank statements. *Id.*

Kane also explained that he did not have access to copies of bank statements predating 2019 because he closed certain accounts. For example, he closed his RBC U.S.A. account #0046 three to four years before filing bankruptcy. T2, 89:4–16. He also did not have access to bank statements from one of his Wells Fargo accounts and his Bank of America account once the accounts were closed. T2, 99:15–100:19.

Kane's only record pertaining to his compensation was a copy of his NHL Standard Player's Contract. Kane testified that he did not have records of his salary deposits because his paychecks were deposited directly into an account at Zions Bank and his wages were distributed between Zions Bank, Centennial Bank, and Professional Bank to pay off Kane's existing debt and "hard money loans." T1, 154:4–12. Kane also provided copies of Deposit Account Statements verifying his employer was directed to deposit his salary into an account managed by the lenders. Centennial Bank did not rebut Kane's testimony. Kane justified his lack of statements showing his compensation.

Kane also did not have records to support the loans he took from individuals. But he did explain those loans in some detail. In *In re Fader*, the bankruptcy court stated, "without adequate records, the debtor must provide adequate explanations." 414 B.R. at 645. Kane testified that he did not have written records documenting all these loans because most of these lenders were friends of his that he had known for many years. T2, 84:22–86:6. Although Kane lacked financial records documenting the loans, Kane provided bank statements that included references to payments to some of these individuals. For example, his bank statements include online transfers to "tony" (Tony Veltri) and "sanchez" or "Davis Sanchez" (Davis Sanchez) who are two of the individuals that Kane loaned money from. *See* Ex. 24, pp. 4, 7, 8, 11, 12, 18, 20, 22. Kane explained that he did not provide records for the loans from Lipsti and Gianakas because they were used to pay off bookies and those transactions did not involve any paperwork, given their legal nature. T2, 86:24–88:2.

ORDER FOLLOWING TRIAL

### d. Kane was a Gambler

Perhaps most importantly, Kane had limited documentation about his gambling and payments to gaming creditors. Centennial Bank argues that Kane's "alleged gambling problem – to extent offered by Kane as an excuse for his present financial predicament – 'does not absolve [him] from keeping records.'" Centennial Bank cites several cases for the proposition that bankruptcy courts have denied debtors a discharge when they lack documentation of gambling winnings or losses. But the cases Centennial Bank relies on are distinguishable.

In *In re Chen*, the debtor identified as a high-stakes gambler and claimed $417,090.77 in non-priority unsecured debt consisting primarily of gambling debt but did not provide any documentation of significant gambling losses. No. AP 16-01166-TWD, 2017 WL 4768104, at *1 (B.A.P. 9th Cir. Oct. 17, 2017). Debtor claimed she had no documentation of her gambling losses because it was "too depressing" for her to think about that. *Id.* at *4. The court found that she was a sophisticated debtor because she had a bookkeeping certificate and was an import agent that started a business. *Id.* at *8. Her lack of documentation for any gambling losses was not justified. *Id.* at *8–9.

These are not Kane's facts. Unlike Chen, Kane had no training in bookkeeping and provided extensive documentation and testimony to show that his gambling losses were paid off by loans he received. It is clear Kane had a serious gambling problem, and his repeated and documented payments to casinos and the District Attorney for Clark County, Nevada, of hundreds of thousands of dollars, demonstrate that.

Centennial Bank also cites *In re Poole*, No. 19-42673 CN, 2022 WL 389514 (Bankr. N.D. Cal. Feb. 8, 2022). In *In re Poole*, a court found that the debtor did not document her gambling activity properly because most of her documentation, ranging from casino records to tax returns, did not account for the significant gambling losses she claimed. *Id.* at *11. Here, Kane produced ample evidence showing that he incurred significant gambling losses, which led him to take out high-interest loans to pay off those debts.

ORDER FOLLOWING TRIAL

Centennial Bank also cites *In re Hong Ming Tran*, 464 B.R. 885 (Bankr. S.D. Cal. 2012). Debtor in that case made the far-fetched claim that he invested his money in gold bars, jewelry, and electronic equipment. He claimed to have sold his assets and gambled away the money but admitted he had no records to support his explanation. Unsurprisingly, the bankruptcy court found "Mr. Tran's story incomplete, questionable in many details, and certainly far short of an explanation . . . ." *Id.* at 895. Because it found his failure to maintain records was not justified, it denied him a discharge under § 727(a)(3). Kane's situation is different. He did not make preposterous claims that were entirely unsupported. Some of his transactions (such as using Rolex watches to pay bookies) might have been unconventional, but his story was largely supported by the record. T2, 69:16–24; T2, 81:9–14. More importantly, he was credible.

The facts here are closer to a 1984 decision from the Florida bankruptcy court. In *In re Hirsch*, debtor was a chronic gambler who did not keep nor maintain records. 36 B.R. 643, 645–46 (Bankr. S.D. Fla. 1984). A licensed realtor, Hirsch made "a couple hundred" stock option trades each month and gambled frequently at Jai-Alai, a sports game. He gambled with borrowed money, his wife's jewelry, and rents on properties he was managing. His situation unraveled when an unpaid creditor resorted to "self-help techniques to collect," which included death threats and shots fired at the family home. *Id.* at 645.

Finding the lack of records not a bar to discharge, the *Hirsch* court noted that "[g]ambling is an activity for which records are seldom kept." *Id.* It found that the debtor's losses to gambling were corroborated by "[h]is pattern of actions over a substantial period [that was] consistent with the explanation that he was a compulsive gambler." *Id.* The court observed that the debtor's "lack of organization and the ineptitude in the accounting is due to incompetence rather than deviousness." *Id.* at 646. Ultimately, the "burden of the debtor under the statutory requirement of keeping adequate books or records is to convince the [bankruptcy court] either by direct or circumstantial evidence that the money was in fact lost and the gambling explanation was not merely a ruse to evade creditors." *Id.* (internal quotation marks and citations omitted).

ORDER FOLLOWING TRIAL

1       The court is convinced Kane provided a justification for his lack of documentation.

2 Centennial Bank's request to deny Kane's discharge under § 727(a)(3) must be denied.

**III.**    **CONCLUSION**

4       Plaintiffs have not shown that that court should deny Kane a discharge. The court

5 will enter judgment for Kane under § 727(a)(3), (4), and (5).

6       IT IS SO ORDERED.

**\*\*\* END OF ORDER \*\*\***

ORDER FOLLOWING TRIAL

**COURT SERVICE LIST**

[ECF recipients only]

ORDER FOLLOWING TRIAL